UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
_____

HARRY PLOSS, as Trustee for the
HARRY PLOSS TRUST DTD 8/16/1993, on
behalf of Plaintiff and all others similarly situated,

                              Plaintiff,

      --against--

KRAFT FOODS GROUP, INC. and
MONDELĒZ GLOBAL LLC,

                            Defendants.
_____

No. _____

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff complains, on information[1] and belief except as to the allegations in ¶15, of

Defendants as follows.

### I.      SUMMARY OF ALLEGATIONS

1.    **Defendants' Manipulation Violation.**  (a) Between November 1 and December

31, 2011 ("Class Period"), Defendants manipulated the prices of the CBOT Chicago Soft Red

Winter Wheat futures contract ("wheat futures contract") expiring in December 2011, the prices

of the March 2012 wheat futures contract, and the prices of the options on such contracts so as to

cause artificial prices and artificial price trends in violation of the Commodity Exchange Act, 7

U.S.C. §1 *et seq.*, ("CEA").

---

[1] Plaintiff's information includes the investigation of counsel based upon publicly available data from the Chicago Board of Trade ("CBOT"), the Chicago Mercantile Exchange ("CME") and other sources; the complaint in *CFTC v. Kraft Foods Group, Inc. and Mondelēz Global LLC*, 15 Civ. 2881 (N.D. Ill.); news articles concerning Defendants; and other information.

(b)    **Defendants' Means of Manipulation.**  During November-December 2011,

Defendants acquired a huge long position in December 2011 wheat futures contracts and a huge

short position in March 2012 wheat futures contracts.  Defendants' huge long position reached

its zenith of 15.5 million bushels on November 29, 2011 by which time Defendants had seriously

distorted prices.  Defendants further engaged in the uncommercial, uneconomic and *per se*

unlawful conduct alleged at ¶¶2-7 and hereinafter.

(c)    **Defendants' Distortions of Prices.**  One of the many price distortions of

Defendants' manipulation was that it proximately caused the price of the December 2011 wheat

futures contract to be artificially high relative to (i) the March 2012 wheat futures contract price,

and (ii) the Toledo cash market wheat price and other cash market wheat prices.   Defendants

thereby caused, among other price artificiality, the spread between the December 2011 wheat

futures contract and the March 2012 wheat futures contract to be artificial.

(d)    **Defendants Proximately Caused Damages to Plaintiff and Class Members.**

On November 29, 2011, Plaintiff liquidated a spread position in which Plaintiff was short the

December 2011 wheat futures contract and long the March 2012 wheat futures contract.  That is,

Plaintiff's small spread position was the **opposite** of Defendants' huge spread position, and

Plaintiff liquidated just as Defendants' opposite position reached its greatest size.  Defendants'

unlawful conduct proximately caused injury and actual damages to Plaintiff and Class members.

2.      Defendants carried out their manipulation through uncommercial, uneconomic,

unlawful and highly unusual conduct.

3.      **Highly Unusual Conduct.** Kraft Foods Group, Inc. ("Kraft") typically sourced

wheat for its use in milling flour from the physical wheat markets and sources other than the

futures markets.  For example, prior to September 2011, Kraft last took delivery of wheat off of

the CBOT in 2002. In stark contrast to its prior history and to commercially sound conduct, Defendants plunged into the December 2011 futures contract and took substantial deliveries. *See* ¶52 *infra*. As Defendants well knew, the deliveries they took on the December 2011 wheat futures contracts would not and did not provide Kraft with the right wheat, at the right time, in the right place. *See* ¶¶44(a)-(c) *infra*.

4. **Unlawfully Large Long Positions**. In addition to being highly unusual, Defendants' manipulative position in also was *per se* unlawful because they violated the maximum limit on lawful positions. For one example, on December 2, 2011, Defendants exceeded and violated the spot month position limit of 600 contracts by having a long position that was 2,110 contracts more than the speculative spot month position limit. For some other examples, Defendants also violated the spot month position limit on December 5, 6, 7, and 8, 2011 as well by 2,106, 1,666, 1,226, and 226 contracts respectively. Also, Defendants' spread position was not commercially constructed nor was it commercially managed so as to reduce Kraft's price risks in any lawful manner.

