UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

———————————————————————

|  |  |
|---|---|
| HARRY PLOSS, as Trustee for the HARRY PLOSS TRUST DTD 8/16/1993, on behalf of Plaintiff and all others similarly situated, | x : : : : |
| Plaintiff, | : : |
| -*against*- | No.  15-cv-2937 : : Honorable Edmond E. Chang |
| KRAFT FOODS GROUP, INC. and MONDELĒZ GLOBAL LLC, | : : : |
| Defendants. | : : |

———————————————————————  x

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Harry Ploss, Richard Dennis, Budicak Inc., Joseph Caprino, Kevin Brown, White Oak Fund LP, Henrik Christensen, and Robert Wallace ("Plaintiffs") complain, on information[1] and belief, except as to their respective allegations in ¶¶15-22 below, of defendants Kraft Foods Group, Inc. and Mondelēz Global LLC ("Defendants" or sometimes "Kraft") as follows.

## I.     SUMMARY OF ALLEGATIONS

1.     **Defendants' Manipulation Violation.**  (a) During November 1 through December 31, 2011 ("Class Period"), Defendants manipulated the prices of the CBOT Chicago Soft Red Winter Wheat futures contract ("wheat futures contract") expiring in December 2011, the prices of the March 2012 wheat futures contract, and the prices of the options on such

———————————

[1] Plaintiffs' information includes the investigation of counsel based upon publicly available data from the Chicago Board of Trade ("CBOT"), the Chicago Mercantile Exchange ("CME") and other sources; the complaint in *CFTC v. Kraft Foods Group, Inc. and Mondelēz Global LLC*, 15 Civ. 2881 (N.D. Ill.); news articles concerning Defendants; and other information.

contracts so as to cause artificial prices and artificial price trends in violation of the Commodity Exchange Act, 7 U.S.C. §1 *et seq*., ("CEA").

(b)      **Defendants' Means of Manipulation.**  During November-December 2011, Defendants acquired a huge long position in December 2011 wheat futures contracts and a huge short position in March 2012 wheat futures contracts.  Defendants' huge long position reached its zenith of 15.5 million bushels on November 29, 2011 by which time Defendants had seriously distorted prices.  Defendants further engaged in the uncommercial, uneconomic and *per se* unlawful conduct alleged at ¶¶2-7 and hereinafter.

(c)      **Defendants' Distortions of Prices.**  One of the many price distortions of Defendants' manipulation was that it proximately caused the price of the December 2011 wheat futures contract to be artificially high relative to (i) the March 2012 wheat futures contract price, and (ii) the Toledo cash market wheat price and other cash market wheat prices.   Defendants thereby caused, among other price artificiality, the spread between the December 2011 wheat futures contract and the March 2012 wheat futures contract to be artificial.

(d)      **Defendants Proximately Caused Damages to Plaintiffs and Class Members.**
For example, on November 29, 2011, Plaintiff Ploss liquidated a spread position in which Plaintiff Ploss was short the December 2011 wheat futures contract and long the March 2012 wheat futures contract.  That is, Plaintiff Ploss' small spread position was the **opposite** of Defendants' huge spread position, and Plaintiff Ploss liquidated just as Defendants' opposite position reached its greatest size.  Defendants' unlawful conduct proximately caused injury and actual damages to Plaintiffs and Class members.

2.      Defendants carried out their manipulation through uncommercial, uneconomic, unlawful and highly unusual conduct.

3.  **Highly Unusual Conduct.**  Defendant Kraft Foods Group, Inc. ("Kraft") typically sourced wheat for its use in milling flour from the physical wheat markets and sources other than the futures markets.  For example, prior to September 2011, Kraft last took delivery of wheat off of the CBOT in 2002.  In stark contrast to its prior history and to commercially sound conduct, Defendants plunged into the December 2011 futures contract and took substantial deliveries.   As Defendants well knew, the deliveries they took on the December 2011 wheat futures contracts would not and did not provide Kraft with the right wheat, at the right time, in the right place.  *See* ¶¶51(a)-(c) *infra*.

4.  **Unlawfully Large Long Positions**.  In addition to being highly unusual, Defendants' manipulative position also was *per se* unlawful because they violated the maximum limit on lawful positions.  For one example, on December 2, 2011, Defendants exceeded and violated the spot month position limit of 600 contracts by having a long position that was 2,110 contracts more than the speculative spot month position limit.  For some other examples, Defendants also violated the spot month position limit on December 5, 6, 7, and 8, 2011 as well by 2,106, 1,666, 1,226, and 226 contracts respectively.  Also, Defendants' spread position was not commercially constructed nor was it commercially managed so as to reduce Kraft's price risks in any lawful manner.

5.  **Dominant Position and Uneconomic Deliveries**.  In addition to the foregoing, Defendants built up their large long position and failed to promptly liquidate same to the point that Defendants held 87% of the open interest of the December 2011 wheat futures contract.

6.  Defendants did so in order to take and did take deliveries of wheat on the December 2011 wheat futures contract that constituted a far more expensive and uneconomic means of sourcing wheat than did Defendants' purchases in the cash market.  The wheat that

Defendants received on delivery of the December 2011 contract cost Defendants $1.21 per bushel more as a source of wheat for milling flour. This excess cost was an extraordinary increase in Kraft's procurement expenses because it equaled 20% of the total price of wheat. Defendants also sold in excess of 80% of the wheat that they received on delivery, *i.e.*, 1320 shipping certificates for December 2011 CBOT wheat, or a total of 6.6 million bushels.

7. **Other Unlawful Conduct.** (a) Beginning in or about 2003 and continuing through January 31 2014 ("Long Class Period"), Kraft engaged in an off-exchange transaction between two of its accounts carrying the long and short positions whereby Kraft's short position was offset by its long position. *See* Fourth and Fifth Claims below. Kraft engaged in these transactions (all of which were cleared as EFPs through the CME) prior to each of the five annual delivery periods for CBOT wheat. Kraft controlled both trading accounts involved in these transactions, never actually transferred physical wheat, and did not complete any documentation that normally is associated with a sale of a physical commodity.

(b) In violation of Section 2 of the Sherman Antitrust Act and Section 4 of the Clayton Act, Defendants entered, monopolized and /or conspired to monopolize the CBOT wheat market. *See* Sixth Claim below.

8. **Actual Damages To Plaintiffs and Class Members.** As a result of their manipulation, Defendants caused the price trends and prices at which Plaintiffs and Class members transacted to be artificial, resulting in actual damages and losses.

## II. JURISDICTION AND VENUE

9. This action arises under Section 22 of the Commodity Exchange Act, 7 U.S.C. §25.

10.     Wheat is a "commodity" in interstate commerce and is the "commodity underlying" wheat futures and options contracts traded on the Chicago Board Of Trade ("CBOT"), as those terms are defined and used in Sections 1(a)4 and 22 of the CEA, 7 U.S.C. §§1a(4) and 25(a)(1)(D), respectively.

