UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HARRY PLOSS, as Trustee for the HARRY PLOSS TRUST DTD 8/16/1993, on behalf of Plaintiff and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 15 C 2937 |
| v. | ) ) | Judge Edmond E. Chang |
| KRAFT FOODS GROUP, INC. and MONDELĒZ GLOBAL LLC, | ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Harry Ploss brings suit on behalf of himself and a proposed class, alleging that Kraft Food Group, Inc. and Mondelēz Global LLC manipulated the market by maintaining a large position of wheat futures in an attempt to influence prices, and not for any legitimate need for wheat (the "long wheat futures scheme").[1] (For simplicity, the Opinion will refer to the Plaintiffs collectively as "Ploss" and to the Defendants collectively as "Kraft.") Ploss also alleges that Kraft manipulated the market by engaging in unlawful wash trades and reporting them to the public as legitimate transactions, in order to create an impression of greater market activity (the "wash trading scheme"). Ploss brings seven total counts: (1) manipulation under Section 9(a)(2) of the Commodity Exchange Act (CEA) for the long wheat

---

[1] The Court has subject matter jurisdiction under 28 U.S.C. § 1331; 7 U.S.C. § 1 *et seq.* (Commodities Exchange Act); and 15 U.S.C. § 2 (Sherman Antitrust Act). The Court also has supplemental jurisdiction over Ploss's state law unjust enrichment claim under 28 U.S.C. § 1367(a), because it forms the same case or controversy as the federal claims.

futures scheme; (2) manipulation under Section 6(c)(1) of the CEA for the long wheat futures scheme; (3) principal-agent liability under Section 2(a)(1)(B) of the CEA for the long wheat futures scheme; (4) manipulation under Section 9(a)(2) of the CEA for the wash trading scheme; (5) manipulation under Section 6(c)(1) of CEA for the wash trading scheme; (6) violation of the Sherman Antitrust Act; and (7) unjust enrichment.

Kraft now moves to dismiss the entire Complaint, arguing that Ploss has not stated any viable claim. For the reasons explained below, the Court denies the motion in part as to the CEA, Sherman Act, and unjust enrichment claims related to the long wheat futures scheme (Counts One, Two, Three, Six, and Seven). The Court grants Kraft's motion as to the CEA claims involving the wash trading scheme (Counts Four and Five) and dismisses those claims without prejudice.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Consolidated Class Action Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). (For simplicity, the Court will refer to the operative Consolidated Class Action Complaint as the "Complaint.") Defendant Kraft Foods Group is one of the largest food and beverage companies in North America. R. 71, Compl. ¶ 23.[2] In 2012, Kraft changed its corporate structure and became Mondelēz International, Inc., which in turn owned Mondelēz Global LLC; the latter operates the North American snack foods division. *Id.* ¶ 25. Kraft, which needs a lot of wheat for its food products,

---

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

processes 90% of its wheat at its primary flour mill in Toledo, Ohio. *Id.* ¶ 51. In order to save on transportation costs, Kraft buys most of its wheat—in particular, No. 2 soft red winter wheat—from the local Toledo cash wheat market. *Id.* ¶¶ 1, 51, 55. The Toledo mill allegedly processes around 15 million bushels of wheat every 6 months, but is not large enough to store that much wheat. *Id.* ¶¶ 51, 85-86. In November 2011, Kraft allegedly had around 4.2 million bushels of wheat stored at its Toledo mill, representing more than 80% of its storage capacity of about 5 million bushels. *Id.* ¶ 51.

## A. The Alleged "Long Wheat Futures Scheme"

In addition to buying wheat from the local Toledo cash market, Kraft is also able to obtain wheat from the futures market on the Chicago Board of Trade (CBOT). *Id.* ¶¶ 56-57. A futures contract is an agreement to buy or sell a commodity at some point in the future, but at a predetermined price. *Id.* ¶ 27. The trader who purchases a futures contract has a "long" position and is obligated to take delivery and pay for the commodity at the future date. *Id.* ¶¶ 27-28. The trader who sells a futures contract has a "short" position and is obligated to make delivery of the commodity at the future date. *Id.* End-users of a commodity like Kraft often use futures markets to hedge against the risk of increasing prices—in other words, "to offset price risks incidental to commercial cash or spot operations … ." *Id.* ¶ 43.[3]

---

[3]For example, if Kraft believes that the price of wheat will go up in 6 months (perhaps there is an anticipated drought), it could purchase a long futures contract now for delivery in 6 months, so that it can obtain wheat at a price that will be lower than the market price in 6 months. (Conversely, if a wheat seller believes that prices will go down in 6 months, she can obtain a short position, betting that she will sell at a price higher than the market price in 6 months.)

Because Kraft is a commercial end-user of wheat, it can apply for an exemption that releases it from the position limits that bind speculators (who, in contrast, have no use for the underlying commodity). *Id.*[4] Speculators are subject to a limit of 600 contracts (long or short) a month, while a hedge exemption allows commercial end-users like Kraft to maintain 5,460 long positions and 6,660 short positions in wheat. *Id.* ¶¶ 2, 40, 44, 57-59; R. 77-1, 10/22/10 Hedge Exemption Letter. Traders must apply for exemptions to CBOT's Market Regulation Department, which approves or denies the request. *Id.* ¶ 44. Hedge exemptions expire one year from the date of issuance and must be renewed. *Id.* Ploss alleges that Kraft applied for an exemption limit in October 2010 and was approved on December 1, 2010. *Id.* ¶ 57. That exemption expired a year later on December 1, 2011, but Kraft did not submit a renewal application until December 28, 2011. *Id.* ¶ 44, 59. So from December 2 to at least December 28,[5] Kraft did not have a hedge exemption and was bound by the 600-contract limit that applied to speculators. *Id.*

CBOT wheat futures contracts expire in March, May, July, September, and December of each year, and the last trade date for a contract month is the business day before the 15th calendar day of that month. *Id.* ¶ 33. By the date of expiration, a party must close out, or satisfy its futures obligations. *Id.* ¶¶ 30, 33. One way that

---

[4]"Speculators buy and sell futures contracts with the objective of profiting from commodity price fluctuations," rather than to hedge against risk. R. 77, Defs.' Br. at 3. Speculation is legal, but the CFTC imposes position limits on speculators in order "[t]o protect futures markets from excessive speculation that can cause unreasonable or unwarranted price fluctuations." *See* http://www.cftc.gov/industryoversight/marketsurveillance/speculativelimits/index.htm.
[5]Ploss does not allege when Kraft's second hedge exemption was approved; presumably, Kraft's expired exemption period extended beyond December 28, 2011, which was the date of its renewal application (and not the effective date of its exemption).

traders meet their obligation is by physically accepting or delivering the goods. *Id.* ¶ 28. A seller makes a delivery by issuing a "shipping certificate," which is a commitment by a facility to deliver the commodity to the buyer. *Id.* ¶ 46. Shipping certificates themselves can also be traded or exchanged for futures positions. *Id.* ¶ 47. But the buyer, or holder of the shipping certificate, cannot specify the delivery location of the commodity. *Id.*

In reality, however, physical deliveries from futures trades are rare. *Id.* ¶¶ 29-30. Instead, traders often close their positions by making an offsetting trade—for example, a buyer of one futures contract (a long position) can liquidate her position by selling one futures contract (a short position), and vice versa. *Id.* "The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader." *Id.* ¶ 30. The total number of futures contracts that a trader has entered into but has not yet liquidated by an offsetting transaction is called the "open interest." *Id.* ¶ 31.

The Complaint alleges that in the summer and fall of 2011, Kraft "radically" changed its wheat sourcing strategy when the cash price of No. 2 soft red winter wheat in the Toledo market rose from $5.74 to $7.72 per bushel. *Id.* ¶ 55. During that same time, the price of December 2011 wheat futures contracts increased from $6.57½ to $7.97. *Id.* ¶ 55. Even though there was enough wheat in the Toledo market to satisfy Kraft's needs, senior management allegedly devised "a strategy to use its status as a commercial hedger to acquire an enormous long position in December 2011 wheat futures contract[s]," purchasing $90 million worth of

December 2011 contracts. *Id.* ¶¶ 55-56, 82. The purpose of obtaining this long position was "to induce sellers to believe that Kraft would in fact take delivery, load out, and use that wheat in its mill in Toledo." *Id.* ¶ 56. In other words, by signaling to the market that Kraft was satisfying its need for wheat from the *futures* market rather than the cash market, Kraft caused the wheat price in the Toledo cash market to drop, because that cash market now believed that there was greater supply than demand. *Id.* ¶¶ 55-56, 82. On October 20, 2011, Kraft's Senior Director of Global Procurement allegedly wrote to the Chief Financial Officer:

> Given our proposal to "take physical delivery in Dec" of 15 mm bushels at 50 cents per bushel below the commercially offered price results in the savings of $7mm+.
>
> In addition, there is a key market dynamic that is important to understand: Once the market sees that Kraft is "stopping" December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft. We will then have the option of redelivering the wheat acquired through the futures market. This will then quickly reverse the negative cash flow impact.

*Id.* ¶ 83. Ploss alleges that Kraft's scheme worked: the price of wheat in the Toledo market indeed dropped, and Kraft was able to obtain wheat in the cash market at more favorable prices. *Id.* ¶¶ 82-83, 87, 89.

Ploss alleges that the $90 million long position was not a bona-fide futures trade because Kraft never intended to use futures market wheat to meet its commercial needs. *Id.* ¶¶ 51, 81. Before its 2011 purchase, Kraft had not accepted delivery of CBOT wheat since 2002. *Id.* ¶ 3. Buying wheat on the futures market was inconvenient and uneconomical (compared to buying wheat in Toledo); for one,

Kraft could not choose the delivery location of futures market wheat and would have incurred substantial transportation and storage costs. *Id.* When Kraft attempted a test run in September 2011 of accepting wheat from the futures market, it concluded that this strategy was not viable because of the additional costs. *Id.* ¶¶ 80-81. Another problem with futures market wheat was that it was of lower quality, because it could have vomitoxin (fungus) levels of up to 4 parts per million, while wheat on the cash market had vomitoxin levels of only 2 parts per million. *Id.* ¶ 51. So to use CBOT wheat, Kraft would have had to buy additional higher-quality cash wheat for mixing so that the CBOT wheat would meet baking specifications. *Id.* ¶ 86. In fact, Kraft's cash contracts typically specified that it would not accept wheat from the futures markets because of the lower quality. *Id.* ¶ 51. In addition, Ploss alleges that the lack of storage capacity for $90 million worth of wheat—or a 6-month supply of 15 million bushels—shows that Kraft did not have a real commercial need for that much wheat. *Id.* ¶ 85. In November 2011, Kraft already had 4.2 million bushels of wheat at its Toledo facility, occupying 80% of its storage capacity of around 5 million bushels. *Id.* ¶ 86. Taking delivery of 15 million additional bushels would have meant paying to store almost all of it at an additional cost of 5 cents a bushel. *Id.*

Because purchasing wheat from the CBOT market was practically and financially unsound, Ploss alleges that there was only one reason for taking a long position in December 2011 wheat contracts: to affect the market price of wheat in ways that would benefit Kraft. *Id.* ¶ 87. In addition to profiting from the lower

prices of Toledo wheat, as detailed above, Kraft also allegedly intended to "inflate the futures price of wheat" and benefit from the price differential between December and March wheat. *Id.* ¶ 82. In December, Kraft held 3,150 long December 2011 wheat futures contracts and 87% of the December 2011 open interest in wheat, causing these futures prices to be artificially high. *Id.* ¶¶ 49, 65, 82. Kraft simultaneously obtained a "huge" short position in March 2012 wheat contracts. *Id.* ¶ 1. This is called a "bull spread position," where the holder is long in nearby futures contracts and short in deferred futures contracts. *Id.* ¶¶ 35-36, 61. Because Kraft's long position caused December 2011 prices to rise artificially, Ploss alleges that the spread between the December and March futures contract narrowed; in other words, Kraft's large long position "caused the market to shift from contango to backwardation ... as the prices of December 2011 CBOT wheat futures contracts became more expensive than those for March 2012." *Id.* ¶ 168.[6] This price

---

[6]Ploss does not define "contango" or "backwardation" or explain the mechanics of how the price differential between December-March contracts actually narrowed.

