IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| HARRY PLOSS, et al., ) | |
| Plaintiffs, ) | No. 15 C 2937 |
| v. ) | Honorable Edmond E. Chang |
| KRAFT FOODS GROUP, INC. and ) MONDELĒZ GLOBAL LLC, ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO CERTIFY FOR APPEAL THE COURT'S MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendants Kraft Foods Group, Inc. and Mondelēz Global LLC (collectively "Kraft") respectfully move pursuant to 28 U.S.C. § 1292(b) to certify for interlocutory appeal three questions arising from this Court's June 27, 2016 Memorandum Opinion and Order ("Opinion") (Dkt. No. 113 ("Op.")).[1] The first is whether a defendant's large futures position, coupled with an alleged intent to affect market prices but absent any other false communications to the market, constitutes "false signaling" market manipulation under §§ 6(c)(1) or 9(a)(2) of the Commodity Exchange Act ("Act"). The second question is whether, when a defendant's purchases in the futures market cause cash and futures market prices to converge, those converging prices are "artificial" for purposes of those same statutory provisions. The third question is whether a defendant can obtain monopoly power in a futures market through open market purchases at open market prices without executing a corner or a squeeze.

---

[1] On January 19, 2016, Kraft filed a similar motion seeking to certify its two manipulation questions for interlocutory appeal in the parallel CFTC enforcement action, *CFTC* v. *Kraft Foods Group, Inc.*, No. 15 C 2881 (N.D. Ill.), Dkt. No. 90. That motion is fully briefed and awaiting ruling by the district court judge presiding over that case.

The Court's Opinion reaches a holding on each of these issues, and each question readily satisfies the requirements for interlocutory appeal under § 1292(b)—each presents (1) "a question of law" that (2) is "controlling" and (3) "contestable" and (4) whose "resolution . . . promise[s] to speed up the litigation." *Arenholtz* v. *Bd. of Trustees of the Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000). The Court's decision denying Kraft's motion to dismiss the consolidated class action complaint ("Complaint") (Dkt. No. 71 ("Compl.")) turned entirely on these three controlling questions of law, and their definitive resolution now, before protracted and costly litigation, is essential to ensure not only that Kraft's motion to dismiss and later motion for summary judgment are properly decided, but also—in the event of a trial—that jurors receive proper instructions.

The legal issues these questions raise are clearly contestable. The CFTC's novel manipulation theory (adopted by Plaintiffs in this case) has drawn significant criticism, and two of the underlying legal issues have divided federal courts. While the Seventh Circuit has yet to address the precise legal questions this case presents, there is substantial reason to believe that the Seventh Circuit would decide the manipulation issues in a manner consistent with its closely analogous decision in *Sullivan & Long* v. *Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995). Furthermore, there is also substantial reason to believe that the Seventh Circuit would not adopt the economically unsound theory of monopoly power articulated in *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 767 F. Supp. 2d 880 (N.D. Ill. 2011) (Hibbler, J.) and relied on by this Court. In fact, this Court's extension of *Dairy Farmers* marks the first time **any** court has sustained a monopolization claim in a commodity-settled futures market[2] where the

---

[2] In a commodity-settled market, traders who do not offset their positions must meet their obligations by delivery of the physical commodity. In a cash-settled market, traders settle positions with cash rather than with physical delivery of the underlying asset.

2

plaintiff has not alleged a corner or squeeze. Immediate appellate review is essential to clarify these novel issues of law.

## ARGUMENT

### I. The Motion Presents Questions of Law

Kraft's three questions are all questions of law for purposes of § 1292(b) because each asks the Seventh Circuit to decide an abstract question under one of three statutes: Sections 6(c)(1) and 9(a)(2) of the CEA, and Section 2 of the Sherman Act. The Seventh Circuit can decide each issue "quickly and cleanly without having to study the record," 219 F.3d at 676, because Kraft contends that the conduct alleged is not market manipulation or monopolization as a matter of law, regardless of whether Plaintiffs can prove the truth of their factual allegations. *See* Order, *In re Potash Antitrust Litig.*, No. 08 C 6910, at 4 (N.D. Ill. Jan. 13, 2010) (Castillo, J.) (citing *Williams* v. *Sims*, 390 F.3d 958 (7th Cir. 2004)) ("The Seventh Circuit has regularly granted interlocutory appeals reviewing denials of motions to dismiss where there was a contestable application of a legal standard.").

