# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| HARRY PLOSS, as Trustee for the | ) | |
| HARRY PLOSS TRUST DTD 8/16/1993, on | ) | |
| behalf of himself and a proposed class, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 15 C 2937 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| KRAFT FOODS GROUP, INC. and | ) | |
| MONDELĒZ GLOBAL LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Harry Ploss and other plaintiffs brought this proposed class-action lawsuit against Kraft Food Group, Inc. and Mondelēz Global LLC, alleging violations of the Commodity Exchange Act (CEA); the Sherman Antitrust Act; and unjust enrichment.[1] (For simplicity, the Opinion will refer to the Plaintiffs collectively as Ploss and to the Defendants collectively as Kraft.) In the Consolidated Class Action Complaint ("Complaint" for short), Ploss alleged that Kraft manipulated the wheat-futures market using two schemes: the long wheat futures scheme, and the wash trading scheme. R. 71, Compl.[2] After a prior motion to dismiss, all that remains are

---

[1]The Court has subject matter jurisdiction over the federal law claims under 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over the state law unjust enrichment claim under 28 U.S.C. § 1367(a) because it forms the same case or controversy as the federal claims.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. The Court cites to some sealed filings, but the information disclosed in this Opinion cannot possibly be justifiably sealed under the requirements of well-established Circuit law. *Baxter Int'l v. Abbott Laboratories*, 297 F.3d 544, 546-47 (7th Cir.

the claims on the long wheat futures scheme. *See* R. 113, Opinion (granting Kraft's motion to dismiss (R. 76) as to Count Four (Section 9(a)(2) EFP wash trading manipulation) and Count Five (Section 6(c)(1) EFP wash trading manipulation)); *Ploss v. Kraft Foods Group, Inc.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016).

Ploss now wishes to certify the class on the remaining claims. *See* R. 237, Mot. Class Cert. In support of the motion for class certification, Ploss submitted expert reports authored by Dr. Craig Pirrong. R. 240, Pirrong Rep.; R. 315, Pirrong Rebuttal Rep. In response, Kraft moves to exclude Pirrong's opening report, R. 276, Defs.' Mot. Exclude, and to strike his rebuttal report, R. 319, Defs.' Mot. Strike. For the reasons below, the Court grants Ploss's motion for class certification and denies Kraft's motions.

## I. Background

This Opinion assumes familiarity with the facts set out in greater detail in the opinion that addressed the motion to dismiss. *Ploss*, 197 F. Supp. 3d 1037. As a quick refresher, Ploss alleges that Kraft manipulated the wheat-futures market by buying and maintaining an enormous position on wheat futures for the purpose of influencing prices, rather than out of any legitimate need for that quantity of wheat. Compl. ¶ 122-138. Specifically, Kraft bought $90 million worth of December 2011 wheat futures contracts, and then refused to liquidate its long position and stopped buying wheat in the cash market. *Id*. ¶¶ 86, 91, 92. These acts, according to Ploss, falsely signaled to the market that Kraft was satisfying its need for wheat from the

---

2002); *Union Oil v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000). Either way, documents filed under seal will noted as "(SEALED)" in the citation.

futures market rather than the cash market, and caused the wheat prices in the cash market to drop and the price of wheat futures to increase. *Id*. ¶¶ 55-56, 82. As a result of the artificial prices allegedly caused by the scheme, all of the Plaintiffs that transacted in December 2011 and March 2012 wheat futures lost money—that is, the Plaintiffs allege that they either bought at a higher price or sold at a lower price than they would have absent Kraft's allegedly manipulative actions.

Ploss now seeks to certify the following two classes under Federal Rule of Civil Procedure 23(b)(3), comprised of all persons who either:

> a. purchased a CBT December 2011 or a CBT March 2012 futures contract after October 31, 2011 except that purchases of CBT March 2012 futures contracts made after December 14, 2011 qualify for inclusion in the Class only to the extent they were made in liquidation of a short position in the CBT March 2012 contract (whether an outright short position or as part of a spread position) which was sold between November 1 and December 14, 2011 inclusive; or

> b. sold put options or purchased call options on the CBT December 2011 contract or on the CBT March 2012 contract after October 31, 2011 except that sales of put options or purchases of call options on the CBT March 2012 contracts made after December 14, 2011 qualify for inclusion in the Class only to the extent they were made in liquidation of a position in the CBT March 2012 contract (whether an outright position or as part of a spread position) which was initiated between November 1 and December 14, 2011 inclusive.

Mot. Class Cert. at 1. In support of the motion, Ploss first submitted an opening expert report authored by Dr. Craig Pirrong. *See* Pirrong Rep. In the opening report, Pirrong opined, among other things, that Kraft caused artificially high prices in the December 2011 and March 2012 wheat futures markets, thus causing the Plaintiffs' damages. *See generally id*. Kraft, unsurprisingly, opposes the class-certification motion. R. 267, Defs.' Resp. Br. (SEALED). To rebut Pirrong's report, Kraft submitted

the expert report of Dr. James Overdahl, who attempted to poke holes in Pirrong's causation opinions. R. 264-3, Overdahl Rep. (SEALED). Ploss then submitted a rebuttal report written by Pirrong, which responded to Overdahl's criticisms. *See* Pirrong Rebuttal Rep. Kraft moves to exclude Pirrong's causation opinions and to strike parts of the rebuttal report.

