**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HARRY PLOSS, as Trustee for the HARRY PLOSS TRUST DTD 8/16/1993, on behalf of Plaintiff and all others similarly situated, ) ) ) ) ) | |
| Plaintiffs, ) ) | Case No. 15-cv-2937 |
| v. ) ) | Judge John F. Kness |
| KRAFT FOODS GROUP, INC. and MONDELĒZ GLOBAL LLC, ) ) ) ) | |
| Defendants. ) | |

**JOINT STATUS REPORT IN REASSIGNED CASE**

I.     **Nature of the Case**

    A.     ***Identify the attorneys of record for each party. Note the lead trial attorney and any local counsel.***  Answer:  Counsel for Plaintiffs[1] and the Class: Christopher Lovell (Lead Attorney) and Christopher McGrath of Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart") and Vincent Briganti (Lead Attorney) and Raymond P. Girnys of Lowey Dannenberg, P.C.  The Court appointed Lovell Stewart and Lowey Dannenberg, P.C. (f/k/a Lowey Dannenberg Cohen & Hart, P.C.) as Class Counsel.  Dkt. Nos. 63, 332, 339.  Marvin Miller of Miller Law LLC is Local Counsel for Plaintiffs.  Counsel for Defendants Kraft Foods Group, Inc. and Mondelēz Global LLC ("Kraft"):  Dean N. Panos (Lead Attorney), J. Kevin McCall, Nicole A. Allen and Thomas E. Quinn of Jenner and Block LLP.

    B.     ***State the basis for federal jurisdiction.***  Answer: The bases for federal jurisdiction include Section 22 of the Commodity Exchange Act ("CEA") (7 U.S.C. §25), Section 2 of the Sherman Antitrust Act ("Sherman Act") (15 U.S.C. §2), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26(a)) and 28 U.S.C. §§1331 and 1337.

    C.     ***Briefly describe the nature of the claims asserted in the complaint and the counterclaims and/or third-party claims and/or affirmative defenses***. Answer:  *Plaintiffs' Statement*: This certified class action lawsuit alleges Kraft manipulated the Chicago Board of Trade ("CBOT") soft red winter wheat futures and options market.  Dkt. No. 71 (Complaint). Plaintiffs seek recovery from Kraft on behalf of the Class of wheat futures and options market participants injured by Kraft's alleged violations. Plaintiffs assert claims against Kraft for manipulation in violation of the CEA, for principal-agent liability in violation of the CEA, for employing a manipulative and deceptive device in violation of the CEA, for violation of Section 2 of the Sherman Act, and for unjust enrichment and restitution/disgorgement under the common law.

    Plaintiffs allege Kraft manipulated CBOT wheat futures and option prices by buying and maintaining a dominant long position (approximately 15 million bushels) in the CBOT December 2011 wheat futures contract for the purpose of influencing prices, rather than because of any legitimate need for that quantity or quality of wheat or because of any bona fide hedging needs. Specifically, Plaintiffs allege Kraft established a 3,000-contract position in the CBOT December 2011 wheat futures contract in order to falsely signal to the market that Kraft planned to source wheat from the futures market using the CBOT delivery process in December 2011. As reflected in Kraft's contemporaneous internal emails, the alleged purposes of this false signal were (a) to increase the "spread" between the prices for the CBOT December 2011 and March 2012 contracts and thereby net Kraft a large profit from its long position in the CBOT December 2011 wheat futures contract and its short position in the CBOT March 2012 wheat futures contract and (b) to depress the prices Kraft would pay to buy wheat in the cash market. Dkt. No. 71, ¶¶83 ("we anticipate the futures curve will begin to

---

[1] The named Plaintiffs are Harry Ploss, Robert Wallace, Kevin Brown, Joseph Caprino, Richard Dennis, White Oak Fund, LP, and Budicak, Inc.

