**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HARRY PLOSS *et al.*, | |
| Plaintiffs, | No. 15-cv-02937 |
| v. | Judge John F. Kness |
| KRAFT FOODS GROUP, INC. *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, a class of wheat futures market participants, bring claims under the Commodity Exchange Act and the Sherman Anti-Trust Act against Defendants Kraft Foods Group, Inc. and Mondelēz Global LLC. Currently before the Court are Defendants' motions to exclude and limit the testimony and opinions of two of Plaintiffs' experts: Dr. Craig Pirrong and Charles Robinson. Pirrong, an economist, presents an event study and analyzes Kraft's allegedly manipulative and monopolistic conduct relevant to this dispute. Based on his analysis, Pirrong would testify that Kraft caused artificially high prices in the December 2011 and March 2012 wheat futures markets. According to Pirrong, Kraft's conduct is consistent with that of a manipulator seeking to obtain the power to move wheat contract prices. Robinson, meanwhile, would testify about Kraft's futures positions and its profits/losses during the period relevant to this case.

Although Defendants have ably presented challenges to the proposed testimony of Pirrong and Robinson, many of Defendants' arguments would more appropriately be made through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," which are "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). If accepted by a jury, Defendants' arguments would threaten the probative value of the proffered testimony of Plaintiffs' experts, but not its admissibility.

As explained below, both Pirrong's and Robinson's opinions are, with one exception, admissible under Rule 702 of the Federal Rules of Evidence. Pirrong is qualified to assess alleged commodity futures manipulation and monopolistic conduct, and his event study is a "scientifically reliable" methodology for testing the manipulation alleged in this case. So, too, is Robinson qualified to review and analyze Kraft's brokerage statements, and his opinions are not otherwise inadmissible.

Pirrong, however, is not qualified to opine about Kraft's state of mind. Pirrong's conclusions about what Kraft "knew" in certain contexts and whether some of Kraft's conduct was "deliberate[] and willful[]" are beyond the scope of economic expertise. Defendants' motion to exclude (Dkt. 450) is thus granted as to Pirrong's inadmissible state-of-mind testimony. In assessing any motions for summary judgment that may be forthcoming, the Court will not consider Pirrong's inadmissible conclusions about Kraft's knowledge, intent, or state of mind. But Defendants' motion to exclude

Pirrong is denied in all other respects, and Defendants' motion to exclude Robinson (Dkt. 451) is denied in its entirety.

## I.  BACKGROUND

The factual and procedural history of this case is complex and is described in previous opinions. *See Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003 (N.D. Ill. 2020) (Chang, J.); *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016) (Chang, J.); *Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp., Inc.*, 2016 WL 11751969 (N.D. Ill. Sept. 2, 2016) (Chang, J.).[1] As is relevant to this Opinion, on September 24, 2021, the Court allowed Defendants to file *Daubert* motions before filing any motions for summary judgment. (Dkt. 433.) On October 23, Defendants filed two such motions, seeking the full exclusion of Pirrong's opinions and testimony (Dkt. 450) and the partial exclusion of, and limitations on, Robinson's opinions and testimony (Dkt. 451).

Pirrong evaluates Kraft's conduct and tests Plaintiffs' theory of market manipulation. In his evaluation, Pirrong considers Kraft's statements and observable behavior, other wheat market participants' reactions to those statements and behavior, and the prices of wheat during the relevant periods. Pirrong filters those considerations through the quantitative and qualitative methodology exemplified in

---

[1] This case was reassigned on February 28, 2020 (Dkt. 347).

his article, *Detecting Manipulation in Futures Markets*.[2] (Dkt. 453 at 49, 57, 63−67 (Under Seal).)[3]

As in *Detecting Manipulation*, Pirrong performed event studies—regression analyses that test the relationships between several variables[4]—to determine the extent to which Kraft's behavior inflated the December or March wheat futures. According to Pirrong, the regression in this case is "used to predict prices during a period in which manipulative price impacts would be expected to occur," and "[d]eviations between observed and predicted prices are indicative of manipulative price distortions, and measures the magnitude of these distortions." (Dkt. 453 at 123.) Among other things, Pirrong concludes that Kraft caused artificially high prices in the December 2011 and March 2012 wheat futures markets, and that Kraft's conduct was "uneconomic" and consistent with the conduct of a manipulator seeking to obtain the power to move prices. According to Pirrong, "Kraft did not behave in a competitive manner: instead, [Kraft] behaved monopolistically[.]" (*Id.* at 235.)

---

[2] *See* Craig Pirrong, *Detecting Manipulation in Futures Markets: The Ferruzzi Soybean Episode*, 6 Am. L. & Econ. Rev. 28 (2004).