5. **Dominant Position and Uneconomic Deliveries**. In addition to the foregoing, Defendants built up their large long position and failed to promptly liquidate same to the point that Defendants held 87% of the open interest of the December 2011 wheat futures contract.

6. Defendants did so in order to take and did take deliveries of wheat on the December 2011 wheat futures contract that constituted a far more expensive and uneconomic means of sourcing wheat than did Defendants' purchases in the cash market. The wheat that Defendants received on delivery of the December 2011 contract cost Defendants $1.21 per bushel more as a source of wheat for milling flour. This excess cost was an extraordinary increase in Kraft's procurement expenses because it equaled 20% of the total price of wheat.

Defendants also sold in excess of 80% of the wheat that they received on delivery, *i.e.*, 1320 shipping certificates for December 2011 CBOT wheat, or a total of 6.6 million bushels.

7. **Other Unlawful Conduct.** Beginning in or about 2003 and continuing through January 2014, Kraft engaged in an off-exchange transaction between two of its accounts carrying the long and short positions whereby Kraft's short position was offset by its long position. Kraft engaged in these transactions (all of which were cleared as EFPs through the CME) prior to each of the five annual delivery periods for CBOT wheat. Kraft controlled both trading accounts involved in these transactions, never actually transferred physical wheat, and did not complete any documentation that normally is associated with a sale of a physical commodity.

8. **Actual Damages To Plaintiff and Class Members.** As a result of their manipulation, Defendants caused the price trends and prices at which Plaintiff and Class members transacted during the Class Period to be artificial and resulting in actual damages and losses.

## II. JURISDICTION AND VENUE

9. This action arises under Section 22 of the Commodity Exchange Act, 7 U.S.C. §25.

10. Wheat is a "commodity" in interstate commerce and is the "commodity underlying" wheat futures and options contracts traded on the Chicago Board Of Trade ("CBOT"), as those terms are defined and used in Sections 1(a)4 and 22 of the CEA, 7 U.S.C. §§1a(4) and 25(a)(1)(D), respectively.

11. The CBOT is one of four Designated Contract Markets comprising the CME Group Inc. As a Designated Contract Market, the CBOT is regulated by the Commodity Futures

Trading Commission ("CFTC").  The CME Group Inc.'s Global Headquarters are located at 20

South Wacker Drive, Chicago, Illinois 60606.

12.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7

U.S.C. §25 and 28 U.S.C. §§ 1331 and 1337.

13.     Venue is proper in the Northern District of Illinois, pursuant to Section 22 of the

CEA, 7 U.S.C. §25(c) and 28 U.S.C. §1391(b)-(d).  The CBOT wheat futures trading was

conducted, and Defendants otherwise transacted business in the Northern District of Illinois.

The claims arose in this District.  Other substantial parts of the events giving rise to the claims

asserted herein occurred in this District.  Kraft Foods Group, Inc. and Mondelēz Global LLC also

both have their headquarters in this District.

14.     Defendants, directly and indirectly, made use of the means and instrumentalities

of transportation or communication in, or the instrumentalities of, interstate commerce, or of the

mails in the connection with the unlawful acts and practices and course of business alleged

herein.

### III.     PARTIES

#### A.     Plaintiff

15.     Plaintiff Harry Ploss is as sole trustee for the Ploss Trust, and is a resident of

Addison, Texas.  On November 29, 2011, the Harry Ploss Trust DTD 8/16/1993 ("Ploss Trust")

purchased twenty (20) CBOT December 2011 wheat futures contracts and sold twenty (20)

CBOT March 2012 wheat futures contracts in order to close out a pre-existing short spread

position in which the Ploss Trust had been short the December 2011 contract and long the March

2012 contract.  This spread trade resulted in a loss of approximately $12,250.  The Ploss Trust

also suffered other losses during November and December 2011 in the December 2011 and/or March 2012 wheat futures contracts.

**B.**  **Defendants**

16.    Defendant Kraft Foods Group, Inc. is one of the largest food and beverage companies in North America with 22,000 employees and annual revenues of more than $18 billion.  Kraft's portfolio includes iconic brands such as Planters, Philadelphia, Kool-Aid, Oscar Mayer, Cracker Barrel, Maxwell House, and Jell-O.  Kraft's headquarters are located at 3 Lakes Drive, Northfield, Illinois 60093.