11.     The CBOT is one of four Designated Contract Markets comprising the CME Group Inc.  As a Designated Contract Market, the CBOT is regulated by the Commodity Futures Trading Commission ("CFTC").  The CME Group Inc.'s Global Headquarters are located at 20 South Wacker Drive, Chicago, Illinois 60606.

12.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. §25 and 28 U.S.C. §§1331 and 1337.

13.     Venue is proper in the Northern District of Illinois, pursuant to Section 22 of the CEA, 7 U.S.C. §25(c) and 28 U.S.C. §1391(b)-(d).  The CBOT wheat futures trading was conducted, and Defendants otherwise transacted business, in the Northern District of Illinois.  The claims arose in this District.  Other substantial parts of the events giving rise to the claims asserted herein occurred in this District.  Kraft Foods Group, Inc. and Mondelēz Global LLC also both have headquarters in this District.

14.     Defendants, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in the connection with the unlawful acts and practices and course of business alleged herein.

### III.     PARTIES

#### A.     Plaintiffs

15.     Plaintiff Harry Ploss is sole trustee for the Ploss Trust, and is a resident of Addison, Texas.  On November 29, 2011, the Harry Ploss Trust DTD 8/16/1993 ("Ploss Trust") purchased twenty (20) CBOT December 2011 wheat futures contracts and sold twenty (20) CBOT March 2012 wheat futures contracts in order to close out a pre-existing short spread position in which the Ploss Trust had been short the December 2011 contract and long the March 2012 contract.  This spread trade resulted in a loss of approximately $12,250.  The Ploss Trust also suffered other losses during November and December 2011 in the December 2011 and/or March 2012 wheat futures contracts.

16.     Plaintiff Richard Dennis resides in Florida.  Plaintiff Dennis traded thousands of CBOT wheat futures contracts during at least August 2006 through January 2014 at artificial prices proximately caused by Defendants' unlawful manipulation as alleged herein.  For example, Dennis held a short position in December 2011 CBOT wheat futures contracts throughout November 2011.  During this time period, Kraft continued to add to its manipulative long positon of December 2011 CBOT wheat futures contract in order to drive prices of the December 2011 CBOT wheat futures contract higher.  By increasing the price of the December 2011 CBOT wheat futures contract, Kraft increased the cost for Dennis to liquidate his short position in December 2011 CBOT wheat futures contracts.  As a result of Kraft's manipulative conduct and unlawful inflation of December 2011 CBOT wheat futures contract prices, Plaintiff Dennis suffered a net loss of $9,750.00 on his short position in December 2011 CBOT wheat futures contracts traded during November 2011.

17.     Plaintiff Budicak Inc. is an Illinois corporation with its principal place of business in Oak Brook, Illinois.  Plaintiff Budicak transacted in the December 2011 and March 2012

CBOT wheat futures contracts during November-December 2011 and such transactions resulted in a net loss of approximately $38,288.

18.     Plaintiff Joseph Caprino resides in Lakewood, New York.  Plaintiff Caprino transacted in the December 2011 and March 2012 CBOT wheat futures contracts during November-December 2011 and such transactions resulted in a net loss of approximately $13,025. Plaintiff Caprino also traded CBOT wheat futures contracts prior to November 2011.

19.     Plaintiff Kevin Brown resides in Oak Brook, Illinois.  Plaintiff Brown transacted in the December 2011 and March 2012 CBOT wheat futures contracts during November-December 2011 and such transactions resulted in a net loss of approximately $6,400.  Plaintiff Brown also traded CBOT wheat futures contracts prior to November 2011.

20.     Plaintiff White Oak Fund LP is a private placement fund headquartered in Burr Ridge, Illinois.  Plaintiff White Oak entered short positions in the March 2012 CBOT wheat futures contract in October and November 2011 and liquidated (*i.e.*, bought back) such positions in December 2011 for a net loss on such transactions of approximately $5,775.

21.     Plaintiff Henrik Christensen is a resident of the United Kingdom.  Plaintiff Christensen transacted in the December 2011 and March 2012 CBOT wheat futures contracts during November-December 2011 and such transactions resulted in a net loss of approximately $862.50.

22.     Plaintiff Robert Wallace resides in Lakewood, New York.  Plaintiff Wallace transacted in the December 2011 and March 2012 CBOT wheat futures contracts during November-December 2011 and such transactions resulted in a net loss of approximately $675. Plaintiff Wallace also traded CBOT wheat futures contracts prior to November 2011.

   **B.**     **Defendants**

23.     Defendant Kraft Foods Group, Inc. is one of the largest food and beverage companies in North America with 22,000 employees and annual revenues of more than $18 billion.  Kraft's portfolio includes iconic brands such as Planters, Philadelphia, Kool-Aid, Oscar Mayer, Cracker Barrel, Maxwell House, and Jell-O.  Kraft's headquarters are located at 3 Lakes Drive, Northfield, Illinois 60093.

24.     Defendant Mondelēz Global LLC ("Mondelēz") operated the North American snack food business for Mondelēz International, Inc., from its headquarters at 3 Parkway N, Deerfield, Illinois 60015.  Mondelēz International, Inc.'s portfolio includes brands such as Oreo, Ritz, Trident, and Honey Maid.

25.     Prior to October 1, 2012, Kraft Foods Inc. owned Defendant Kraft Foods Group, Inc., which operated the North American snack food business.  On October 1, 2012, Kraft Foods Inc. split into two companies by completing a spin-off of Defendant Kraft Foods Group, Inc. and transferring the North American snack foods business to its then-affiliate Defendant Mondelēz Global LLC.  Kraft Foods Inc. then changed its name to Mondelēz International, Inc. which has since owned Defendant Mondelēz Global LLC.  Defendant Mondelēz Global LLC operates the North American snack food business that is the subject of this action.  The operative spin-off agreements apportion liability between Defendant Kraft Foods Group, Inc. and Mondelēz International, Inc.

26.     Defendants are responsible for, and acted for one another with respect to the challenged trading.  Each was an agent and/or person acting on behalf of the other Defendant.

## IV.     UNDERLYING ALLEGATIONS

### A.     Background

27.  **Futures Contract**.  A futures contract is an agreement to buy (the "long") or sell (the "short") a commodity, such as wheat, at a date in the future.

28.  **"Long" and "Short."**  Thus, futures contracts have two sides.  The "long" side is the buyer of the contract.  In the rare event that the long does not offset or liquidate (*see* below), the long is obligated to take delivery and pay for the commodity.  The "short" side is the seller of the contract.  In the rare event that the short does not enter an offsetting trade, the short is obligated to make delivery of the commodity during the delivery dates.

29.  However, futures markets are carefully designed to facilitate ease of trading into and out of futures contract positions without deliveries.  As a result, deliveries are rare and, in practice, a very small percentage of all futures contracts traded each year are satisfied by delivery of the underlying commodities.