Kraft cites the CFTC glossary, Defs.' Br. at 4, which defines backwardation as a "market situation in which futures prices are progressively lower in the distant delivery months." *See* CFTC Dictionary, available at http://www.cftc.gov/ConsumerProtection/ EducationCenter/CFTCGlossary/index.htm. It is the opposite of contango, where "prices in succeeding delivery months are progressively higher than in the nearest delivery month." *Id.* Contango represents the ordinary pattern in the futures market; "typically, the further in the future the delivery date, the greater the purchase price of the futures contract," because far-off prices reflect additional costs for "storage, insurance, financing, and other expenses the producer incurs as the commodity awaits delivery." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 48 (S.D.N.Y. 2012). Backwardation—or higher prices in the near term—can happen when "there is a shortage or tightness in immediate supply," so "traders are willing to pay a higher premium for near-term supply relative to long-term supply." *Id.* Thus, Ploss seems to be alleging that there was originally a normal gap between December and March futures prices, when the former was cheaper and the latter was more expensive. But Kraft's large long position caused December contracts to artificially increase, thus closing the price gap between the December and March contracts.

differential allegedly led to even larger profits. *Id.* ¶¶ 49, 61, 87.[7] Kraft's Senior Director of Global Procurement wrote another email that month to explain its spread strategy:

> As you may recall, we established a long Dec Wheat/Short March Wheat spread at 35 cents (Mar premium to Dec) for the purpose of taking delivery of CME wheat, representing a $7MM+ saving over commercially sourced wheat. Since Monday we have "stopped" 2.2MM bushels of wheat at a cost of $13.2MM. As expected, the Dec/Mar spread has narrowed to app[roximately] 11 cents resulting in a marked to market gain of $3.6MM on our open spread position. Meanwhile, with the narrowing spread, the cash wheat basis has declined from +80 cents to +50 cents over Dec futures. As we begin purchasing this cheaper basis commercial wheat, we will unwind the existing spread position. If all goes according to plan, we will still save $7MM on the commercial cost of wheat vs where it was a few weeks ago as well as make $2-3MM on reversing out of the Dec/Mar wheat spread.

*Id.* ¶ 89.

Out of the 15 million bushels of wheat (equal to around 3,000 shipping certificates) that it held in futures contracts, Kraft ultimately obtained only 1,320 shipping certificates of December 2011 wheat, or 6.6 million bushels. *Id.* ¶¶ 86, 91.

---

[7]Ploss does not detail the mechanics of spread trading, but the general gist is that a trader can profit from changes in "spreads," or price differentials between two contracts with different expiration dates. Compl. ¶ 26. Suppose a trader goes long on a December contract at $700 and goes short on a March contract at $680. Suppose that as December nears, the December contract rises to $710, and the March contract rises (at a slower pace) to $685. The trader now offsets the positions by placing a trade that is equal and opposite to her original trades. As to the December contract, the trader gains $10 (buys the contract for $700 and sells the contract at $710). As for the March contract, the trader loses $5 (buys the contract for $685 and sells for $680). Overall, the trader still gains $5.

By using a spread, a trader can profit even when the price of the futures contracts drops. This is because traders profit from the widening or narrowing of the spread, and not necessarily from the changes in the individual contract prices. Here, Ploss alleges that because Kraft's large long December 2011 position caused the December 2011 price to artificially rise compared to the price of the March 2012 contract, Kraft was able to profit from its December/March spread. *Id.* ¶¶ 66, 68. At this stage of the case, the Court is not assessing the financial viability of this trading strategy; rather, it must accept these allegations as true.

But Kraft only loaded out 660,000 bushels (132 contracts), which was less than 5% of its original December 2011 wheat position; it sold the remaining 1,188 shipping certificates for $35,725,074. *Id.* ¶ 91. And on December 9, Kraft offset its remaining 826 contracts of December 2011 wheat, amounting to 78.3% of the trading volume that day. *Id.* ¶ 92. Ploss alleges that Kraft's failure to purchase a similar quantity of wheat in the cash market demonstrated that it did not actually need this wheat for the Toledo mill. *Id.* In total, Ploss alleges that Kraft made more than $5.4 million in trading profits and savings from this strategy of manipulating prices in the Toledo wheat market and on the CBOT. *Id.* ¶ 78.

### B. The Alleged "Exchange for Physical Wash Trading Scheme"

In addition to the alleged long wheat futures scheme, Ploss also alleges that Kraft engaged in unlawful wash trades in violation of the CEA and caused inaccurate trading information to be published to the wheat market. The Complaint does not explicitly define a wash trade, but it suggests that they occur when the same investor simultaneously buys and sells a financial instrument in order to give the false appearance of higher trading volume. *Id.* ¶¶ 121-44.

More specifically, Ploss alleges that from 2003 to 2014, Kraft made non bona-fide "exchange for physical" (EFP) transactions, where parties trade physical commodities for an offsetting futures contract. *Id.* ¶¶ 45, 131. These transactions happen off the Exchange and give the parties the option to change the delivery period and location. *Id.* ¶ 122. Chicago Mercantile Exchange (CME) and CBOT Rules regulate EFPs and require them to be bona-fide trades between separate

accounts under independent control. *Id.* ¶¶ 125-26. Parties to an EFP transaction must document the trade and report certain information to the Exchange, such as the volume of the physical commodity traded. *Id.* ¶¶ 127-29. This volume information (but not price information) is then published daily on CME Group's website. *Id.* Ploss alleges that EFP volume "is an important element in the price discovery function of the market, by reflecting supply and demand factors" and is considered by traders when deciding whether or not to transact. *Id.* ¶ 130.

Ploss alleges that Kraft's off-exchange EFP transactions between 2003 and 2013 were unlawful because they were between two of Kraft's own accounts in violation of Exchange rules. *Id.* ¶¶ 131-33. These were allegedly not bona fide because Kraft was the counterparty to its own trades, and there was no physical exchange of wheat. *Id.* Yet Kraft reported the trading volumes to CBOT, which in turn reported them to the broader wheat market, allegedly because Kraft hoped to drum up trading volume. *Id.* ¶ 134. Thus, "by reporting these EFP transactions, Kraft duped the CBOT wheat market into believing that a bona fide ownership transfer of CBOT wheat futures had occurred" and made the market believe that there was a greater demand for wheat than there really was. *Id.* In turn, this "caused the prices of CBOT wheat futures contracts to be artificial by injecting artificial supply and fundamentals used to price these contracts." *Id.* ¶¶ 134-36.

### C. Claims in This Case

Plaintiff Harry Ploss (as the trustee of the Harry Ploss Trust) originally brought this action in April 2015, R. 1, but later amended his individual complaint

into the Consolidated Class Action Complaint at issue in this motion, R. 71, Compl. The Consolidated Class Action Complaint includes seven other plaintiffs: Richard Dennis, Budiack Inc., Joseph Caprino, Kevin Brown, White Oak Fund LP, Henrik Christensen, and Robert Wallace. Compl. ¶¶ 15-22. All of the Plaintiffs transacted in December 2011 and March 2012 wheat futures and allege that they lost money because of the artificial prices caused by Kraft's unlawful December 2011 wheat futures position—that is, the Plaintiffs allege that they either bought at a higher price or sold at a lower price than they would have without Kraft's allegedly manipulative actions. *Id.*

Ploss, on behalf of all of the Plaintiffs, brings seven counts against Kraft: (1) price manipulation under Section 9(a)(2) of the CEA for the long wheat futures scheme, 7 U.S.C. § 13(a)(2); (2) use of a manipulative device under Section 6(c)(1) of the CEA for the long wheat futures scheme, 7 U.S.C. § 9(1); (3) principal liability under Section 2(a)(1)(B) of the CEA for the manipulative acts of its agents in connection with the long wheat futures scheme, 7 U.S.C. § 2(a)(1)(B); (4) price manipulation under Section 9(a)(2) of the CEA for the EFP wash trading scheme, 7 U.S.C. § 13(a)(2); (5) use of a manipulative device under Section 6(c)(1) of the CEA for the EFP wash trading scheme, 7 U.S.C. § 9(1); (6) violation of the Sherman Antitrust Act, 15 U.S.C. § 2; and (7) state-law unjust enrichment. *Id.* ¶¶ 102-76. Kraft now moves to dismiss each of these claims for failure to state a claim. R. 76, Defs.' Mot. Dismiss.

Relatedly, at the same time that Ploss filed suit in April 2015, the Commodity Futures Trading Commission brought a parallel enforcement action against Defendants Kraft and Mondelēz, with substantially similar allegations about Kraft's participation in the wheat futures market. *See Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 2015 WL 9259885 (N.D. Ill. Dec. 18, 2015). That CFTC enforcement action contained only CEA claims for the long wheat futures scheme, *id.*, while this private action also includes CEA claims for the EFP wash trading scheme as well as antitrust and unjust enrichment claims. The district court in *CFTC v. Kraft* denied Kraft's motion to dismiss late last year. *Id.*

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citation and internal quotation marks omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of*

*Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson,* 551 U.S. 89 at 94. "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679.

As will be discussed below, some of Ploss's claims are subject to the heightened pleading standard for fraud. Those claims must satisfy Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Put differently, allegations of fraud "must describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (citation and internal quotation marks omitted).

### III. Analysis

### A. The Alleged "Long Wheat Futures Scheme"

### 1. Commodity Exchange Act Overview

Before diving into each of the anti-manipulation counts under the Commodity Exchange Act, it will be helpful to provide an overview of the two relevant anti-

manipulation provisions of the CEA: Sections 9(a)(2) and 6(c)(1), which are codified at 7 U.S.C. §13(a)(2) and 7 U.S.C. § 9(1), respectively. The former has been the longstanding anti-manipulation provision of the CEA, and the latter was revised as part of the 2010 Dodd-Frank Amendments. Section 9(a)(2) makes it a felony to "manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap … ." 7 U.S.C. § 13(a)(2). The CEA also provides a private cause of action for price manipulation. 7 U.S.C. § 25(a) ("Any person … who violates this chapter … shall be liable for actual damages resulting from" a prohibited transaction, including "a manipulation of the price of any such [futures] contract or swap or the price of the commodity underlying such contract or swap.").

In addition, Congress more recently amended Section 6(c)(1) as part of the Dodd-Frank Amendments, strengthening the anti-fraud and anti-manipulation provisions of the CEA. The amended provision makes it

> unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate … .

7 U.S.C. § 9(1); *see* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, July 21, 2010, 124 Stat. 1376. The revisions are meant to "augment the Commission's existing authority to prohibit fraud and manipulation." 76 Fed. Reg. at 41,398-401. Private parties can also sue to enforce Section 6(c)(1). 25

U.S.C. § 25(a)(1)(D)(i) (providing a private right of action for the use or attempted use of "any manipulative device or contrivance in contravention of such rules").