### II. The Questions of Law Are Controlling

The resolution of Kraft's questions of law would significantly affect the continuing course of the litigation and, if resolved in Kraft's favor, effectively end both this case and the parallel enforcement action. If the conduct alleged does not state a claim for manipulation or monopolization, this case is over. All that would remain is Plaintiffs' unjust enrichment claim, which depends on the validity of their manipulation claims. Appellate review is also critical here to ensure the proper scope and focus of discovery, the proper standard for summary judgment, and that jurors receive proper instructions in the event of a trial.

**III.     The Questions of Law Are Contestable**

The novelty of the manipulation and monopolization theories in this case, the existence of circuit and district court authority contrary to this Court's and the *CFTC* court's decisions, and the absence of clearly controlling Seventh Circuit authority demonstrate that there are substantial grounds for difference of opinion on all three of Kraft's questions. *See In re Brand Name Prescription Drug Antitrust Litig.*, 878 F. Supp. 1078, 1081 (N.D. Ill. 1995) (citations omitted) (questions are "contestable" if they present "difficult central question of law which [are] not settled by controlling authority").

> **A.     Can a "false signaling" market manipulation claim under §§ 6(c)(1) or 9(a)(2) be based on a defendant's large futures position and alleged intent to manipulate in the absence of any other alleged false communication to the market?**

This Court, like the *CFTC* court, determined that Congress intended the additional provisions added to the CEA in § 6(c)(1) to parallel § 10(b) of the Securities Exchange Act and SEC Rule 10b-5 and that courts should look to cases interpreting those provisions to guide their interpretation of how CEA §§ 6(c)(1) applies to a claim based on "false signaling." (Op. at 19-20.) The Court, like the *CFTC* court, also applied the same analysis to Plaintiffs' "false signaling" claim under § 9(a)(2).

The Seventh Circuit has not addressed "false signaling" manipulation in the commodities context, but it has addressed comparable manipulation claims under § 10(b). In the closely analogous case of *Sullivan & Long*, the court held that short selling is neither deceptive nor manipulative absent other representations, actual or implicit, even where the trader cannot possibly meet his commitment to deliver on short sales and intends those short sales to depress the stock price. *See* 47 F.3d at 864-65. The defendant in that case was not required to have enough stock to cover its short sales, and as a matter of law, those short sales did not amount to

an implicit representation that there ever existed enough stock to cover those short sales. *Id.* at 863-64. Applying that same principle here, Plaintiffs could not have been deceived by Kraft's failure to disclose its intent to not take delivery or load out wheat because Kraft was not required to take delivery on its long position. And as a matter of law, there was no implicit representation about Kraft's need for wheat or its intent to take delivery. Plaintiffs even allege that such deliveries are rare. In sum, there is no precedent for the principle underlying the decisions in *CFTC* and this case that a hedger (or any trader) must have an immediate demand for wheat, and an ability to store that wheat, to have a "legitimate economic motive" for taking a large long position. Indeed, that notion directly conflicts with CFTC hedging regulations.[3]

Rather than applying the principles articulated in *Sullivan & Long*, this Court relied on the district court's decision in the *CFTC* case and an out-of-circuit case, *ATSI Commc'ns Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007), in holding that under §§ 6(c)(1) and 9(a)(2), Plaintiffs were not required to plead an additional deceptive act beyond Kraft's buying futures with an alleged intent to manipulate, which the Court interprets to be the alleged absence of a legitimate economic motive. The Court acknowledged that even *ATSI* required "something more" than open market trades to "create a false impression of how market participants value a security." (Op. at 30 (quoting *ATSI*, 493 F.3d at 101).) But the Court, like the *CFTC* court, ultimately held that *ATSI*'s "something more" was really nothing more than an allegedly improper motive—Kraft's alleged lack of legitimate demand—coupled with "market behavior," which the Court acknowledged consisted of no more than open market trades at prices set by the market. (Op. at 21-22, 30.) Kraft's futures position alone, according to the Court, could make

---

[3] CME and CFTC regulations permit commercial users to take positions equal to *twelve* months' demand for wheat, regardless of those users' immediate needs or ability to store that amount of wheat. *See* CFTC Speculative Limits, *available at* http://www.cftc.gov/IndustryOversight/ MarketSurveillance/SpeculativeLimits/speculativelimits.