## II. Legal Standard

To justify class certification, a plaintiff must satisfy each requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as at least one of the subsections of Rule 23(b). S*ee Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Here, Ploss is seeking class certification under Rule 23(b)(3). So in addition to the requirements of Rule 23(a), he must also show predominance and superiority. *See* Fed. R. Civ. P. 23(b)(3). Separate and apart from the requirements in Rule 23(a) and (b)(3), "a class must be sufficiently definite that its members are ascertainable." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012); *Oshana*, 472 F.3d at 513 ("The plaintiff must also show ... that the class is indeed identifiable as a class.").

Failure to meet any of those requirements precludes class certification. *Harper*, 581 F.3d at 513 (cleaned up).[3] The Court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see also Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010) ("[A] court may take a peek at the merits before certifying a class," but that peek is "limited to those aspects of the merits that affect the decisions essential under Rule 23."). At the same time, however, the ultimate inquiry at the class-certification stage are the requirements of Rule 23. *See Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015). So class-certification proceedings cannot be allowed to turn into a preemptive determination of the merits if the answers to merits questions are not needed to decide the certification motion. *Id.*

### III. Analysis

### A. Rule 23 Requirements

Kraft challenges Ploss's showing on (1) typicality; (2) the adequacy of class representatives; (3) predominance; and (4) ascertainability.[4] The Court addresses each in turn.

### 1. Typicality and Adequacy

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that

---

[4]Kraft failed to oppose and effectively concedes Ploss's showings on numerosity, Fed. R. Civ. P. 23(a)(1); commonality, Fed. R. Civ. P. 23(a)(2); adequacy of counsel, Fed. R. Civ. P. 23(a)(4); and superiority, Fed. R. Civ. P. 23(b)(3). *See generally* Defs.' Resp. Br. (SEALED); *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument ... results in waiver.").

gives rise to the claims of other class members and is based on the same legal theory." *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 866 (7th Cir. 2018) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)) (cleaned up). The typicality requirement "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at-large." *Id.* (cleaned up).

Relatedly, Rule 23(a)(4) requires that the named plaintiffs "fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). "To be an adequate representative, the named plaintiff must be part of the class and possess the same interest and suffer the same injury as the class members." *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)) (cleaned up). A class representative is not adequate if, for example, the proposed representative is subject to a defense to which other class members are not, or if the representative cannot prove the elements of the class's claim for reasons unique to the representative. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724-25 (7th Cir. 2011).

Here, the named Plaintiffs'[5] claims are all typical of those of the class. All class members, including the named Plaintiffs, bought December 2011 and March 2012 wheat futures and allegedly lost money because of the artificial prices caused by the scheme. There simply is nothing that distinguishes the claims of the proposed representatives from those of the rest of the class. The proposed representatives' claims target the same conduct, and seek relief under the Commodity Exchange Act

---

[5]The named plaintiffs are Harry Ploss, Robert Wallace, Nathan Wallace, Kevin Brown, Joseph Caprino, Richard Dennis, White Oak Fund, LP, and Budicak, Inc.

and the Sherman Act based on the same legal theories and on the same facts. The named Plaintiffs are adequate class representatives for largely the same reason: the claims of the named Plaintiffs are identical, both legally and factually, to those of the proposed class members. There are no individual defenses or unique obstacles to proving the claims that would in any way impede the named Plaintiffs' ability to adequately represent the interest of the class members. *See Conrad*, 6869 F.3d at 539.

Kraft contends, though, that Ploss failed to establish both typicality and adequacy because the named Plaintiffs are supposedly subject to one of Kraft's defenses: that Kraft's conduct did not signal that it would physically load out the wheat pursuant to the futures contracts. Defs.' Resp. Br. at 26-28 (SEALED). Before getting into what this defense really means, it is worth going back to the allegations in the Complaint and Kraft's defenses. The Complaint alleges that, as part of the long wheat futures scheme, Kraft bought $90 million worth of December 2011 wheat futures contracts, even though it did not make financial sense to do so. Compl. ¶¶ 55-56, 82. This purchase signaled to market participants that Kraft would supposedly satisfy its need for wheat from the futures market, and not from the local cash market. *Id*. ¶ 55. This in turn artificially caused prices in the cash market to fall and the December 2011 futures prices to rise, both of which put Kraft ahead by millions of dollars. *Id*. ¶¶ 82-83, 87, 89. That was just as predicted by Kraft's Senior Director of Global Procurement in internal emails written in October and December 2011. *Id*. ¶¶ 83, 89.