flatten…thereby reducing the commercial wheat basis to Kraft."). Kraft's contemporaneous emails further confirm that Kraft's alleged manipulative strategy worked as planned. *Id* ("as expected, the Dec/Mar spread has narrowed…with the narrowing of the spread, the cash wheat basis has declined…"). Plaintiffs contend that, absent manipulation, taking delivery of wheat on the CBOT delivery market was highly uneconomic for Kraft; it required Kraft to pay high prices for the wrong quantity and quality of wheat in the wrong places and at the wrong times. Plaintiffs also contend that Kraft's 15-million-bushel position in the CBOT December 2011 contract increased, rather than decreased, Kraft's price risks such that Kraft's position was not a bona fide hedge.

*Kraft's Statement*: Kraft denies that it did anything wrong and asserts that Plaintiffs' claims have no merit. Kraft uses millions of bushels of wheat each year to produce flour for its snack brands. Although Kraft typically buys the wheat it needs in the "cash market" from farmers, grain elevators, or merchandisers, the CFTC and CME allow end users like Kraft to source wheat from the futures market when it makes economic sense to do so, such as when the price of wheat in the cash market is higher than the futures price. In the second half of 2011, cash wheat prices in Kraft's typical draw area were higher relative to futures prices than they had been in recent years. Kraft responded by establishing a 3,000-contract futures position in September 2011, which gave it the option to take delivery of 15 million bushels of wheat in December if conditions in the cash market did not improve and if it received wheat in locations that made economic sense to use. Kraft could not control where it received wheat from the futures market; that decision rested with grain elevators who maintained short positions in the market. Unfortunately for Kraft, its efforts to obtain wheat from the futures market were thwarted by grain elevators who, pursuing their own economic interest, chose to make delivery in locations where it was uneconomic for Kraft to load out the wheat. Kraft loaded out a minimal amount of wheat from the futures market but sold the majority back to the grain elevators, in accordance with CME rules. Kraft made no trades in the futures market during almost the entirety of the class period; by definition, the abnormal price impacts plaintiffs allege were necessarily the result of other market participants' trading. Nobody in the market knew, or could have known, the existence or size of Kraft's futures position at any time. And between the time Kraft established its position and prior to the close of trading on November 29, 2011, Kraft's futures position was below the number of contracts any market participant could hold under CME's rules, including speculators. Kraft's position constituted an average of 4% of the long open interest in November—in other words, it was not "dominant."

*Affirmative Defenses*. Kraft has asserted the following affirmative defenses: all or some of the Class members' claims are barred, in whole or in part, by the statute of limitations set forth in 7 U.S.C. § 25(c); the doctrine of laches and/or waiver because all or some of the Class members were on notice of their claims by at least December 2011; the doctrines of estoppel and/or unclean hands because one or more Class members engaged in conduct designed to impact the price of CBOT wheat futures and/or thwart Kraft's ability to obtain wheat from the futures market; the assumption of risk, because

2

Class members willingly entered into wheat futures contracts that expressly required them to delivery, or take delivery of, #2 SRW wheat or to close their futures positions. Kraft has asserted other defenses not specified as affirmative defenses under Rule 8(c)(1) in its Answer to Plaintiffs' Consolidated Class Action Complaint. *See* Dkt. No. 119. Plaintiffs assert Kraft's defenses are unsupported.