[3] Many of the parties' filings relevant to the Court's decision are under seal. But the information disclosed in this Opinion cannot be justifiably sealed under the requirements of well established law in this Circuit. *Baxter Int'l v. Abbott Laby's*, 297 F.3d 544, 546−47 (7th Cir. 2002); *Union Oil v. Leavell*, 220 F.3d 562, 567−68 (7th Cir. 2000). Under-seal documents are indicated as being "Under Seal" only in the first citations to those documents.

[4] *See* Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation*, 15 Stan. J.L. Bus. & Fin. 183, 190 (2009) ("An event study is a statistical regression analysis that examines the effect of an event, such as an allegedly fraudulent statement or omission, on a dependent variable, such as a company's stock price." (cleaned up)).

Charles Robinson analyzes Kraft's brokerage statements to calculate and describe Kraft's futures positions as well as its profits and losses at various times relevant to the case. (Dkt. 455 at 56−59 (Under Seal).) Robinson also estimates the "results" of Kraft's wheat futures purchases and the costs of Kraft's shipments of wheat to its Toledo mill. (*Id.* at 60−61.)

## II.    STANDARD OF REVIEW

A witness who is qualified as an expert by "knowledge, skill, training, or education" may testify if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Supreme Court of the United States explained in *Daubert*, a court's decision whether to admit an expert's testimony or opinion must be guided by three determinations: (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (cleaned up).

In making determinations about admissibility, the Court is required to consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000). Although it is imperative that the

expert's opinion "be reasoned and founded on data," the reliability of an expert's methodology turns "primarily" on "the validity of the methodology employed by [the] expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) (citing *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)).

Under Rule 702, exclusion of expert testimony "is the exception rather than the rule." *See* Fed. R. Evid. 702 Advisory Comm.'s Notes to the 2000 Amends. *Daubert* emphasized that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596; *see also Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). An expert's credibility and "whether his or her theories are correct given the circumstances of a particular case" are "factual" questions that are "left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith,* 215 F.3d at 719.

In other words, the district court is designated as the "gatekeeper" of expert testimony, but "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion: the inquiry must focus . . . solely on principles and methodology, not on the conclusions they generate." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595); *see Smith,* 215 F.3d at 719.

## III.    DISCUSSION

### A.    Craig Pirrong

Pirrong received his undergraduate degree and PhD in economics from the University of Chicago. (Dkt. 453 at 47.) Pirrong has written articles and a book about commodity futures pricing and manipulation, and, since the mid-1990s, he has drafted numerous reports about wheat and other commodity futures contracts. (*Id.* at 47−49.)[5] In the present case, Pirrong would testify that Kraft caused artificially high prices in the wheat futures markets and that Kraft's conduct was consistent with the conduct of a commodity market manipulator.

Based on a review of Pirrong's reports and the related materials in the record, the Court is satisfied that Pirrong's proposed testimony is relevant and that the principles and methodology Pirrong applies are sound. *Schultz*, 721 F.3d at 431. Pirrong's opinions are relevant because, if credited by a jury, Pirrong's testimony would support a finding that Kraft caused artificially high prices in the December 2011 and March 2012 wheat futures markets. *See Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) ("An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case."). Defendants do not dispute the relevance of Pirrong's testimony to Plaintiffs' case. (*See, e.g.*, Dkt. 465 at 1 (Under Seal) ("All of [Plaintiffs'] claims continue to depend entirely on Pirrong, and specifically on his opinions and 'event studies'

---

[5] Although Defendants dispute Pirrong's qualifications to offer the opinions at issue in this case, they do not challenge his credentials.

purporting to link Kraft's alleged 'false signals' with 'artificial' and 'monopoly' prices that supposedly harmed the class.").)

Pirrong's report is also "scientifically reliable" under current law. The non-exhaustive list of factors relevant to evaluating reliability includes "whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94). Pirrong's event study methodology is both tested and testable; in fact, it is based on the event-study methodology exemplified in his peer-reviewed *Detecting Manipulation* article. At bottom, that methodology is regression-based: Pirrong compares "an outcome (called the dependent variable) and one or more factors (called independent variables) that may be related to that outcome." *Manpower, Inc.*, 732 F.3d at 808. Pirrong accordingly provides error estimates (*see, e.g.*, Dkt. 453 at 129−32) that Defendants may evaluate and dispute if they choose.