17.    Defendant Mondelēz Global LLC ("Mondelēz") operated the North American snack food business for Mondelēz International, Inc., from its headquarters at 3 Parkway N, Deerfield, Illinois 60015.  Mondelēz International, Inc.'s portfolio includes brands such as Oreo, Ritz, Trident, and Honey Maid.

18.    Prior to October 1, 2012, Kraft Foods Inc. owned Defendant Kraft Foods Group, Inc., which operated the North American snack food business.  On October 1, 2012, Kraft Foods Inc. split into two companies by completing a spin-off of Defendant Kraft Foods Group, Inc. and transferring the North American snack foods business to its then-affiliate Defendant Mondelēz Global LLC.  Kraft Foods Inc. then changed its name to Mondelēz International, Inc. which has since owned Defendant Mondelēz Global LLC.  Defendant Mondelēz Global LLC operates the North American snack food business that is the subject of this action.  The operative spin-off agreements apportion liability between Defendant Kraft Foods Group, Inc. and Mondelēz International, Inc.

19.    Defendants are responsible for, and acted for one another with respect to the challenged trading.  Each was an agent and/or person acting on behalf of the other Defendant.

6

## IV.  UNDERLYING ALLEGATIONS

**A.  Background**

20.  **Futures Contract**.  A futures contract is an agreement to buy (the "long") or sell (the "short") a commodity, such as wheat, at a date in the future.

21.  **"Long" and "Short."**  Thus, futures contracts have two sides.  The "long" side is the buyer of the contract.  In the rare event that the long does not offset or liquidate (*see* below), the long is obligated to take delivery and pay for the commodity.  The "short" side is the seller of the contract.  In the rare event that the short does not enter an offsetting trade, the short is obligated to make delivery of the commodity during the delivery dates.

22.  However, futures markets are carefully designed to facilitate ease of trading into and out of futures contract positions without deliveries.  As a result, deliveries are rare and, in practice, a very small percentage of all futures contracts traded each year are satisfied by delivery of the underlying commodities.

23.  **Offset By Trading**.  Rather, futures market participants almost always "offset" their futures contracts before the expiration month when deliveries occur.  For example, a purchaser of one wheat futures contract may liquidate or cancel or offset his future obligation to take delivery of wheat, by selling one wheat futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract.  The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

24.  **Open Interest**.  Open interest is the total number of futures contracts long or short in a delivery month or market that has been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery.

25.    **Volume**.  Volume is the number of contracts traded during a specific period of time.

26.    The CBOT trades wheat futures contracts expiring in March (H), May (K), July (N), September (U) & December (Z) of each year.  The last trade date for a particular CBOT wheat futures contract is the business day prior to the 15th calendar day of the contract month.  CBOT wheat futures contracts are settled by physical delivery.  The last delivery date is the second business day following the last trading day of the delivery month.

27.    Every aspect of a futures contract traded on the CBOT, such as the grade and amount of wheat, is standardized, except the price and delivery month.  This standardization of futures contracts is specifically designed to facilitate the ease of trading of fungible contracts in one central market place.

28.    "Spread positions" are commonly used positions.  Typically, in a spread position, the trader is long/short a futures contract for one delivery month and short/long the same futures contract for another delivery month.  For example, a person could be short the December 2011 wheat futures contract and long the March 2012 wheat futures contract, which would be called a spread position.

29.    "Spreads" may refer to the price differential between any two items. For example, "spreads" refers to the price differences between futures contracts on the same item only with different expirations.  Similarly, "spreads" may refer to the difference between the cash market price and the futures market price.

30.    Prices of CBOT wheat futures contracts are quoted in cents per bushel.  The contract size for a CBOT wheat futures contract is 5,000 bushels, or about 136 metric tons.

31.     CBOT wheat futures contracts are traded subject to the rules and regulations of the CBOT, including Chapter 14 (Wheat Futures) of the CBOT Rulebook.[2]  Chapter 14 of the CBOT Rulebook sets forth the details for deliveries on CBOT wheat futures contracts, including, for example, wheat grade differentials, location differentials and delivery points.

32.     According to the CEA, position limits are specifically designed "[t]o reduce the potential threat of market manipulation or congestion (especially during trading in the delivery [or spot] month)…"  *See* 7 U.S.C. § 7(d)(5).