30.  **Offset By Trading**.  Rather, futures market participants almost always "offset" their futures contracts before the expiration month when deliveries occur.  For example, a purchaser of one wheat futures contract may liquidate or cancel or offset his future obligation to take delivery of wheat, by selling one wheat futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract.  The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

31.  **Open Interest**.  Open interest is the total number of futures contracts long or short in a delivery month or market that has been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery.

32.  **Volume**.  Volume is the number of contracts traded during a specific period of time.

33.     The CBOT trades wheat futures contracts expiring in March (H), May (K), July (N), September (U) & December (Z) of each year.  The last trade date for a particular CBOT wheat futures contract is the business day prior to the 15th calendar day of the contract month.  CBOT wheat futures contracts are settled by physical delivery.  The last delivery date is the second business day following the last trading day of the delivery month.

34.     Every aspect of a futures contract traded on the CBOT, such as the grade and amount of wheat, is standardized, except the price and delivery month.  This standardization of futures contracts is specifically designed to facilitate the ease of trading of fungible contracts in one central market place.

35.     "Spread positions" are commonly used positions.  Typically, in a spread position, the trader is long/short a futures contract for one delivery month and short/long the same futures contract for another delivery month.  For example, a person could be short the December 2011 wheat futures contract and long the March 2012 wheat futures contract, which would be called a spread position.

36.     "Spreads" may refer to the price differential between any two items. For example, "spreads" refers to the price differences between futures contracts on the same item only with different expirations.  Similarly, "spreads" may refer to the difference between the cash market price and the futures market price.

37.     Prices of CBOT wheat futures contracts are quoted in cents per bushel.  The contract size for a CBOT wheat futures contract is 5,000 bushels, or about 136 metric tons.

38.     CBOT wheat futures contracts are traded subject to the rules and regulations of the CBOT, including Chapter 14 (Wheat Futures) of the CBOT Rulebook.[2]  Chapter 14 of the

---

[2] Available at http://www.cmegroup.com/rulebook/CBOT/II/14/14.pdf.

CBOT Rulebook sets forth the details for deliveries on CBOT wheat futures contracts, including, for example, wheat grade differentials, location differentials and delivery points.

39.     According to the CEA, position limits are specifically designed "[t]o reduce the potential threat of market manipulation or congestion (especially during trading in the delivery [or spot] month)…"  *See* 7 U.S.C. § 7(d)(5).

40.     During the November-December 2011, the speculative position limits in effect for wheat futures contracts was 5,000 contracts net long or short for any single contract month, 6,500 contracts net long or short for all months combined, and 600 contracts net long or short in the spot month.  Regulation 150.2, 17 C.F.R. § 150.2 (2011).  "Spot month."  Spot month refers to the futures contract that matures and becomes deliverable during the present month.

41.     The position limits on wheat, along with eight other agricultural commodities, are referred to as "legacy" limits because these contracts on agricultural commodities have been subject to federal position limits (as opposed to exchange set position limits) for decades.

42.     The CBOT adopted speculative position limits for wheat futures contracts in accordance with those specified in Regulation 150.2, 17 C.F.R. § 150.2 (2011).  *See* CBOT Rule 14102.E; CME/CBOT Rule 559; CBOT Rulebook Chapter 5, Position Limit, Position Accountability and Reportable Level Table.  Therefore, during November-December 2011, the CBOT's position limits in effect for wheat futures was 5,000 contracts net long or short for any single contract month, 6,500 contracts net long or short for all months combined, and 600 contracts net long or short in the spot month.  *Id.*

43.     Traders who are bona fide hedgers, such as producers or end-users of a commodity, can apply for exemptions to speculative position limits by showing a bona fide hedging need.  According to Regulation 1.3(z)(iv), 17 C.F.R. § 1.3(z)(iv), "no transactions or

positions shall be classified as bona fide hedging unless their purpose is to offset price risks incidental to commercial cash or spot operations and such positions are established and liquidated in an orderly manner in accordance with sound commercial practices…."

44.     CBOT Rules 559 and 14102.E set out the procedures for requesting an exemption from position limits.  Requests for hedge exemptions from position limits must be submitted to the Market Regulation Department, which reviews the request and, if approved, issues a letter setting out the increased position limit it approved.  Hedge exemptions expire one year following the date the most recent exemption was approved and are renewable only through the submission of another hedge exemption request.  Failure to timely renew a hedge exemption will result in expiration of the exemption.

45.     "Exchange for physical" ("EFP") is a transaction in which the buyer of a cash commodity transfers to the seller a corresponding amount of long futures contracts, or receives from the seller a corresponding amount of short futures, at a price difference mutually agreed upon.  In this way, the opposite hedges in futures of both parties are closed out simultaneously.

46.     "Shipping certificate" is issued by exchange-approved facilities and represents a commitment by the facility to deliver the commodity to the holder of the certificate under the terms specified therein.  Unlike an issuer of a warehouse receipt, who has physical product in store, the issuer of a shipping certificate may honor its obligation from current production, through-put, or from its inventories.  CBOT rules require that delivery against the wheat futures contract be made by delivery of registered wheat shipping certificates.

47.     The buyer of the futures contract (i.e., the party taking delivery) does not have the ability to specify delivery location of the wheat shipping certificate.  Also, shipping certificates

may be bought and sold between traders or exchanged for futures positions through a transaction referred to as an "exchange for physical" or "EFP" transaction.

**B.     Substantive Allegations**

48.     During the Class Period, Defendants manipulated the prices of December 2011 Chicago Soft Red Winter Wheat futures contract ("wheat futures contract"), and March 2012 wheat futures contract, and the options on such wheat futures contracts traded on the CBOT (*see* fn. 1) so as to cause artificial prices and artificial price trends in violation of the CEA.

49.     One of the primary distortions of Defendants' manipulation was that it proximately caused the price of the December 2011 wheat futures contract to be artificially high relative to (a) the March 2012 wheat futures contract price, and (b) the Toledo cash market wheat price, and other cash market wheat prices.   This particular distortion meant that the spread between the December 2011 wheat futures contract and the March 2012 wheat futures contract was artificial.

50.     Defendants' unlawful conduct proximately caused injury and actual damages to Plaintiffs, including on Plaintiff Ploss' previously alleged liquidation on November 29, 2011.

51.     Taking delivery on CBOT wheat futures contracts did not provide Kraft with the right wheat (*see* "a" below), in the right place (*see* "b" below), at the right time (*see* "c" below) for its food processing needs.

(a)     **Right Wheat**.  Generally, wheat acquired via the futures market is of a lower quality than wheat acquired in the cash market.  In 2011, CBOT rules specified that wheat deliverable against the CBOT wheat futures contract could have vomitoxin (fungus) levels of up to 4 parts per million.  However when Kraft purchases wheat in the cash market, its contracts typically specify maximum vomitoxin levels of 2 parts per million.  In fact, Kraft's cash

contracts typically specify that it will **not accept** wheat registered for delivery under CBOT wheat futures contracts because of its lower quality.