The CFTC also promulgated Regulation 180.1 under Section 6(c)(1). That regulation, in turn, explains that that a person shall not "intentionally or recklessly"

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,
>
> (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce … a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce … .

7 C.F.R. § 180.1. The regulation added that "[n]othing in this section shall affect, or be construed to affect, the applicability of Commodity Exchange Act section 9(a)(2)." 7 C.F.R. § 180.1(c). One of the differences between the older and newer provisions is that Section 9(a)(2) requires the manipulation (or attempted manipulation) of *prices*, but Section 6(c)(1) expands liability for any manipulative or deceptive device regardless of whether the conduct intended to or did affect prices. *Compare* 7 U.S.C. § 13(a)(2) (it is a violation to "manipulate or attempt to manipulate the price of any commodity"), *with* 7 U.S.C. § 9(1) (it is a violation to "directly or indirectly … use or

employ … in connection with any … contract of sale of any commodity … any manipulative or deceptive device").

The CFTC provided some additional guidance for the amended version of Section 6(c)(1). In new regulations, the agency explained that the amended 6(c)(1) was based on federal securities laws: "Given the similarities between CEA section 6(c)(1) and Exchange Act section 10(b), the Commission deems it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b–5.10." 76 Fed. Reg. at 41,399. Section 6(c)(1)'s language parallels that of Section 10(b) of the Securities and Exchange Act, which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe … ." 15 U.S.C. § 78j(b). And like Regulation 180.1, SEC Rule 10b-5 clarifies that it is unlawful, "in connection with the purchase or sale of any security":

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5. Finally, the CFTC explained that "[t]o account for the differences between the securities markets and the derivatives markets, the

Commission will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b–5.11." 76 Fed. Reg. at 41,399.

## 2. Section 6(c)(1) Manipulation

The bulk of the parties' dispute is over Count Two, Ploss's manipulation claim under Section 6(c)(1), so the Court starts there. As explained above, this newer section of the CEA prohibits the use of "any manipulative or deceptive device or contrivance" connected to any futures contract. 7 U.S.C. § 9(1). The gist of Ploss's claim is that Kraft violated this section "by putting on an enormous futures position in order to force wheat futures and cash prices to move in a favorable direction." R. 87, Pls.' Resp. at 25. In response, Kraft argues that the "(1) Plaintiffs do not identify any misrepresentation or misleading omission by Kraft; (2) Plaintiffs fail to allege facts supporting the inference that Kraft engaged in intentional or reckless misconduct; and (3) Plaintiffs fail to allege reliance." R. 77, Defs.' Br. at 18-19. The parties also dispute which pleading standard—Rule 8(a) or Rule 9(b)—applies. *Id.* at 19; Pls.' Resp. at 14. As explained next, the Court concludes that Ploss has stated a manipulation claim under Section 6(c)(1) and denies Kraft's motion to dismiss this claim.

### i. Misrepresentation Requirement

Kraft's first argument is that a misleading misrepresentation or omission— which Ploss does not allege—is necessary to state a manipulation claim under Section 6(c)(1). Defs.' Br. at 19. (This analysis is closely tied to the relevant pleading

standard, which the Court will address in the next section. *See infra* Section III.A.2.ii.) Because Section 6(c)(1) is similar to federal securities laws, 76 Fed. Reg. at 41,399, Kraft points to cases interpreting Section 10(b) and Rule 10b-5 of the Securities and Exchange Act to argue that an explicit misrepresentation is required in the Section 6(c)(1) context. Defs.' Br. at 19. Kraft focuses on *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995), where the Seventh Circuit explained that aggressive short selling that decreased a stock's price did not form "the basis for a claim under Rule 10b-5, which requires proof of either deception or manipulation," because there were no "representations, true or false, actual or implicit, concerning the number of shares that [the defendant] would sell short." 47 F.3d at 864-65 (citations omitted). *Sullivan* involved the bankrupt LTV Corporation, which had announced a reorganization plan where shareholders would receive new shares worth 3 to 4 cents, compared to the previous share price of 30 cents. *Id.* at 859. Expecting that the price of the stock would fall after the announcement, the defendant began aggressively shorting the stock in order to make a profit. *Id.*[8] The Seventh Circuit held that no deception was involved, because the defendant was simply taking advantage of the publicly-available information in LTV's bankruptcy reorganization plan and was "bring[ing] market values into closer, quicker

---

[8]"A short sale is a sale at a price fixed now for delivery later." *Sullivan*, 47 F.3d at 859. As the Seventh Circuit explains, "[a] trader sells stock short when he thinks the price of the stock is going to fall, so that when the time for delivery arrives he can buy it at a lower price and pocket the difference." *Id.* For example, if a trader "sells the stock short at 50 cents a share, and the price falls to 40 cents before he delivers the stock, he can buy the stock for 40 cents a share, deliver it to the buyer, and have made a profit of 10 cents." *Id.* In *Sullivan*, the defendant shorted shares of LTV Corporation thinking that the price would fall; plaintiffs, on the other hand, "were buyers on the other side of [the defendant's] short sales" and "thought the price of the old shares would rise … ." *Id.*

conformity with economic reality. The profit that such trading brings at the expense of less knowledgeable traders provides the incentive for a private, for-profit firm, such as [the defendant], to provide this economic service." *Id.* at 860. In other words, this was permissible price arbitrage—"identify[ing] and eliminat[ing] disparities between price and value … where the difference cannot be attributed to any prospective change in value." *Id.* at 862.[9] Because there was nothing unlawful about making trades based on a better understanding of the bankruptcy plan, there could be no liability. *Id.* at 865.

*Sullivan*, however, did not hold that a market manipulation claim in the securities context always requires an explicit misrepresentation. Although it is true that "most forms of manipulation involve deception in one form or another," Rule 10b-5 "requires proof of either deception *or* manipulation." 47 F.3d at 865 (emphasis added) (citations and internal quotation marks omitted); *see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) ("[Section] 10(b) … prohibits only the making of a material misstatement (or omission) *or* the commission of a manipulative act." (emphasis added) (citation omitted)). This interpretation is consistent with the text of Section 10(b), which plainly prohibits "any manipulative *or* deceptive device." 15 U.S.C. § 78j(b) (emphasis added). Similarly, the corresponding regulation makes it unlawful "(a) To

_____

[9]Another example of arbitrage is when "the identical stock is selling for different prices on two exchanges at the same time. Since the value is the same, the prices should be the same. By buying stock on the exchange where the price is lower and reselling it on the other exchange, the arbitrageur brings about a convergence of price with value." *Sullivan*, 46 F.3d at 862. This is not market manipulation; it is actually the "[t]he opposite of a practice that creates artificial prices, [because] it eliminates artificial price differences." *Id.*

employ any device, scheme, or artifice to defraud" *or* "(b) To make any untrue statement of a material fact or to omit to state a material fact ... ." 17 C.F.R. 240.10b-5. The statute and regulations themselves thus recognize a difference between two types of unlawful actions: manipulative acts and explicit misrepresentations.

In addition, several courts have explained that an explicit misrepresentation is not needed for a Section 10(b) securities action because "a transaction [that] sends a false pricing signal to the market" can form the basis of a market manipulation claim. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007). This is based on the theory that investors generally assume that they are trading on "an efficient market free of manipulation" and "that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.* (citation and internal quotation marks omitted). Like *Sullivan*, *ATSI* acknowledged that high-volume short selling, without "something more," was insufficient to state a market manipulation claim. *Id.* But when trading activity is "willfully combined with something more to create a false impression of how market participants value a security," a plaintiff can state a market manipulation claim. *Id.* at 101; *see also Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir. 1991) ("Manipulation, broadly stated, is an intentional exaction of a price determined by forces other than supply and demand."). The district court in the enforcement version of this case, *CFTC v. Kraft*, analyzed similar authorities and also concluded that like securities plaintiffs, CEA

plaintiffs may plead manipulation under Section 6(c)(1) by alleging that a defendant had an improper motive in making its commodities transactions and that it "misle[d] or cheat[ed] the market through [its] actions, rather than through [its] representations." *CFTC v. Kraft*, 2015 WL 9259885, at *9 (holding that a manipulation claim may be based on misrepresentations *or* market manipulation).

Similarly, in *In re Amaranth National Gas Commodities Litigation*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008), the New York district court applied the principles established in *Sullivan* and *ATSI* to the commodities markets. Although *In re Amaranth* analyzed the term "manipulation" under Sections 9(a) and 6(c)(1) of the CEA *before* the enactment of the Dodd-Frank Amendments, the rationale is still helpful here because the court was generally explaining the characteristics of manipulation in the commodities context. *Id.* It explained that "[j]ust as with securities, commodities manipulation deceives traders as to the market's true judgment of the worth of the commodities. Similarly, for the same reasons that *ATSI* concluded that short selling, without more, cannot constitute securities manipulation, entering into futures contracts or swaps, without more, cannot constitute commodities manipulation." *Id.* That is, "[i]f a trading pattern is supported by a legitimate economic rationale, it cannot be the basis for liability under the CEA because it does not send a false signal." *Id.* Although the court required "something more," or "some additional factor that causes the dissemination of false or misleading information," that "additional factor need not be a misstatement or omission." *Id.* For example, "[b]ecause every transaction signals

that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate," *id.*, and using that false signal to manipulate commodity pricing can qualify as manipulation. The reasoning of these cases are persuasive and analogous to the Section 6(c)(1) context, so the Court holds that an explicit misrepresentation is not required for a Section 6(c)(1) manipulation claim, which may be based on market activity that sends a false pricing signal to the market.

### ii. Pleading Standard: 8(a) or 9(b)?

Having concluded that a manipulation claim under Section 6(c)(1) can be based on market activity short of an explicit misrepresentation, the next question is whether market-manipulation claims are subject to the heightened pleading standards for fraud. Rule 9(b) requires that "a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). The rule requires a complaint to "state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (citations and internal quotations marks omitted). Put differently, the plaintiff "must describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (citation and internal quotations marks omitted). Kraft argues that Section 6(c)(1) and Rule 180.1 only apply to fraudulent conduct, and thus are governed by Rule 9(b), Defs.'

Br. at 19, while Ploss argues that manipulation based on "market activity" does not have to sound in fraud, so only Rule 8(a) applies, Pls.' Resp. at 27.