5

"sellers in the Toledo market believe that Kraft would satisfy its need for wheat from the futures market." (Op. at 30.)

Yet circuit and district courts—including district courts interpreting *ATSI*—have rejected the Court's interpretation of "false signaling" manipulation because a large position alone does not communicate *anything* in any relevant legal sense. "Mere sales [or purchases] do not inject false information into the marketplace, nor can a party inject false information into the marketplace . . . simply by selling [or buying] stock on the open market." *Nanopierce Techs., Inc.* v. *Southridge Capital Mgmt.*, No. 02 C 0767, 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008) (following *ATSI*); *see also GFL Advantage Fund, Ltd.* v. *Colkitt*, 272 F.3d 189, 211 (3d Cir. 2011) (market manipulation requires "some other type of deceptive behavior in conjunction with [open market trades]" that injects inaccurate information into the marketplace).

Other courts, by contrast, hold that otherwise legitimate trading can constitute manipulation solely because of the actor's purpose. This Court opted to follow the pleading standard first articulated in *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008), a case that purported to rely on *ATSI*, but interpreted *ATSI* differently than other courts in the same district, *see Nanopierce*, 2008 WL 1882702, at *2. *Amaranth* and other courts represent only one side of the split of authority on the pleading standard for open market manipulation claims. *See Markowski* v. *S.E.C.*, 274 F.3d 525, 529 (D.C. Cir. 2001); *S.E.C.* v. *Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007).

This Court's decision to follow the latter line of authority presents a question on which there are substantial grounds for a difference of opinion. Even under *ATSI*, "buying and holding large positions" without "legitimate demand" is insufficient to allege manipulation under §§ 6(c)(1) or 9(a)(2). (Op. at 26-27, 38.) Notably, *ATSI* relied on the Seventh Circuit's decision

6

in *Sullivan & Long* and the Third Circuit's decision in *GFL* in determining that "[t]o be actionable as a manipulative act, [otherwise legal, open market activity] must be willfully combined with *something more* to create a false impression of how market participants value a security." 493 F.3d at 101 (emphasis added). "Mere sales [or purchases] do not inject false information into the marketplace, nor can a party inject false information into the marketplace . . . simply by selling [or buying] stock on the open market." *Nanopierce*, 2008 WL 1882702, at *2 (following *ATSI*). Thus, under the *GFL Advantage*, *ATSI*, and *Nanopierce* line of authority, purchasing a security—even in high volume and with the intent to increase or decrease the price—is not alone manipulative.

The specific facts alleged here, although they are irrelevant to the legal question of whether "false signaling" manipulation requires something beyond open market trades, illustrate why the Seventh Circuit is not likely to follow the *Amaranth* line of cases. Neither Plaintiffs nor the Court articulate *how* Kraft's position signaled anything about its intent or demand. Speculators never have a "bona fide" or "legitimate" demand for any wheat but Plaintiffs concede that speculators can hold a position far in excess of Kraft's "large long position" at any time except during the spot month.[4] The Court does not suggest that speculators' positions signal an intent to take delivery or even a demand for wheat. Yet the Court accepts Plaintiffs' conclusion that Kraft's (undisclosed) position somehow did. (Op. at 29-30.) The implausibility of Plaintiffs' allegation is precisely why *ATSI*, *GFL Advantage*, and *Nanopierce* hold that "false