To defend against these allegations, Kraft argues that its conduct did *not* signal that Kraft would physically load out under the futures contracts. Defs.' Resp. Br. at 26 (SEALED). In other words, Kraft broadly contends that it did not send any false signals, defraud anyone, or cause any market participants to make trades based on artificially high prices for December or March futures. *Id.*[6] With this defense laid out, Kraft argues that the named Plaintiffs are subject to a unique defense because they supposedly made admissions in line with the defense. *Id.* Kraft points out, for example, that Ploss conceded that, back in December 2011, he did not get a signal about what Kraft was going to do in the wheat market, and that before this litigation, Ploss did not know when Kraft bought its December long position. *Id.* at 28; *see also* R. 264-21, Ploss Dep. Tr. at 119:14-120:13 (SEALED). Ploss also testified that he did not know when Kraft sold its March position, nor did he know that Kraft was "stopping wheat" (which means, in futures jargon, standing for delivery of the wheat) in the December delivery period. Ploss Dep. Tr. at 124:21-125:10, 252:20-254:14 (SEALED). Likewise, the representative for White Oak Fund, one of the named Plaintiffs, testified that, in December 2011, no one at White Oak had any specific understanding about Kraft's futures position or whether any shipping certificates would be delivered. Defs.' Resp. Br. at 27 (SEALED); *see also* R. 264-22, Exh. 22, Sullivan Tr. 72:21-77:22 (SEALED).

---

[6]It is worth noting that this defense applies only to Ploss's claim for *misleading* conduct in violation of Section 6(c)(1) of the Commodity Exchange Act. It does not apply to Ploss's the intentional-manipulation claim under Section 9(a)(2) of that Act, nor to the Sherman Act claims. *See Ploss*, 197 F. Supp. 3d at 1055 ("[T]he Court holds that an explicit misrepresentation is not required for a Section 6(c)(1) manipulation claim, which may be based on market activity that sends a false pricing signal to the market."); *id.* at 1059 n.11.

At first glance, this testimony suggests that Kraft is right—the named Plaintiffs did not rely on any misrepresentations made by Kraft. The problem for Kraft, however, is that Ploss's theory of liability is based on how Kraft's conduct affected the market as a *whole*, rather than on any overt misrepresentations to *particular* market participants. *See Ploss*, 197 F. Supp. at 1055. That theory of liability is often referred to as a "fraud on the market" theory, and is often invoked in securities-fraud cases. It posits that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988). Under that theory, "misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id*. Likewise, in a commodities-manipulation case, the fraud on the market theory assumes that buyers and sellers rely on public misstatements whenever the investor buys or sells futures contracts at the price set by the market because the market transmits information to the participants in the form of the market price. *Id*. Here, by definition, if Kraft manipulated the prices in the wheat futures market, then *all* of the class members bought and sold contracts at manipulated prices. In other words, the class members relied on "misrepresentations" that were baked into the market price at the time of their transactions, rather than explicit misrepresentations directed at them specifically. *See Ploss*, 197 F. Supp. 3d at 1055. So it is unimportant, under Ploss's theory of liability, whether any of the named Plaintiffs had direct and specific knowledge of Kraft's conduct or its futures positions. What Kraft labels as

admissions by the named Plaintiffs is neither specific to those Plaintiffs nor anyway much of a defense.[7] The named Plaintiffs have met the typicality and adequacy requirements.

## 2. Predominance

Moving on to predominance, Rule 23(b)(3) requires, in relevant part, "that the questions of law or fact common to the class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In other words, common questions must be "more prevalent or important than" individual ones. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). But individual questions need not be totally absent for this requirement to be met: "[T]he action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*

"Predominance is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012), cert. denied, 137 S. Ct. 1582 (2017)) (cleaned up). That means a plaintiff can meet the predominance requirement by showing that common evidence will be used to prove the class members' claims. *Id.* A plaintiff is not required, however, "to prove

---

[7]Kraft also suggests that Plaintiffs Budicak and Dennis are somehow inadequate because they received wheat warehouse receipts at some point during their trading careers. Defs.' Resp. Br. at 26-27 (SEALED). But Kraft offers no explanation or legal support for this contention.

materiality at the class-certification stage. In other words, they need not, at that threshold, prove that the predominating question will be answered in their favor." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

The predominance analysis begins with the elements of the underlying cause of action. *Messner*, 669 F.3d at 815 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011)). As a reminder, Ploss brings three claims arising from the alleged scheme: (1) manipulation under Sections 6(c)(1) and 9(a)(2) of the Commodity Exchange Act; (2) monopolization under Section 2 of the Sherman Antitrust Act; and (3) common law unjust enrichment.[8] Section 6(c)(1) of the Commodity Exchange Act makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of "Commission regulations." 7 U.S.C. § 9(1). As pertinent here, to establish a Section 6(c)(1) claim, a plaintiff must show that the defendant intentionally or recklessly used or employed (or attempted to use or employ) any manipulative device, scheme, or artifice to defraud; or intentionally or recklessly engaged (or attempted to engage) in any act fraudulent or deceitful practice or course of business. 17 C.F.R. § 180.1(a)(1), (3).