      *D.    Describe the relief sought by the plaintiff(s). Quantify the damages, if any. (A ballpark estimate is acceptable and will not be admissible; it is simply to give the Court a feel for the case.)* Answer: In this certified class action, Plaintiffs and the Class seek the following relief: (1) a judgment awarding Plaintiffs and the Class damages against Kraft for their alleged violations of the CEA, together with pre-judgment interest at the maximum rate allowable by law; (2) a judgment awarding Plaintiffs and the Class damages against Kraft for their alleged violations of the Sherman Act, including treble damages, together with pre-judgment interest at the maximum rate allowable by law; (3) a judgment awarding Plaintiffs and the Class any and all sums of Kraft's unjust enrichment; (4) an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Kraft's unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiffs and the Class; (5) an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' fees, experts' fees and other expenses; and (6) such injunctive and declaratory relief, and such other and further relief, as the Court may deem just and proper. Plaintiffs' expert, Professor Craig Pirrong, has estimated class-wide, non-trebled damages between $346.4 and $618 million, exclusive of options on the March 2012 contract and pre-judgment interest. Kraft asserts that Plaintiffs are not entitled to any damages because they have not, and cannot, establish that Kraft violated the CEA or the Sherman Act or that Kraft's conduct impacted any prices. Kraft further asserts that the damages methodology on which Plaintiffs rely is flawed, not generally accepted, not supported by evidence, and incapable of assigning any price impact to Kraft. Kraft also asserts that identifying actual damages to any market participant will require individual inquiry to identify offsetting gains in the cash and futures markets. Plaintiffs dispute Kraft's foregoing assertions.

      *E.    List the names of any parties who have not yet been served.* Answer: Both defendants have been served.

## II.    Discovery and Pending Motions

      *A.    Briefly describe all pending motions, including the date the motion was filed and the briefing schedule, if any. Have any of the pending motions been mooted? Do any of the pending motions no longer require a ruling for any other reason?* Answer: There are no pending motions.

      *B.    Is this case in the "Mandatory Initial Discovery Pilot" (MIDP) Project? (Information about the MIDP can be found on the Northern District of Illinois home webpage, under "Resources & Information.") If the case is subject*

*to MIDP, the parties should be prepared to report on the status of compliance with the MIDP and any upcoming MIDP deadlines.* Answer: No.

  C. ***What is the current discovery schedule?*** Answer: Currently, there is no discovery schedule. The parties have negotiated a proposed scheduling order attached as Exhibit A hereto.

  D. ***Briefly describe all fact and expert discovery that the parties have conducted, including any electronic discovery, and state whether discovery has been bifurcated. Describe any discovery that the parties still need to complete. Do the parties anticipate that they will complete discovery by the current deadline?*** Answer: Plaintiffs have served requests for documents, interrogatories and requests for admission on Kraft. Kraft responded to the foregoing discovery. Plaintiffs deposed nine current or former employees of Kraft. Kraft produced to Plaintiffs copies of 27 deposition transcripts of fact witnesses taken in the related "CFTC Action" pending before Judge Blakey.[2] Plaintiffs served a Rule 30(b)(6) deposition notice on Kraft, to which Kraft objected on a number of grounds. Plaintiffs ultimately agreed to withdraw that notice without prejudice subject to reaching certain stipulations. Plaintiffs intend to pursue a Rule 30(b)(6) deposition in the merits phase of this case absent such stipulations. Kraft continues to object to such a deposition as unnecessary and inconsistent with the purpose of Rule 30(b)(6). Kraft served requests for documents, interrogatories and requests for admissions on Plaintiffs and Plaintiffs responded. Kraft deposed the eight Plaintiffs.

  In connection with Plaintiffs' motion for class certification, the parties engaged in certain expert discovery. Kraft deposed Plaintiffs' two experts who submitted expert reports in support of Plaintiffs' motion for class certification. Plaintiffs deposed Kraft's expert who submitted an expert report in connection with Defendants' opposition to Plaintiffs' class certification motion. As detailed in the attached proposed schedule, the parties anticipate conducting merits expert discovery (including the exchange of written expert reports and depositions) following the close of fact discovery. Kraft anticipates taking additional discovery on individual issues from claimants, if necessary, following any verdict on class-wide liability and the existence and amount of daily price artificiality, if any. Plaintiffs reserve their rights to object to the scope of any future discovery Kraft may seek following a verdict on liability.