Regression analyses in general, and event studies in particular, are common in complex litigation. *See, e.g.*, *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020) (documenting the increasing use of event studies "for proving or disproving price impact and loss causation"); *Manpower, Inc.*, 732 F.3d at 808 (collecting cases); *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *8 (N.D. Ill. Mar. 5, 2015) (finding that "event study methodology met *Daubert*'s exacting standards"); *Chi. Tchrs.*

*Union, Loc. 1 v. Bd. of Educ. of City of Chi.*, 2020 WL 914881, at *7 (N.D. Ill. Feb. 25, 2020); *SEC v. Ustian*, 2020 WL 416289, at *1 n.1 (N.D. Ill. Jan. 26, 2020).

In constructing regressions such as those employed by Pirrong in this case, experts are given substantial "latitude" in their selection of variables and data. *Manpower, Inc.*, 732 F.3d at 808. Disputes over Pirrong's selections "go[] to the probative weight of the analysis rather than to its admissibility." *Id.* at 808–09 (Whether an expert "selected the best data set to use . . . is a question for the jury, not the judge."); *see Jordan v. Dominick's Finer Foods*, 115 F. Supp. 3d 950, 963 (N.D. Ill. 2015) ("[O]bjections as to whether an expert considered certain factors that the opposing side deems irrelevant generally go to the weight of the expert's opinion, not its admissibility."); *see also A.H. v. Ill. High School Ass'n*, 263 F. Supp. 3d 705, 714 (N.D. Ill. 2017) (observing that the "sufficient facts or data" requirement is a "somewhat Gordian one—an expert must take into account all of those facts which are necessary to support [her] findings, not just some of them, and [she] cannot conveniently disregard contrary evidence, but a party cannot disqualify the other side's expert simply by disputing the facts upon which [she] relied" (cleaned up)).

Despite the relevance of Pirrong's opinion, and the reliability of the methodology he employs, Defendants seek to exclude (1) Pirrong's opinions as to Kraft's knowledge of allegedly false, manipulative, and monopolistic acts; (2) Pirrong's event studies and associated opinions; and (3) Pirrong's event studies as a method of proving class-wide economic and competitive injury. (*See generally* Dkt. 465.) As explained below, Defendants' concerns with particular facets of Pirrong's

methodology, and with the conclusions he reaches, are generally better addressed through cross-examination or presentation of contrary evidence; those concerns are not grounds for exclusion *ab initio*. *See Daubert*, 509 U.S. at 596.

> 1. *Pirrong's Opinions as to Kraft's Knowledge of Allegedly False, Manipulative, and Monopolistic Acts*

Defendants first argue that Pirrong's opinions must be excluded because they depend on testimony "about Kraft's state of mind and the legal character of [Kraft's] business conduct." (Dkt. 465 at 12.) According to Defendants, Pirrong's "opinions violate controlling prohibitions on expert testimony about ultimate facts or legal issues . . . and another party's knowledge or 'intent.' " (*Id.* at 3.)[6]

> a. Ultimate issue testimony

Defendants rightly note that experts "can't speculate" about significant issues; they need a "scientific basis for [their] opinion[s]." *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). That rule is related to a more general prohibition against experts testifying "as to legal conclusions that will determine the outcome of the case." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

---

[6] In support of their motion, Defendants cite to *Hershey v. Pac. Inv. Mgmt. Co. LLC*, in which another judge in this District excluded expert testimony offered by Pirrong. (*See* Dkt. 465 at 14 (citing 697 F. Supp. 2d 945 (N.D. Ill. 2010)).) Based on *Hershey*, Defendants argue that "Pirrong's opinions about Kraft's 'knowledge' of the 'uneconomic' nature of its positions, and his related opinions that Kraft's conduct was 'false,' 'manipulative,' and 'monopolistic,' are inadmissible." (*Id.* at 14–15.) But Defendants' argument is undermined by the Seventh Circuit cases—some of which were decided after *Hershey*, and which further clarified the law governing admissibility of expert testimony. *See Ploss*, 431 F. Supp. 3d at 1022 (*Hershey* is "not binding" (citing *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 573 (7th Cir. 2009))).

As the Seventh Circuit has repeatedly explained, however, "[e]ven in court, . . . an expert is free to give a bottom line, provided that the underlying data and reasoning are available on demand." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002); *see Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 n.2 (7th Cir. 2000) ("Historically, witnesses were expressly prohibited from testifying about the ultimate issue facing the jury," but the historical rule was "eliminated" by Rule 704.); Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). There is a difference "between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007).