33.     During the Class Period, the speculative position limits in effect for wheat futures contracts was 5,000 contracts net long or short for any single contract month, 6,500 contracts net long or short for all months combined, and 600 contracts net long or short in the spot month. Regulation 150.2, 17 C.F.R. § 150.2 (2011).  "Spot month."  Spot month refers to the futures contract that matures and becomes deliverable during the present month.

34.     The position limits on wheat, along with eight other agricultural commodities, are referred to as "legacy" limits because these contracts on agricultural commodities have been subject to federal position limits (as opposed to exchange set position limits) for decades.

35.     The CBOT adopted speculative position limits for wheat futures contracts in accordance with those specified in Regulation 150.2, 17 C.F.R. § 150.2 (2011).  *See* CBOT Rule 14102.E; CME/CBOT Rule 559; CBOT Rulebook Chapter 5, Position Limit, Position Accountability and Reportable Level Table.  Therefore, during the Class Period, the CBOT's position limits in effect for wheat futures was 5,000 contracts net long or short for any single contract month, 6,500 contracts net long or short for all months combined, and 600 contracts net long or short in the spot month.  *Id.*

---

[2] Available at http://www.cmegroup.com/rulebook/CBOT/II/14/14.pdf.

36.     Traders who are bona fide hedgers, such as producers or end-users of a commodity, can apply for exemptions to speculative position limits by showing a bona fide hedging need.  According to Regulation 1.3(z)(iv), 17 C.F.R. § 1.3(z)(iv), "no transactions or positions shall be classified as bona fide hedging unless their purpose is to offset price risks incidental to commercial cash or spot operations and such positions are established and liquidated in an orderly manner in accordance with sound commercial practices…."

37.     CBOT Rules 559 and 14102.E set out the procedures for requesting an exemption from position limits.  Requests for hedge exemptions from position limits must be submitted to the Market Regulation Department, which reviews the request and, if approved, issues a letter setting out the increased position limit it approved.  Hedge exemptions expire one year following the date the most recent exemption was approved and are renewable only through the submission of another hedge exemption request.  Failure to timely renew a hedge exemption will result in expiration of the exemption.

38.     "Exchange for physical" ("EFP") is a transaction in which the buyer of a cash commodity transfers to the seller a corresponding amount of long futures contracts, or receives from the seller a corresponding amount of short futures, at a price difference mutually agreed upon.  In this way, the opposite hedges in futures of both parties are closed out simultaneously.

39.     "Shipping certificate" is issued by exchange-approved facilities and represents a commitment by the facility to deliver the commodity to the holder of the certificate under the terms specified therein.  Unlike an issuer of a warehouse receipt, who has physical product in store, the issuer of a shipping certificate may honor its obligation from current production, through-put, or from its inventories.  CBOT rules require that delivery against the wheat futures contract be made by delivery of registered wheat shipping certificates.

40.     The buyer of the futures contract (i.e., the party taking delivery) does not have the ability to specify delivery location of the wheat shipping certificate.  Also, shipping certificates may be bought and sold between traders or exchanged for futures positions through a transaction referred to as an "exchange for physical" or "EFP" transaction.

**B.     Substantive Allegations**

41.     During the Class Period, Defendants manipulated the prices of December 2011 Chicago Soft Red Winter Wheat futures contract ("wheat futures contract"), and March 2012 wheat futures contract, and the options on such wheat futures contracts traded on the CBOT (*see* fn. 1) so as to cause artificial prices and artificial price trends in violation of the CEA.

42.     One of the primary distortions of Defendants' manipulation was that it proximately caused the price of the December 2011 wheat futures contract to be artificially high relative to (a) the March 2012 wheat futures contract price, and (b) the Toledo cash market wheat price, and other cash market wheat prices.   This particular distortion meant that the spread between the December 2011 wheat futures contract and the March 2012 wheat futures contract was artificial.

43.     Defendants' unlawful conduct proximately caused injury and actual damages to Plaintiff, including on Plaintiff's previously alleged liquidation on November 29, 2011.

44.     Taking delivery on CBOT wheat futures contracts did not provide Kraft with the right wheat (*see* "a" below), in the right place (*see* "b" below), at the right time (*see* "c" below) for its food processing needs.