(b) **Right Place**. Due to the location of Kraft's primary flour mill in Toledo, Ohio (where Kraft processes 90% of its wheat), Kraft ordinarily purchases wheat from the Toledo region so as to minimize transportation costs. (Kraft's Toledo plant is on the Maumee River, which flows into Lake Erie.) However, a long who demands delivery of CBOT wheat futures contracts may **not** specify to which CBOT delivery point a wheat shipping certificate may be tended and numerous delivery points are outside of the Toledo region. In fact, upon standing for delivery on its long CBOT December 2011 futures contract position, the shipping certificates received by Kraft specified delivery points which were all outside of the Toledo region. The distance between the delivery point and Kraft's Toledo mill significantly increased Kraft's transposition costs.

(c) **Right Time**. In November 2011, Kraft already held more than 4.2 million barrels of wheat inventory at its Toledo mill, or more than 80% of its 5 million barrel storage capacity. Ultimately, Kraft took delivery of 1,320 wheat shipping certificates against its long December 2011 wheat futures contract position, the equivalent of 6.6 million bushels of wheat. Thus, Kraft took delivery of more than 1.6 million bushels of wheat shipping certificates than it even had the **capacity** to store at its Toledo mill, assuming its inventory was zero, **which it was not**. (Again, in fact, Kraft was already at more than 80% capacity in November 2011.)

52.     Accordingly, taking delivery on CBOT wheat futures contracts in order to source wheat for Kraft's processing operations involved paying higher costs to obtain lower quality wheat in the wrong place. This is uncommercial and uneconomic conduct in which a rational person would not engage.

53.     In fact, Kraft did not take delivery of any CBOT wheat futures contracts between 2003 and August 2011 inclusive.

54.     Kraft likewise would not have taken delivery during December 2011 unless Kraft could thereby create some other benefit to Kraft.  Defendants intended that other benefit to be profits from the price distortions that Defendants caused.

55.     In late Summer of 2011, cash wheat prices for No. 2 Soft Red Winter Wheat at Toledo, Ohio had risen from a price of $5.74 per bushel on June 30, 2011 to $7.72 per bushel on August 26, 2011.  During that same time period, the price of December 2011 wheat futures contracts increased from $6.57½ to $7.97. Even though cash market wheat prices were rising, there was sufficient wheat available in the cash wheat market for Kraft to purchase and deliver to its mill in Toledo to satisfy Kraft's needs.

56.     In response to these elevated cash prices, however, Kraft radically changed its conduct from sourcing wheat in the cash market to sourcing wheat from the CBOT.  Kraft's wheat procurement staff developed, and Kraft senior management approved, a strategy to use its status as a commercial hedger to acquire an enormous long position in December 2011 wheat futures contract in order to induce sellers to believe that Kraft would in fact take delivery, load out, and use that wheat in its mill in Toledo.

57.     As a commercial end user of flour, Kraft is eligible to seek a hedge exemption to cover its wheat needs.  In or about October 2010, Kraft submitted such an application to the CME. On October 22, 2010, it received an exemption approval letter, permitting it to maintain wheat positions in excess of the speculative position limit, effective December 1, 2010.  The exemption approval letter noted that "positions in the last five days of trading of any futures

contract may not exceed Kraft Foods, Inc.'s unfilled anticipated requirements of the same cash commodity for that month and the next succeeding month."

58.     Exemptions must be renewed on an annual basis, and for Kraft to renew its exemption, the application had to have been submitted to the CME by no later than December 1, 2011.

59.     Kraft did not submit a request for renewal of its hedge exemption until December 28, 2011. Consequently, beginning on December 2, Kraft no longer had a CME hedge exemption for the December 2011 wheat contract, and it was bound by the 600-contract speculative position limit in that commodity. Kraft also did not request a hedge exemption with the Commission for December 2011.

60.     The amount of contracts open in any futures contract is called the open interest. The amount of the open interest in the December 2012 contract peaked on or about September 23, 2011, and then declined.  The open interest had fallen by approximately 60% by November 15, 2011.  While the open interest was going down, Defendants' percentage of the open interest and, for a while, the size of their positions were going up.

61.     (a)     One strategy known in the futures markets to be manipulative is for the holder of a bull spread position to take a significant delivery.  A bull spread position is a position in which the holder is long the nearby futures contract and short the deferred futures contract.

(b)     Here, Defendants had a bull spread position in which they were long the December 2011 contract and short the March 2012 contract.

(c)     The reason for the use of this manipulative strategy is that the artificially increased prices that the manipulator causes in the front month, may not be recovered in the cash market after the manipulation of the front month price ends.  This is because the cash market

prices typically fall afterwards. But this problem is solved when the manipulator simultaneously sells the deferred month futures contract at the same time it is purchasing the front month futures contract. Such sales "lock in" a means to "bury the corpse" of the high price wheat or deliveries taken on the long position in the front month.

(d)     Kraft intentionally employed this well-known manipulative strategy during the events at issue.

62.     Defendants had the ability to influence prices. This is based on multiple facts. These include Defendants' false signaling to the market; Defendants' buying of long futures positions for wheat which they did not have room to store; Defendants' buying of futures positions in violation of position limits; Defendants' increasing their share of December 2011 wheat futures when the open interest in the December 2011 contract was declining; Defendants' causation of artificial distortions in prices; and all the other facts alleged herein.

63.     Regarding artificial prices, the difference between the prices of two futures contract prices is referred to as a spread. Spreads are frequently used as an indication of whether prices are artificial.

64.     Here, during October-November 2011, Defendants were accumulating and failing to liquidate a large long position in the December 2011 contract and a large short position in the March 2012 contract. That is, Defendants were buying and then failing to sell out of the December 2011 futures. And Defendants were selling and then failing to buy out of the March 2012 contract prices.

65.     Defendants' unliquidated purchases of the December 2011 contract were tending to increase the December 2011 futures contract price. Defendants' unliquidated sales of the March 2012 contract were tending to decrease the March 2012 contract prices.

66. If Defendants' conduct was causing prices to distort and move to artificial levels between November 1 and the contract expiration in December 2011, then one expected symptom of that price artificiality would be that the price of the December 2011 contract would increase compared to the price of the March 2012 contract.

67. Plaintiffs' expert performed a regression analysis in order to test this expectation. The daily change in the December 2011 futures price was the dependent variable. The daily change in the March 2012 price was the control variable. The baseline sample for this regression consisted of data from October 1 through the December contract expiration in each year from 1990 until 2010.

68. The outcome of this event study is that the December 2011 futures price was in fact higher, by a statistically significant amount, than the March 2012 price, and the cumulative unexpected price changes are highly statistically significant. It is highly unlikely that the increase in the December 2011 price relative to the March 2012 price would have occurred by chance in a competitive market.