Again, the only other court to have addressed this issue is *CFTC v. Kraft* in the parallel enforcement action. *CFTC v. Kraft*, 2015 WL 9259885, at *6. There, the district court concluded that Section 6(c)(1) reaches only fraudulent conduct because the plain language of the statute, which prohibits "any manipulative device, scheme, or artifice to defraud" can only mean that the "[CEA] prohibits: (1) the use of manipulative devices to defraud; (2) the use of schemes to defraud; and (3) the use of artifices to defraud." *Id.* The district court also relied on Section 10(b) and Rule 10b-5 of the Securities and Exchange Act, both of which use language similar to Section 6(c)(1) and thus provide instructive precedent for Section 6(c)(1). 76 Fed. Reg. at 41,399. The district court in *CFTC v. Kraft* explained that these securities provisions have been interpreted to require a showing of fraud. 2015 WL 9259885, at *7 (*citing, e.g., Chiarella v. U.S.*, 445 U.S. 222, 234-45 (1980); *Dirks v. SEC*, 463 U.S. 646, 667 n.27 (1983)). Because securities manipulation involves "intentional or willful conduct designed to *deceive or defraud* investors by controlling or artificially affecting the price," *id.* (emphasis in original) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)) (internal quotation marks omitted), or "practices that are intended to mislead investors by artificially affecting market activity," *id.* (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)) (internal quotation marks omitted), all manipulation must sound in fraud. *See also* 76 Fed. Reg. at 41,400

(CFTC explaining that "Rule 180.1 prohibits fraud and fraud-based manipulations").[10]

*CFTC v. Kraft* then went on to hold that, although manipulation requires fraud, "the exact pleading requirements for a cause of action under Section 10(b) [still] vary depending on the type of claim alleged." 2015 WL 9259885, at *9. For manipulation claims involving a material misrepresentation or omission, a plaintiff must allege "(1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of security; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation." *Id.* (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (explaining the elements of a fraud claim under Section 10(b) of the Securities Exchange Act). Like this Court, *CFTC v. Kraft* also held that manipulation may be based on market behavior that does not depend on a specific misrepresentation. *Id.* The court concluded that cases based on market manipulation were also fraudulent, but could be alleged with less specificity. *Id.* In those cases, a plaintiff must plead with particularity "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the commodities at

---

[10]Although it may seem incongruous that fraud, which requires intent to manipulate or deceive, *Ernst*, 425 U.S. at 193, could be reconciled with the scienter requirement of Section 6(c)(1), which permits recklessness, courts have held that in the securities context, "reckless disregard of the truth counts as intent" under § 10(b) and Rule 10b-5. *See S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (citing *Ernst*, 425 U.S. at 185); *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1238 (7th Cir. 1988) ("reckless disregard for the truth of … representations" meets the scienter requirement of Rule 10b-5 (citation omitted)); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 822 (N.D. Ill. 2000) (same).

issue." *Id.* (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)).

This holding of *CFTC v. Kraft* is persuasive and well-reasoned. The Court agrees that manipulation based on explicit misrepresentations sound in fraud, but declines to decide at this time whether manipulation claims based on market behavior must also always be subject to Rule 9(b) in precisely the same way as a misrepresentation case. When manipulation is based on an explicit misrepresentation or omission, it is true that the allegations must meet the heightened pleading standards of Rule 9(b). Thus, such a claim requires a material misrepresentation (or omission), scienter, a connection with the purchase or sale of security, reliance, economic loss and loss causation. *Dura Pharm.*, 544 U.S. at 341; *see also Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (same). But for manipulation based on market activity rather than overt misrepresentations, there is some support for the conclusion that Rule 8(a) could apply, depending on the specific facts. In the CEA Section 9(a)(2) context, for example, which prohibits price manipulation, 7 U.S.C. § 13(a)(2), some courts have held that a case-by-case determination of the appropriate pleading standard is appropriate, depending on the type of claim brought. That is, Rule 9(b) would govern manipulation claims based on explicit misrepresentations, while Rule 8(a) would apply to manipulation claims based on market activity. *See, e.g.*, *Premium Plus Partners, L.P. v. Davis*, 2005 WL 711591, at *15 (N.D. Ill. Mar. 28, 2005) (explaining that "[a]lthough the Court does not purport to endorse a rule that Rule 9(b) pleading requirements *never*

could apply to a CEA manipulation claim," Rule 8(a) applied to the instant claim, which did not "sound in fraud" and involved no allegedly false statements (emphasis in original)); *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198, at *10 (S.D.N.Y. Dec. 20, 2013) *on reconsideration in part*, 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014) ("[T]he case specific approach" instructs courts to "appl[y] Rule 9(b) where the allegations involve disseminating false or misleading information in the market" but Rule 8(a) "[w]here a plaintiff has alleged a manipulative trading strategy[.]" (citing cases)); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 531 (S.D.N.Y. 2008) (same). It is possible that a similar analysis would apply in the Section 6(c)(1) context, even though there arguably are "material differences" between the text and contextual background of the two CEA sections. *See CFTC v. Kraft*, 2015 WL 9259885, at *8 (explaining that the language in the two sections is different, and that "Section 6(c)(1) is nearly identical to Section 10(b) of the Exchange Act.").

In any event, the Court does not need to decide the pleading standard for Section 6(c)(1) market-manipulation actions at this time, because Ploss has met, for its long wheat futures claims, both Rule 8(a) and (more importantly) the tougher pleading requirements of Rule 9(b). Under Rule 9(b), the plaintiff "must describe the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441-42 (citation and internal quotation marks omitted). *CFTC v. Kraft* held that in the market-manipulation context, this requires a plaintiff to plead with particularity "what manipulative acts were performed, which defendants performed them, when

the manipulative acts were performed, and what effect the scheme had on the market for the commodities at issue." 2015 WL 9259885, at *9 (citing *ATSI*, 493 F.3d at 101). As explained below, regardless of whether the appropriate pleading standard is Rule 8(a) or 9(b), Ploss has met it.

### iii. Market Manipulation

Applying the standards previously discussed, the Court concludes that Ploss has successfully alleged a commodities-manipulation claim under Section 6(c)(1) by pleading that Kraft misled the market with its actions, even absent an affirmative misrepresentation. The Complaint's detailed allegations provide more than "enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and they also sufficiently "describe the who, what, when, where, and how of the fraud" as required by Rule 9(b), *Pirelli*, 631 F.3d at 441-42 (citation and internal quotation marks omitted). (But remember, the Court does not definitely decide whether Rule 9(b) applies to all Section 6(c)(1) manipulation claims.)

Specifically, Ploss alleges that Kraft schemed to obtain a large long position in December 2011 futures contracts not because of any bona-fide commercial need for wheat, but because it wished to "depress cash market wheat prices and inflate the futures price of wheat." Compl. ¶ 82. According to Ploss, Kraft's acquisition of 3,150 December 2011 contracts ($90 million worth) was not bona fide because Kraft never intended to take delivery of futures market wheat, which required expensive delivery, transportation, and storage solutions as compared to buying wheat from the local cash market. *Id.* ¶¶ 51, 81-82, 160. The Complaint sets forth factual

allegations to support this: first, when Kraft attempted a test run in September 2011 of accepting delivery of futures market wheat, it concluded that this strategy was not viable because of the additional costs. *Id.* ¶¶ 80-81. Plus, futures market wheat was of a lower quality, and Kraft had not taken delivery of futures market wheat since 2002. *Id.* ¶¶ 3, 51. To use CBOT wheat, Kraft would have had to buy additional higher-quality cash wheat for mixing so that the CBOT wheat would meet baking specifications. *Id.* ¶ 86. Finally, Kraft allegedly did not have the capacity to store $90 million worth of wheat, or a 6-month supply of 15 million bushels. *Id.* ¶ 85. In November 2011, Kraft already had 4.2 million bushels of wheat at its Toledo facility, occupying 80% of its storage capacity. *Id.* ¶ 86. Acquiring 15 million additional bushels of wheat would have meant paying for more storage—an additional cost of five cents a bushel. *Id.* Ultimately, Kraft only accepted delivery of 660,000 bushels of wheat, or less than 5% of its December 2011 position, showing (at least as this stage of the case) that Kraft never really needed 15 million bushels of wheat for its mill operations. *Id.* ¶ 91.

Even though the purchase of futures contracts seemed uneconomic, Ploss alleges that Kraft ultimately benefited from this purchase. First, the large long position made sellers in the Toledo market believe that Kraft would satisfy its need for wheat from the futures market, and not from the local cash market. *Id.* ¶ 56. This caused cash prices in the Toledo market to fall, and in turn, allowed Kraft to purchase wheat in the Toledo market at lower prices. *Id.* Ploss alleges that Kraft's Senior Director of Global Procurement outlined this strategy in an email: "[T]here is

a key market dynamic that is important to understand: Once the market sees that Kraft is 'stopping' December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft." *Id.* ¶ 83. Second, it is alleged that Kraft also intended for its December 2011 acquisition to artificially increase December 2011 futures prices relative to March 2012 futures prices; thus, when Kraft shorted its March 2012 futures contracts, it also benefited from the artificial increase of December 2011 futures and the narrowed spread between the December and March contract prices. *Id.* ¶¶ 1, 49, 61, 64-70, 87. Ploss alleges that this trading strategy of purchasing unneeded futures contracts ultimately yielded over $5.4 million in profits and savings to Kraft. *Id.* ¶ 78.

In sum, Ploss alleges specific details about the scheme, suggesting that Kraft's high-volume futures acquisition was "willfully combined with something more to create a false impression of how market participants value a security." *ATSI*, 493 F.3d at 101 (citing *Sullivan*, 47 F.3d at 861-62). That "something more" was a false signal through its market behavior that Kraft intended to source its wheat from the futures market, so that the transaction was not representative of true supply and demand. Market manipulation has been adequately alleged.[11]

---

[11]Kraft also claims that the Section 6(c)(1) claim must fail because Kraft has failed to allege reliance. R. 89, Defs.' Reply at 10. But reliance on a direct misrepresentation is not necessary, because the Court has concluded that an explicit misrepresentation is not required to state a claim. What has been adequately alleged on reliance—that the market relies on the transactions to signal true, rather than manipulative, demand—is all that is necessary.

### iv. Scienter

Kraft also argues that Ploss has not alleged intentional or reckless misconduct and that the allegation that "Kraft desired to make the market believe that it would take delivery, load out, and store that wheat for use in its mill" is conclusory. Defs.' Br. at 23-24 (citing Compl. ¶ 87). As just explained, however, the allegations of intent are not merely conclusory—Ploss alleges more than enough concrete facts to support his contention that Kraft intentionally and knowingly deceived the market. *See supra* Section III.A.2.iii. There is no need to rehash all of those facts, but the main point is that Kraft allegedly obtained a huge long position in wheat futures contracts even though it did not make financial sense to take physical delivery of futures market wheat. *Id.* Kraft intentionally signaled to the market that it would source its wheat from the futures market (despite knowing it did not actually intend to do so), which caused the Toledo cash market prices to fall and the December 2011 futures prices to rise, both of which financially benefited Kraft. *Id.* All of the allegations previously discussed sufficiently describe how Kraft intended to deceive the market, how it carried out this deception, and how it benefited. *Id.*

Kraft also argues that the emails from its Senior Director of Global Procurement actually demonstrate that Kraft *did intend* to take delivery of the December 2011 wheat, and not the other way around. Defs.' Br. at 24-25. The October 20, 2011 email notes that "[Kraft's] proposal to 'take physical delivery in Dec' of 15 mm bushels at 50 cents per bushel below the commercially offered price

results in the savings of $7mm+." Compl. ¶ 83. Sure, a factfinder ultimately might believe Kraft's interpretation of this email, after considering a full factual presentation at trial and bearing in mind that Ploss will bear the burden of proof. But at this stage of the case, the Court must accept the allegations in the Complaint as true, and give all reasonable inferences to Ploss—in other words, the Court must accept that this email reflects the intent to *carry out* the manipulative strategy. Nothing in this email contradicts that allegation. Even though the email does mention "the proposal to 'take physical delivery in Dec,'" *id.*, the part about taking physical delivery is surrounded by quote marks, and when read in context, those could be the written equivalent of air quotes. More significantly, the email goes on to explain that "[o]nce the market sees that Kraft is 'stopping' December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft." *Id.* This directly supports Ploss's allegation—that as a result of obtaining a large long December 2011 futures position, Kraft intended that the Toledo cash market would be left with a wheat surplus. Rather than storing the extra wheat, the Toledo market reduced the cash wheat prices, and Kraft took advantage. With all this, Ploss has adequately pled scienter and all of the elements of a manipulation claim under Section 6(c)(1). The Court denies Kraft's motion to dismiss this count.