---

[4] The Court's opinion incorrectly states that speculators are always subject to a 600-contract limit. (Op. at 4.) As Plaintiffs allege, speculators are only restricted to 600 contracts during the spot month, which in this case was December. At all other times, any trader may hold 5,000 contracts net long or short of any single contract month. (Compl. ¶ 42.) So as of November 29, 2011, when Kraft had acquired its "large long position" of 3,150 contracts, Kraft's position was 1,850 contracts below what any speculator could hold. Moreover, there is nothing in the applicable regulations to create an obligation or support an inference that by purchasing a large long futures position, Kraft must take delivery of the futures or immediately acquire an equivalent amount of wheat in the cash market.

signaling" manipulation requires something more than open market trades; open market trades, on their own, inject no information into the marketplace about the trader's intent or demand for delivery of the underlying commodity on either the cash or futures markets.[5]

> B. **Where a defendant's purchases in the futures market cause converging prices in the cash and futures market, can those converging prices be artificial under §§ 6(c)(1) or 9(a)(2)?**

Kraft's second question is an issue of first impression in the commodities context, but has been addressed by the Seventh Circuit in the securities context in *Sullivan & Long*. Specifically, the Seventh Circuit has held that the phenomenon alleged by Plaintiffs—convergence—is the opposite of artificiality. The Court held that lawful, open market purchases at market prices could create artificial prices for wheat on both the futures market and the cash market despite the fact that Plaintiffs alleged those prices moved towards convergence at the time of contract expiration and delivery. The Court held that an artificial price could exist based solely on Kraft's alleged lack of "true commercial demand" to support its large long position despite the fact that Plaintiffs alleged wheat cash and futures prices converged as they were supposed to do. An "essential point" of *Sullivan & Long*, however, is that conduct that causes convergence does not create artificial prices—it eliminates them. *See* 47 F.3d at 862, 865.

In *Sullivan & Long*, the defendant engaged in substantial naked short selling, selling more shares than were outstanding so that it was not possible to deliver all the shares it sold short. 47 F.3d at 863. The Seventh Circuit held that this conduct did not constitute market manipulation and that even by engaging in such a large volume of naked short selling designed to drive the price down—so much that the defendant could not possibly deliver on its

---

[5] *ATSI*, *GFL Advantage*, and *Nanopierce* also reflect the general rule, expressly set out in the CEA, that traders have no obligation to disclose the purpose of their trades. 7 U.S.C. § 9(1). To give any effect to that statutory provision, no inference of intent can be drawn from the establishment of a market position.

8

obligations—the defendant did not create an artificial price. *Id.* at 862 (holding that defendant's conduct "eliminate[d] artificial price differences").

The Seventh Circuit also warned that it "would think twice before concluding that [securities] laws prohibit 'schemes' that accelerate rather than retard the convergence between the price of a stock and its underlying economic value and therefore promote rather than impair the ultimate goals of public regulation of the securities markets." *Id.* at 861. The same basic principle applies with even greater force to commodities futures markets, where the effective functioning of that market depends on the cash and futures prices converging as contract expiration nears.[6] While this is an issue of first impression, there are substantial grounds to believe that the Seventh Circuit would apply its holding in *Sullivan & Long* to the futures markets; that is, the court would hold that conduct that causes convergence cannot create an artificial price, even where a party intends not to make delivery and intends to affect price through its trading.

### C. Can a Defendant Obtain *Monopoly* Power in a Futures Market By Purchasing Futures on the Open Market at Open Market Prices Without Executing a Corner or a Squeeze?

This Court's decision sustaining Plaintiffs' Section 2 claim is the first instance in which any court has sustained a monopolization claim in a commodity-settled futures market[7] where

---

[6] As Kraft noted in its briefing on its motion to dismiss, *Sullivan & Long* is not the only source of support for its position that convergence is the economic opposite of artificiality. The utility of futures markets is predicated on the cash price and futures price converging at contract expiration. (*See* Defs.' Reply. at 4, 6.) It is the threat of making or taking delivery, rather than actually doing so, that forces convergence—that threat is what "test[s] markets and . . . force[s] price relationships." (*See* Defs. Reply at 4 (quoting Senate Wheat Report at 62).)