The next Commodity Exchange Act provision relied on by Ploss is Section 9(a)(2). That section makes it a felony to "manipulate or attempt to manipulate the

---

[8]The parties do not extensively address whether Ploss has met class-certification requirements for the unjust enrichment claim, perhaps thinking that the arguments overlap.

price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap … ." 7 U.S.C. § 13(a)(2). A Section 9(a)(2) claim has four elements: "(1) the defendant[] possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764-65 (7th Cir. 2015).[9] Lastly, Section 2 of the Sherman Act makes it unlawful for anyone to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce … ." 15 U.S.C. § 2. This section of the Sherman Act prohibits "the employment of unjustifiable means to gain that power" and requires "two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power … ." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

The parties agree that, based on the elements of those claims, there are two common questions in this case: (1) whether Kraft engaged in the alleged long wheat futures scheme; and (2) whether that scheme inflated futures prices in the marketplace. Courts have found that common questions do predominate over individual questions in cases alleging price manipulation under the Commodity Exchange Act and § 2 the Sherman Act. *See Kohen v. Pacific Inv. Mgt. Co. LLC*, 244 F.R.D. 469, 482 (N.D. Ill. 2007) ("Other courts considering class certification for price

---

[9]The parties dispute whether loss causation is an element of a Section 9(a)(2) CEA claim. As discussed in further detail below, the Court need not decide that issue at this juncture. *See infra* n.12.

manipulation claims under the CEA have also found common questions to predominate.") (citing cases), *aff'd*, 571 F.3d 672 (7th Cir. 2009); *Messner*, 669 F.3d at 814 ("In antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification.") (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (cleaned up). As explained next, so, too, do the common questions predominate here.

Ploss argues that he can demonstrate that Kraft engaged in the scheme based on common evidence, starting with emails between Kraft executives. *See* R. 235, Class Cert. Br. at 2-6 (SEALED). For example, in December 2011, Kraft's Senior Director of Global Procurement wrote an email explaining Kraft's spread strategy:

> Since Monday we have "stopped" 2.2MM bushels of wheat at a cost of $13.2MM. As expected, the Dec/Mar spread has narrowed to app[roximately] 11 cents resulting in a marked to market gain of $3.6MM on our open [CBT December 2011-CBT March 2011] spread position. Meanwhile, with the narrowing spread, the cash wheat basis has declined from +80 cents to +50 cents over Dec[ember] futures…. If all goes according to plan, we will still save $7MM on the commercial cost of wheat vs where it was a few weeks ago as well as make $2-3MM on reversing out of the Dec[ember]/Mar[ch] wheat spread.

Class Cert. Br. at 6 (SEALED) (citing R. 298-3, 12/6/2011 Email (PLOSS-DEF-00001756) (SEALED)). In addition to the emails, the class will rely on the futures positions taken by Kraft in order to prove the scheme, and no class member will need to rely on contracts or records that are specific to the member. In light of the fraud on the market theory of liability, it is not surprising that the class will be able to rely on common evidence in its endeavor to prove that Kraft engaged in the scheme. Indeed, Kraft does not really contest that the class's proof as to the existence of the scheme will be the same across the class. *See generally* Defs.' Resp. Br. (SEALED).

The tougher common-question issue is whether the class can rely on common evidence to prove that the scheme artificially inflated futures prices in the marketplace and, if it did inflate prices, by how much. To prove the effect on prices, Ploss relies on Pirrong's event-study methodology.[10] Class Cert. Br. at 6-7; 10-13 (SEALED); *see also* Pirrong Rep. ¶ 4. Pirrong performed event studies to determine whether, and the extent to which, the scheme inflated the December or March wheat futures during the class period. *See id.* 6-7; *see also* Pirrong Rep. ¶¶ 6-7; 29; 225-233. An event study is a regression analysis that seeks to show that the market price of a stock (or here a commodity) tends to respond to pertinent publicly reported events, in an attempt to isolate the effect of a certain event on the price. *See Halliburton*, 573 U.S. at 280. Kraft does not contest that an event study can be used to prove that the scheme inflated prices. Indeed, event studies are routinely relied on to prove causation. *See Schleicher*, 618 F.3d at 684 (finding that an event study effectively "verified that the price … changed rapidly, and in the expected direction, in response to new information"); *see also In re Groupon, Inc. Sec. Litigation*, 2015 WL 1043321, at *8-9 (N.D. Ill. Mar. 5, 2015) (event study offered by plaintiffs' expert established "with a very high degree of statistical confidence that a cause-and-effect relationship existed between surprise corporate announcements and an immediate response in [company's] stock price"), *objections overruled*, 2015 WL 13628131 (N.D. Ill. May 12,

<hr>

[10]Kraft challenges the reliability of Pirrong's event study under Rule 702 and *Daubert*. *See* Defs.' Mot. Exclude. But as explained in detail below, Ploss need not actually "prove that the predominating question will be answered *in their favor*." *Amgen*, 568 U.S. at 466 (emphasis added). If it turns out that Pirrong's event study is in fact unreliable, then that would end the case in one fell swoop, so the common issues do predominate: a failure of proof on causation would end the litigation across the entire class. *See id.*

2015). Instead, Kraft argues that Ploss failed to satisfy the predominance requirement because individual questions predominate. Kraft offers five separate arguments in contending that individual questions overwhelm common ones.