  E. ***Briefly summarize all substantive rulings issued in the case. (For each ruling, include the date and the docket number.)*** Answer: On June 27, 2016, the Court issued a Memorandum Opinion and Order that denied Kraft's motion to dismiss Plaintiffs' CEA claims, Sherman Act claims and common law unjust enrichment claims relating to Kraft's "long wheat futures scheme." Dkt. No. 113. The Court granted Kraft's motion to dismiss Plaintiffs' claims that Kraft engaged in a "wash trading scheme" in violation of the CEA. *Id*. On January 3, 2020, the Court issued a

---

[2] *U.S. Commodity Futures Trading Commission v. Kraft Foods Group, Inc.*, 15 C 02881 (N.D. Ill.). *See* Section "V" below.

4

Memorandum Opinion and Order granting Plaintiffs' motion for class certification and certified a Class of CBOT wheat futures and options traders. Dkt. No. 332. On February 21, 2020, the United States Court of Appeals for the Seventh Circuit denied Kraft's petition to appeal the Court's January 3, 2020 Order granting Plaintiffs' motion for class certification. Dkt. No. 345.

F. **_Briefly describe any anticipated motions_**. Answer: Pursuant to Rule 23(c)(2)(B), Plaintiffs expect to file a motion seeking approval of the form and manner of class notice no later than two weeks after the reassignment status conference. Kraft has requested that Plaintiffs stipulate to the mutual use in this case of fact witness depositions from the CFTC case. *See* "D" above. Kraft will file a motion to permit that use absent a stipulation. Plaintiffs reserve their right to oppose that motion and have proposed an alternative stipulation which the parties are in the process of discussing. Kraft anticipates filing a motion for summary judgment and *Daubert* motions directed at Dr. Pirrong, to the extent Plaintiffs rely on the opinions he offered in his two reports relating to class certification, whether by reference or as part of any report he offers in the merits stage of the case.

### III. Trial

A. **_Have any of the parties demanded a jury trial?_** Answer: Yes, Plaintiffs have demanded a jury trial.

B. **_What is the trial date (if any)? If there is no trial date, when will the parties be ready for trial?_** Answer: There is no scheduled trial date. The parties believe they will be ready for trial approximately ninety (90) days after the Court rules on dispositive motions. *See* proposed scheduling order.

C. **_Have the parties filed a final pretrial order? If not, when is the deadline for the filing?_** Answer: No. There is currently no deadline for the parties to file a final pretrial order.

D. **_Estimate the length of trial._** Answer: The parties estimate trial to last ten to fifteen business days.

### IV. Settlement, Referrals, and Consent

A. **_Have any settlement discussions taken place? If so, what is the status? Has the plaintiff issued a written settlement demand? And if so, did the defendant respond in writing? (Do not provide any particulars of any demands or offers that have been made.)_** Answer: Plaintiffs made a settlement demand to Kraft in March 2019. Kraft did not respond with a counteroffer to Plaintiffs' March 2019 settlement demand because that demand, in Kraft's view, did not reflect a realistic basis to discuss settlement. Consistent with the Court's January 3, 2020 minute entry, Class Counsel emailed Kraft's counsel on January 16, 2020 and requested their position

5

concerning further settlement discussions. Following that email, Kraft's counsel contacted Class Counsel and requested that Plaintiffs issue a new settlement demand lower than Plaintiffs' March 2019 demand. Plaintiffs have not made (and do not intend to make) a reduced settlement demand.

    *B.*     ***Has this case been referred to the Magistrate Judge for discovery supervision and/or a settlement conference?*** <u>Answer</u>: No.

    *C.*     ***Do the parties wish to request a settlement conference the assigned Magistrate Judge?*** <u>Answer</u>: The parties do not wish to request a settlement conference at this time.

    *D.*     ***Have counsel informed their respective clients about the possibility of proceeding before the assigned Magistrate Judge for all purposes, including trial and entry of final judgment? Do all parties <u>unanimously consent</u> to that procedure?*** <u>Answer</u>: Counsel have advised their respective clients about the possibility of proceeding before a Magistrate Judge for all purposes. However, the parties do not unanimously consent to that procedure.