In other words, parties may not call experts to opine about *legal* issues. Judges are considered "experts on law," so, for example, "when a federal court applies state law, the court does not permit expert testimony on the meaning of the 'foreign' law." *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 495−96 (7th Cir. 2009). Parties may, however, call experts who address *ultimate* issues in their testimony. *Donahue*, 279 F.3d at 446; *see Sanders v. City of Chicago Heights*, 2016 WL 4417257, at *6 (N.D. Ill. Aug. 19, 2016) ("Although Rule 704(a) states that an opinion is not objectionable just because it embraces an ultimate issue, Rules 702 and 704[] prohibit experts from offering opinions about legal issues that will determine the outcome of a case." (cleaned up)).

Contrary to Defendants' contentions, Pirrong does not offer inadmissible "legal conclusions." Pirrong does not proffer testimony "on purely legal matters and made

up solely of legal conclusions," nor does he offer conclusions as to whether Defendants' "actions violated the [law]." *Good Shepherd Manor Found., Inc.*, 323 F.3d at 564. Although Pirrong occasionally cites legal authority in his reports, such as for regulatory definitions of concepts (*see, e.g.*, Dkt. 453 at 222−23), those citations do not transform any of his conclusions into "legal conclusions" or otherwise render his testimony inadmissible under prevailing law.[7] Pirrong reaches only factual conclusions about Kraft's behavior, and as explained above, he adequately supports his conclusions with "data and reasoning." *Donahue*, 279 F.3d at 446.

b.    Mental state testimony

Whether Pirrong can testify about Defendants' mental states—what Kraft "knew" or "intended"—is more complicated. Pirrong, an economist, lacks an "analytically sound bas[i]s," *DePaepe*, 141 F.3d at 720, for ostensibly psychological conclusions about Kraft's knowledge or intentions, and Defendants point to several

---

[7] Defendants also cite to part of Pirrong's report where, according to Defendants, Pirrong "(mis)interprets the Sherman Act to assert that Kraft's futures constitute 'direct evidence' of 'monopolization.'" (Dkt. 465 at 15 (citing Dkt. 453 at 194−95).) But Defendants misread that portion of Pirrong's report. Rather than interpreting the Sherman Act, Pirrong merely relies on Plaintiffs' counsel's interpretation of the law to justify his decision not to undertake a particular avenue of investigation. (*See* Dkt. 453 at 195−96 ("Counsel has instructed me that under the law, it is possible to demonstrate monopolization and attempted monopolization under Section 2 of the Sherman Act either by an analysis of a defendant's market share in the relevant market or by direct evidence of market power. My analysis, which provides direct empirical documentation showing beyond cavil that Kraft had market/monopoly power in the relevant market, therefore renders it completely unnecessary to undertake any analysis of market share.").) That portion of his report contains no inadmissible legal conclusions.

places in Pirrong's report where he seems to reach such psychological conclusions (Dkt. 465 at 13).[8]

Experts' "assertions about another person's 'intent' [frequently] are neither helpful nor admissible under Rule 702." *United States v. Schultz*, 2016 WL 7409911, at *3 (N.D. Ill. Dec. 22, 2016) (collecting cases). Exclusion of such experts' testimony is appropriate, for example, where the experts' opinions amount to legal conclusions that a party violated a particular law. *See, e.g.*, *Klaczak v. Consol. Med. Transp. Inc.*, 2005 WL 1564981, at *10 (N.D. Ill. May 26, 2005) (striking expert opinion that defendant acted "knowingly" and "willfully"); *Isom v. Howmedica, Inc.*, 2002 WL 1052030, at *2 (N.D. Ill. May 22, 2002) (similar); *Baldonado v. Wyeth*, 2012 WL 1802066, at *8 (N.D. Ill. May 17, 2012) (similar).

Where, as here, an expert's testimony does not amount to inadmissible legal conclusions, the Court's assessment of purportedly inadmissible state-of-mind testimony turns on whether the expert's opinion "would assist the jury and if so, whether its probative value is outweighed by its danger for unfair prejudice." *Isom*, 2002 WL 1052030, at *1. To show that such expertise would be helpful, the proponent must persuade the Court that the expert is "more qualified than an ordinary juror to draw those inferences" about the party's state of mind. *Dahlin v. Evangelical Child & Fam. Agency*, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002). Where the expert lacks the requisite qualifications, the expert's testimony will almost always be

---

[8] Defendants do not supply an exhaustive list of state-of-mind statements that they find objectionable. (*E.g.*, Dkt. 465 at 13 (listing "example[s]" of Pirrong's purportedly state-of-mind opinions).) But such a list is not necessary at this stage.

unhelpful because he or she is "in no better position than the jury to assess [the party's] subjective intent." *Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*, 2004 WL 783356, at *6 (N.D. Ill. Jan. 28, 2004); *see, e.g.*, *DePaepe*, 141 F.3d at 720 (an engineer "could not testify *as an expert* that [the defendant] had a particular motive").