(a)     **<u>Right Wheat</u>**.  Generally, wheat acquired via the futures market is of a lower quality than wheat acquired in the cash market.  In 2011, CBOT rules specified that wheat deliverable against the CBOT wheat futures contract could have vomitoxim (fungus) levels of up

11

to 4 parts per million.  However when Kraft purchases wheat in the cash market, its contracts typically specifically maximum vomitoxin levels of 2 parts per million.  In fact, Kraft's cash contracts typically specify that it will **not accept** wheat registered for delivery under CBOT wheat futures contracts because of its lower quality.

(b)     **Right Place**.  Due to the location of Kraft's primary flour mill in Toledo, Ohio (where Kraft processes 90 of its wheat), Kraft ordinarily purchases wheat from the Toledo region so as to minimize transportation costs.  (Kraft's Toledo plant is on the Maumee River, which flows into Lake Erie.)  However, a long who demands delivery of CBOT wheat futures contracts may **not** specify to which CBOT delivery point a wheat shipping certificate may be tended and numerous delivery points are outside of the Toledo region.  In fact, upon standing for delivery on its long CBOT December 2011 futures contract position, the shipping certificates received by Kraft specified delivery points which were all outside of the Toledo region.  The distance between the delivery point and Kraft's Toledo mill significantly increased Kraft's transposition costs.

(c)     **Right Time**.  In November 2011, Kraft already held more than 4.2 million barrels of wheat inventory at its Toledo mill, or more than 80% of its 5 million barrel storage capacity.  Ultimately, Kraft took delivery of 1,320 wheat shipping certificates against its long December 2011 wheat futures contract position, the equivalent of 6.6 million bushels of wheat.  Thus, Kraft took delivery of more than 1.6 million bushels of wheat shipping certificates than it even had the **capacity** to store at its Toledo mill, assuming its inventory was zero, **which it was not**.  (Again, in fact, Kraft was already at more than 80% capacity in November 2011.)

45.     Accordingly, taking delivery on CBOT wheat futures contracts in order to source wheat for Kraft's processing operations involved paying higher costs to obtain lower quality

wheat in the wrong place. This is uncommercial and uneconomic conduct in which a rational person would not engage.

46.    In fact, Kraft did not take delivery of any CBOT wheat futures contracts between 2003 and August 2011 inclusive.

47.    Kraft likewise would not have taken delivery during December 2011 unless Kraft could thereby create some other benefit to Kraft. Defendants intended that other benefit to be profits from the price distortions that Defendants caused.

48.    In late Summer of 2011, cash wheat prices for No. 2 Soft Red Winter Wheat at Toledo, Ohio had risen from a price of $5.74 per bushel on June 30, 2011 to $7.72 per bushel on August 26, 2011. During that same time period, the price of December 2011 wheat futures contracts increased from $6.57½ to $7.97. Even though cash market wheat prices were rising, there was sufficient wheat available in the cash wheat market for Kraft to purchase and deliver to its mill in Toledo to satisfy Kraft's needs.

49.    In response to these elevated cash prices, however, Kraft radically changed its conduct from sourcing wheat in the cash market to sourcing wheat from the CBOT. Kraft's wheat procurement staff developed, and Kraft senior management approved, a strategy to use its status as a commercial hedger to acquire an enormous long position in December 2011 wheat futures contract in order to induce sellers to believe that Kraft would in fact take delivery, load out, and use that wheat in its mill in Toledo.

50.    In developing the strategy, Kraft, acting through certain of its procurement staff and senior management, intended that the futures market would react to its huge long position by increasing the price of the December 2011 wheat futures contract while reducing the differential between the December 2011 wheat futures contract price and the price of cash market wheat.

Kraft executed its plan, and the market reacted as Kraft expected, yielding Kraft more than $5.4 million in futures trading profits and savings from its strategy.

51.     Kraft, acting through its procurement staff, uncommercially and uneconomically acquired its December 2011 wheat futures contract long position without any intention whatsoever of loading out, delivering, and using the majority of the CBOT wheat it stood to take delivery of.