69. The unexpected increase of the December 2011 contract price compared to the March 2012 price is not explained by the information that was made available about the fundamentals of supply and demand during November-December 2011. That information indicated that, if anything, the March 2012 contract price should gain relative to the December 2011 contract price.

70. But the distortion of the December-March spread is exactly what would be expected to have occurred if Defendants' large purchases of the December contract and large sales of the March 2012 contract were overwhelming, and/or causing perceptions in the market that overwhelmed, the normal forces of supply and demand then existing.

71.    This is the preliminary stage of the litigation before Plaintiffs have received Defendants' trading records and other discovery. But even at this preliminary stage, the foregoing event study strongly indicates that Defendants' conduct did cause prices to distort unexpectedly and artificially.

72.    Plaintiffs expect that discovery will show additional grounds to establish both price artificiality and that Defendants caused the price artificiality.

73.    In the latter respect, another indication of price artificiality involves the spread between the December 2011 CME price for soft red wheat and the December 2011 prices for hard red wheat and hard spring wheat futures contracts transacted, respectively, on the Kansas City and Minneapolis exchanges. Because Defendants are not alleged to have been selling the December futures contracts on the Kansas City or Minneapolis exchanges, this comparison may be less robust.

74.    But Plaintiffs' expert also performed an event study of this relationship. The changes in the December 2011 CME futures price were the dependent variable. The changes of the foregoing December hard red wheat and hard spring wheat futures contracts prices were the control variable.

75.    Once again, the baseline control period was 1990-2010.

76.    Cumulative unexpected price changes in this event study are also positive, statistically significant, and highly unlikely to have occurred by chance in a competitive market. Even this comparison indicates that prices became artificial during the Class Period. On this basis as well, Plaintiffs have good grounds to believe and do allege that Defendants caused futures prices to become artificial.

77.     In order to determine the most appropriate test for price artificiality, Plaintiffs first need to obtain Defendants' trading records and other basic information from discovery. Only then may Plaintiffs select the most appropriate benchmarks, variables, and specifications. But the event studies now available, strongly and plausibly indicate that Defendants' conduct caused prices to distort abnormally and unexpectedly, and become artificial.

78.     In developing the strategy, Kraft, acting through certain of its procurement staff and senior management, intended that the futures market would react to its huge long position by increasing the price of the December 2011 wheat futures contract while reducing the differential between the December 2011 wheat futures contract price and the price of cash market wheat. Kraft executed its plan, and the market reacted as Kraft expected, yielding Kraft more than $5.4 million in futures trading profits and savings from its strategy.

79.     Kraft, acting through its procurement staff, un-commercially and uneconomically acquired its December 2011 wheat futures contract long position without any intention whatsoever of loading out, delivering, and using the majority of the CBOT wheat it stood to take delivery of.

80.     **Kraft Confirms That Deliveries Are An Uncommercial And Uneconomic Means of Acquiring Wheat For Its Cash Market Operation.**  In September 2011, at a time when there was sufficient cash market wheat available for purchase to satisfy Kraft's needs, Kraft radically changed its conduct from sourcing wheat in the cash market to sourcing wheat from the CBOT.  Kraft, acting through its procurement staff, tested the outcome from deliveries on the December 2011 wheat futures contract in September 2011 by taking delivery of 250,000 bushels of CBOT wheat constituting fifty shipping certificates.

81.     Upon standing for delivery during this "test run," thirty-one of the fifty shipping certificates that Kraft received in September 2011 were for wheat at locations on the Mississippi River more than 650 miles from Kraft's mill location, in Toledo.  In order to get this wheat to Kraft's Toledo mill, one would have had to use at least two different modes of transportation to ship the wheat from its locations to the mill which was in the opposite direction of the normal commercial flow of wheat.  This meant that Kraft could not use barges to transport the wheat directly to its mill and, due to exchange rules, Kraft could not require that the wheat be loaded directly on to rail transport.  As a result of this "test" involving just fifty shipping certificates, Kraft knew that it could not rely upon taking delivery of CBOT wheat to source wheat easily transportable to its mill.

82.     Despite this, in October 2011, Kraft's wheat procurement staff proposed to Kraft's senior management that Kraft adopt a strategy of buying $90 million of December 2011 wheat futures contracts in early December 2011 in order to depress cash market wheat prices and inflate the futures price of wheat.

83.     In an October 20, 2011 email to Kraft's Chief Financial Officer and other senior management, the Kraft Senior Director Global Procurement, explained the manipulative strategy as follows:

> Given our proposal to "take physical delivery in Dec" of 15 mm bushels at 50 cents per bushel below the commercially offered price results in the savings of $7mm+.
>
> In addition, there is a key market dynamic that is important to understand: Once the market sees that Kraft is "stopping" December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft. We will then have the option of redelivering the wheat acquired through the futures market. This will then quickly reverse the negative cash flow impact.

84.     When considering the Kraft procurement staff's $90 million December 2011 wheat futures contract proposal, Kraft's senior management required that the futures position could not exceed $50 million by the end of December.  Kraft's procurement staff agreed to sell at least $40 million of the proposed $90 million position by the end of the month.  Kraft's senior management then approved the procurement staff's proposal for Kraft to buy $90 million of December 2011 wheat futures contracts, knowing that procurement staff would sell $40 million of the position before the end of the month.

85.     Kraft did **not** have a bona fide commercial need for $90 million of wheat in December 2011.  This amount of wheat would have equaled approximately 15 million bushels, or a six-month supply for Kraft's mill.   Kraft had never before possessed that quantity of wheat, and did not have enough storage capacity within its own facilities to store that amount of wheat.  In fact, Kraft did not even have a bona fide commercial need for, or current storage capacity to house, $50 million of wheat (its proposed $90 million position net of selling $40 million), which would amount to more than an additional three months' supply for its mill.

86.     As of November 2011, Kraft already possessed more than 4.2 million bushels of wheat in storage at its mill, which represented more than 80% of its storage capacity.  If Kraft were to have taken delivery of 15 million bushels of wheat (or approximately 3,000 shipping certificates) in December 2011, it would have had to locate additional storage and pay additional costs of approximately five cents per bushel for nearly all of the wheat for up to six months.  Relatedly, in order to use CBOT wheat, Kraft would have had to buy and store additional higher-quality cash wheat to blend with the lower-quality CBOT wheat so as to ensure the wheat would meet its baking specifications.  Therefore, Kraft would have needed to locate and pay for additional storage of far in excess of 15 million bushels.

87.     Kraft never had any intention of taking delivery of 15 million bushels of wheat. Rather, Kraft desired to make the market believe that it would take delivery, load out, and store that wheat for use in its mill.  Kraft intended for the market to react to its long position by lowering the price of cash market wheat available in the Toledo area, which would allow Kraft to obtain wheat in the cash market at more favorable prices.  Kraft also intended to profit from the positions it held in December 2011 and March 2011 wheat futures contracts by narrowing the spread between these two contracts.