### 3. Section 9(a)(2) Manipulation

Count One is also a claim for manipulation based on the long wheat futures scheme detailed above, but under Section 9(a)(2) of the CEA. Remember, Section

9(a)(2) makes it unlawful for any trader to "manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity … ." 7 U.S.C. § 13(a)(2). The related regulation includes the same prohibition. 17 C.F.R. § 180.2 ("It shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."). Because the new Dodd-Frank provisions were not intended to affect Section 9(a)(2), the four-part test that courts have adopted for Section 9(a)(2) still stands. 7 C.F.R. § 180.1(c) ("Nothing in this section shall affect, or be construed to affect, the applicability of Commodity Exchange Act section 9(a)(2)."). That test requires a plaintiff to allege four elements: "(1) the defendant[] possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764-65 (7th Cir. 2015). The Court concludes that Ploss has alleged each of these elements. These four elements overlap some, but the Court will address each one in turn.[12]

---

[12]The parties do not dispute the appropriate pleading standard for a Section 9(a)(2) claim, but they do not explain whether Rule 8(a) or 9(b) applies. As already explained, some cases suggest that the pleading standard would depend on the type of claim brought in the Section 9(a)(2) context. *See supra* Section III.A.2.ii. That is, manipulation based on trading behavior (or at least some forms of it) might be subject to Rule 8(a), but manipulation based on misrepresentations is subject to Rule 9(b). *Id.* In any event, Ploss has met the pleading standard for both Rule 8(a) and Rule 9(b) in this Section 9(a)(2) manipulation claim. The allegations underlying this claim are the same as those supporting the Section 6(c)(1) manipulation claim, and the Court has already explained that the latter allegations would meet a heightened pleading standard. *Id.*

### i. Ability to Influence Prices

First, Ploss alleges that Kraft was able to influence prices in two markets: the Toledo cash market and the December 2011 futures market. Ploss's allegations are not merely conclusory; he explains that by obtaining a large December 2011 long position, Kraft "induce[d] sellers to believe that Kraft would in fact take delivery, load out, and use that wheat in its mill in Toledo." Compl. ¶ 56. As a result, cash prices in Toledo indeed decreased because sellers believed that Kraft no longer needed their wheat. *Id.* ¶¶ 87-89. Kraft was able to generate these false impressions because it is one of the largest food companies and commercial end-users of wheat, and because it had historically sourced its wheat from the Toledo cash market. *Id.* ¶¶ 23, 51. At the same time, Kraft's long position in December 2011 wheat futures also artificially inflated the prices of those contracts, because the large position indicated increased demand. *Id.* ¶¶ 1, 16, 82. Ploss alleges that Kraft at one point had 87% of the open interest of December 2011 wheat contracts, putting it in a dominant position where it could control prices. *Id.* ¶ 166.

Kraft first argues that Ploss cannot show ability to control prices because he does not allege classic forms of manipulation, such as a "corner" or a "squeeze," which require either control of the deliverable supply or a shortage of that supply. Defs.' Br. at 12. In a corner, a trader "gains control of the supply or the future demand of a commodity and requires the shorts to settle their obligations, either by the purchase of deliverable quantities of the supply or offsetting long contracts, at an arbitrary, abnormal and dictated price imposed by the cornerer." *Great W. Food*

*Distributors v. Brannan*, 201 F.2d 476, 478 (7th Cir. 1953) (defendant purchased eggs in the cash and futures market and demanded high prices from shorts when an artificial shortage resulted). A squeeze is similar to a corner but does not require the trader to control the cash crop; the trader takes advantage of a shortage in the cash commodity and "force[s] shorts facing an inadequate cash supply to cover their positions at unfair prices." *Frey*, 931 F.2d at 1175 (defendants took advantage of low supply conditions in the wheat market). The latter can occur when there is a natural disaster, a strike, or other problems leading to a shortage. *See In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1035 (N.D. Ill. 1995). In both cases, shorts in the market are forced "into settling their holdings with the dominant long at above-market prices as the delivery date approaches." *Frey*, 931 F.2d at 1175.

The Court, however, agrees with *CFTC v. Kraft* that a manipulation claim is not bound to corners and squeezes. 2015 WL 9259885, at *14. As many courts recognize, manipulation is not specifically defined in the CEA because "[t]he methods and techniques of manipulation are limited only by the ingenuity of man." *Premium Plus Partners, L.P. v. Davis*, 653 F. Supp. 2d 855, 876 (N.D. Ill. 2009) *aff'd sub nom. Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971)); *see also Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 485 (N.D. Ill. 2007) *aff'd*, 571 F.3d 672 (7th Cir. 2009) (explaining that corners and squeezes are "by no means [the] exclusive" "situations in which manipulative intent may be inferred") (citation and internal quotation marks

omitted)). Rather, "the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished," *Premium Plus*, 653 F. Supp. 2d at 876 (citation and internal quotation marks omitted), and should focus on whether there has been "an intentional exaction of a price determined by forces other than supply and demand," *Frey*, 931 F.2d at 1175. So manipulation can exist whenever there is "[b]uying or selling in a manner calculated to produce the maximum effect upon prices." *U.S. Commodity Futures Trading Comm'n v. Enron Corp., & Hunter Shively*, 2004 WL 594752, at *5 (S.D. Tex. Mar. 10, 2004) (citation and internal quotation marks omitted); *DH2, Inc. v. Athanassiades*, 404 F. Supp. 2d 1083, 1092 (N.D. Ill. 2005) ("The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999) (internal quotation marks omitted)).

Consequently, even though Ploss does not allege that Kraft controlled the physical wheat supply or that Kraft exploited a supply shortage, Ploss's allegations of non-traditional manipulation techniques can still sustain a CEA violation. Ploss alleges that wheat prices were driven by forces other than supply and demand. In particular, Kraft allegedly obtained a large long position in December 2011 wheat futures even though it had no intention of actually using futures market wheat for its mill operations, so it could make the market believe that it was not going to source its wheat from the Toledo market. *Id.* ¶¶ 1, 51, 55-56, 81-83. Ploss alleges

that this ruse worked; in response to Kraft's purchase, prices in the Toledo market fell as anticipated, and Kraft was able to take advantage of those lower prices. *Id.* ¶¶ 82-83, 87, 89. Meanwhile, Kraft also hoped that its long position would inflate the price of futures contracts as the number of open long positions dramatically increased. *Id.* ¶¶ 49, 65, 82. This holding "constituted a dominant position" that "gave Kraft great influence or control over the prices of December 2011 CBOT wheat futures contracts." *Id.* ¶ 166. According to Ploss, Kraft again succeeded: the prices of December 2011 wheat contracts rose, and Kraft was able to make more money from its December-March spread position. *Id.* ¶¶ 35, 61, 87. So Ploss has adequately alleged the "ability to influence prices," when the allegations are viewed on "a fact-specific, case-by-case analysis." *In re Soybean Futures*, 892 F. Supp. at 1044.

Finally, Kraft argues that it had no ability to influence prices when it did not disseminate any false information that would have affected market prices. Defs.' Br. at 12. But like Section 6(c)(1), manipulation under Section 9(a)(2) can be based on a trader's actions, not just her statements. *See supra* Section III.A.2.i. As *In re Amaranth* put it, manipulation is based on sending false signals to the market, which need not be in the form of a misstatement or omission. 587 F. Supp. 2d at 534. Rather, as noted above, "[b]ecause every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate." *Id.* So again, the lack of a false statement does not preclude a manipulation claim.

## ii. Existence of an Artificial Price and Causation

Next, Ploss has adequately pled both the existence of an artificial price and causation. "[A]rtificially high or low prices … do not reflect the underlying conditions of supply and demand." *Sullivan*, 47 F.3d at 862 (citing *Ernst*, 425 U.S. at 199); *see also In re Soybean Futures*, 892 F. Supp. at 1053 n.28 ("[A] price is said to be 'artificial' or 'distorted' if it does not reflect the market or economic forces of supply and demand operating upon it." (citing *Sullivan*, 47 F.3d at 861-62)); *Hershey v. Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 958 (N.D. Ill. 2010) (same). In deciding whether there is an artificial price, courts must "search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market." *In re Indiana Farm Bureau*, 1982 WL 30249, at *4 n.2 (CFTC Dec. 17, 1982).

Here, Ploss alleges that the prices of cash wheat in Toledo and of December 2011 wheat contracts were caused not by legitimate forces of supply and demand, but by Kraft's purchase of $90 million worth of futures that falsely indicated that Kraft was going to source its wheat from the futures market. Compl. ¶¶ 55-56, 82-83. Ploss pleads causation by alleging that cash prices in Toledo went down as sellers believed they would be left with a large supply, *id.*, and that prices of December 2011 wheat futures contracts went up in response to Kraft's dominant long position, *id.* ¶¶ 78, 163, 168. Ploss also alleges that an expert who analyzed futures prices concluded that the "unexpected" increase in December 2011 prices was likely not due to chance in a competitive market but rather to Kraft's long

position. *Id.* ¶¶ 67-77. Although Kraft may challenge the expert's conclusions later in this litigation, for now the Court must accept these allegations as true.

Kraft admits that a $90 million purchase of wheat futures contracts could have affected prices, but it argues that the resulting prices were not artificial because the purchase reflected a bona fide commercial need. Defs.' Br. at 12-13. Kraft emphasizes that its purchase equated to 15 million bushels, or a 6-month supply for Kraft's mill, an amount that is not unreasonable given that Kraft is one of the largest food companies and wheat consumers. *Id.* Kraft also points to its hedge exemption, which allowed it to maintain a position equal to 12 months of wheat. *Id.* at 14. Although a factfinder may ultimately believe Kraft's version of the facts, this is not an issue for a motion to dismiss. Again, at the pleading stage, the Court must accept the plaintiff's allegations as true, and Ploss has pled more than enough facts to show that Kraft's $90 million wheat acquisition was commercially unfeasible. As noted earlier, futures market wheat is of a lower quality than cash wheat, has higher fungus levels, and needs to be mixed with additional cash wheat. *Id.* ¶¶ 51, 86. Sourcing wheat from the futures market also incurs substantial transportation and storage costs, as the wheat is delivered from outside the Toledo area. *Id.* "Accordingly, taking delivery on CBOT wheat futures contracts … involved paying higher costs to obtain lower quality wheat in the wrong place." *Id.* ¶ 52. What's more, in November 2011, Kraft had already filled more than 80% of its storage capacity in its Toledo mill, which only had capacity for 5 million bushels. *Id.* ¶ 51. Ploss alleges that Kraft had never before stored 15 million bushels of wheat at

its mill, and that taking delivery of these contracts would have required additional storage costs of approximately 5 cents per bushel for up to 6 months, as well as additional purchases of high-quality wheat to blend in with the low-quality wheat to make the latter fit for consumption. *Id.* ¶¶ 85-86. All of these facts support the inference that the purchase of $90 million of wheat did not represent true commercial demand, and thus caused artificial changes in wheat prices in both the cash and futures markets.

### iii. Intent to Cause an Artificial Price

The last element of a Section 9(a)(2) manipulation claim requires "specific intent." *In re Dairy Farmers*, 801 F.3d at 765. This means that "[m]ere knowledge that certain actions might have an impact on the futures market is not sufficient … ." *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012) (citing *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 249 (5th Cir. 2010)). Rather, a plaintiff must make "a showing that the accused acted (or failed to act) with the purpose or conscious object of influencing prices." *In re Soybean Futures*, 892 F. Supp. at 1058 (citation and internal quotation marks omitted).