[7] For purposes of this motion and this motion only, Kraft assumes that a commodities futures market can constitute a relevant antitrust market. As noted in Kraft's briefing on its motion to dismiss, the position on which the Section 2 claim here is based—that futures and the cash commodity are not interchangeable products in the same relevant market—is unsupported by any case except *Dairy Farmers* and is wholly inconsistent with Plaintiffs theory that Kraft, without speaking a word,

9

the plaintiffs do not allege the defendant controlled the deliverable supply (a corner) or the existence of some other congestion or bottleneck causing deliverable supplies to be low or slow to market (a squeeze). In becoming the first court to do so, this Court acknowledged that Plaintiffs' allegations concerning Kraft's ability to control prices present the "closest question as to the survival of the antitrust claim." (Op. at 57.)

At a minimum, then, there are substantial grounds for differences of opinion over whether a defendant's open market purchases at open market prices can support a monopolization claim in the absence of allegations that the defendant set any price or excluded any competitor. *United States* v. *E.I. du Pont de Nemours & Co.* ("*Cellophane*"), 351 U.S. 377, 391 (1956) (monopoly power is "the power to control prices or exclude competition"). In fact, as set forth below, without some restriction on the deliverable supply, it is economically impossible for any party to control prices or exclude competing traders in either a cash-settled or commodity-settled futures market.

> **1. It is Economically Impossible to Control Prices or Exclude Competitors From a Futures Market Without Executing a Corner or a Squeeze**

Even if Plaintiffs *had* alleged that Kraft set prices or excluded competitors, those allegations would be not only implausible, but impossible. This Court did not acknowledge that impossibility and instead relied on *Dairy Farmers* to hold that a monopolization claim in the futures markets need not be based on a corner or a squeeze. (Op. at 55, 60.) But *Dairy Farmers* ignores the basic economics of a futures market and conflicts with established Seventh Circuit

---

deceived the market into believing that it would substitute CBOT wheat for wheat purchased in the cash market.

authority.[8] The Seventh Circuit has explained that it is impossible to control prices or exclude competitors in a cash-settled futures market because no trader can restrict the deliverable supply. Cash is unlimited at any point in time and not susceptible to monopolization. *See Kohen* v. *Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 675 (7th Cir. 2009) ("if a cash option exists there is no market to corner (no one can corner the U.S. money supply!)"); *see also Bd. of Trade* v. *S.E.C.*, 187 F.3d 713, 725 (7th Cir. 1999) ("there can never be a mismatch between demand and supply near the expiration, or at any other time").

*Dairy Farmers* acknowledged *Kohen*, acknowledged the absence of barriers to entry in a futures market, and acknowledged that other traders could have participated in the milk futures market but simply chose not to do so because they thought prices were too high. 767 F. Supp. 2d at 904-06. That court nevertheless refused to apply the principles of *Kohen* and instead sustained the monopolization claim because the defendants had purportedly placed competing traders in a position "where they would not be able to seize control of a meaningful portion of the markets." 767 F. Supp. 2d at 904. But that is not an indicia of monopoly power recognized by the Seventh Circuit or any other circuit court. The recognized indicia of monopoly power are (i) setting, not paying, prices, and (ii) excluding competitors, not paying more than competitors think prudent.

*Dairy Farmers* directly conflicts with the Seventh Circuit's decision in *Kohen* as it pertains to the cash-settled futures markets. Moreover, the economic principles recognized in *Kohen* apply equally to a commodity-settled market like wheat futures. To monopolize a commodity-settled market, a trader must own a large portion of the long futures interest *and* the deliverable supply must be restricted, either because the trader owns it or there is some other market congestion or bottleneck. That is because in a commodity-settled market like wheat

---

[8] *Dairy Farmers* was the first decision to hold that a cash-settled futures market could be monopolized. And it remains the only decision to do so because it rests on legal and economic error.

futures, without some restriction on the deliverable supply, no one can be forced to meet any price, even an "artificially inflated" one. A short seller can deliver wheat instead of paying the inflated futures price, and anyone else can choose not to buy. *See, e.g., In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Re. (CCH) ¶ 23,786, 1987 WL 106879, at *4-8 (CFTC July 15, 1987) (explaining traders "lack[] the ability to influence prices if other market participants can bypass [their] demands and extinguish their obligations elsewhere"). Consistent with these economic principles, every monopolization case in commodity-settled markets has (until now) involved a corner or a squeeze and no court (except *Dairy Farmers*) has sustained a monopolization claim involving cash-settled futures markets. (*See* Defs.' Mem. at 33 (collecting cases).)