First, Kraft argues that the differences in *when* class members traded wheat futures precludes predominance. Defs.' Resp. Br. at 23-24 (SEALED). But Kraft offers no legal or factual support for this argument. *Id*. Questions about when a given investor purchased or sold futures can be resolved mechanically in these types of cases. *See Schleicher*, 618 F.3d at 68 ("There will be some person-specific issues, such as when (and how many shares) a given investor purchased or sold … But these questions can be resolved mechanically. A computer can sort them out using a database of time and quantity information."). What's more, predominance does not require the total absence of individual questions, *Tyson Foods, Inc.*, 136 S. Ct. at 1045, especially questions about timing that Pirrong's proposed method either can readily handle for each class member—or cannot reliably answer for *any* class member. Either way, the answer will be provided with common evidence.

Second, Kraft argues that individual issues predominate because Ploss did not identify a particular "signal" that the market as a whole received and interpreted in a uniform way. Defs.' Resp. Br. at 24-25 (SEALED). On that premise, Kraft contends that the parties would have to investigate, for each day of the class period, two things: (1) what information was known to the market on that date; and (2) whether traders in the market reacted to that information in a way that caused artificial prices. *Id*. at 25 (citing R. 264-2, Pirrong Dep. Tr. at 128:7-130:4, 247:5-23, 251:18-254:3

(SEALED)). To support this argument, Kraft relies on *Premium Plus Partners v. Davis*, 2008 WL 3978340, at *6 (N.D. Ill. Aug. 22, 2008). There, each proposed class member's trading strategy had to be considered in evaluating whether the defendants' alleged misconduct caused financial loss to the class members. 2008 WL 3978340, at *4. So the different trading strategies among class members precluded predominance. *Id*. at *6. But Kraft does not explain why, given the fraud on the market theory of liability, that sort of variation is important in this case.

Indeed, in this case, Pirrong testified that his event study does not look at one particular event or "signal"; instead, he analyzes the impact of the flow of information throughout the liquidation period. *See* Pirrong Dep. Tr. at 251:18-254:3 (SEALED). Pirrong explained that analyzing the effect of just one event tends to underestimate the full impact of the flow of information because some of the flow of information occurs before the actual event being analyzed. *Id*. at 251:3-254:3. Based on Pirrong's explanation, it makes little sense to try to pinpoint one particular signal, as Kraft suggests the Court will eventually have to do. Again, if Pirrong's methodology is flawed on the merits, then it will be flawed across the entire class and still based on common evidence.

Third, Kraft argues that its statute of limitations defense will require individualized, claim-by-claim analysis, and thus those individual issues predominate. Defs.' Resp. Br. at 25-26 (SEALED). A private cause of action under the Commodity Exchange Act has a two-year statute of limitations period. 7 U.S.C. § 25(c) ("Any such action shall be brought not later than two years after the date the

cause of action arises."). The limitations period begins to run when the plaintiff has actual or constructive knowledge—that is, "when [she] knew or in the exercise of reasonable diligence should have known of defendant's alleged misconduct." *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991) (cleaned up); *see also Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845 (N.D. Ill. 2009) (same).

As a preliminary matter, although the Seventh Circuit has not expressly opined on the issue, the First Circuit has held that individualized statute of limitations determinations do no automatically preclude class certification. *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("As long as a sufficient constellation of issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)."). Several courts in this District have likewise rejected a blanket prohibition against class certification based on statute of limitations differences. *See In re Evanston Nw. Healthcare Corp. Antitrust Litig.*, 268 F.R.D. 56, 67 (N.D. Ill. 2010) (citing cases), *vacated on other grounds sub nom. Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012).

In support of its statute of limitations argument, Kraft relies on *Crissen v. Gupta*, 2014 WL 4129586, at *18 (S.D. Ind. Aug. 19, 2014). Defs.' Resp. Br. at 25 (SEALED). But Kraft again fails to engage with the facts of that case in any meaningful way. Indeed, in *Crissen*, it appears that the defendants submitted undisputed evidence showing that the court would have to examine the statute of

limitations defense as it pertained to each class member's particular circumstances. 2014 WL 4129586, at *18. That is not the case here. Kraft's evidence does not undisputedly show that the statute of limitation requires an individualized inquiry. Generally speaking, the fraud on the market theory will frame the limitations defense, which means that the limitations defense will succeed or fail based on class-wide proof. Against this, Kraft can provide only three examples of class members—grain elevators CGB, Bunge, and Cargill—who supposedly "certainly knew" during the delivery period that Kraft did not load out any futures wheat because they were the elevators who tendered uneconomic shipping certificates to Kraft and then bought the certificates back. Defs.' Resp. Br. at 26 (SEALED) (citing R. 264-46, Ex. 46, 12-2001 Delivery Wheat.xlsx (SEALED)). That might be evidence as to three class members on the limitations defense, but Kraft does not explain how this evidence is indisputable proof that those three members knew or should have known that they had manipulation claims at that time. Ultimately, the common-proof litigation over the limitations defense (not to mention the common-proof liability question) will predominate over individual questions on the defense.