**V.**     **Other**

    *A.*     ***Is there anything else that the plaintiff(s) wants the Court to know? (Please be brief.)*** <u>Answer</u>: The Commodity Futures Trading Commission ("CFTC") is an independent federal regulatory agency charged by Congress with the responsibility for administering and enforcing the provisions of the CEA. The CFTC filed a complaint against Kraft in April 2015 alleging that Kraft's long wheat futures scheme and certain other conduct violated numerous provisions of the CEA, including the CEA's anti-manipulation provisions. In the CFTC Action, the CFTC's economic expert (Dr. William Wilson) relied upon and applied the economic framework designed to test for manipulation set forth in Dr. Craig Pirrong's peer-reviewed article "Detecting Manipulation In Futures Markets: The Ferruzzi Soybean Episode," *American Law and Economics Review* at 28 (2004) ("Detecting Manipulation"). Dr. Wilson applied the "event study methodology" in Dr. Pirrong's "widely accepted" Detecting Manipulation article to the facts here and concluded that Kraft caused artificial prices. Dr. Pirrong is Plaintiffs' economic expert in this action. Kraft, through its economic expert in the CFTC Action (Dr. Scott Irwin), also relied upon Dr. Pirrong's Detecting Manipulation article. Kraft's expert Dr. Irwin stated: "[t]he bottom-line is that application of standard time series techniques developed by Pirrong is the reliable and generally accepted way to test the manipulation allegations against Kraft as in the original Ferruzzi case [*i.e.*, the case study in Dr. Pirrong's Detecting Manipulation article] …"

In this action, Dr. Pirrong applied, with appropriate variations, the economic principles and methods set forth in his Detecting Manipulation article to the facts of this case and concluded that Kraft caused prices of the CBOT December 2011 and March

6

2012 contracts to be artificial from at least November 3 through December 14, 2011. Plaintiffs dispute Kraft's below statements.

**B.     Is there anything else that the defendant(s) wants the Court to know? (Please be brief.)** [3] Answer: The CFTC sued Kraft in 2015, alleging that Kraft caused artificial prices by taking delivery of wheat in the futures market between November 29, 2011 (the start of the December futures delivery period) and December 14, 2011 (the end of the delivery period). Kraft vigorously defended its conduct in that case, including filing summary judgment and *Daubert* motions that threatened to terminate the proceedings as to completed manipulation. While those motions were pending, Kraft reached an agreement with the CFTC to settle the case for a fraction of the penalty the CFTC sought. Unlike nearly every other CFTC settlement, the settlement with Kraft contained no findings of fact, conclusions of law, or any admission suggesting Kraft's conduct constituted manipulation. Judge Blakey has since vacated the settlement, and determined that the CFTC had engaged in "egregious misconduct" related to the settlement. *See* CFTC Action Dkt. No. 378.

Although Plaintiffs in large part copied the CFTC's complaint, they are attempting to recover damages back to November 1, 2011—a full month before even the CFTC alleges Kraft caused any price impact. To support their claim, Plaintiffs have relied on a so-called event study Dr. Pirrong, which Pirrong admitted analyzes no particular event. Dr. Pirrong also admitted that he started his study on November 1, a month before Kraft stood for delivery, simply because class counsel instructed him to do so. Dr. Pirrong has been the resident expert for Plaintiffs' counsel in nearly every manipulation case they have brought. Although Judge Chang declined to address the reliability of Dr. Pirrong's work on class certification, he observed "[i]f it turns out that Pirrong's event study is in fact unreliable, then that would end the case in one fell swoop." Dkt. No. 332 at 14 n.10.