Pirrong's assessment of the objective information available to him is properly within the scope of his expertise. *See, e.g.*, *Goldberg v. 401 N. Wabash Venture LLC*, 2013 WL 1624989, at *3 (N.D. Ill. Apr. 15, 2013) (distinguishing inadmissible state-of-mind testimony from admissible testimony about an entity's "objective and historical development experience" based on the expert's "prior experience" with similar entities (cleaned up)); *Dahlstrand v. FCA US, LLC*, 2021 WL 4318322, at *3 (N.D. Ill. Jan. 14, 2021) (finding admissible an expert's testimony "about what plaintiff should have known regarding [a particular subject], based on testimony from multiple witnesses"); *United States Commodity Futures Trading Comm'n v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016) ("Experts are not permitted to testify to an actor's state of mind, but an expert can testify to whether a given practice is consistent with a given state of mind."); *Media Sport & Arts S.R.L. v. Kinney Shoe Corp.*, 1999 WL 946354, at *4 (S.D.N.Y. Oct. 19, 1999) (permitting expert testimony on "whether the parties' behavior conformed with industry customs and practices and whether this evidences the intent of the parties to be bound by [the] contract"). In his reports, Pirrong makes clear that certain conclusions are drawn only in his capacity as an economist. (*See, e.g.*, Dkt. 453 at 126, 184, 187−88, 239.) Pirrong also acknowledged during his deposition that "[he] cannot know what is in [Kraft's]

mind[]" and that his opinions are based on the "objective information" available to him. (Dkt. 453 at 394.)

Reading Pirrong's reports in their totality and with the benefit of his deposition transcript, the Court is satisfied that some of the statements identified by Defendants (Dkt. 465 at 13–14) are properly limited to subjects within the scope of his economic expertise and are rooted in his observations about Kraft's objective behavior. For example, when Pirrong concludes Kraft took "actions that lacked a legitimate economic motive," he is not offering information about Kraft's psychological motivations; rather, he is expressing his opinion as to whether there was any "legitimate commercial or economic reason" for Kraft's behavior. (Dkt. 453 at 120.)

But other statements in Pirrong's reports amount to inadmissible testimony about Kraft's state of mind. When Pirrong opines that Kraft "*knew* it would not get wheat delivered to it in Toledo (or Chicago), but on the Mississippi or Ohio" (Dkt. 453 at 218; *see* Dkt. 465 at 13), he is venturing outside his area of expertise. Even if Pirrong were to ground that opinion in statements made by Kraft (according to Pirrong, "[Kraft's] very own complaints about high basis levels") that he filters through his economic lens (Dkt. 453 at 218), it is difficult to disaggregate the plausibly admissible component of Pirrong's opinion about Kraft's objective behavior from the clearly inadmissible testimony about Kraft's state of mind. Likewise, when Pirrong concludes that Kraft "deliberately and willfully acquired [its monopoly] power," he inadmissibly opines about Kraft's corporate *mens rea*. (*Id.* at 237.) Pirrong

is not "more qualified than an ordinary juror" to draw such inferences. *Dahlin*, 2002 WL 31834881, at *3.

Pirrong's admissible testimony about Kraft's objective conduct will be helpful to a jury, and any risks associated with his testimony are outweighed by its probative value. Although some of Pirrong's conclusions about Kraft's state of mind are inadmissible, those statements do not warrant excluding his reports in their entirety or barring his testimony. Defendants' motion to exclude (Dkt. 450) is thus granted only as to Pirrong's inadmissible state-of-mind testimony. Plaintiffs are reminded that Pirrong is neither qualified to opine about Kraft's state of mind nor otherwise authorized to reach legal conclusions about Defendants' conduct. In assessing any forthcoming motions for summary judgment, the Court will only consider Pirrong's opinions and testimony to the extent that those opinions and testimony are admissible. If Pirrong is called to testify before a jury, and he is asked to opine outside his area of expertise or about other inadmissible subjects, such testimony can be addressed through objections, cross-examination, and limiting instructions.

### 2. *Pirrong's event studies and associated opinions*

#### a. Pirrong's event studies of price artificiality

Defendants next argue that Pirrong's event studies depart from the generally accepted standards for rigorous and methodologically-sound event studies by failing to isolate the price effects of the challenged event. (Dkt. 465 at 16.) According to Defendants, (1) "Pirrong's event studies . . . fail to isolate any specific or public signal as the cause of the price 'artificiality' they describe," (2) "Pirrong's event window

independently renders his studies unreliable," and (3) "Pirrong's studies . . . fail to control for several other known price drivers." (*Id.* at 17−31.)