52.     **Kraft Confirms That Deliveries Are An Uncommercial And Uneconomic Means of Acquiring Wheat For Its Cash Market Operation.**  In September 2011, at a time when there was sufficient cash market wheat available for purchase to satisfy Kraft's needs, Kraft radically changed its conduct from sourcing wheat in the cash market to sourcing wheat from the CBOT.  Kraft, acting through its procurement staff, tested the outcome from deliveries on the December 2011 wheat futures contract in September 2011 by taking delivery of 250,000 bushels of CBOT wheat constituting fifty shipping certificates.

53.     Upon standing for delivery during this "test run," thirty-one of the fifty shipping certificates that Kraft received in September 2011 were for wheat at locations on the Mississippi River more than 650 miles from Kraft's mill location, in Toledo.  In order to get this wheat to Kraft's Toledo mill, one would have had to use at least two different modes of transportation to ship the wheat from its locations to the mill which was in the opposite direction of the normal commercial flow of wheat.  This meant that Kraft could not use barges to transport the wheat directly to its mill and, due to exchange rules, Kraft could not require that the wheat be loaded directly on to rail transport.  As a result of this "test" involving just fifty shipping certificates, Kraft knew that it could not rely upon taking delivery of CBOT wheat to source wheat easily transportable to its mill.

54.     Despite this, in October 2011, Kraft's wheat procurement staff proposed to Kraft's senior management that Kraft adopt a strategy of buying $90 million of December 2011 wheat futures contracts in early December 2011 in order to depress cash market wheat prices and inflate the futures price of wheat.

55.     In an October 20, 2011 email to Kraft's Chief Financial Officer and other senior management, the Kraft Senior Director Global Procurement, explained the manipulative strategy as follows:

> Given our proposal to "take physical delivery in Dec" of 15 mm bushels at 50 cents per bushel below the commercially offered price results in the savings of $7mm+.
>
> In addition, there is a key market dynamic that is important to understand: Once the market sees that Kraft is "stopping" December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft. We will then have the option of redelivering the wheat acquired through the futures market. This will then quickly reverse the negative cash flow impact.

56.     When considering the Kraft procurement staff's $90 million December 2011 wheat futures contract proposal, Kraft's senior management required that the futures position could not exceed $50 million by the end of December.  Kraft's procurement staff agreed to sell at least $40 million of the proposed $90 million position by the end of the month.  Kraft's senior management then approved the procurement staff's proposal for Kraft to buy $90 million of December 2011 wheat futures contracts, knowing that procurement staff would sell $40 million of the position before the end of the month.

57.     Kraft did **not** have a bona fide commercial need for $90 million of wheat in December 2011.  This amount of wheat would have equaled approximately 15 million bushels, or a six-month supply for Kraft's mill.   Kraft had never before possessed that quantity of wheat, and did not have enough storage capacity within its own facilities to store that amount of wheat.

In fact, Kraft did not even have a bona fide commercial need for, or current storage capacity to house, $50 million of wheat (its proposed $90 million position net of selling $40 million), which would amount to more than an additional three months' supply for its mill.

58.     As of November 2011, Kraft already possessed more than 4.2 million bushels of wheat in storage at its mill, which represented more than 80% of its storage capacity. If Kraft were to have taken delivery of 15 million bushels of wheat (or approximately 3,000 shipping certificates) in December 2011, it would have had to locate additional storage and pay additional costs of approximately five cents per bushel for nearly all of the wheat for up to six months. Relatedly, in order to use CBOT wheat, Kraft would have had to buy and store additional higher-quality cash wheat to blend with the lower-quality CBOT wheat so as to ensure the wheat would meet its baking specifications. Therefore, Kraft would have needed to locate and pay for additional storage of far in excess of 15 million bushels.

59.     Kraft never had any intention of taking delivery of 15 million bushels of wheat. Rather, Kraft desired to make the market believe that it would take delivery, load out, and store that wheat for use in its mill. Kraft intended for the market to react to its long position by lowering the price of cash market wheat available in the Toledo area, which would allow Kraft to obtain wheat in the cash market at more favorable prices. Kraft also intended to profit from the positions it held in December 2011 and March 2011 wheat futures contracts by narrowing the spread between these two contracts.

60.     Kraft procurement employees, including the Senior Director Global Procurement and the Associate Director of Procurement, executed the manipulative strategy, ultimately accumulating 3150 long December 2011 wheat futures contracts by November 29, 2011, the first day of the delivery period, equivalent to 15.75 million bushels or approximately $93.5 million of

wheat.  As of December 7, 2011, Kraft's spot month wheat position constituted 87% percent of the December 2011 wheat futures contract open interest.