88.     Kraft procurement employees, including the Senior Director Global Procurement and the Associate Director of Procurement, executed the manipulative strategy, ultimately accumulating 3150 long December 2011 wheat futures contracts by November 29, 2011, the first day of the delivery period, equivalent to 15.75 million bushels or approximately $93.5 million of wheat.  As of December 7, 2011, Kraft's spot month wheat position constituted 87% percent of the December 2011 wheat futures contract open interest.

89.     In a second email to Kraft senior management on December 2, 2011 email, the Kraft Senior Director Global Procurement confirmed that the manipulative strategy was working as planned:

> As you may recall, we established a long Dec Wheat/Short March Wheat spread at 35 cents (Mar premium to Dec) for the purpose of taking delivery of CME wheat, representing a $7MM+ saving over commercially sourced wheat. Since Monday we have "stopped" 2.2MM bushels of wheat at a cost of $13.2MM. As expected, the Dec/Mar spread has narrowed to app[roximately] 11 cents resulting in a marked to market gain of $3.6MM on our open spread position. Meanwhile, with the narrowing spread, the cash wheat basis has declined from +80 cents to +50 cents over Dec futures. As we begin purchasing this cheaper basis commercial wheat, we will unwind the existing spread position. If all goes according to plan, we will still save $7MM on the commercial cost of wheat vs where it was a few weeks ago as well as make $2-3MM on reversing out of the Dec/Mar wheat spread.

90.     Upon standing for delivery of December 2011 wheat futures contracts, the shipping certificates that Kraft received were all for wheat located outside the Toledo area, in warehouses on the Mississippi River which are not required to transport wheat to Toledo by rail. In order to take delivery, Kraft had to arrange for at least two different modes of shipment.  First, the wheat had to be barged to a location where it could then be transferred to rail, and then shipped to Kraft's mill. These shipping arrangements significantly and uneconomically increased Kraft's costs by approximately $1.21 per bushel.

91.     Ultimately, Kraft took delivery of 1,320 shipping certificates for December 2011 CBOT wheat, or a total of 6.6 million bushels.  Kraft only loaded out 660,000 bushels (132 contracts) of that wheat *i.e.*, less than 5% of the wheat position it carried in early December 2011 and equivalent to approximately $4 million worth of wheat.  After cash market wheat prices declined, Kraft resold 1,188 of its December 2011 shipping certificates for $35,725,074.

92.     On December 9, Kraft offset all of its 826 remaining long wheat futures contracts in the market (80% of the open interest), which amounted to 78.3% of the trading volume that day.  Kraft did not purchase a similar quantity of wheat in the cash market, which would be expected if it had really needed that wheat for its operations.

93.     There was no public announcement more than two years before this action was filed and the action did not accrue two years before now.  On the contrary, the facts of the manipulation were totally concealed.

## V.     CLASS ALLEGATIONS

94.     Plaintiffs bring this action on behalf of Plaintiffs, and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons who, (a) between November 1, 2011 through December 31,
> 2011 ("Class Period"), purchased and/or sold December 2011 or March

2012 CBOT wheat futures contracts and/or options on those contracts and/or (b) between at least January 1, 2003 through January 31, 2014 ("Long Class Period"), purchased and/or sold CBOT wheat futures contracts and/or options on those contracts. Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.[3]

95. The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States. The number and identity of Class members is unknown to Plaintiffs, but can be readily ascertained. Plaintiffs believe that there are hundreds or perhaps thousands or more members of the Class.

96. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether Defendants' conduct violated the CEA;

    b. whether Defendants' conduct otherwise constitutes violations of laws;

    c. the operative time period and extent of Defendants' foregoing violations;

    d. whether Defendants' violations caused injury and damage to Plaintiffs and members of the Class; and

    e. the appropriate measure of the amount of damages suffered by the Class.

97. Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. Plaintiffs and members of the Class they seek to represent have all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

---

[3] Plaintiffs reserve the right to amend and/or modify the class definition.

98.     Plaintiffs will fully and adequately protect the interests of all members of the Class.  Plaintiffs have retained counsel experienced in commodity futures manipulation class actions.  Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

99.     The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

100.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

101.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The damages suffered by the individual Class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

## VI.     CLAIMS FOR RELIEF

### AS AND FOR A FIRST CLAIM
### AGAINST ALL DEFENDANTS
(Manipulation In Violation of the Commodity Exchange Act,
7 U.S.C. §§1, *et seq*. and Regulation 180.2)

102. Plaintiffs incorporate by reference and re-allege all the allegations in this complaint, as though fully set forth herein.

103. Defendants Kraft and Mondelēz were each an agent and/or other person on behalf of the other Defendants.

104. Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices of CBOT #2 Soft Red Winter Wheat futures contracts and options in violation of the CEA, 7 U.S.C. §§1, *et seq.* and Regulation 180.2, 17 C.F.R. §180.2.

105. Defendants acted for one another, including as alleged herein. In all the circumstances previously alleged, Defendants had the ability to cause and did cause artificial prices.

106. By the foregoing conduct, Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

107. Because the actions of Defendants' wheat procurement staff occurred within the scope of their employment, office, or agency with Defendants, Defendants are liable as principals for their violations of the CEA pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2 (2014).

108. Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

109. Plaintiffs and Class members are each entitled to damages for the violations alleged herein.

## AS AND FOR A SECOND CLAIM

**AGAINST ALL DEFENDANTS**
**(Manipulation In Violation of the Commodity Exchange Act,**
**7 U.S.C. §§1, *et seq*. and Regulation 180.1(a))**

110.     Plaintiffs incorporate by reference and re-allege all the allegations in this complaint, as though fully set forth herein.

111.     Defendants intended to affect or acted recklessly with regards to affecting the prices of the December 2011 wheat futures contract and engaged in overt acts in furtherance of its intent.

112.     By the foregoing conduct, Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud and engaged in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in violation of the 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. §9, and Section 22 of the CEA, as amended, 7 U.S.C. §25, and Regulation 180.1, 17 C.F.R. §180.1.

113.     Because the actions of Defendants' wheat procurement staff occurred within the scope of their employment, office, or agency with Defendants, Defendants are liable as principals for their violations of the CEA pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2 (2014).

114.     Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

115.     Plaintiffs and Class members are each entitled to damages for the violations alleged herein.

**AS AND FOR A THIRD CLAIM**
**AGAINST ALL DEFENDANTS**
**(Principal-Agent Liability In Violation of the Commodity**
**Exchange Act, 7 U.S.C. §§1, *et seq*. and Regulation 1.2)**

116.    Plaintiffs incorporate by reference and re-allege all the allegations in this complaint, as though fully set forth herein.