Here, Ploss has successfully pled specific intent with allegations that Kraft purposely obtained its long position to reduce cash market prices. The intent is bolstered by emails from Kraft's Senior Director of Global Procurement, in which he stated that Kraft's actions will "reduc[e] the commercial wheat basis to Kraft," Compl. ¶ 83, and allow Kraft to take advantage of "the cash wheat basis [that] has declined from +80 cents to +50 cents over Dec futures," *id.* ¶ 89. Ploss also alleges

that Kraft acquired the December 2011 long futures contracts in order to increase those contracts' prices and profit from "artificially mov[ing] the spread" between its December and March positions. *Id.* ¶¶ 1, 87, 163. Kraft's Senior Director of Global Procurement wrote another email that "[a]s expected, the Dec/Mar spread has narrowed," and that "[i]f all goes according to plan, we will … make $2-3MM on reversing out of the Dec/Mar wheat spread." *Id.* ¶ 89. In total, these strategies would "result[] in savings of $7mm+." *Id.* ¶ 83. So according to Ploss, Kraft's goal in obtaining a large December 2011 futures position was to profit from resulting price changes, not to fulfill any bona fide need for commercial wheat. *Id.* ¶¶ 82-83, 87, 89.

In response, Kraft argues that Ploss "ha[s] not alleged specific intent to manipulate, only an effort to get the best price for wheat." Defs.' Br. at 15. In other words, the "allegations amount to no more than a commercial end-user seeking to acquire a commodity from the most cost-efficient supply channel through using options available to any futures market participant, and responding to changing market conditions." *Id.* Kraft's argument seems to be that it was just shopping around for the best wheat prices by telling a seller—the Toledo cash market—that it was going to a competitor—the futures market—and then returning to the first seller, who decided to lower prices. According to Kraft, even if it *did* intend to affect prices, its intent was not unlawful; any resulting change in prices would be the result of natural convergence or arbitrage—that is, two markets moving towards the same price. *Id.*

The problem with Kraft's argument, however, is that it is unlawful manipulation to use its market power "as one of the largest and most sophisticated participants in the wheat market," Compl. ¶ 134, to knowingly affect prices when it had no bona-fide, commercial need for the physical wheat *and* no need to hedge against potential risk. In those circumstances, the behavior is more than just shopping around—it is manipulation. The Court has already explained why taking delivery of the futures market wheat would be uneconomical, demonstrating (at least at the dismissal-motion stage) that Kraft's intent was not bona fide. *See supra* Section III.A.2. In addition, the Complaint also shows that Kraft's long position was not a bona fide attempt to hedge against *genuine risk*, another signal of improper intent. *Id.* ¶ 57. As a commercial end-user of flour, Kraft was able to purchase up to 5,460 long wheat contracts to cover its wheat needs. *Id.*; 10/22/10 Hedge Exemption Letter. Ploss alleges that "[t]raders who are bona fide hedgers, such as producers or end-users of a commodity, can apply for exemptions to speculative position limits by showing a *bona fide hedging need*." *Id.* ¶ 43 (emphasis added). And Ploss cites to CFTC regulations, *id.*, which permit only bona fide hedging, or "transactions or positions [that] *normally represent a substitute for transactions to be made or positions to be taken at a later time in a physical marketing channel*, and where *they are economically appropriate to the reduction of risks in the conduct and management of a commercial enterprise*." 17 C.F.R. § 1.3(z) (emphasis added); *see also id.* § 1.3(z)(iv) ("[N]o transactions or positions shall be classified as bona fide hedging unless their purpose is to *offset price risks* incidental to commercial cash or

spot operations … ." (emphasis added)). Speculators who trade futures contracts for profit and not to hedge against risk, Defs.' Br. at 3, are subject to position limits in order "[t]o protect futures markets from excessive speculation that can cause unreasonable or unwarranted price fluctuations." *See* http://www.cftc.gov/industryoversight/marketsurveillance/speculativelimits/index.htm; R. 89, Defs.' Reply at 7 n.10. Presumably, hedge exemptions are limited to bona fide hedging needs to prevent similar unwarranted price fluctuations that would result if commercial end-users began using their hedging exemptions for any purpose at all. Thus, Kraft was doing more than looking for the most "cost-efficient supply channel." Defs.' Br. at 15. That Kraft's futures purchase was not rooted in a commercial need for the physical commodity or a genuine hedging risk both signal the intent to manipulate prices.[13]

Relatedly, Kraft also argues that any lack of intent to take physical delivery of the wheat is not evidence of manipulation when Ploss has already admitted that physical deliveries are actually rare on the futures market. Defs.' Reply at 4 n.5; Compl. ¶ 29. But Ploss's allegations are not necessarily contradictory. It is true that the Complaint alleges that most trades do not end in physical delivery. *Id.* Perhaps this is because most trades on the exchange are speculative. Or perhaps hedgers

---

[13]To be clear, in discussing the hedging regulations, the Court is not suggesting that a CEA manipulation claim rests upon a regulatory violation. Rather, these hedging regulations cast light on Kraft's improper *intent*. That is, by maintaining large positions that do not represent true substitutes for transactions in the cash market and that are not meant to truly hedge against the risk of the wheat price increases, Kraft's intent was unlawful and manipulative under the CEA. *See also In re Soybeans Futures*, 892 F. Supp. at 1036 (suggesting that a hedge position that "far exceeded [the defendants'] actual needs" could be "a ruse to mislead the commodities market and its regulators.").

often do not end up taking physical delivery of the underlying commodity because the risk disappears or the risk analysis changes, so they no longer need the futures contracts and close out with an offsetting trade. So it is true that it might be perfectly lawful to not have an intent to take physical delivery of wheat. At the same time, however, the intent not to take delivery also might *not* be bona fide, as was alleged in this case, when a person trades with the desire to influence prices and has no need for the underlying commodity and no need to hedge against real risk. Thus, the intent not to take delivery may indicate manipulation, as it does here, when reasonable inferences are drawn in Ploss's favor. Accordingly, Ploss has adequately pled Kraft's specific intent to influence prices, and with the other elements also adequately alleged, Ploss has stated a claim for price manipulation under Section 9(a)(2) of the CEA.

### 4. Principal-Agent Liability

Count Three is a principal-agent claim that is based on Counts One and Two. Because the Court does not dismiss these counts, Count Three may stand as well. Section 2(a)(1)(B) of the CEA is called "liability of principal for act of agent" and provides that "[t]he act, omission, or failure of any [agent] within the scope of his employment or office shall be deemed the act, omission, or failure of [the principal], as well as of [the agent]." 7 U.S.C. § 2(a)(1)(B). This section "enacts a variant of the common law principle of respondeat superior" and "makes an employer strictly liable … for torts committed by his employees in the furtherance of his business." *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 966 (7th

Cir. 1986). Because the underlying manipulation claims under Sections 6(c)(1) and 9(a)(2) will move forward, *see supra*, this claim will too. Later in the litigation, Ploss will have to establish vicarious liability for the defendant corporations by showing that their employees violated the manipulation sections described above.

### 5. Statute of Limitations

Kraft's final argument on the long wheat futures scheme is that the three CEA claims are time-barred because the two-year limitations clock began to run in December 2011, yet Ploss did not bring this action until 2015. Defs.' Br. at 9-11. This argument is rejected.

A private cause of action under the CEA has a two-year statute of limitations period. 7 U.S.C. § 25(c) ("Any such action shall be brought not later than two years after the date the cause of action arises."). The limitations period begins to run when the plaintiff has actual or constructive knowledge—that is, "when [she] knew or in the exercise of reasonable diligence should have known of defendant's alleged misconduct." *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991) (citations omitted); *see also Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845 (N.D. Ill. 2009) (same). Because statutes of limitations are affirmative defenses, "plaintiffs need not anticipate and attempt to plead around all potential defenses." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). Importantly, the defense is not appropriate as grounds for dismissal when it depends on factual determinations. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). So "[a]s long as

there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial)." *Id.* (citations omitted). On the other hand, "dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674-75 (7th Cir. 2009) (citation omitted).

Kraft's main limitations argument is that Ploss pled himself out of court because his "theory that Kraft deceived the market is predicated on allegedly public signals sent by Kraft, public signals which also would put Plaintiffs on inquiry notice of their potential claims." Defs.' Br. at 10. Kraft points out numerous facts that should have provided notice of the fraud, including Kraft's "abnormally large long position" in December 2011 wheat contracts and the resulting increase in futures prices, and Kraft's failure to take delivery of the contracts (allegedly showing that Kraft did not really need $90 million worth of wheat at its mill). *Id.* at 10-11. But these facts do not necessarily require a trader to conclude that Kraft was manipulating the market. In fact, the crux of the Complaint is that Kraft's transactions were structured to *deceive* others into believing that Kraft would take delivery and that its long position was reflective of Kraft's true wheat needs. The public could have believed, for example, that Kraft was executing a bona fide hedge, or that Kraft did not ultimately take delivery of the contracts because it was able to find cheaper wheat elsewhere. Any number of reasonable conclusions other than manipulation would have been plausible from Kraft's behavior. What's more, this is

not a case where there was significant media coverage that exposed the scheme; on the contrary, Ploss alleges that "[t]here was no public announcement more than two years before this action was filed ... [and] the facts of the manipulation were totally concealed." Compl. ¶ 93. Because there is more than "a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense," dismissal on these grounds is inappropriate. *Sidney Hillman*, 782 F.3d at 928.

## B. The Alleged "EFP Wash Trading Scheme"

### 1. Section 9(a)(2) Manipulation

Next, Ploss argues that Kraft violated the anti-manipulation provisions of the CEA by carrying out the EFP wash trading scheme. Ploss is not bringing these claims under Section 4c's wash trade prohibition, which he admits cannot sustain a private right of action.[14] Pls.' Resp. at 30-31. Instead, Ploss argues that the EFP wash trades form the basis of a *manipulation* claim under Sections 6(c)(1) and 9(a) of the CEA. In response, Kraft argues that Ploss's market manipulation allegations are conclusory and lack "basic information," such as how the prices were artificial, how the Plaintiffs were harmed as a result, and how Kraft benefited from the scheme. Defs.' Br. at 25-28. The Court agrees that the wash trading allegations fail to state an adequate claim.

To review the facts: from 2003 to 2014, Kraft allegedly made non bona-fide "exchange for physical" (EFP) transactions, which involves trading physical commodities for an offsetting futures contract. Compl. ¶¶ 45, 131. These

---

[14]Section 4c of the CEA provides that "[i]t shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of a transaction" that includes "a 'wash sale.'" 7 U.S.C. § 6c(a).

transactions happen off the exchange, and the parties are permitted to change the delivery period and location. *Id.* ¶ 122. Under CME and CBOT rules, bona fide trades must occur between separate accounts under independent control. *Id.* ¶¶ 125-26. Parties to an EFP transaction must also document the trade and report it to the exchange. *Id.* ¶¶ 127-28. The parties report the volume of the physical commodity exchanged (but not the price), and this information is published daily on CME Group's website. *Id.* ¶¶ 128-29. Ploss alleges that EFP volume "is an important element in the price discovery function of the market, by reflecting supply and demand factors" and is considered by traders when deciding whether or not to transact. *Id.* ¶ 130.

Ploss alleges that Kraft made off-exchange EFP transactions between two of its own accounts from 2003 to 2013. *Id.* ¶¶ 131-33. These were illegitimate wash trades because Kraft was the counterparty to its own trades, and there was no physical exchange of wheat. *Id.* Kraft reported the trading volumes to CBOT, which in turn reported them to the broader wheat market. *Id.* ¶ 134. Ploss alleges that "by reporting these EFP transactions, Kraft duped the CBOT wheat market into believing that a bona fide ownership transfer of CBOT wheat futures had occurred" and made the market believe that there was greater demand for wheat than actually existed. *Id.* In turn, this "caused the prices of CBOT wheat futures contracts to be artificial by injecting artificial supply and fundamentals used to price these contracts." *Id.* ¶¶ 134-36.