### 2. Predatory Bidding is the Only Possible Claim Absent a Corner or a Squeeze

Without a corner or a squeeze, which Plaintiffs do not allege, predatory bidding is the only possible theory of antitrust injury when a competitor bids up the price in a market. However, Plaintiffs' allegations that Kraft overbid on the open market do not meet the "predatory bidding" standard set forth in the Supreme Court's decision in *Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 323-24 (2007).[9] The Court correctly held that Plaintiffs did not plead a claim for predatory bidding.

---

[9] Plaintiffs' Complaint does not even allege that they were "priced out" of the market. Instead, Plaintiffs' alleged damages in this case purportedly arise *because* they participated in the market. Plaintiffs allege only that Kraft paid prices that Plaintiffs considered "too high" and as a result Kraft acquired a large share of the open interest in December 2011 wheat futures. That is not anticompetitive or monopolistic behavior. It is basic supply and demand. Plaintiffs do not even allege that Kraft realized monopoly profits when it liquidated its long position. They allege that Kraft was successful in lowering the price of physical wheat in the physical wheat market—a market that the Court considers separate from the futures market, (Op. at 54-55), and in which Plaintiffs do not allege to have participated.

Nevertheless, the Court, again relying on *Dairy Farmers*, held that *Weyerhaeuser* did not govern Plaintiffs' claim that Kraft drove the price up by paying a "commercially unreasonable" price for its long futures position.[10] The Seventh Circuit is unlikely to sustain that holding. To the extent the Seventh Circuit would even entertain a monopolization claim without allegations of a corner or a squeeze, it is likely to apply the Supreme Court case most closely analogous to the conduct Plaintiffs actually allege: overbidding.

In short, there are substantial grounds for differences of opinion over whether a party can acquire monopoly power in a commodity-settled market without executing a corner or a squeeze. This Court is the first to reach this holding, and the single district court case on which the Court's decision relies—*Dairy Farmers*—cannot be squared with Seventh Circuit precedent and the economics of futures markets. Before litigation proceeds on this novel theory of monopolization in the futures markets, this Court should permit the Seventh Circuit to determine whether it is a valid theory.

## IV. The Resolution of Kraft's Questions of Law Will Expedite the Litigation.

The resolution of these questions will expedite the litigation and "materially advance the ultimate termination of the case." 28 U.S.C. § 1292(b). If Counts I, II, III, and VI of Plaintiffs' Complaint are dismissed, nothing will remain of Plaintiffs' suit for this Court to resolve. Indeed, even if the Seventh Circuit rules in favor of Kraft on only one of the manipulation or antitrust questions, that ruling would materially reduce the burden and scope of this litigation. In *Sterk* v. *Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012) (Posner, J.), the court held that where a grant of interlocutory appeal would destroy one of the plaintiff's main claims, that

---

[10] Even in *Dairy Farmers*, where the district court declined to apply *Weyerhaeuser*, the plaintiffs alleged injuries other than artificial prices. But here, the Complaint plainly alleges antitrust injury *only* from artificial prices due to Kraft's alleged open market purchases at inflated prices. That allegation is arguably relevant to a manipulation claim, but does not allege antitrust injury.

13

was sufficient to satisfy the "may materially advance" clause of § 1292(b). As such, Kraft's questions of law are particularly ripe for review at this stage.