Fourth, Kraft argues that individual damages issues will predominate over common questions. Defs.' Resp. Br. at 28-32 (SEALED). To establish damages, Ploss relies on Dr. Charles Robinson, who in turn relied on Pirrong's event study as the basis of damages calculations. *See* Class Cert. Br. at 11 (SEALED); *see also* R. 241, Robinson Rep.¶¶ 21-25. Invoking the Supreme Court's decision in *Comcast*, Kraft argues that Pirrong's event study cannot identify how much artificiality should be

attributed to a particular type of signal, which creates the risk that the damages model will "identify damages that are not the results of the wrong." Defs.' Resp. Br. at 30 (SEALED) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013)). In *Comcast*, the Supreme Court held that a plaintiff seeking class certification must establish that damages can be reliably measured in a manner that is consistent with the plaintiff's theory of liability. *See Comcast*, 569 U.S. at 35; *see also Mullins v. Direct Digital*, LLC, 795 F.3d 654, 671 (7th Cir. 2015) ("[T]he method of determining damages must match the plaintiff's theory of liability and be sufficiently reliable."). In other words, "a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide injury that the suit alleges." *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 799 (7th Cir. 2013). The plaintiffs in *Comcast* filed an antitrust suit and specified four different theories of liability. 569 U.S. at 29-31. The district judge certified a class limited to only *one* of the four theories. *Id*. The plaintiffs' damages expert, however, estimated the extent of the damages premised on the assumption that *all* four liability theories had been established. *Id*. at 36-37. This damages model had serious flaws and could not be used to show predominance, the Supreme Court concluded, because it identified damages that were *not* the result of the wrong and presented "nearly endless" permutations based on four theories of liability. *Id*. at 36-38. Unlike the plaintiff in *Comcast*, however, Ploss asserts only *one* theory of liability that cuts across the entire class, and it is the theory of liability on which Pirrong based the event studies. So proof of the damages caused by the scheme will either fail or succeed on a class-wide basis.

Like much of its opposition to the class-certification motion, Kraft is really making a merits argument against the damages model.

Lastly, Kraft argues that class certification should be denied because the named Plaintiffs have failed to show that they have "antitrust standing." Defs.' Resp. Br. at 46-47 (SEALED). Antitrust standing, often referred to as antitrust impact, concerns the issue of "which plaintiffs may bring the cause of action." *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056 (7th Cir. 2019); *see also Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994) ("[A]ntitrust standing' is not a jurisdictional requirement ...."). It requires that a plaintiff's claimed injuries be "of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Tri-Gen Inc. v. Int'l Union of Oper. Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). But at the class-certification stage, a plaintiff is not required to actually *prove* this element.[11] Instead, a plaintiff need only "demonstrate that the element of antitrust impact is *capable of proof* at trial through evidence that is common to the class rather than individual to its members." *Messner*, 669 F.3d at 818 (7th Cir. 2012) (emphasis added). For the reasons already discussed earlier in this Opinion, Ploss has satisfied this requirement: he proposes to use common evidence—Pirrong's event study—to prove that Kraft's alleged scheme

---

[11]To support denial of class certification at this stage, Kraft cites *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009), but that case involved Article III standing, not "antitrust standing."

injured the members of the class. All in all, none of Kraft's arguments on lack of predominance are persuasive.

### 3. Ascertainability

In addition to Rule 23's requirements, a class must also be ascertainable, meaning that the class must be "defined clearly and based on objective criteria." *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015). A clear definition is one that "identif[ies] a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id*. at 660. Kraft argues that Ploss's proposed class is not ascertainable for three reasons. None of the reasons are right.

First, Kraft argues that Ploss's proposed class definition is not ascertainable because it includes intraday and hedging traders. Defs.' Resp Br. at 47-50 (SEALED). According to Kraft, Ploss's damages model cannot calculate damages for intraday traders (because the model uses per-day differences between actual and hypothetical prices). *See* Defs.' Resp Br. at 48 (SEALED) (citing Pirrong Dep. Tr. at 335:17-336:6 (SEALED)). And as far as hedging traders go, Kraft argues that any loss that a hedging trader might have suffered on its futures position would be offset by a physical wheat transaction. *See id*. at 49. At best, though, Kraft's argument is again that some class members' claims will fail on the merits if and when damages are decided, "a fact generally irrelevant to the district court's decision on class certification." *See Messner*, 669 F.3d at 823; *see also Schleicher,* 618 F.3d at 687 ("The chance, even the certainty, that a class will lose on the merits does not prevent its certification."); *Payton v. County of Kane,* 308 F.3d 673, 677 (7th Cir. 2002) (observing

that "a determination on the propriety of class certification should not turn on [the] likelihood of success on the merits"). There is a difference between a class including members who could not have been harmed at all by the defendant's conduct, and those who ultimately were not harmed. The former, but not the latter, can preclude certification. *See Messner*, 669 F.3d at 824 ("[A] class is defined too broadly" if it "include[s] a great number of members who for some reason *could not* have been harmed by the defendant's allegedly unlawful conduct."); *see also Kohen*, 571 F.3d at 677 (explaining that "if the [class] definition is so broad that is sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad" and the class should not be certified). This distinction is critical for class certification purposes and can be illustrated by the case Kraft relies on in support of its argument, *Clark v. Bumbo Int'l Tr.*, 2017 WL 3704825 (N.D. Ill. Aug. 28, 2017).