Dr. Pirrong's event study follows no accepted methodology, including the methodology described in his "peer-reviewed" article. Another court in this district has excluded Dr. Pirrong's opinions in a similar case, where, as here, he claimed to apply the methodology in his Ferruzzi article. Plaintiffs' claim that the CFTC's expert applied Pirrong's "event study methodology" is false, as is Plaintiffs' implication that any of Kraft's experts have endorsed the methodology Pirrong has applied in this case. The bottom line is that Dr. Pirrong began his "event study" one month before Kraft stood for delivery for the sole purpose of manufacturing damages, because by his own admission he would find no damages if he applied an accepted methodology examining the period of interest.

---

[3] Kraft requested that Plaintiffs remove Section V.A because it injects argument into what Kraft believes should be an objective report to the Court, and runs contrary to this Court's instruction not to engage in extensive discourse. Because Plaintiffs refused, Kraft offers this response in Section V.B.

**Exhibit A**

| CASE EVENT | PROPOSED DATE |
|---|---|
| **CLASS CERTIFICATION** | |
| Plaintiffs to Submit Proposed Notice to Class | No later than 14 days after reassignment conference |
| **FACT DISCOVERY[1]** | |
| Close of Fact Discovery (except as to post-trial discovery)[2] | 120 days after entry of scheduling order.[3] |
| **MERITS EXPERT REPORTS AND MERITS EXPERT DISCOVERY** | |
| Plaintiffs' Merits Expert Reports | 60 days after close of fact discovery. |
| Kraft's Merits Expert Reports | 120 days after Plaintiffs' expert reports. |
| Plaintiffs' Rebuttal Merits Expert Reports | 75 days after Kraft's expert reports. |
| Close of Merits Expert Discovery | 45 days after rebuttal expert reports. |
| **DISPOSITIVE MOTIONS** | |
| Opening Motions and Briefs | 60 days after close of merits expert discovery. |
| Opposition Briefs | 60 days after opening motions and briefs. |
| Reply Briefs | 45 days after opposition briefs |
| **TRIAL** | |

---

[1] The parties recognize that the ongoing global health crisis may impede discovery in this action such that the proposed fact discovery deadline may need to be adjusted.

[2] Kraft intends to assert individual defenses with regard to liability and damages against Class member claimants, which will require post-trial discovery. Although Plaintiffs are not opposed to some post-trial discovery, Plaintiffs reserve their right to object to the scope of such discovery.

[3] Kraft's agreement to the fact discovery deadline assumes it will not have to re-depose fact witnesses from the CFTC Action. As discussed in the joint reassignment report, the parties are working in good faith on a mutually agreeable stipulation. If Kraft cannot obtain a stipulation or Court order allowing the mutual use of the CFTC depositions, it will have to re-depose some or all of those witnesses, which may require more than the 120 days allowed for fact discovery.

**Exhibit A**

| CASE EVENT | PROPOSED DATE |
|---|---|
| Proposed Trial Date[4] | 90 days after ruling on summary judgment |
| **POST-TRIAL PROCEEDINGS (IF NECESSARY)[5]** | |
| Notice of Verdict | TBD |
| Resolution of damages methodology to be applied following claims submission | TBD |
| Claims Submission Deadline | TBD |
| Post-Trial Discovery Period | TBD |
| Adjudication of disputed liability and damages issues concerning claims. | TBD |
| Plaintiffs to move for distribution of funds, attorneys' fees, expenses, and Class Representative awards | TBD |

---

[4] While Kraft's position is that the proposed trial should address class-wide liability and the existence and amount of daily artificiality, if any, on a per futures contract basis, the parties agree that the Court need not determine the scope of the trial for purposes of entering this schedule.

[5] Although the Court may defer entering a schedule to govern the case following a verdict on class-wide liability and daily price artificiality, the parties have provided the general contours of the work that may need to be undertaken following a verdict in Plaintiffs' favor. The precise tasks, time required, and scope of discovery will ultimately depend on the nature of the verdict and the nature and number of claimants.