Even if valid (an issue not decided here), such critiques do not render Pirrong's opinions unreliable. Defendants' concerns are with the design of Pirrong's regression—especially with his selection of variables, including control variables. To address those concerns, the Court would necessarily wade into the province of the trier of fact. As the Supreme Court and Seventh Circuit have confirmed "on a number of occasions," the selection of the variables to include in a regression analysis "is normally a question that goes to the probative weight of the analysis rather than to its admissibility." *Manpower, Inc.*, 732 F.3d at 808; *see Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part) (explaining that "failure [of a regression analysis] to include variables will affect the analysis' probativeness, not its admissibility").

Pirrong's event study methodology is reliable (*see above*), and he has approached his analysis of the present case with "the same level of intellectual rigor that characterizes the practice of an" expert in his field. *Smith*, 215 F.3d at 719. Pirrong explains in great detail his choices of variables (*e.g.*, Dkt. 453 at 65−66), his selection of the event window (*e.g.*, *id.* at 64−65, 132−40), and more (*see generally id.* at 47−246). Accordingly, Defendants' critiques of Pirrong's regression construction, and of his application of the event study methodology in the present case, are more appropriately addressed, if at all, through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."

*Daubert*, 509 U.S. at 596; *see Stollings*, 725 F.3d at 766 (same); *see, e.g., Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 424 (7th Cir. 2015) (proposing limiting instruction to the jury as a "simple solution" to potential problem with expert's testimony).

> b.      Pirrong's antitrust opinions

Defendants also seek to exclude Pirrong's antitrust opinions for several reasons (Dkt. 465 at 31–38), but Defendants' arguments as to those opinions are similarly unavailing. Defendants first argue that "Pirrong's antitrust analysis violates controlling law on the definition of monopoly power." (*Id.*) According to Defendants, Pirrong's opinions are inadmissible because Pirrong asserts "that Kraft was a monopolist" despite that his findings as to Kraft's market control demonstrate that Kraft did not have monopoly power as a matter of law. (*Id.* at 32.) Pirrong's error, according to Defendants, stems from his conflation of the *economic* definition of "market power" with the *legal* definition of "monopoly power." (*Id.* at 32–33.)

But in context and with the benefit of cross-examination at any trial, Pirrong does not offer inadmissible legal conclusions about Kraft's status (or non-status) as a monopolist. *See Sanders*, 2016 WL 4417257, at *6 (distinguishing admissible testimony about "ultimate issue[s]" from inadmissible testimony about "legal issues"). As on other issues, Pirrong offers his opinions in his capacity "[a]s an economist." (Dkt. 453 at 184; *see id.* at 187–88.)

In fact, Pirrong's economic opinions are in line with the Seventh Circuit's acknowledgement that, "[f]or antitrust purposes monopoly power and market power

18

typically are used interchangeably and simply mean that a firm can influence the price it receives for its product." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452 n.10 (7th Cir. 2020) (quotation omitted). In other words, Pirrong's occasional conflation of "market power" and "monopoly power" does not render his testimony inadmissible. Pirrong does not opine as to whether Kraft's conduct satisfies any legal standards or meets any legal definitions—either of which might render such an opinion inadmissible. *See Good Shepherd Manor Found., Inc.*, 323 F.3d at 564; (*see also above*). Any risk of confusion about the nature and meaning of Pirrong's testimony can be addressed and mitigated through cross-examination, limiting instructions, or both.

Second, and relatedly, Defendants argue that Pirrong's antitrust opinions are "divorced from any reliable empirical analysis" because Pirrong defines the market he examines in his report differently from how courts—especially the Supreme Court—define markets in other cases. (Dkt. 465 at 31, 35−38.) But Defendants have not cited any authority requiring the exclusion of testimony where non-legal experts define non-legal terms in ways that differ from how those terms are defined by courts in other cases. Defendants are free to dispute how Pirrong defines the relevant market through cross-examination, and they are free to call witnesses who present alternative or contrary views (provided the testimony of those witnesses is

admissible).[9] How Pirrong defines the market in his analysis is not a valid reason to exclude Pirrong's testimony.

### 3. Pirrong's Event Studies as a Method of Proving Class-Wide Economic and Competitive Injury

Finally, Defendants argue that application of Pirrong's estimates of "price artificiality" to actual class member trades "reveals that a significant portion of the class was not harmed by the prices he attributes to Kraft's allegedly 'false' and 'anticompetitive' demand signals for 2011 wheat." (Dkt. 465 at 38.) Defendants cite a purported admission by Robinson in support of that conclusion. (*Id.* (citing Dkt. 441 at 12 (Under Seal)).) According to Defendants, Robinson "admits 'that somewhere in the range of about half of all traders would have paid net artificiality while about half of all traders would have received net artificiality.' " (Dkt. 441 at 12.)