61.     In a second email to Kraft senior management on December 2, 2011 email, the Kraft Senior Director Global Procurement confirmed that the manipulative strategy was working as planned:

> As you may recall, we established a long Dec Wheat/Short March Wheat spread at 35 cents (Mar premium to Dec) for the purpose of taking delivery of CME wheat, representing a $7MM+ saving over commercially sourced wheat. Since Monday we have "stopped" 2.2MM bushels of wheat at a cost of $13.2MM. As expected, the Dec/Mar spread has narrowed to app[roximately] 11 cents resulting in a marked to market gain of $3.6MM on our open spread position. Meanwhile, with the narrowing spread, the cash wheat basis has declined from +80 cents to +50 cents over Dec futures. As we begin purchasing this cheaper basis commercial wheat, we will unwind the existing spread position. If all goes according to plan, we will still save $7MM on the commercial cost of wheat vs where it was a few weeks ago as well as make $2-3MM on reversing out of the Dec/Mar wheat spread.

62.     Upon standing for delivery of December 2011 wheat futures contracts, the shipping certificates that Kraft received were all for wheat located outside the Toledo area, in warehouses on the Mississippi River which are not required to transport wheat to Toledo by rail. In order to take delivery, Kraft had to arrange for at least two different modes of shipment.  First, the wheat had to be barged to a location where it could then be transferred to rail, and then shipped to Kraft's mill. These shipping arrangements significantly and uneconomically increased Kraft's costs by approximately $1.21 per bushel.

63.     Ultimately, Kraft took delivery of 1,320 shipping certificates for December 2011 CBOT wheat, or a total of 6.6 million bushels.  Kraft only loaded out 660,000 bushels (132 contracts) of that wheat *i.e.*, less than 5% of the wheat position it carried in early December 2011 and equivalent to approximately $4 million worth of wheat.  After cash market wheat prices declined, Kraft resold 1,188 of its December 2011 shipping certificates for $35,725,074.

64.     On December 9, Kraft offset all of its 826 remaining long wheat futures contracts in the market (80% of the open interest), which amounted to 78.3% of the trading volume that day.  Kraft did not purchase a similar quantity of wheat in the cash market, which would be expected if it had really needed that wheat for its operations.

65.     There was no public announcement more than two years before this action was filed and the action did not accrue two years before now.  On the contrary, the facts of the manipulation were totally concealed.

## V.     CLASS ALLEGATIONS

66.     Plaintiff brings this action on behalf of Plaintiff, and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons who, between November 1, 2011 and December 31, 2011, purchased and/or sold December 2011 or March 2012 CBOT wheat futures contracts and/or options on those positions.  Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

67.     The Class is so numerous that joinder of all members is impracticable.  Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.  The number and identity of Class members is unknown to Plaintiff, but can be readily ascertained.  Plaintiff believes that there are hundreds or perhaps thousands or more members of the Class.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

  a.   whether Defendants' conduct violated the CEA;

  b.   whether Defendants' conduct otherwise constitutes violations of laws;

    c.   the operative time period and extent of Defendants' foregoing violations;

    d.   whether Defendants' violations caused injury and damage to Plaintiff and members of the Class; and

    e.   the appropriate measure of the amount of damages suffered by the Class.

69.    Plaintiff's claims are typical of the claims of the other members of the Class it seeks to represent. Plaintiff and members of the Class it seeks to represent have all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

70.    Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in commodity futures manipulation class actions. Plaintiff has no interests which are adverse to or in conflict with other members of the Class.

71.    The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

72.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

73.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and

prosecution of the action through representatives would be unobjectionable.  The damages

suffered by the individual Class members may be relatively small; and therefore, the expense and

burden of individual litigation make it virtually impossible for them to redress the wrongs done

to them.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## VI.   CLAIMS FOR RELIEF

**AS AND FOR A FIRST CLAIM**
**AGAINST ALL DEFENDANTS**
**(Manipulation In Violation of the Commodity Exchange Act,**
**7 U.S.C. §§1, *et seq*. and Regulation 180.2)**

74.     Plaintiffs repeat and re-allege the previous allegations as if fully set forth herein.

75.     Defendants Kraft and Mondelēz were each an agent and/or other person on behalf

of the other Defendants.