117.    Defendants were each an agent and/or other person on behalf of the other Defendants.

118.    This included when Defendants, through their employees, agents and/or others directed, developed, executed and otherwise acted with respect the scheme, artifice, or manipulative device alleged herein.

119.    Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2 (2014), each of the aforementioned Defendants is liable for the acts of its employees, agents and/or another person acting for it.

120.    Plaintiffs and Class members are each entitled to damages for the violations alleged herein.

**AS AND FOR A FOURTH CLAIM**
**AGAINST ALL DEFENDANTS**
**(For Manipulation by Fictitious EFP Transactions in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*)**

121.    Plaintiffs incorporate by reference and re-allege all the allegations in this complaint, as though fully set forth herein.

122.    An Exchange of Futures for Physical ("EFP") is an off-exchange transaction in which market participants can privately negotiate to trade an exchange futures contract for a corresponding physical commodity or forward contract on a physical commodity. An EFP gives parties the ability to alter the delivery period and the delivery location.

123.    Under CFTC Regulation 1.38(a), 17 C.F.R. § 1.38(a), off-exchange futures trades are permitted only when they are executed in accordance with the rules of the relevant exchange.

124.     CME Rule 538 and CBOT Rule 538 (collectively, "Rule 538") permit "Exchanges for Related Positions" – of which EFPs are a sub-set – under certain conditions. EFPs are permissible only if they are between opposing accounts that are independently controlled.

125.     Under Rule 538, "independently controlled accounts" include (a) opposing accounts with different beneficial ownership; (b) accounts of separate legal entities of a common beneficiary, but that are under independent control; or (c) "accounts of the same legal entity, provided that the account controllers operate in separate business units."

126.     Further, under Rule 538, the EFP transaction must involve a privately negotiated and simultaneous exchange of a futures position for a corresponding and offsetting cash physical position. There must be a bona fide transfer of ownership of the commodity.

127.     The parties to EFP transaction must retain records documenting the exchange, including order tickets, cash confirmations, signed contracts, documentation representing the transfer of ownership of the commodity, and futures account statements reflecting confirmation of the EFP.

128.     EFP transactions must be cleared through and reported to the appropriate exchange, generally within one hour after the parties agree on the price and quantity of the futures contract and corresponding commodity.

129.     Among the information reported to the exchange is the volume of physical commodity exchanged in the EFP.  However, only EFP volumes are published daily on the CME Group website by instrument; the price at which the underlying exchange takes place remains private.

130. This EFP volume information is an important element in the price discovery function of the market, by reflecting supply and demand factors. Market participants consider this information when transacting in the cash and derivatives markets for the commodity.

131. Kraft used several trading accounts to enter into CBOT wheat futures transactions for both long and short purposes. Beginning in or about 2003 and continuing through January 2014, prior to each of the five annual delivery periods (in March, May, July, September and December) for CBOT wheat futures, Kraft conducted off-exchange EFP transactions between the two Kraft-controlled accounts carrying long and short CBOT wheat futures positions.

132. Upon information and belief, the two accounts were controlled by the same business unit and have the same beneficial ownership.

133. Instead of negotiating a fair market price for the exchange with a third-party, Kraft's finance department priced each EFP transaction itself and communicated that pricing information to Kraft's wheat procurement staff, which directed Kraft's clearing firm to "execute" the transaction at that level. However, because Kraft was its own counterparty to these trades, despite being cleared through the CME and reported as an EFP, there was no exchange of physical wheat in any of these transactions.

134. Kraft, as one of the largest and most sophisticated participants in the wheat market, knew that these fictitious EFP transactions would be published by the CBOT to the broader wheat market. Thus, by reporting these EFP transactions, Kraft duped the CBOT wheat market into believing that a bona fide ownership transfer of CBOT wheat futures had occurred and caused the market to believe that it took or made delivery of physical CBOT wheat by reporting the volume of the EFP transaction. This caused the prices of CBOT wheat futures

contracts to be artificial by injecting artificial supply and demand fundamentals used to price these contracts.

135.    Kraft, through its acts alleged herein, specifically intended to and did cause unlawful and artificial prices of CBOT wheat futures and options contracts during the Long Class Period.

136.    As alleged herein, Kraft had the ability to cause and did cause artificial prices. From 2003 to January 2014, Kraft performed CBOT wheat futures EFP transactions between two Kraft accounts at prices unilaterally determined by Kraft.

137.    Kraft's EFP transactions constituted, or were of the character of, wash sales, accommodation trades, or fictitious sales, or constituted the reporting, registering or recording of a transaction price that was not true and bona fide, violating Sections 4c(a) and 22(a) of the CEA, 7 U.S.C. §§ 6c(a) and 25(a).

138.    Kraft intentionally engaged in fictitious, self-dealing EFP transactions to give the false appearance of legitimate trading and market activity and to distort the supply and demand fundamentals used to price CBOT wheat futures.

139.    Kraft's EFP transactions were reported to the CBOT and/or CME and thus the transaction volume information was disseminated throughout the public market.

140.    The EFP transactions were used or may have been used to hedge any CBOT wheat transaction in interstate commerce or to determine the price basis of any such transaction in interstate commerce.

141.    Kraft purposefully engaged in EFP transactions that were barred under CBOT rules with the intent to cause artificial CBOT wheat futures and options contract prices in

interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

142. Kraft's foregoing manipulative conduct caused CBOT wheat futures and options contract prices to be artificial and deprived Plaintiffs and other traders of a lawfully operating market during the Long Class Period.

143. Plaintiffs and others who transacted in CBOT wheat futures and options contract during the Long Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulation of the CEA, 7 U.S.C. §§ 1 et seq., and as a direct result thereof were injured and suffered damages.

144. Plaintiffs and Class members who purchased or sold CBOT wheat futures and options during the Long Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

**AS AND FOR A FIFTH CLAIM**
**AGAINST ALL DEFENDANTS**
**(For Employing a Manipulative and Deceptive Device in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* and CFTC Rule 180.1(a))**

145. Plaintiffs incorporate by reference and re-allege all the allegations in this complaint, as though fully set forth herein.

146. As alleged herein, from at least 2003 to January 2014, Kraft conducted EFP transactions between Kraft accounts holding long and short CBOT wheat futures positions.

147. Under CFTC Regulation 1.38(a), 17 C.F.R. § 1.38(a), off-exchange transactions are permitted only to the extent that the transactions comply with the written rules of the contract market that have been submitted to and approved by the CFTC.

148. CME Rule 538 and CBOT Rule 538 (collectively, "Rule 538") titled "Exchange for Related Positions" govern EFP transactions. Among other requirements, Rule 538 provides:

a. Opposing accounts to an EFP transaction must be independently controlled, by at minimum separate business units if the accounts are owned by the same legal entity;

b. The EFP transaction must involve on one side an exchange futures and the related position, *i.e.* "a physical transaction or a forward contract on a physical transaction" on the other;

c. The related position of the EFP cannot be a futures contract;

d. The execution of an EFP requires a "bona fide transfer of ownership of the underlying asset";

e. Each EFP transaction must be submitted to the clearinghouse;

149.     Each year from 2003 through January 2014, Kraft conducted and reported EFP transactions prior to each of the five annual CBOT wheat delivery period involving CBOT long and short positions in Kraft's accounts. The EFP transactions were executed at a price determined by Kraft's finance department, not a price negotiated at arms-length with another third party.