Ploss comes close to stating a claim, but he does not allege some critical elements of the wash trading scheme, including how the EFP transactions impacted futures prices, how Kraft gained from the alleged manipulation, and how the Plaintiffs were harmed. Thus, he has not adequately alleged the ability to influence prices or the existence of artificial prices for the Section 9(a)(2) claim. First, as to ability to influence, Ploss only alleges that Kraft reported its EFP transactions to the exchange, which then published the volume information (but not price information) to the broader market. *Id.* ¶ 129. And he alleges that "market participants consider this information when transacting in the cash and derivative markets for the commodity." *Id.* ¶ 130. But "considering" this information does not necessarily mean that the traders relied upon the information to trade and that this information caused any change in prices. Although Ploss alleges that the volume information "duped the CBOT wheat market," *id.* ¶ 134 and caused artificial prices, this conclusion is barebones because there are no allegations explaining the link between the published volumes and the price changes. In fact, it is not actually clear that the published information affected prices at all—Ploss alleges that "[t]he EFP transactions were used or *may have been used to* …. determine the price basis" of wheat futures. *Id.* ¶ 140 (emphasis added). For the same reasons, the Complaint does not adequately say (with *factual* allegations, rather than conclusions) that there were artificial prices, nor is there information about *how* the prices were artificial, whether they went up or down, or how Kraft benefited from the scheme. Finally, the allegations do not establish the plausibility of actual damages, which

are required to sustain a private right of action under the CEA. 7 U.S.C. § 25(a)(1)

("Any person … who violates this chapter … shall be liable for actual damages … .").

Although Kraft allegedly made unlawful EFP wash transactions between 2003 and

2014, the Plaintiffs only allege that they were harmed from trading in December

2011 and March 2012 futures contracts as a result of Kraft's long wheat futures

scheme. Compl. ¶¶ 15-22. None of the Plaintiffs have alleged that artificial prices

from the EFP wash scheme caused any injuries, whether the Plaintiffs traded at

prices that were higher or lower than they should have been, or how artificial prices

otherwise harmed their transactions. The lack of this information means that Ploss

has not even alleged a claim under the more generous Rule 8(a) standard, much less

Rule 9(b), because the Complaint does not provide Kraft with notice of how the

wash trades impacted prices or how the Plaintiffs were injured.

The Court thus grants Kraft's motion on Count Four, which is dismissed

without prejudice. If the Plaintiffs believe that they can adequately re-plead this

claim, then they will have to seek leave to amend the Complaint.

## 2. Section 6(c)(1) Manipulation

Similarly, the wash trading allegations under Section 6(c)(1) fail for the same

reasons. Unlike the long wheat futures scheme, these allegations are based on an

explicit misrepresentation as opposed to market behavior. This EFP scheme is

based on a false report—that is, intentionally or recklessly "delivering, or causing to

be delivered … a false or misleading or inaccurate report concerning crop or market

information or conditions that affect or tend to affect the price of any commodity in

interstate commerce … ." 7 U.S.C. § 9(1)(A); 17 C.F.R. § 180.1(a)(4). Kraft allegedly submitted false volume information to CBOT, which then published the information to the market; this may form the basis of a false-report claim. Because claims that are based on an explicit misrepresentation sound in fraud, the heightened pleading standard of Rule 9(b) applies. *See supra* Section III.A.2.ii.

In addition to a material misrepresentation or omission, a fraud claim also requires reliance, causation, and loss, *Dura Pharm.*, 544 U.S. at 341, which Ploss has not alleged. Again, Ploss has only alleged that traders "considered" the allegedly misleading information in an unspecified way and that "[t]he EFP transactions were used or may have been used to …. determine the price basis" of wheat futures. *Id.* ¶¶ 130, 140.[15] And the Complaint does not allege how the EFP transactions impacted futures prices, how Kraft gained from the alleged manipulation, and how the Plaintiffs were harmed. The Section 6(c)(1) claims fail

---

[15]Neither party raises the fraud-on-the-market theory of reliance. In the securities context, that theory relieves a plaintiff from alleging that she *individually relied* on a misleading statement, based on the idea that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business … . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (citation and internal quotation marks omitted). *See also, e.g., Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010) ("When someone makes a false (or true) statement that adds to the supply of available information, that news passes to each investor *through the price of the stock*." (emphasis in original)); *Ziemack v. Centel Corp.*, 856 F. Supp. 430, 433 (N.D. Ill. 1994) ("[F]raud on the market theory allows a plaintiff who relied on the integrity of the market but never heard the allegedly fraudulent statements to sue." (citation omitted)).

Ploss has not made this argument, so it is waived. Even if he did argue it, it is unclear whether it would have been successful. Asserting fraud-on-the-market "clearly require[s] a plaintiff to specifically plead facts that show a well-developed, efficient market," *Greenberg v. Boettcher & Co.*, 755 F. Supp. 776, 782 (N.D. Ill. 1991) (citing cases), which Ploss has not done.

for many of the same reasons already described above in the Section 9(a)(2) context. *See supra* Section III.B.1. So Count Five is also dismissed without prejudice.

## C. Sherman Act

Ploss next alleges that Kraft violated the Sherman Act by gaining control of a large interest in wheat futures at the end of 2012 in order to create anticompetitive prices. Compl. ¶¶ 158-71. In response, Kraft argues that Ploss has failed to state a claim of monopolization because Ploss does not allege (1) a relevant antitrust market; (2) monopoly power; or (3) a predatory bidding claim. Defs.' Br. at 31-34. The Court disagrees, as explained below.

Section 2 of the Sherman Act makes it unlawful for anyone to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce … ." 15 U.S.C. § 2. This section of the Sherman Act prohibits "the employment of unjustifiable means to gain that power" and requires "two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power … ." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Unlawful acquisition of monopoly power is "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," all of which are permissible. *Id.*; *see also Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) ("Section 2 forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power." (citation omitted)).

### 1. Monopoly Power in Relevant Market

The first element, possession of monopoly power, means "the power to exclude competition or to control price[.]" *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) (citation omitted); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1198 (7th Cir. 1983) (monopoly power "is the economic power to exclude or limit entry of competitors into the relevant market or to control prices in the relevant market"). So this element itself contains two sub-requirements: (1) a relevant market; and (2) possession of monopoly power in that market.

### i. Relevant Market

Kraft's first contention is that Ploss has failed to identify a relevant market. Defs.' Br. at 29-31. "For purposes of § 2 of the Sherman Act, a market is defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011) (citing *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956)). Put another way, "the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market." *Id.* (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 201-02 (2d Cir. 2001)). Ploss alleges that the relevant market is December 2011 soft red winter wheat futures contracts. Compl. ¶¶ 163, 166. Kraft believes that this is not a relevant market because it does not

include the cash market; according to Kraft, wheat on the cash market is a substitute for wheat on the futures market (and vice versa). Defs.' Br. at 29-31.

The problem with Kraft's argument is that when it comes to futures contracts, a confined period of time indeed can define a relevant market for antitrust purposes. In *In re Dairy Farmers*, the district court held that the June, July, and August 2004 Class III milk futures markets were each relevant markets. 767 F. Supp. 2d at 902. The court explained that "there [was] a unique value to be gained from trading in June 2004 Class III milk futures versus futures for another month or another type of milk because futures positions can be used to hedge against price changes for the underlying commodity during the same period of time." *Id.* In other words, cash-bought milk versus futures-bought milk have distinct features and are not necessarily substitutes—the former is used for immediate consumption, and the latter is used for hedging against risks. *See id.* And each contract month satisfies a different hedging need. *Id.* What's more, the defendants in *In re Dairy Farmers* "[were] not accused of inflating the price of milk futures by gaining control of the underlying commodity" through a corner or a squeeze, and it was not a problem that the relevant market did not include the cash crop. *Id.* at 904.[16] Here, too, Ploss alleges that the wheat futures market is often used for hedging, Compl. ¶¶ 43-44, suggesting that the December 2011 wheat futures contracts also have a unique value for hedging purposes. So Ploss is not

---

[16]Although the *In re Dairy Farmers* defendants allegedly "engage[d] in [a] related scheme to bid up the price of cheese," the court did not rely on this scheme or this physical market to conclude that the plaintiffs had alleged monopoly power in the Class III milk futures markets. 767 F. Supp. 2d at 904.

required to also include the cash wheat market in the market definition, because cash wheat and futures market wheat are not necessarily interchangeable. Nor must an antitrust violation be based on a corner or squeeze involving control over both markets.

Another reason that counsels against dismissal is that "market definition is a deeply fact-intensive inquiry, [and] courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *In re Dairy Farmers*, 767 F. Supp. 2d at 901 (internal quotation marks omitted) (quoting *Todd*, 275 F.3d at 199-200). Courts should dismiss antitrust claims based on a market argument only when it is certain that "the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way." *Id.* (citation and internal quotation marks omitted). To be sure, facts unearthed in discovery might prove otherwise, but it is plausible that December 2011 contracts are a viable market for antitrust-analysis purposes, so dismissal on these grounds is not appropriate at this time.

### ii. Monopoly Power

On the next market-related issue—possession of monopoly power in the December 2011 futures market—Ploss may allege either (1) "direct evidence of anticompetitive effects"; or (2) indirect evidence of monopoly power with allegations of "[the] relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that

case." *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (citations omitted). Ultimately, the allegations must show that the defendant has the "power to control prices or exclude competition in a relevant market." *MCI*, 708 F. 2d at 1107 (internal quotation marks omitted) (quoting *E.I. duPont*, 351 U.S. at 391); *see also Grinnell,* 384 U.S. at 571 (same). "[W]here plaintiffs fail to identify any facts from which the court can infer that defendants had sufficient market power to have been able to create a monopoly, their § 2 claim may be properly dismissed." *Endsley*, 230 F.3d at 282 (citation and internal quotation marks omitted).

For example, in *In re Dairy Farmers*, the "Plaintiffs undoubtedly allege[d] that Defendants' actions caused the price of Class III milk futures to be artificially inflated" and that "as a result of Defendants' actions, some plaintiffs purchased Class III milk futures at what were essentially noncompetitive prices." 767 F. Supp. 2d at 903. The defendants exerted monopoly power by "[buying] up all of the available long positions in three months' worth of Class III milk futures contracts … in an effort to gain control of those markets and sell their positions at an unreasonably high price." *Id.* at 886. This was sufficient to allege that the defendants had the ability to control prices, which the defendants made anticompetitive. *Id.* at 903.

Like the *In re Dairy Farmers* plaintiffs, Ploss has also alleged direct evidence of anticompetitive effects by pleading Kraft's ability to control prices and the resulting anticompetitive prices. Kraft also obtained a large long position in December 2011 wheat contracts not because it wanted to consume that wheat or

hedge against price risks, but to artificially inflate the prices of those futures contracts with a massive increase in long open positions. *Id.* ¶¶ 1, 16, 82, 166-68. Ploss further alleges that Kraft held a "commercially-unreasonable number of long positions … that constituted a dominant position. This gave Kraft greater influence or control over the prices of December 2011 CBOT wheat futures contracts." *Id.* ¶ 166. At one point, its positions accounted for 87% of the open interest. *Id.* ¶¶ 5, 88. Kraft then "used its position of control" to force up December 2011 wheat prices, even "caus[ing] the market to shift from contango to backwardation … ." *Id.* ¶¶ 167-68. In other words, although futures prices are usually higher for further-out contracts, Kraft allegedly caused this trend to reverse so that near-term contracts became more expensive, falsely signaling an increased demand in near-term contracts. *See id.* At this stage, these allegations are enough to allege monopoly power in the relevant market. Again, discovery might very well prove otherwise (indeed, this is the closest question as to the survival of the antitrust claim), but Ploss gets the benefit of assuming the allegations as true (and the benefit of reasonable inferences) at this dismissal-motion stage.