**V.    The Questions Presented Are of Great Importance.**

While not formally a factor under § 1292(b), this Court's Opinion may have significant implications given that this Circuit is home to the largest commodity trading market in the country. From the outset of this case, the CFTC and Plaintiffs' aggressive interpretation of § 6(c)(1) and Rule 180.1 has drawn critical attention from the legal and trading communities. *See, e.g.*, Michael Spafford & J. Bub Windle, *CFTC Action Against Kraft May Be an Important Early Test of New Anti-Fraud Authority, Part 2*, December 10, 2015 (available at http://www.paulhastings.com/publications-items/details/?id=98c9e769-2334-6428-811c-ff00004cbded). Among the concerns raised by the community is that Plaintiffs' position leaves market participants unable to "tailor [their] behavior . . . [to] an amorphous regulatory regime, particularly in markets, such as commodities markets, that are based on asymmetrical information and where . . . participants have no duty to disclose material non-public information before trading." *Id.*

Furthermore, the Court's presumption that a legitimate economic motive must relate to—and communicate to the market—an immediate need for wheat overlooks (and will materially constrain) the fundamental purpose of hedging, as well as the fact that most market participants are speculators with no actual demand for wheat. CFTC rules (and Kraft's hedge exemption) authorize wheat users like Kraft to take futures positions equal to twelve months' supply, including purchases *anticipated* over that period, and Plaintiffs admit that wheat users rarely intend to take delivery and use wheat from the futures market. By holding that Plaintiffs adequately alleged that Kraft's futures position did not reflect a "legitimate demand" because Kraft purportedly did not intend to take delivery on its position or immediately acquire cash

wheat in an equivalent amount, the Court's decision, without guiding precedent, effectively rewrites CFTC regulations and constrains commercial users' ability to hedge *future* demand, which is the fundamental purpose of the futures market. Immediate review will forestall that result.

Finally, the Court's extension of the monopolization theory in *Dairy Farmers* threatens to curtail legitimate trading by turning every large trader into a putative monopolist. In holding that Kraft need not control the deliverable supply to obtain monopoly power, the Court held that Plaintiffs could allege monopoly power solely on the basis of Kraft's "dominant" long position of 3,150 contracts. Yet Plaintiffs also allege that Kraft's position was below the 5,000 limit that applied to every market participant at the time Kraft acquired its position. (Compl. ¶ 42.) In other words, under the Court's analysis, any trader that takes a position equal to 63% of the CFTC's position limit is at risk of controlling prices and excluding competitors—meaning that antitrust claims for the first time may be viable in many futures markets even though, as here, there has been no corner or squeeze of the market. That theory, in addition to being at odds with economic principles and arguably contrary to Seventh Circuit law, will curtail trading by many market participants who fear being subject to expensive and burdensome antitrust litigation every time they take a significant, and lawful, position.

## VI. Effect of the *CFTC* Court's Ruling on Kraft's Pending Motion for Interlocutory Appeal

As stated above, on January 19, 2016, Kraft filed a motion to certify issues for interlocutory appeal in the parallel enforcement action to this case. *CFTC*, 15 C 2881, Dkt. No. 90. That motion, which is fully briefed and pending before Judge Blakey, proposes to certify for appeal questions that are identical to Kraft's first two questions in this case (the "Manipulation Questions").

If the *CFTC* court grants Kraft's motion, this Court should certify the Manipulation Questions and stay discovery because it is then likely that the Seventh Circuit will clarify these key legal issues. The Manipulation Questions are identical. By immediately certifying the Manipulation Questions in this case, the Court will allow the Seventh Circuit to consider whether to accept Kraft's appeal in both cases and, if it does, consolidate the cases for ruling.

This Court also should certify Kraft's third question because Plaintiffs' monopolization claim is wholly dependent on the alleged manipulation under the CEA. Plaintiffs' manipulation claims depend on their allegation that Kraft manipulated the futures market by paying an artificially high price for wheat futures. That is the essence of their monopolization claim as well. (*See* Compl. ¶¶ 166-67, 170 (purporting to state a Section 2 claim based on Kraft's allegedly "commercially-unreasonable" futures purchases, which allegedly subjected Plaintiffs to "artificially determined prices")). There would be no logical reason to seek clarification on Plaintiffs' novel manipulation claim without seeking similar clarification on their unprecedented monopolization claim.

If the *CFTC* court denies Kraft's motion, this Court still should grant Kraft's petition. This case involves decisions of first impression with respect to manipulation and monopolization in the commodities markets. The Seventh Circuit's consideration of these issues, even if only in the context of this case, will govern and guide both cases going forward.