In *Clark*, a consumer-fraud case, the plaintiff brought a class action alleging that a statement on the defendant's website was false and misleading. *Clark*, 2017 WL 3704825, at *1. The plaintiff's proposed class definition included all individuals who had visited the defendant's website during the class period and bought the defendant's product. *Id*. at *2. To oppose class certification, the defendants submitted undisputed evidence showing that a visitor to the website would not necessarily have seen the statement unless they navigated to the specific part of the website where the statement appeared. *Id*. at *3-4. The district court denied class certification, reasoning that the proposed class was overbroad because it included members who merely visited the website, as opposed to the specific web page that contained the

quote. *Id.* at *4. In other words, the class included a substantial number of members who could not have been misled by the statement because they never even saw it. The difference here is that Kraft has not presented any evidence showing that intraday or hedging trader *could not* have been harmed by Kraft's Scheme. Indeed, these traders could have been harmed—they purchased wheat futures at the allegedly inflated prices. And just because Ploss might not be able to later prove that hedging traders suffered a net loss or that Pirrong's model can calculate an intraday trader's injury does not mean that the class definition is overbroad. *See Messner*, 669 F.3d at 823-24.

Second, Kraft argues that the class should not be certified because it would be impossible to identify class members. For this argument, Kraft first contends that Ploss's relevant market definition conflicts with Pirrong's analysis. Long story short, Kraft argues that Ploss's proposed class should be limited to individuals who bought or sold deliverable wheat at the Mississippi River region during the delivery period. Defs.' Resp. Br. at 43 (SEALED). Based on *Kraft's* proposed class definition, it would be impossible to identify the class members because there is no repository of who actually bought or sold deliverable wheat at the Mississippi River region during the delivery period. *Id.* at 45 (SEALED).

As a preliminary matter, the relevant market definition is generally a merits question of fact that is reserved for the jury. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 725 (7th Cir. 2004) ("[T]he definition of a relevant market is a question of fact."); *see also Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir.

1986) ("Claims of monopolization under section 2 of the Sherman Act … require the trier of fact to delineate the relevant market.") (cleaned up). Either way, at this stage, Ploss is not required to demonstrate that "there is a reliable and administratively feasible way to identify all who fall within the class definition." *Mullins*, 795 F.3d at 657-58 (cleaned up). Ascertainability instead depends on "the adequacy of the class definition itself," not "whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Id.* at 658.

As a final argument, Kraft argues that the class period cannot start until November 29, 2011 and must end by December 9, 2011. Defs.' Resp. Br. at 16-21; 45-46 (SEALED). But Kraft does not explain how the start and end date of the class period relates to any Rule 23 requirement. Ironically, the case Kraft relies on, *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *20 (S.D.N.Y. Aug. 13, 2018), explicitly rejected the very argument Kraft now attempts to make: "the start date of the class period is unrelated to the Rule 23 requirements." 2018 WL 3913115, at *20. Kraft is free to present its class-period argument either on a motion for summary judgment or at trial. But at this stage, it is premature.

## B. Challenges to Pirrong's Reports

Kraft moves to exclude the causation opinions in Pirrong's report on the grounds that those opinions do not satisfy the standards for admissibility of expert opinion under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 (1993). Defs.' Mot. Exclude; R. 286, Defs.' Mot. Exclude Br. at 2. In particular, Kraft argues that Pirrong's causation opinions are unreliable because

he failed to isolate potential causes of price differences. *See* R. 283, Defs.' Mot. Exclude Br. at 15 (SEALED).

Rule 702 governs the admissibility of expert witness testimony. *See Daubert*, 509 U.S. at 588; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). To allow expert testimony, the district court must find that (1) the expert is proposing to testify to valid scientific, technical, or other specialized knowledge, and (2) her testimony will assist the trier of fact to understand or determine a fact in issue. *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420 (7th Cir. 2005).

Kraft also moves to strike what it argues is new and improper material in Pirrong's rebuttal report. Specifically, Kraft challenges six portions of Pirrong's rebuttal report on the following topics: (1) Kraft's signals to the market in September and October 2011; (2) the November 1, 2011 event study start date; (3) the larger trader correlation analysis; (4) the impact on prices during the delivery period; (5) the statistical significance of the March 2012 contract residuals; and (6) Pirrong's opinions on market power. *See generally* R. 321, Defs.' Mot. Strike Br. All six of these additional opinions were offered by Pirrong in support of the causation analysis.

Rule 26(a)(2) governs expert rebuttal reports. The Rule limits rebuttal reports to evidence that, not surprisingly, contradicts or rebuts the other side's expert. Fed. R. Civ. P. 26(a)(2)(D)(ii). "Testimony offered only as additional support to an argument made in a case in chief, if not offered to contradict, impeach or defuse the impact of the evidence offered by an adverse party, is improper on rebuttal." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) (cleaned up).

When an expert's report or testimony is "critical" to class certification, a district court must make a conclusive decision on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) (citing *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010)); *see also Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 354-55 (2011) (expressing doubts regarding district court's conclusion that "*Daubert* did not apply to expert testimony at the certification stage of class-action proceedings"). Expert testimony is critical if it is "important to an issue decisive for a class certification decision." *Messner*, 669 F.3d at 812.