Even if Robinson's admission were not in dispute,[10] the conclusion that Defendants draw from it—that Pirrong's estimates show a significant portion of the class was not harmed by Kraft's conduct—is not a valid basis for exclusion of an expert's testimony. *See Daubert,* 509 U.S. at 595 ("The focus . . . must be solely on principles and methodology, not on the conclusions that they generate."); *Smith,* 215 F.3d at 718 ("[S]oundness of the factual underpinnings of the expert's analysis and

---

[9] Defendants' abilities to cross-examine Pirrong, and to present contrary evidence, adequately insulate against the risk that Pirrong's opinions on monopoly power may mislead a jury. (*See* Dkt. 465 at 37–38.)

[10] Plaintiffs dispute the validity and admissibility of Robinson's admission. (*See* Dkt. 504 at 49 (Under Seal).)

the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

\* \* \*

Accordingly, Defendants' motion to exclude Pirrong's testimony and opinions (Dkt. 450) is granted as to Pirrong's inadmissible state-of-mind testimony but denied in all other respects.

## B. Charles Robinson

Robinson received his undergraduate degree in mathematics from Magdalene College at the University of Cambridge. (Dkt. 455 at 54.) After working as an auditor and accountant, he formed and managed a commodity brokerage. (*Id.*) Robinson has testified as an expert in at least four other cases involving alleged manipulation of commodity futures contracts, and he has served as a non-testifying consulting expert in many other cases over the past two decades. (*Id.* at 55.)

In the present case, Robinson "analyze[s], calculate[s] and summarize[s] certain data and information from documents produced in this litigation"—especially Kraft's brokerage statements. (Dkt. 455 at 55–56.) Robinson offers two sets of calculations in his initial report: "Trading Calculations," in which he assesses Kraft's futures positions, applies Pirrong's artificiality estimates to Kraft's futures positions, and calculates Kraft's profits and losses at times relevant to the present dispute; and "Cost Calculations," in which he estimates the "results" of Kraft's wheat futures purchase and the costs of Kraft's shipment of wheat to its Toledo mill. (*Id.* at 56–62.)

Robinson's potential testimony is relevant to the present case, and the methodology he employs is reliable. If credited by a jury, Robinson's testimony would assist the jury in understanding and evaluating Kraft's conduct. *See Stuhlmacher*, 774 F.3d at 409. Robinson applies his skills as an accountant and his knowledge of the commodities markets to review and analyze Kraft's behavior. Although Defendants characterize parts of Robinson's analysis as "second grade math" (Dkt. 447 at 10 (Under Seal)), the Court is satisfied that the approach Robinson employs in his report is reliable for *Daubert* purposes.

Defendants nonetheless seek to limit the admissibility of Robinson's Trading Calculations to the extent of his current disclosures and to exclude Robinson's Cost Calculations in their entirety. (Dkt. 451; Dkt. 447.)

### 1. *Robinson's Trading Calculations*

First, while conceding that Robinson's Trading Calculations are admissible, if only narrowly, Defendants ask that Robinson's Trading Calculations be "strictly limited to the scope of Robinson's current disclosures." (Dkt. 447 at 2−3.)[11] According to Defendants, Robinson should not be allowed to "offer any substantive opinions or justifications for the methodology or data used in his calculations." (*Id.* at 6.)

Defendants' request may be premature. It is true that, under Rule 26, experts must provide written reports with "complete statement[s] of all opinions the

---

[11] Defendants also ask that the admissibility of the Trading Calculations be "contingent on the admissibility of the Pirrong opinions they apply." (Dkt. 447 at 5.) Having found that Pirrong's relevant opinions are admissible (*see above*), the Court will not further address Defendants' arguments that turn on the admissibility of Pirrong's testimony.

witness[es] will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Failure to provide such reports may be grounds to bar a witness from testifying. *See* Fed. R. Civ. P. 37(c)(1). But experts are not "strictly limited" to the words in their reports. *See Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009). Rather, such reports must "convey the substance of the expert's opinion[s] so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (cleaned up).