76.     Defendants, through their acts alleged herein, specifically intended to and did

cause unlawful and artificial prices of CBOT #2 Soft Red Winter Wheat futures contracts and

options in violation of the CEA, 7 U.S.C. §§1, *et seq*. and Regulation 180.2, 17 C.F.R. §180.2.

77.     Defendants acted for one another, including as alleged herein.  In all the

circumstances previously alleged, Defendants had the ability to cause and did cause artificial

prices.

78.     By the foregoing conduct, Defendants manipulated the price of a commodity in

interstate commerce or for future delivery on or subject to the rules of any registered entity, in

violation of the CEA.

79.     Because the actions of Defendants' wheat procurement staff occurred within the

scope of their employment, office, or agency with Defendants, Defendants are liable as

principals for their violations of the CEA pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C.

§2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2 (2014).

80.     Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

81.     Plaintiff and Class members are each entitled to damages for the violations alleged herein.

**AS AND FOR A SECOND CLAIM**
**AGAINST ALL DEFENDANTS**
**(Manipulation In Violation of the Commodity Exchange Act,**
**7 U.S.C. §§1, *et seq*. and Regulation 180.1(a))**

82.     Plaintiffs repeat and re-allege the previous allegations as if fully set forth herein.

83.     Defendants intended to affect or acted recklessly with regards to affecting the prices of the December 2011 wheat futures contract and engaged in overt acts in furtherance of its intent.

84.     By the foregoing conduct, Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud and engaged in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in violation of the 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, and Regulation 180.1, 17 C.F.R. §180.1.

85.     Because the actions of Defendants' wheat procurement staff occurred within the scope of their employment, office, or agency with Defendants, Defendants are liable as principals for their violations of the CEA pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2 (2014).

86.     Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

87.     Plaintiff and Class members are each entitled to damages for the violations

alleged herein.

**AS AND FOR A THIRD CLAIM**
**AGAINST ALL DEFENDANTS**
**(Principal-Agent Liability In Violation of the Commodity**
**Exchange Act, 7 U.S.C. §§1, *et seq*. and Regulation 1.2)**

88.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint

with the same force and effect as if fully restated herein.

89.     Defendants were each an agent and/or other person on behalf of the other

Defendants.

90.     This included when Defendants, through their employees, agents and/or others

directed, developed, executed and otherwise acted with respect the scheme, artifice, or

manipulative device alleged herein.

91.     Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. 2(a)(1)(B) and Regulation 1.2, 17

C.F.R. §1.2 (2014), each of the aforementioned Defendants is liable for the acts of its employees,

agents and/or another person acting for it.

92.     Plaintiff and Class members are each entitled to damages for the violations

alleged herein.

**AS AND FOR A FOURTH CLAIM**
**AGAINST ALL DEFENDANTS**
**(Unjust Enrichment and Restitution/Disgorgement)**

93.     Plaintiffs incorporate by reference and re-allege the preceding allegations, as

though fully set forth herein.

94.     Defendants financially benefited from their acts.  In addition to being unlawful,

Defendants' acts are also unfair and inequitable.  For any of these reasons, it is unjust and

inequitable for Defendants to have unjustly enriched themselves and now retain the benefits from acting in this manner.

95. Also, these inequitable acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact wheat contracts at artificial prices.

96. Each Defendant should pay its own unjust enrichment to Plaintiff and members of the Class.

97. Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A) For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representative and their counsel as Class counsel;

(B) For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C) For a judgment awarding Plaintiffs and the Class any and all sums of Defendants' unjust enrichment;

(D) For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiffs and the Class;

(E)     For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(F)     For such injunctive and declaratory relief, and such other and further relief as the Court may deem just and proper.

### VIII.   DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury.

Dated: April 2, 2015

By: */s/ Marvin A. Miller*
Marvin A. Miller
**MILLER LAW LLC**
115 South LaSalle St., Suite 2910
Chicago, Illinois 60603
Telephone:  (312) 332-3400

Christopher Lovell
Christopher M. McGrath
Amanda N. Miller
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900
(212) 719-4677 (fax)

*Counsel for Plaintiff*