150.     The EFP transactions violated Rule 538 by, inter alia, failing to involve accounts that were independently controlled, failing to exchange physical CBOT wheat, and failing to effect a bona fide transfer of ownership of CBOT wheat futures. The EFP transactions were fictitious and failed to satisfy market rules.

151.     Kraft permitted information about its EFP transaction to be transmitted to a clearinghouse and made available to the market. In purporting to transmit proper EFP transaction information to the market, Kraft misled the market as to its activity in the CBOT wheat futures

and physical markets and injected artificial supply and demand fundamentals used to price these contracts.

152.    These artificial supply and demand fundamentals directly affected the price of CBOT wheat in the cash and derivatives markets.

153.    By reporting the fictitious EFP transactions, Kraft delivered or caused to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce. Kraft disseminated its fictitious EFP transactions knowing, or acting in reckless disregard of the fact that each such transaction report was false, misleading or inaccurate.

154.    Kraft's reporting of its fictitious EFP transactions caused CBOT cash market wheat and wheat futures prices to be artificial.

155.    By their intentional or reckless misconduct, Kraft violated Sections 6(c) and 22 of the CEA, as amended, 7 U.S.C. §§ 9 and 25, and CFTC Regulation 180.1, 17 C.F.R. § 180.1.

156.    Kraft's conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Long Class Period.

157.    Plaintiffs and the Class are each entitled to damages for violations of the CEA alleged herein. Plaintiff and members of the Class who purchased and sold CBOT wheat futures and options contracts during the Long Class Period were injured and each are entitled to their actual damages for the violations of the CEA alleged herein.

**AS AND FOR A SIXTH CLAIM**
**AGAINST ALL DEFENDANTS**
**(For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)**

158. Plaintiffs incorporate by reference and re-allege all the allegations in this complaint, as though fully set forth herein.

159. Kraft procurement employees, including the Senior Director Global Procurement and the Associate Director of Procurement, executed Kraft's manipulative strategy.

160. Defendants ultimately accumulated 3,150 long December 2011 wheat futures contracts by November 29, 2011, the first day of the delivery period. Through this accumulation, Kraft held at least 35.5% of the market open-interest in December 2011 CBOT wheat contracts, equivalent to 15.75 million bushels or approximately $93.5 million of wheat.

161. Kraft was unable to store 15 million bushels of wheat, if delivered, without incurring additional costs. Thus, Kraft acquired such a volume of wheat in a manner in which it could not be stored by Kraft in a commercially reasonable manner. Thereby, Kraft was threatening to cause inefficiency in the movement and handling of the wheat crop.

162. Kraft's percentage of open-interest in December 2011 CBOT wheat contracts continued to increase until its position constituted 87% of the December 2011 wheat futures contract open-interest as of December 7, 2011.

163. Kraft used its market power to raise December 2011 wheat futures prices and artificially move the spread between the December 2011 price and the March 2012 wheat futures contracts prices.

164. In violation of Section 2 of the Sherman Antitrust Act and Section 4 of the Clayton Act, Defendants monopolized and /or conspired to monopolize the market for December 2011 soft red wheat futures contracts from a time unknown to Plaintiffs until at least December 9, 2011 or later.

165.    Kraft acquired CBOT wheat futures contracts as part of a plan to acquire monopoly power in the wheat market for its own financial benefit.

166.    Defendants entered into a commercially-unreasonable number of long positions in the December 2011 wheat futures contracts that constituted a dominant position. This gave Kraft great influence or control over the prices of December 2011 CBOT wheat futures contracts.

167.    Defendants, in fact, had caused prices to become artificial during November-December 2011.

168.    Defendants' unlawful price control affected December 2011 soft red wheat futures contract prices during November-December 2011. For example, Kraft used its position of control to force the spread between the December 2011 and March 2012 CBOT wheat futures contracts to narrow by artificially increasing the prices of December 2011 CBOT wheat futures contracts. This even caused the market to shift from contango to backwardation on December 14, 2011, as the prices of December 2011 CBOT wheat futures contracts became more expensive than those for March 2012.

169.    The anticompetitive effects of Defendants' conduct far outweigh any ostensible competitive benefits or justifications.

170.    Defendants' anticompetitive conduct had severe adverse consequences on competition and price discovery. Plaintiffs and other members of the Class that traded CBOT wheat futures contracts were deprived of normal, competitive trading patterns and, instead, were subjected to artificially determined prices as a result of Defendants' unlawful and manipulative conduct. As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

171.     Plaintiffs and members of the Class have been injured in their business or property by Defendants' attempted monopolization and monopolization of the CBOT wheat market.  Plaintiffs and members of the Class are each entitled to treble damages for the violations of the Sherman Antitrust Act alleged herein.

### AS AND FOR A SEVENTH CLAIM
### AGAINST ALL DEFENDANTS
**(Unjust Enrichment and Restitution/Disgorgement)**

172.     Plaintiffs incorporate by reference and re-allege all the allegations in this complaint, as though fully set forth herein.

173.     Defendants financially benefited from their acts.  In addition to being unlawful, Defendants' acts are also unfair and inequitable.  For any of these reasons, it is unjust and inequitable for Defendants to have unjustly enriched themselves and now retain the benefits from acting in this manner.

174.     Also, these inequitable acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact wheat contracts at artificial prices.

175.     Each Defendant should pay its own unjust enrichment to Plaintiffs and members of the Class.

176.     Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

### VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representative and their counsel as Class counsel;

(B)     For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)     For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the Sherman Act, including treble damages, with prejudgment interest at the maximum rate allowable by law:

(D)     For a judgment awarding Plaintiffs and the Class any and all sums of Defendants' unjust enrichment;

(E)     For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiffs and the Class;

(F)     For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(G)     For such injunctive and declaratory relief, and such other and further relief as the Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury.

Dated: August 14, 2015

*/s/ Christopher Lovell*
Christopher Lovell
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900

*Interim Class Counsel*

*/s/ Marvin A. Miller*
Marvin A. Miller
**MILLER LAW LLC**
115 South LaSalle St., Suite 2910
Chicago, Illinois 60603
Telephone: (312) 332-3400

*Liaison Counsel*

*/s/ Vincent Briganti*
Vincent Briganti
Geoffrey M. Horn
**LOWEY DANNENBERG COHEN
& HART, P.C**
One North Broadway
White Plains, New York 10601
Telephone: (914) 997-0500

*Interim Class Counsel*