Kraft responds that the 87% figure "is a shock tactic but not a plausible allegation of monopoly power" because "open interest" reflects the total number of outstanding (non-liquidated) futures contracts at a given time, but it does *not* reflect the size of the market. Defs.' Br. at 32. Put another way, Kraft says that it could not have excluded competitors in a market with no barriers to entry and no cap in trading capacity; Kraft contends that any other trader could have entered the

market, purchased December 2011 wheat futures contracts, and diluted Kraft's 87% share. *Id.* Kraft also repeats that it could not have monopolized the futures market if it did not have a dominant position of physical wheat—essentially arguing that corners and squeezes are the only forms of antitrust violations in the futures markets. *Id.* at 33.

But *In re Dairy Farmers* persuasively rejected similar arguments—there, the defendants contended that there were no barriers to entry in a cash-settled milk futures market; relatedly, the defendants also argued that they could not have executed a corner or a squeeze of the futures market if they could not control the cash market. 767 F. Supp. 2d at 903. As to barriers to entry, the court explained that in a cash market, a trader settles her obligations by paying cash to close out a position, and not by physical delivery or acceptance of goods. *Id.* The defendants argued that "because cash-settled futures do not have a deliverable supply, there can never be a mismatch between demand and supply near the expiration [of the futures contracts], or at any other time." *Id.* (citation and internal quotation marks omitted). In other words, because there could be no shortage of cash (like there could be with physical goods), the defendants could not monopolize the milk futures market because they could not take advantage of a supply shortage. *Id.* That also meant, according to the defendants, that anyone could enter the futures market at any time. *Id.* Although the court acknowledged that cash-settled markets often have low (or no) barriers to entry, the plaintiffs' claims nevertheless survived because they alleged that "[defendants] conspired to bid up the price of milk futures in order

to buy up all of the long positions available in the relevant markets in spite of the CME position limits. Moreover, by bidding up the price of futures, they were able to control 100% of the markets for at least one day." *Id.* at 904. Although it was true that other traders *theoretically* could have entered the market, the plaintiffs alleged that in *reality*, "Defendants had placed the rest of the competition in a position, at least temporarily, where they would not be able to seize control of a meaningful portion of the markets." *Id.* Similarly, the court emphasized that the plaintiffs' antitrust theory need not rely on a corner, squeeze, or traditional scheme involving control over the supply of the physical commodity—rather, it was enough to allege that the defendants excluded others from the market by obtaining a dominant long position that "exceed[e]d what any one other investor could possibly control." *Id.* at 904.

Likewise, the same type of monopoly power is at issue in this case. Ploss alleges that Kraft succeeded in excluding competitors from taking a meaningful position in the December 2011 wheat futures market. In particular, Kraft's 87% long position "constituted a dominant position" that "gave Kraft great influence or control over the prices … ." *Id.* ¶ 166. And it allegedly "used its position of control to force the spread between the December 2011 and March 2012 CBOT wheat futures contracts," to increase December 2011 prices, and to shift the pricing curve from contango to backwardation. *Id.* ¶ 168. Like *In re Dairy Farmers*, even though it may be true that other participants *theoretically* could have entered the market, Ploss alleges that in *reality*, competitors were priced out of any meaningful ability to do

so. *Id.* Finally, as explained in *In re Dairy Farmers*, monopoly power does not have to look like a traditional corner or squeeze, 767 F. Supp. 2d at 903-04, and case law has not interpreted the statute in such a confined way. Ploss therefore has alleged monopoly power in a relevant market.

## 2. Willful Acquisition

The second element of a monopolization claim under § 2 of the Sherman Act requires "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570-71. The willful acquisition prong is meant "[t]o safeguard the incentive to innovate, [so] the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*" *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original). Willful acquisition of monopoly power requires intent, not "to obtain a monopoly or to capture an ongoing increase in market share," which is "the aim of every business endeavor," but rather intent to "maintain or achieve monopoly power by anticompetitive means." *Endsley*, 230 F.3d at 283. There are myriad examples of anticompetitive conduct, including refusal to deal with competitors, *Verizon*, 540 U.S. at 408, predatory pricing or bidding, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007), or exclusive horizontal agreements (among competitors), *Toys "R" Us*, 221 F.3d at 935. The precise boundaries of anticompetitive conduct are sometimes difficult to define, but as the Supreme Court put it, "[i]f a firm has been attempting

to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory [or exclusionary]." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (citation and internal quotation marks omitted).

In the commodities context, some courts have explained that "an *intentionally manipulative* trading strategy to raise the prices of [futures contracts] in order to profit from [defendants'] long positions may constitute exclusionary conduct." *Shak v. JPMorgan Chase & Co.*, 2016 WL 154119, at *17 (S.D.N.Y. Jan. 12, 2016) (emphasis in original) (citing *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41 (S.D.N.Y. 2012); *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198. And "to support such an inference, the allegations must be of conduct that, were it not intended to obtain or sustain monopoly power, would be uneconomic and irrational. In other words, the alleged conduct must be such that a reasonable inference of intent to control prices and exclude competitors may be drawn." *Shak*, 2016 WL 154119, at *17. The Court has already explained how Kraft's behavior was uneconomic and financially irrational, and it need not repeat the analysis here. *See supra* Sections III.A, III.C.1. Those allegations suggest that Kraft "used [its] bidding tactics and [its] large market share ... to exclude competitors" and that it "did not gain [its] monopoly power purely by chance or through their superior business acumen." *In re Dairy Farmers*, 767 F. Supp. 2d at 905. Because Ploss's allegations suggest that price changes of December 2011 wheat

futures were driven by willful anticompetitive conduct, and not by chance or other legitimate economic reason, Ploss's monopoly claim stands.

Kraft nevertheless argues that Ploss has failed to allege a predatory bidding claim, which is a type of exclusionary conduct. Defs.' Br. at 34. Such a claim "involves the exercise of market power on the buy side or input side of a market"; it works when "a purchaser of inputs bids up the market price of a critical input to such high levels that rival buyers cannot survive (or compete as vigorously) and, as a result, the predating buyer acquires (or maintains or increases its) monopsony power." *Weyerhaeuser*, 549 U.S. at 320 (citation and internal quotation marks omitted). In *Weyerhaeuser*, the Supreme Court reversed a holding that the defendant drove a competitor out of business by artificially inflating the price of sawlogs by overbidding and buying more logs than necessary. *Id.* at 314-15. Kraft believes that the standards in *Weyerhaeuser* are applicable here, but Ploss has not actually pled a predatory bidding scheme. Pls.' Br. at 36 n.18. Ploss has not pled that Kraft bid up prices of inputs, nor is there any explanation of what those inputs would even be—as the *In re Dairy Farmers* court explained, a commodities antitrust claim alleging a conspiracy to obtain a dominant share of the commodities markets "do[es] not fit neatly into the prototypical descriptions of predatory pricing or predatory bidding schemes laid out in *Weyerhaeuser*." 767 F. Supp. 2d at 905-06. Like the *In re Dairy Farmers* court, this Court also concludes that *Weyerhaeuser* does not apply because the alleged anticompetitive conduct does not involve predatory bidding, but rather obtaining a large market share of a futures market to

"place[] the rest of the competition in a position, at least temporarily, where they would not be able to seize control of a meaningful portion of the markets." *Id.* at 904. *See supra* Section III.C.1. Thus, the willful acquisition element is also adequately alleged, and the Court denies Kraft's motion with regards to Count Six.

## D. Unjust Enrichment

Count Seven, the final claim, is one for unjust enrichment. That is a claim against "a defendant [who] has unjustly retained a benefit to the plaintiff's detriment," and whose "retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (citation and internal quotation marks omitted). Ploss bases this claim on the same underlying facts as the manipulation and antitrust claims, seeking restitution and disgorgement. Compl. ¶¶ 172-76. Kraft argues that this claim cannot stand because (1) it is based on the same underlying facts as the statutory claims, which fail; and (2) the CEA preempts common law unjust enrichment claims.

The first argument is readily rejected because the Court has already held that the statutory claims related to the long wheat futures scheme are not dismissed. It is true that "[i]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Cleary*, 656 F.3d at 517; *see also In re Dairy Farmers*, 801 F.3d at 765 ("When the plaintiff's particular theory of unjust enrichment is based on alleged

fraudulent dealings and we reject the plaintiff's claims that those dealings, indeed, were fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable."). But because the Court has held that the CEA manipulation claims for the long wheat futures scheme survive Kraft's motion to dismiss, Ploss's unjust enrichment claim based on those same underlying facts may also proceed. But to the extent that Ploss's unjust enrichment claim relies on the EFP wash trading scheme, that claim is dismissed without prejudice. *See supra* Section III.B.

As to preemption, Kraft's main argument is that the remedy of disgorgement expressly "conflict[s] with the limited remedies Congress has prescribed" under the CEA, which allows only for actual damages. Defs.' Br. at 35 (citing 7 U.S.C. § 25(a)). But Kraft's argument is inconsistent with the statutory text. True, the CEA's provision for private rights of action does require actual damages, *id.*, and provides that "[t]he rights of action authorized by this subsection … shall be the exclusive remedies *under this chapter* … ." 7 U.S.C. § 25(a)(2) (emphasis added). The key, however, is the phrase "under this chapter"—nowhere does the provision suggest that it limits remedies from other federal or state law actions. *See Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156-57 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995) (the qualifier "under this chapter" "indicates that the exclusivity provision extends only to private actions seeking redress under the CEA, and does not curtail actions brought under other federal laws or state law"). Kraft has pointed to no other source of the CEA that expressly preempts the unjust

enrichment claim, or to any other reason that "application of state law would directly affect trading on or the operation of a futures market, [such that state law] would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Am. Agric. Movement*, 977 F.2d at 1156-57 ("[T]he structure and history of the CEA indicate that the propriety of conflict preemption depends upon the particular context in which a plaintiff seeks to bring a state law action." (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (internal quotation marks omitted)); *Holladay v. CME Grp.*, 2012 WL 5845621, at *2 (N.D. Ill. Nov. 16, 2012) (a state law claim that "envisions no administrative agency involvement which might conflict with the jurisdiction of the Commodity Futures Trading Commission" was not preempted). Therefore, Kraft's motion to dismiss Count Seven is also denied.

## IV. Conclusion

For the reasons explained above, Kraft's motion to dismiss [R. 76] the Consolidated Class Action Complaint is denied as to Count One (Section 9(a)(2) long wheat futures manipulation); Count Two (Section 6(c)(1) long wheat futures manipulation); Count Three (principal-agent liability for long wheat futures manipulation); Count Six (Sherman Act claim); and Count Seven (unjust enrichment). The Court grants Kraft's motion as to Count Four (Section 9(a)(2) EFP wash trading manipulation) and Count Five (Section 6(c)(1) EFP wash trading manipulation), but these claims are denied without prejudice. Ploss may seek leave to amend the Complaint for Counts Four and Five.

Kraft must answer the Complaint and its surviving counts by July 18, 2016. The parties shall issue their first-round of written discovery requests no later than July 22, 2016. At the July 14, 2016 status hearing, the Court will set the remainder of the discovery schedule.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: June 27, 2016