## CONCLUSION

For the foregoing reasons, Kraft requests that the Court certify its June 27, 2016 Memorandum Opinion and Order for immediate appeal pursuant to 28 U.S.C. § 1292(b). *see also* Fed. R. App. Proc. 5(a)(3) (the District Court may amend an order to certify it for appeal).

Dated: July 15, 2016

Respectfully Submitted,

KRAFT FOODS GROUP, INC.
MONDELĒZ GLOBAL LLC

By: _/s/ Dean Panos_
One of their Attorneys

Dean N. Panos
J. Kevin McCall
Nicole A. Allen
Thomas E. Quinn
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

*Attorneys for Defendant Kraft Foods Group, Inc. & Mondelēz Global LLC*

## CERTIFICATE OF SERVICE

I, Thomas E. Quinn, an attorney, certify that on July 15, 2016, I served the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO CERTIFY FOR APPEAL THE COURT'S MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT** on counsel of record listed below via the Court's ECF system:

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle St., Suite 2910
Chicago, Illinois 60603
mmiller@millerlawllc.com
*Counsel for Plaintiff Harry Ploss*

Christopher Lovell
Gary S. Jacobson
Christopher M. McGrath
Benjamin M. Jaccarino
Ian T. Stoll
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
clovell@lshllp.com
*Counsel for Plaintiff Harry Ploss*

Vincent Briganti
Geoffrey M. Horn
Peter D. St. Phillip, Jr.
Christian Levis
Michelle E. Conston
Raymond Girnys
LOWEY DANNENBERG COHEN &
HART, P.C
One North Broadway
White Plains, New York 10601
vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com
*Counsel for Plaintiff Richard Dennis*

Zachary J. Ziliak
Michael S. Davis
ZILIAK LAW, LLC
141 W. Jackson Blvd., Suite 4048
Chicago, Illinois 60604
zachary@ziliak.com
mdavis @ziliak.com
*Counsel for Plaintiff Budicak Inc.*

Linda P. Nussbaum
Bradley J. Demuth
Susan Schwaiger
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
lnussbaum@nussbaumpc.com
bdemuth@nussbaumpc.com
sschwaiger@nussbaumpc.com
*Counsel for Plaintiff Henrik Christensen*

| | |
|---|---|
| Jennifer W. Sprengel<br>Anthony F. Fata<br>CAFFERTY CLOBES MERIWETHER<br>& SPRENGEL LLP<br>150 S. Wacker Drive, Suite 3000<br>Chicago, Illinois 60606<br>jsprengel@caffertyclobes.com<br>afata@caffertyclobes.com<br>*Counsel for Plaintiff Budicak Inc.* | Steven A. Kanner<br>Robert J. Wozniak<br>Donald L. Sawyer<br>Douglas A. Millen<br>FREED KANNER LONDON &MILLEN LLC<br>2201 Waukegan Road, Suite 130<br>Bannockburn, IL 60015<br>skanner@fklmlaw.com<br>rwozniak@fklmlaw.com<br>dsawyer@fklmlaw.com<br>*Counsel for Plaintiff White Oak Fund*<br> *and*<br>*Counsel for Plaintiffs Robert Wallace, Nathan Wallace, Kevin Brown and Joseph Caprino* |
| W. Joseph Bruckner<br>Heidi M. Silton<br>Kate M. Baxter-Kauf<br>LOCKRIDGE GRINDAL NAUEN P.L.L.P.<br>100 Washington Avenue South<br>Suite 2200<br>Minneapolis, MN 55401<br>wjbruckner@locklaw.com<br>hmsilton@locklaw.com<br>kmbaxter-kauf@locklaw.com<br>*Counsel for Plaintiffs Robert Wallace, Nathan Wallace, Kevin Brown and Joseph Caprino* | David Lesht<br>THE LAW OFFICES OF<br>EUGENE M. CUMMINGS, P.C.<br>55 West Monroe Street, Suite 3500<br>Chicago, IL 60603<br>dlesht@emcpc.com<br>*Counsel for Plaintiff Henrik Christensen* |

                                                  */s/ Thomas E. Quinn*
                                                    Thomas E. Quinn