Kraft argues that Pirrong's opinion is critical to Ploss's ability to satisfy the commonality[12] and predominance requirements for class certification because Pirrong's opinion is the only evidence that Ploss offers to support the causation theory. R. 283, Defs.' Mot. Exclude Br. at 1 (SEALED). But Kraft is again mixing the merits of Pirrong's opinions with what is required at the class-certification stage. Neither Pirrong's causation opinions in his initial report nor the "new" material in his rebuttal report are critical to establishing any of the Rule 23 requirements for class certification. That's because a plaintiff need not actually *prove* loss causation in order to obtain class certification. *See Halliburton*, 563 U.S. at 812-13; *see also Schleicher*, 618 F.3d at 686.[13] The Supreme Court in *Halliburton* explicitly rejected

---

[12]It bears noting that Kraft did not object to Ploss's commonality showing in its opposition to class certification. *See generally* Defs.' Resp. Br. (SEALED).

[13]The parties dispute whether loss causation is an element of a Section 9(a)(2) Commodity Exchange Act claim. Ploss argues that it does not apply to that type of claim,

foisting on plaintiffs a requirement to prove loss causation in order to obtain certification. *See Halliburton*, 563 U.S. at 812-13. So regardless of whether or not Plaintiffs can ultimately prove causation on the merits using Pirrong's model does not affect class certification. *See Scheicher*, 618 F.3d at 686. ("Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win."). At this stage, all that Ploss was required to do was show that the class's claims will rely on common evidence. And that Ploss has done, specifically by relying on Pirrong's event study. Ploss need not also prove (yet) that he will actually prevail on the causation question using the event study.

Against *Halliburton*, Kraft relies on *Fener v. Operating Engineers Construction Industry and Misc. Pension Fund*, 579 F. 3d 401 (5th Cir. 2009), a Fifth Circuit case—but that case predates *Halliburton*. Following an earlier Fifth Circuit decision, *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), the court in *Fener* held that securities-fraud plaintiffs had to prove loss causation in order to obtain class certification. 579 F.3d at 411. But the Supreme Court in *Halliburton* explicitly abrogated the holding in *Oscar Private Equity*. 563 U.S. at 813. Likewise, the Seventh Circuit declined to follow the holding in *Oscar Private Equity* a year earlier in *Schleicher*:

> "*Oscar Private Equity* represents a go-it-alone strategy by the Fifth Circuit. It is not compatible with this circuit's decisional law, and we disapprove its

---

Class Cert. Br. at 1 (SEALED), meanwhile Kraft argues it does, Defs.' Resp. Br. at 38 (SEALED). But regardless of who ends up being right on this issue, either way, proving loss causation is not required for class certification. *See Halliburton*, 563 U.S. at 812-13. So the Court need not at this time answer the question of whether loss causation is also an element of a Commodity Exchange Act claim.

holding. It has not been adopted by any other circuit, and it has been rejected implicitly by some."

618 F.3d at 687. To say the obvious, this Court declines to follow *Fener*. And none of the other cases cited by Kraft help its position. *See* Defs.' Mot. Exclude Br. at 18-20 (citing cases). For one thing, they are all procedurally inapposite because they were merits-based decisions on summary judgment. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 186 (D. Mass. 2012) (deciding motion for summary judgment), *aff'd sub nom., Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 97 (1st Cir. 2014); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1272-73 (N.D. Okla. 2007), *aff'd. sub nom., In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) (same); *Hershey v. Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 955, 957 (N.D. Ill. 2010) (same). And for another, they are not binding. *See Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 573 (7th Cir. 2009) ("[D]istrict court cases are not binding precedent."). Because the objected-to material is not critical to class certification, the Court need not decide either of Kraft's motions targeting the expert reports at this time. The motions are denied without prejudice.

## IV. Conclusion

For the reasons discussed, Ploss's motion for class certification [R. 228] is granted as to the proposed classes. To repeat, the following class is certified on the federal claims and the state law claim: Ploss now seeks to certify the following two classes under Federal Rule of Civil Procedure 23(b)(3), comprised of all persons who either:

a. purchased a CBT December 2011 or a CBT March 2012 futures contract after October 31, 2011 except that purchases of CBT March 2012 futures contracts made after December 14, 2011 qualify for inclusion in the Class only to the extent they were made in liquidation of a short position in the CBT March 2012 contract (whether an outright short position or as part of a spread position) which was sold between November 1 and December 14, 2011 inclusive; or

b. sold put options or purchased call options on the CBT December 2011 contract or on the CBT March 2012 contract after October 31, 2011 except that sales of put options or purchases of call options on the CBT March 2012 contracts made after December 14, 2011 qualify for inclusion in the Class only to the extent they were made in liquidation of a position in the CBT March 2012 contract (whether an outright position or as part of a spread position) which was initiated between November 1 and December 14, 2011 inclusive.

The parties shall confer on the proposed Notice to the Class, starting with Ploss drafting a proposed notice and circulating it to Kraft by January 13, 2020. If practicable, Ploss shall file a motion proposing the notice plan in advance of the January 23, 2020 status hearing.

ENTERED:

     s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: January 3, 2019