Even testimony outside the scope of experts' reports does not automatically render such testimony inadmissible. Rather, in such circumstances, courts must assess whether the experts' non-disclosure—the testimony they offer ostensibly beyond that promised in the experts' reports—"was justified or harmless." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (citation omitted); *see Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000) ("Rule 37 precludes the trial judge from imposing the exclusion sanction unless it finds the party's failure to comply with Rule 26(a) was both unjustified and harmful to the opposing party."). To the Court's knowledge, Plaintiffs have not sought to offer Robinson's opinions as to anything outside Robinson's report. As such, the Court is unable to make any findings about the justification or harm of such testimony.[12]

---

[12] If Robinson later seeks to testify about opinions outside the scope of his report, Defendants may renew their motion to bar such testimony at that time.

Defendants separately seek to characterize Section VI of Robinson's Report as lacking "meaningful independent analysis" and as a merely "mechanical application of [the Pirrong studies] to the [Kraft] brokerage summaries Robinson draws on his own expertise to analyze." (Dkt. 447 at 7.) But there is nothing objectionable "about an expert relying upon the work of a colleague." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017); *see also* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."). In fact, "it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). Robinson's use of Pirrong's artificiality estimates in part of his report does not render the former's opinions inadmissible.

Robinson's opinions are distinguishable from the clearly inadmissible testimony excluded in the cases cited by Defendants. In *SEC v. Nutmeg Group, LLC*, the excluded expert had "not conducted any meaningful independent analysis," 2017 WL 1545721, at *19 (N.D. Ill. Apr. 28, 2017), and in *Gopalratnam*, the district court prohibited a party from admitting testimony through one expert that was not in the expert's area of expertise and was, in fact, completely drawn from the work of another expert, 877 F.3d at 788–89. In contrast to those cases, Robinson "appl[ied] Dr. Craig Pirrong's estimates of artificiality in the December 2011 and March 2012 CBOT SRW futures contract to the plaintiffs' positions in that contract." (Dkt. 455 at 59.)

Robinson's "independent analysis," *Nutmeg*, 2017 WL 1545721, at *19, is enough to render the opinions offered in Section VI of his report admissible.

### 2. *Robinson's Cost Calculations*

Defendants also seek to exclude Robinson's Cost Calculations in their entirety because, according to Defendants, those calculations (1) "are not expert testimony at all," (2) "are not the product of any reliable methodology," and (3) could mislead the jury and "jeopardize the integrity of the judicial process" by "addressing dispositive issues with no lawful or reliable foundation." (Dkt. 447 at 8–11.)

Defendants first argue that Robinson's Cost Calculations must be excluded because those calculations "do not even purport to draw on any of Robinson's expertise" and instead "merely summarize cost figures that were taken directly out of source documents." (Dkt. 447 at 8 (quotation omitted).) But brokerage statements are not always intuitive or straightforward. (*See* Dkt. 455 at 92 (Robinson: "I've been around the commodities market for a good, long time and I have seen commodity statements of all type. Believe . . . me[,] there is no fixed format, and interpretation is sometimes a little bit difficult.")); *cf. Merrill Lynch, v. Curran*, 456 U.S. 353, 356 (1982) (describing commodity futures markets trading as "esoteric"). Robinson's experience as an accountant, as well as his work with brokerage statements (Dkt. 455 at 92 (Robinson: "I don't think there's a commodities statements I couldn't read and interpret, and I'm a mathematician and accountant and I have the ability to do these analyses."); *see id.* at 54–55), qualify him to review and analyze Kraft's transactions and accounts in this case. *See Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.

1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.").

Defendants' concerns about the "reliability" of Robinson's methodology are similarly misplaced. Defendants attack the "foundation" of Robinson's conclusions, comparing Robinson to the proposed expert in another case who "never conducted any research on the" specific subject about which the expert was being called to testify. (*See* Dkt. 447 at 9 (citing *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1023−24 (N.D. Ill. 2011)).) But the Court is satisfied that Robinson's accounting background and his experience in commodities markets provide an adequate "foundation" for the conclusions he reaches in his Cost Calculations, *see Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010), and, unlike the expert in *Obrycka*, Robinson's opinions are based on his personal analysis of Kraft's transactions.

Finally, Defendants' argument that Robinson's Cost Calculations risk misleading the jury (Dkt. 447 at 9) is unpersuasive. To the extent that Defendants' concerns hold water, those concerns are better addressed to Robinson on cross-examination, through the presentation of contrary evidence, or, as appropriate, through instructions to the jury. *See Stollings*, 725 F.3d at 766. Excluding Robinson's Cost Calculations is not warranted.

## IV. CONCLUSION

Defendants' motion to exclude Pirrong's opinions and testimony (Dkt. 450) is granted in part and denied in part. Defendants' motion to partially exclude Robinson's opinions and testimony (Dkt. 451) is denied.

SO ORDERED in No. 15-cv-02937.

Date: October 28, 2022

_____
JOHN F. KNESS
United States District Judge