**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HARRY PLOSS, et al., | ) | Case No. 15-cv-2937 |
| | ) | |
| Plaintiffs, | ) | Judge John F. Kness |
| | ) | |
| v. | ) | |
| | ) | |
| KRAFT FOODS GROUP, INC. and | ) | |
| MONDELĒZ GLOBAL LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' CORRECTED MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DECERTIFY THE 2020 CLASSES**

Dean Panos
J. Kevin McCall
Nicole A. Allen
Thomas Quinn
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
dpanos@jenner.com
jmccall@jenner.com
nallen@jenner.com
tquinn@jenner.com

Elizabeth Papez
Helgi C. Walker
Joshua Lipton
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8608
epapez@gibsondunn.com
hwalker@gibsondunn.com
jlipton@gibsondunn.com

Christopher Joralemon
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave.
New York, NY 10166
(212) 351-2668
cjoralemon@gibsondunn.com

*Attorneys for Defendants Mondelēz Global LLC & Kraft Foods Group, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

SUMMARY OF ARGUMENT .........................................................................................2

BACKGROUND ...............................................................................................................8

I.      CLAIMS AND DEFENSES .................................................................................8

      A.      CEA Claims ...............................................................................................9

      B.      Antitrust Claims ......................................................................................12

      C.      Unjust Enrichment (Illinois) ..................................................................13

II.     PRIOR CERTIFICATION RULINGS..................................................................13

      A.      2019 Certification Proceedings ..............................................................13

      B.      2020 Order..............................................................................................13

III.   RECORD DEVELOPMENTS SINCE 2020.........................................................14

      A.      New Discovery Regarding Alleged Class Member Injury and Damages............14

      B.      New Discovery About Kraft's Alleged "Signals" and "Market Power" ..............16

      C.      *Daubert* Litigation and Rulings.........................................................23

LEGAL STANDARDS......................................................................................................25

I.      THE 2020 CLASSES MUST BE DECERTIFIED UNDER RULE 23(a) .....................27

      A.      The Current Record Shows That the Named Plaintiffs Are Neither Typical Nor Adequate Class Representatives..................................................................27

      B.      The Current Record Also Shows a Lack of Rule 23(a) Commonality ................30

            1.      There Is No Common Proof of Class-Wide Injury...................................31

            2.      There Is No Common Proof of *Basic* Liability .....................................32

            3.      There is No Common Proof of *Kohen* Liability .....................................38

            4.      There Is No Common Proof of Antitrust Liability ...................................39

II.     THE 2020 CLASSES MUST ALSO BE DECERTIFIED UNDER RULE 23(b)(3) .......41

    A.     Individualized Issues Will Predominate on Plaintiffs' CEA Claims....................43

    B.     Individualized Issues Will Also Predominate on Plaintiffs' Monopoly
            Claim ...............................................................................................................45

III.    THE 2020 CLASSES ARE NOT ASCERTAINABLE AND VIOLATE
      *COMCAST* ............................................................................................................47

## TABLE OF AUTHORITIES

Page(s)

CASES

*Allied Ortho. Appl., Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (D.C. Cal. 2007) ........................................................................30

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ...........................................................................................25

*Am. Honda Motor Co., Inc. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ..............................................................................26

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .....................................................................................27, 42

*Amgen Inc. v. CT Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ...........................................................................................44

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ...........................................................................45, 46

*Assoc. Gen. Contractors v. Carpenter*,
  459 U.S. 519 (1983) ......................................................................13, 28, 45, 46

*Atl. Richfield Co. v. USA Pet. Co.*,
  495 U.S. 328 (1990) ...........................................................................................12

*Basic v. Levinson*,
  485 U.S. 224 (1988) .............................................................3, 32, 35, 36, 43

*Bazemore v. Friday*,
  478 U.S. 385 (1986) ...........................................................................................25

*Braun v. Lorillard Inc.*,
  84 F.3d 230 (7th Cir. 1996) ................................................................................25

*Brown v. Electrolux Home Prods., Inc.*,
  817 F.3d 1225 (11th Cir. 2016) ............................................................................7

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) ..............................................................................49

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................5, 7, 8, 26, 30, 31, 40, 41, 42, 43, 45, 47, 49, 50

**TABLE OF AUTHORITIES**
(continued)

Page

*Conrad v. Boiron, Inc.*,
    869 F.3d 536 (7th Cir. 2017) ....................................................................................... 27, 28

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    801 F.3d 758 (7th Cir. 2015) ............................................................................................... 9

*Deslandis v. McDonald's USA, LLC*,
    2021 WL 3187668 (N.D. Ill July 28, 2021) .......................................................... 13, 40, 41

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .......................................................................................... 11, 16, 35

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ...................................................................................... 25, 26

*Ellis v. Elgin Riverboat Rest.*,
    217 F.R.D. 415 (N.D. Ill. 2003) ............................................................................. 3, 8, 34, 43

*Exhaust Unltd., Inc. v. Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004) ......................................................................................... 39

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ............................................................................. 21, 24, 35, 36

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021) .............................. 5, 11, 12, 16, 21, 22, 26, 32, 33, 35, 36, 43, 47, 48

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
    29 F.4th 839 (7th Cir. 2022) ............................................................................................. 43

*Halliburton Co. v. Erica P. John Fund, Inc.*
    573 U.S. 258 (2014) ........................................................................................................ 32

*Hannah's Boutique, Inc. v. Surdej*,
    112 F. Supp. 3d 758 (N.D. Ill. 2015) .................................................................................. 12

*Hannah's Boutique, Inc. v. Surdej*,
    2015 WL 4055466 (N.D. Ill. July 2, 2015) .................................................................. 12, 39

*Howard v. Cook County Sheriff's Office*,
    989 F.3d 587 (7th Cir. 2021) ..................... 1, 4, 5, 8, 25, 27, 29, 30, 31, 32, 34, 37, 41, 42, 47

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
    131 Ill. 2d 145 (1989) ...................................................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
  864 F.2d 1409 (7th Cir. 1989) ........................................................................12

*Johnson v. Yahoo! Inc*,
  2018 WL 835339 (N.D. Ill. Feb. 13 2018) ............................................ 30, 42, 47

*In re Kalobios*,
  258 F. Supp. 3d 99 (N.D. Cal. 2017) .................................................................35

*Kleen Prods., LLC v. Int'l Paper Co.*,
  831 F.3d 919 (7th Cir. 2016) ..................................................................... 45, 46

*Kohen v. Pac. Inv. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009) .................................................. 4, 6, 10, 22, 31, 38

*Kottaras v. Whole Foods Mkt., Inc.*,
  281 F.R.D. 16 (D.D.C. 2012) ...........................................................................32

*Lara v. First Nat'l Ins. Co. of Am.*,
  25 F.4th 1134 (9th Cir. 2022) ..........................................................................44

*McGarry & McGarry LP v. Bankr. Mgmt. Sols., Inc.*,
  937 F.3d 1056 (7th Cir. 2019) .........................................................................12

*Messner v. Northshore Univ. Health Sys.*,
  669 F.3d 802 (7th Cir. 2012) ..........................................7, 25, 30, 39, 44, 45, 49

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*,
  317 F.3d 703 (7th Cir. 2003) ...........................................................................12

*Moss v. United Airlines, Inc.*,
  20 F.4th 375 (7th Cir. 2021) ................................................................. 8, 42, 50

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ...........................................................................37

*In re Nat. Gas*,
  358 F. Supp. 2d 336 (S.D.N.Y. 2005) .................................................................9

*In re NorthShore Univ. Healthsys. Antitrust Litig.*,
  2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) .....................................................41

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ......................................................................... 12, 13, 39

**TABLE OF AUTHORITIES**
(continued)

Page

*Parko v. Shell Oil Co.*,
  739 F.3d 1083 (7th Cir. 2014) ...................................................................26

*In re Rail Freight Fuel Surcharge Antitrust Lit.*,
  934 F.3d 619 (D.C. Cir. 2019) ..........................................................8, 26, 45, 49

*Santiago v. City of Chicago*,
  19 F.4th 1010 (7th Cir. 2021) ..................... 1, 2, 5, 8, 25, 26, 27, 28, 29, 30, 42, 44, 47, 48, 49

*Shields v. Fed. Int'l de Natation*,
  2022 WL 425359 (N.D. Cal. Feb. 11, 2022) .......................................30

*Sullivan & Long, Inc. v. Scattered Corp.*,
  47 F.3d 857 (7th Cir. 1995) .................................................................9, 10

*Tarrify Props., LLC v. Cuyahoga Cnty.*,
  37 F.4th 1101 (6th Cir. 2022) ............................................................43

*In re Term Commodities Cotton Futures Litig.*,
  2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) ..................................38

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ...................................................... 1, 4, 8, 42, 48, 49

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................................................44

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ........................................................................12

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) .........................................................12, 45

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..........................................................1, 25, 27, 36, 37

**STATUTES**

7 U.S.C. § 25(a)(1), (2) .......................................................... 9, 10, 31

15 U.S.C. § 2 ................................................................................12

15 U.S.C. § 15(a) ........................................................... 12, 31, 44

28 U.S.C. § 2072(b) .........................................................................1

**TABLE OF AUTHORITIES**
(continued)

Page

**OTHER AUTHORITIES**

Frank H. Easterbrook, *Monopoly, Manipulation, and the Regulation of Futures Markets*,
    59 J. of Bus. S103, S106 (1986)..........................................................................38

**RULES**

Fed. R. Civ. P. 23(a)(3), (4)...........................................................................29

Defendants Mondelēz Global LLC and Kraft Foods Group, Inc. (collectively "Kraft") hereby respectfully move to decertify the plaintiff classes originally certified on January 3, 2020 pursuant to Federal Rule of Civil Procedure 23(b)(3). Ex. 1 ("2020 Order").

## INTRODUCTION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).[1] The certification requirements in Rule 23 reflect this principle. They ensure that class actions serve only as a "procedural device" for aggregating claims that meet certain criteria— foremost, that the claims are justiciable in their own right. Newberg on Class Actions § 1:1 (6th ed. 2022). This limitation is necessary because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Accordingly, class certification cannot "extend" a court's "jurisdiction" to claims that would not be individually justiciable, such as claims by plaintiffs who have no injury that would be redressed by a judgment against the defendant. *Id.* Nor can it otherwise "abridge" or "modify" any "substantive right," including a defendant's due process right to try defenses specific to individual plaintiffs. *Id.*; *see also* 28 U.S.C. § 2072(b).

It is precisely because class actions implicate these jurisdictional limits and procedural guarantees that a court "*must* assure itself *at all stages of the litigation* that a certified class meets the requirements of Rule 23." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 599 (7th Cir. 2021). The Seventh Circuit recently applied this principle to decertify two Rule 23 class actions. *See id.*; *Santiago v. City of Chicago*, 19 F.4th 1010 (7th Cir. 2021). These cases, and settled Supreme Court law, require the same result here.

Since the Court entered the 2020 Order, discovery has revealed that five of the eight named

---

[1] All emphasis in this brief is added, and internal source cites omitted, unless otherwise noted.

Plaintiffs—and nearly half of all class members—were not and could not have been injured under Plaintiffs' theory of this case. Instead, a great many class members profited from the very prices they challenge. And they did so based on information and transactions so varied that every claim will require extensive individual litigation under Plaintiffs' own expert analyses. The reason—as Plaintiffs admitted at the *Daubert* hearing last year—is that "you can't call this . . . a fraud on the market case." Ex. 12 at 32:4-5. These developments unravel the 2020 Order, which certified the classes "in light of the fraud on the market theory" that "common evidence" would show that "all" class members "lost money" in the same market where Kraft's alleged "false signals" supposedly inflated prices. Ex. 1 at 3, 13. The foundation for these rulings is gone. And the record now before the Court precludes certification under Rule 23 and controlling law.

## SUMMARY OF ARGUMENT

The grounds for decertification "begin[]" with "the elements of" Plaintiffs' claims, *Santiago*, 19 F.4th at 1017, and run through the Court's October 2022 *Daubert* order. Dkt. 561.

***The Certified Claims.*** The claims at issue allege that Kraft's 2011 wheat-sourcing activities for its flour mill in Ohio violated the Commodity Exchange Act (CEA), the Sherman Antitrust Act, and the Illinois doctrine of unjust enrichment. Dkt. 71 ¶¶ 15–22, 102–15, 158–71. Plaintiffs do not dispute that Kraft needed wheat for its Toledo mill, which produces most of the flour required to make Oreo® cookies, Ritz® crackers, and other popular snacks. Ex. 13 at Facts 1, 2. They also do not dispute that futures contracts are a legitimate way to procure wheat. Indeed, Plaintiffs allege that Kraft took the 2011 futures position at issue here "in response to" increasingly "elevated cash prices" for the wheat Kraft usually buys in Toledo. Dkt. 71 ¶¶ 55–56. Nonetheless, they say Kraft "knew" the futures position was "uneconomic" from the start, and that Kraft's real intent was not to procure wheat, but instead to manipulate and monopolize the futures market. Specifically, they say Kraft used its contracts to send "false signals" of demand for futures wheat

that caused "artificial" and "anticompetitive" inflation of futures prices (and depression of cash prices) from November 1 to December 14, 2011 (the "Class Period"). Ex. 1 at 2–3.

**The 2020 Order.** The 2020 Order certified two nationwide (futures contract and options) classes on the claims above. Ex. 1 at 29. The classes encompass a vast and heterogeneous group of traders—banks, hedge funds, grain silos, manufacturers, exporters, farm operators, and individual arbitrageurs—who executed a hodgepodge of individual trading strategies. The common issue the order says unites them all is financial loss from Kraft's alleged "fraud on the market." *Id.* at 3, 9–10, 19–22. Specifically, it credits the claim that "*all* of the Plaintiffs" in this case "lost money" because the "false signals" from Kraft's position "artificially" inflated the price of all contracts they purchased during the six-week Class Period. Ex. 1 at 2–3, 9–16, 19–22.

The 2020 Order recognized that this "false signals" claim requires proof of reliance on the challenged signals. And it said "Kraft is right" that the named Plaintiffs have *disclaimed* such reliance. Ex. 1 at 9. That disclaimer was one of many skunks to arrive at the certification garden party in 2019. But the 2020 Order disposed of them all in one stroke. It said because Plaintiffs' "theory of liability" is the "fraud on the market" theory the Supreme Court recognized in *Basic v. Levinson*, 485 U.S. 224 (1988), Ex. 1 at 9–16, Kraft's "false signals" of demand caused "artificial" inflation to be "baked into" the price of every contract in the class definitions. *Id.* at 9–10, 19–22. Accordingly, all class members were presumptively and adversely affected (and in the same way) by the alleged "false signals" even if they were unaware of Kraft's position. *See id.* And that is how the story went until 2020, when Kraft started taking the discovery that has blown Plaintiffs' "fraud on the market" theory out of the water.

**The Current Record.** Rule 23 "requires this Court to review the propriety of class certification in light of new evidence and pretrial litigation." *Ellis v. Elgin Riverboat Rest.*, 217 F.R.D. 415, 420 (N.D. Ill. 2003). Here, "newly produced" trading data and related expert work

"critical to class certification" have dissolved the "glue"—and specifically the *Basic* "fraud on the market theory"—the 2020 Order cites as "holding the [certified] class[es] together." *Howard*, 989 F.3d at 596-97, 603; Ex. 1 at 9–12, 19–22. Notably, Plaintiffs' expert analysis shows that five of the eight named Plaintiffs—and an estimated *38% to 44% of all class members*—suffered no injury from their contract purchases. The reason is that the 2020 class definitions are fatally overbroad. They include all traders who "*purchased* wheat futures at the allegedly inflated prices." Ex. 1 at 23. But the record now shows that many of these "purchasers" were *also* sellers of contracts at the allegedly elevated prices. And because the class period is so long, many class members who purchased contracts sold them for more than they paid. Further, new discovery shows that several of these sellers were grain silos or other sophisticated parties who had long positions as large (or larger) than Kraft's position. And it shows that many of them had better information than Kraft did about the delivery economics that supposedly made Kraft's position misleading. Accordingly, the certified classes are full of members who were not deceived about anything, and both profited from—and contributed to—the price inflation Plaintiffs challenge.

    ***Grounds for Decertification.*** Decertification is now required for two principal reasons that cut across all of Plaintiffs' claims and all of the analysis in the 2020 Order. *First*, the classes here are brimming with "a great many persons" who suffered no redressable harm "at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009). Decertification is required for this reason alone. "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for [alleged] legal infractions." *TransUnion,* 141 S. Ct. at 2205. *Second*, the current record shows that even class members who suffered some financial loss on their contract purchases could not prove their liability claims with common evidence. They would have to litigate issues and defenses of deception, reliance, causation, and antitrust impact that would require precisely the individualized

inquiries Rule 23 forbids. Where, as here, the post-certification record shows that some class members are "situated differently from the others in a material way," the Court must "reassess" the Plaintiffs' case under Rule 23. *Howard*, 989 F.3d at 599. To do that, the Court must engage in a "rigorous analysis" of the certified claims, *id.* at 601, and "break[] them down into their constituent elements" to assess "which issues are common, individual, and predominant" under Rule 23. *Santiago*, 19 F.4th at 1018. The parties prepared the record for that analysis over the last 18 months. And it shows that the current classes must be decertified for several reasons the 2020 Order did not address because they are "enmeshed in" new "factual and legal issues" central to "plaintiffs' cause[s] of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

The headline is that Plaintiffs do not have the "fraud on the market" evidence the 2020 Order assumed they would, and that the Supreme Court requires for the current classes to remain certified under *Basic*'s presumption of class-wide reliance and injury. Plaintiffs admit they do not have common proof of the "timing" of class trades in relation to both a "public misrepresentation" by Kraft and a drop in futures prices "when the truth" of Kraft's alleged false signals was revealed. *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1957–58 (2021). The record here, including Plaintiffs' admitted expert studies, shows only that class members purchased contracts during a six-week period in which Kraft held a long position and Pirrong's regression observes price inflation. But as the Supreme Court stressed in *Goldman*, a purchaser of securities (here, futures contracts) *is not injured* if she both buys *and* sells the security at the allegedly inflated price. *See id.* The record now shows that the classes here are filled with such purchasers. The reason is that Plaintiffs' event study does not relate class purchases to the "truth" and "timing" benchmarks *Goldman* says "must be satisfied by plaintiffs before class certification." *Id.* at 1959. Plaintiffs admitted as much at the 2022 *Daubert* hearing. They said "you *can't* call this . . . a fraud-on-the-market case." Ex. 12 at 32:3–5. But that is exactly what the 2020 Order had to call

5

it to justify the existing certifications under *Basic* and Rule 23. Ex. 1 at 9-23.

At the same hearing, Plaintiffs tried to make up for this fatal departure from the 2020 Order by pivoting from its *Basic* theory of class-wide injury to the argument that Kraft's conduct here is analogous to part of the "corner and squeeze" scenario their expert addressed in an academic paper (*Detecting Manipulation*) about a soybean manipulation case from the 1980s. Plaintiffs presumably did so because the Seventh Circuit has held that some corner cases can support a "*prima facie*" (*Basic*-like) presumption of injury to "net short sellers" in futures markets on both manipulation and monopoly claims. *Kohen,* 571 F.3d at 679. But that presumption cannot replace the shattered *Basic* foundation for the 2020 certifications here, because the facts do not fit. *Kohen* recognized a "corner and squeeze" position as a market power manipulation and "form of monopolization" *only* because the holder maintained "a large long futures position" while "*simultaneously*" acquiring a very large ("great white" sized, Ex. 12 at 17:2–4) share of "market power in the *deliverable supply of the underlying good*." *Kohen,* 571 F.3d at 674. These facts are not present here, because Kraft did not control the deliverable supply of 2011 futures wheat. That power belonged to several *class members*. Accordingly, this case does not fit either the *Basic* or *Kohen* pattern for presuming class-wide reliance on (or injury from) an allegedly manipulative or "false" trading position, much less support any aspect of Plaintiffs' separate monopoly claim.

This case thus presents a far stronger record for decertification than the recent decisions in *Howard*, *Santiago*, and *Ellis*. The 2020 certifications here assumed that the record would support the *Basic* presumption on Plaintiffs' CEA and antitrust claims. But it does not. Nor does it support a presumption of class-wide harm on the "corner" theory in *Detecting Manipulation* and *Kohen*. Instead, it shows that pervasive individualized issues divide the certified classes on core issues of liability and justiciability. The parties' experts had to "interpret[]" and obtain individualized fact discovery just to assess injury for the named parties. These inquiries would be required throughout

the certified contract class. They would be even more complicated for class members who held options, which none of the named Plaintiffs did. And they would be virtually impossible to conduct with respect to antitrust claimants in a "market" the 2020 Order itself rejected as unascertainable because it did not exist until the end of the Class Period, and there is no "repository" of who traded in it. Ex. 1 at 14.

The reason this case is crawling with such individualized issues is that Plaintiffs' common proof of injury does not "fit" any recognized theory of liability on their statutory claims. This scenario is the gold standard for decertification. Where, as here, class plaintiffs rely on expert studies to show common harm from alleged statutory violations, the "first step" for the "study is the translation of the *legal theory* of the harmful event into an analysis of the *economic impact of that event*." *Comcast*, 569 U.S. at 37–38. Without that link, the studies would subject the defendant to liability for damages "that are not the result of the wrong." *Id.* That is a due process problem in any case. But it is especially dangerous in class actions that wield an "*in terrorem*" power from "the sheer number of class members and the potential payout" that would be "magnified unfairly" if the classes include "many members who could not bring a valid claim even under the best of circumstances." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 825 (7th Cir. 2012).

These concerns are at their apex here because the 2020 Order assumed Plaintiffs would prove their claims through a "fraud on the market" study their own lawyers have now disclaimed as "totally inappropriate" for this case. Ex. 12 at 41:15. This disconnect destroys the "fraud on the market" foundation for the 2020 certifications. Plaintiffs have no common proof or theory of class-wide injury to replace it. And at this stage of the litigation any "doubts about" that must be resolved in favor of decertification. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016). That is the Supreme Court's instruction for Rule 23 review, which is the

opposite of the instruction *Daubert* supplies for expert admissions. Dkt. 561 at 6. The Court's *Daubert* order stressed that exclusion of expert evidence is "the exception rather than the rule." Dkt. 561 at 6. Plaintiffs relied on that rule to get Pirrong's novel studies admitted. And now they are stuck with them under Rule 23, where the tables are turned and the studies must meet the "higher standard" for class certification. *In re Rail Freight Fuel Surcharge Antitrust Lit.,* 934 F.3d 619 (D.C. Cir. 2019) ("*Rail Freight II*"). Plaintiffs bear the burden of satisfying that standard even on a "motion for decertification." *Ellis*, 217 F.R.D. at 419–20. But even with admitted expert evidence and eight years of litigation, they cannot meet it. Indeed, the deficiencies in the Rule 23 record now are so great that continued class litigation would go beyond improperly subjecting Kraft to "*in terrorem*" litigation against undamaged plaintiffs. It would require the Court to adjudicate claims by hundreds of scarecrows who have suffered no justiciable injury at all. *See Moss v. United Airlines, Inc*., 20 F.4th 375, 379 n.7 (7th Cir. 2021) (citing *TransUnion*, 141 S. Ct. at 2205, 2208). Because there is no common method for narrowing the class or adjudicating liability on a class-wide basis, decertification is the only proper remedy. *See Comcast*, 569 U.S. at 33–34; *Howard*, 989 F.3d at 599; *Santiago*, 19 F.4th at 1016–18.

## BACKGROUND

As noted, Rule 23 analysis "begins . . . with the elements of the underlying cause of action." *Santiago*, 19 F.4th at 1017. Accordingly, this section begins with the claims and defenses Plaintiffs seek to litigate on behalf of the certified classes. It then summarizes the 2020 Order granting certification. And it ends by summarizing the new developments that compel decertification now.

## I.    CLAIMS AND DEFENSES

The 2020 Order certified two nationwide classes defined as "[a]ll persons" who "purchased and/or [in  some instances] sold December 2011 or March 2012 CBOT wheat futures [i] contracts and/or [ii] options on those contracts" between November 1, 2011, and December 31, 2011. Ex.

1 at 2–3.  The order certified these classes on claims alleging:  (1) price manipulation under CEA § 9(a)(2), 7 U.S.C. § 13(a)(2) (Count 1); (2) use of a manipulative or deceptive device under CEA § 6(c)(1), 7 U.S.C. § 9(1) (Count 2); (3) monopolization under Sherman Act § 2, 15 U.S.C. § 2 (Count 6); and (4) unjust enrichment under Illinois law (Count 7). *See* Dkt. 113 (dismissing other claims in Dkt. 71).  The elements and defenses most relevant to the Rule 23 analysis are as follows.

A.   **CEA Claims**

Plaintiffs allege that Kraft's "false signals" of demand for futures wheat violated two sections of the CEA:  [1] use of a manipulative or deceptive device in violation of Section 6(c)(1)[2]; and [2] price manipulation in violation of Section 9(A)(2).[3]  Dkts. 71; 332.  These claims are only "actionable" if Plaintiffs can show "*actual damages resulting from*," and "*caused by*," the alleged manipulation.  7 U.S.C. § 25(a)(1), (2).

***Manipulative Device.***  The only manipulative "device" Plaintiffs say Kraft used to violate the CEA is a common trading position:  namely, a large long position in the December 2011 wheat futures contract.  Many traders held such positions, which simply represent the right to buy physical wheat from counterparties (short position holders) at the end of the contract (the delivery period).  As a result, all futures trades can be viewed as sending some supply and demand "signal" for the underlying commodity.  And because all trades occur through anonymous orders on a public exchange, every trade or position can affect prices.  That is why CEA manipulation claims require *more* than just proof of a position that moved price.  *See, e.g.*, *Sullivan & Long, Inc. v. Scattered*

---

[2] In addition to actual damages, Plaintiffs' Section 6 claim requires proof that Kraft used a *manipulative or deceptive* device to make *public* statements that presumptively affected the price of open and efficient market trades.  *In re Nat. Gas*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005).

[3] In addition to actual damages from the alleged price manipulation, and as relevant here, Plaintiffs' Section 9 claim requires evidence that:  (1) an *artificial* price existed; (2) Kraft caused it; and (3) Kraft specifically intended to cause it.  *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764–65 (7th Cir. 2015) (affirming summary judgment for defendant).

9

*Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (no manipulation despite evidence that a short seller's trades intentionally moved the market price of the shares in issue).

Two of the most common manipulative positions are known as "corners" and "squeezes." *Kohen*, 571 F.3d at 678–79. Corners involve more than just a large long position. A "corner" is a "form of monopoly" that allows a trader "to influence the price of a futures contract by" maintaining "a large long futures position" while "*simultaneously*" and "intentionally acquiring market power in the *deliverable supply of the underlying good*" that is so large the trader can squeeze shorts who need that supply to meet the long position's demand. *Kohen*, 571 F.3d at 674. Plaintiffs do not allege a corner here. A "short squeeze" also involves a long position that *exceeds deliverable supply* of the underlying good across all contract locations. *See id.* Plaintiffs do not allege such a short squeeze here.

**False Signals.** Because Plaintiffs do not, and cannot, allege a "corner or squeeze" claim in this case, they must allege something else that distinguished Kraft's long position from others in the Class Period "order flow." Plaintiffs' theory is that Kraft's position was uniquely "uneconomic" because Kraft supposedly knew that futures delivery locations would be too far from its mill to be worth shipping, so its position sent an intentionally "false" signal of "economic" demand for futures wheat. Ex. 2 ¶¶ 44, 116, 121, 124. There are endless problems with this claim. But for Rule 23 purposes, the key is that it must satisfy the CEA's requirements for "false signal" cases. Ex. 1 at 2–3. In such cases, "the essence of the offense is creating 'a *false* impression of supply and demand'" that other traders rely upon to their detriment. *Sullivan & Long*, 47 F.3d at 864. The requirement of a "*false* impression" is critical, because futures positions themselves are not "manipulative" or "deceptive"—and the prices they create are not "artificial"—unless the signals they send are *knowingly false*. *Id.* Detrimental reliance is also essential, because private plaintiffs cannot recover on "false signal" claims unless they *relied* on the signals and suffered

"*actual damages*" as a "result[]." 7 U.S.C. § 25(a)(1), (2).

Basic *"Fraud on the Market."* Because the named Plaintiffs admit they "did not rely on any misrepresentations made by Kraft," Ex. 1 at 9, the 2020 Order held that the only theory that could support class certification on the CEA claims here is the "fraud on the market" theory in *Basic*. *Id.* This theory "assumes that buyers and sellers rely on *public misstatements* whenever the[y] buy[] or sell[] [securities] at the price set by the market because the market transmits information to the participants in the form of the market price." Ex. 1 at 9. But as the Supreme Court stressed last year, plaintiffs asserting *Basic* "fraud on the market" claims must have evidence that: "(1) the alleged *misrepresentation* was *publicly known*; (2) it was material; (3) the [affected security] traded in an efficient market; and (4) the plaintiff traded [the security] between the time the misrepresentation was made *and the truth was revealed*." *Goldman*, 141 S. Ct. at 1958. The last requirement is critical here, because merely *purchasing* a security at a price allegedly "inflated because of [a] misrepresentation" does *not* show that the misrepresentation "caused" the Plaintiff "actual damages." *See id.* As the Supreme Court explained, "at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong." *Id.* If "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation *will not have led to any loss*." *Id.*

The relationship between the "*Basic* prerequisites" above and the proof of class-wide injury Rule 23 requires is the reason the elements of "publicity, market efficiency, and market timing 'must be satisfied' by plaintiffs '*before* class certification.'" *Goldman*, 141 S. Ct. at 1959. And even such proof does "not guarantee class certification," because "defendants may rebut the *Basic* presumption" in a variety of ways. *Id.* They may show that the challenged "false signal" did not

"actually affect the market price." *Id.* Or they may present evidence that "*severs the link* between the alleged misrepresentation and either the price received (or paid) by [a] plaintiff, or his decision to trade at the fair market price." *Id.*

## B. Antitrust Claims

Although Plaintiffs rely on the same evidence for their CEA and antitrust claims, their monopoly claim is legally distinct. It arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits private parties from monopolizing (or attempting to monopolize) "trade or commerce." *See id.* Monopolization claims require market power so "substantial" it causes harm to competition. *Hannah's Boutique, Inc. v. Surdej*, 2015 WL 4055466, at *4 (N.D. Ill. July 2, 2015); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018); *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414–15 (7th Cir. 1989). And even where private plaintiffs have evidence that a defendant possessed such power, they can bring a Section 2 claim only if they have been competitively "*injured in [their] business or property by*" the alleged monopoly. 15 U.S.C. § 15(a); *Atl. Richfield Co. v. USA Pet. Co.*, 495 U.S. 328, 334 (1990).

To show this injury "from a *competition-reducing* aspect or effect of the defendant's behavior," antitrust plaintiffs need *more* than proof of financial loss. *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003); *McGarry & McGarry LP v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1065 (7th Cir. 2019) (elaborating six elements plaintiffs must prove). They must show actual losses that resulted from *competitive* restraints caused by the defendant's "possess[ion of] 'monopoly power *in [a] relevant market.*'" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020) (quoting *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). At the certification stage, an antitrust plaintiff need not prove the market relevant to his claims. But "at least a rough definition of a product and geographic market" is necessary, *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 772 (N.D. Ill. 2015), because

12

that is what allows courts "to measure [the defendant's] ability to lessen or destroy competition." *Am. Express Co.*, 138 S. Ct. at 2284–85. Further, because antitrust injury must be direct, plaintiffs must typically show that they were either "competitors or consumers" in the relevant market. *Assoc. Gen. Contractors v. Carpenter*, 459 U.S. 519, 539 (1983). In class actions, failure to make either showing supports decertification. *See Deslandis v. McDonald's USA, LLC*, 2021 WL 3187668 (N.D. Ill July 28, 2021).

### C. Unjust Enrichment (Illinois)

To recover on an unjust enrichment claim under Illinois law, Plaintiffs must show that Kraft "unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160 (1989). Plaintiffs' theory of unjust enrichment here is derivative of the statutory violations they allege, so the grounds for decertification of their CEA and Sherman Act claims also apply to their unjust enrichment claim.

## II. PRIOR CERTIFICATION RULINGS

### A. 2019 Certification Proceedings

Plaintiffs moved for class certification years after they filed this suit. Yet even then, they had not identified any public "false signal[s]" Kraft allegedly sent from November 1 to December 14, 2011. The complaint simply alleged that Kraft manipulated and monopolized the futures market through its "huge" December 2011 long position, which "reached its zenith of 15.5 million bushels on November 29, 2011." Dkt. 71 at 2 & ¶¶ 104, 111, 164. The crux of the certification motion was that Kraft held this 3,000-contract position (which Kraft acquired in September 2011) "*without any intention whatsoever* of loading out, delivering, and using the majority of the [futures] wheat it stood to take delivery of." Dkt. 71 ¶ 79; Mot. ¶ 20; Mem. at 3–4.

**B.  2020 Order**

The 2020 Order was based on the allegations above and the limited record in 2019, and was decided before the recent Supreme Court and Seventh Circuit decisions in *Goldman*, *TransUnion*, *Howard*, and *Santiago*.  Based on the evidence and law available at the time, it relied on *Basic*'s "fraud on the market" theory to support three assumptions about what a more developed record would show.  *First*, the 2020 Order assumed the evidence would show that Kraft made at least one "public misrepresentation" as defined in *Basic*.  Ex. 1 at 9.  *Second*, the order assumed that Plaintiffs' evidence (and specifically Pirrong's event studies) would show that "all of the Plaintiffs that transacted in December 2011 and March 2012 wheat futures lost money" because "they either bought at a higher price or sold at a lower price than they would have absent Kraft's allegedly manipulative actions."  *Id.* at 3, 6, 9–10, 14, 16, 18, 23.  *Third*, the 2020 Order assumed that common evidence of futures price inflation would double as evidence of antitrust injury in a relevant geographic and product "market" under the Sherman Act.  *Id.* at 20–21.  These assumptions are the foundation for the 2020 rulings that:  (i) the named plaintiffs are typical and adequate class representatives of common claims under Rule 23(a), *id.* at 5–10; (ii) "questions of law or fact common to the class members predominate over any questions affecting only individual members" under Rule 23(b), *see id.* at 10–21; and (iii) the classes are "ascertainable" because they use "objective criteria" to identify "a particular group, harmed during a particular time frame, in a particular location, in a particular way" by Kraft, *see id.* at 21–24.

## III.  RECORD DEVELOPMENTS SINCE 2020

In the three years since the classes in this case were certified, the parties have completed discovery and concluded *Daubert* litigation that takes the bottom out of the 2020 Order.  This record negates all of the assumptions underlying the Order's certification of Plaintiffs' CEA "fraud on the market" claims.  And it independently requires decertification of their antitrust claims.

### A. New Discovery Regarding Alleged Class Member Injury and Damages

*Named Plaintiffs*. Plaintiffs' common proof of injury on all of their claims is Pirrong's regression studies, which purport to estimate the dollar amount of "artificiality" in the price of wheat futures contracts each day between November 1 and December 14, 2011. *See* Ex. 2 ¶¶ 64–65. Pirrong's admitted expert opinions say that by ███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████ *Id.* ¶ 67. Plaintiffs' expert Robinson did that math for the named parties. Specifically, he used Pirrong's estimates to calculate the "net artificiality" each named Plaintiff "paid" (lost on their positions) or "received" (gained on their positions). Ex. 5 at 24. The upshot is that only two of the eight named Plaintiffs ████████████████████████████ ██████████████████████████████████████████████████████. App. A. Robinson concluded that Plaintiff ██████████████████████████. *Id.* And it is undisputed that the record contains no evidence of losses by Plaintiffs ███████████ ████████████████, because all three were day traders (meaning they bought and sold their positions within the same day), and Pirrong's model only shows artificiality for overnight positions. Plaintiffs ████████████████████, for whom they offered no net position analysis, just as they offered none for options holders. *See id.* And it is unclear whether ████████████████████████████████████████ ████████████████████████████████████████████████████. Appendix A; Ex. 4 at 146:6-24 (Robinson concession that ███████████████████████ ████████████████████████████

*Class-Wide Injury Estimates.* Merits expert discovery last year also showed that applying Plaintiffs' expert methodology to the CME data demonstrates that ██████████████████ ████████████████████████████████████████████████████████████████████



███████████████████████████████████████████████. Ex. 6 ¶ 32. One of Kraft's experts, Dr. Christopher Vellturo, applied Pirrong's artificiality estimates and Robinson's netting methodology to a random sample of the accounts in Pirrong's data set. In an expert opinion Plaintiffs did not challenge under *Daubert*, Vellturo ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Ex. 6 ¶ 222; *see also id.* ¶¶ 230–32. That is because those class members ████████████████████████████████████████

████████████████████████████ *Id.* ¶ 232; *cf. Dura Pharm.*, 544 U.S. at 42–43. In response, Pirrong purported to conduct ██████████████████████████████████████ Ex. 3 ¶ 627. But he similarly found that ████████████████████████████████████████

██████████████████████████ *Id.* Specifically, Pirrong testified that ████████████████████

████████████████████████████████ so ████████████████████████ Ex. 11 at 353:24–355:8. Robinson similarly admitted in his deposition ████████████████

████████████████████████████████████████████████████████████

████████████████████████ Dkt. 441 at 12 (████████████████████).

All of the foregoing evidence eviscerates the 2020 Order's assumption that, "[a]s a result of the artificial prices allegedly caused by the scheme, *all* of the Plaintiffs that transacted in December 2011 and March 2012 wheat futures lost money." Ex. 1 at 3. Instead, Plaintiffs' admitted expert analyses show that the certified classes are chock full of members who *profited* from the alleged price "artificiality" Plaintiffs challenge in this suit.

## B. New Discovery About Kraft's Alleged "Signals" and "Market Power"

As noted, the 2020 Order rests entirely on *Basic's* "fraud on the market theory," which requires common proof of a "public misstatement" as well as class trades in relation to that misstatement and when the "truth was revealed." *Goldman*, 141 S. Ct. at 1959. The current record

contains no common proof of any of these three requirements for the 2020 *Basic* certifications.

*2020 Fact Discovery.* Before fact discovery closed in December 2020, Kraft insisted that Plaintiffs ███████████████████████████████████████████████████ ████████████████████████████ Ex. 14 at 9. But Plaintiffs refused to do so. Instead, they said they would ████████████████████████████████████████████ ██████████████████████████████████████████████████████ █████ Ex. 14 at 9–21. Plaintiffs similarly refused to provide substantive answers to interrogatories about ███████████████████████████████████████ *See id.* at 21–31, 35–36.

*Plaintiffs' Opening Merits Reports (December 2020).* Pirrong's December 2020 merits report said that at the start of the Class Period on November 1, 2011, Kraft ███████████ ██████████████████████████████████████████████████████ ██████. Ex. 2 ¶ 323. To address the fact that Kraft's long position was admittedly *not* public, Pirrong asserted that the demand "signal" associated with it ██████████████████████ ██████████████████████████████████████████████ Ex. 2 ¶ 323. And to address the fact that this ████████████████████████████, Pirrong asserted that Kraft's status as a miller made its position a credible "signal" of demand to "consume" the futures wheat, but that its mill location made futures deliveries uneconomic. *See id.* ¶ 333. For these reasons, Pirrong said Kraft's position, but not other long positions, ██████████████ ███████████████████████████. *Id.*; Dkt. 561 at 19.

Ironically, the private emails Plaintiffs cite from certain class members undercut these assertions. For example, the Andersons, a powerful grain conglomerate, was █████████ ██████████████████████████████████████████████████████ ████████████████. Ex. 2 ¶ 172. Ignoring this, Pirrong insisted that all class members

"expected" Kraft to liquidate its position before November 29 (the start of the December "delivery period"). *See id.* ¶¶ 322–23. He then opined that Kraft's failure to liquidate its position in November was an "unexpected" and "false" signal that Kraft would actually consume up to 15 million bushels of wheat, *see id.* ¶¶ 128, 210, 310, which ████████████████████████████ ███████████████████████████████████████████████████████████████. *Id.* ¶¶ 310, 322–23; *id.* ¶ 405 (Plaintiffs' allegations ██████████████████████ ████████████████████████████████).

The record that developed after Pirrong issued these opening merits opinions further undermined Plaintiffs' theory that Kraft's futures position deceived the market into believing Kraft would use the position to consume up to 15 million bushels of delivery wheat. The CME rules that allow long position holders to sort delivery certificates and hold or resell those issued for inconvenient locations are public. So there was nothing "unexpected" about Kraft taking delivery in accordance with those rules to see where its certificates landed. Indeed, the emails Plaintiffs cite show that is exactly what class members familiar with Kraft's position expected Kraft to do, because Kraft did it (and received some futures wheat close to its mill) in September 2011. As the Andersons noted: ████████████████████████████████████████████████████████ ████ Dkt. 503 at Fact 32. The fact that December delivery locations would be chosen by short position holders (not Kraft) was also information known or available to class members from the CME's contract rules. *See* Ex. 13 at Fact 10. And information on historic delivery locations, current wheat stores, shipping rates, and local cash prices was not information proprietary to Kraft, but information that was available to all or most class members. *See id.* at 13. Indeed, the traders who had the best sense of December delivery locations were class members (███████████████) who controlled significant amounts of the wheat registered for delivery.

This evidence is critical under Rule 23, because it shows that in addition to engaging in

highly individualized contract purchases and sales, individual class members were exposed to the "truth" about the delivery economics of Kraft's position in many individual ways that could preclude them from proving their claims in this case. The 2020 Order does not address this evidence, and Plaintiffs' admitted expert work does not provide a common method for addressing it either. *See* Ex. 6 ¶ 227; *see also* Ex. 5 at Ex. 5; Ex. 5 ¶ 5.

**New CME Data and Kraft's Expert Reports (January – April 2021).** In early 2021, Kraft obtained new CME data and introduced (unchallenged) expert reports that put even more distance between Plaintiffs' evidence and the "*Basic* prerequisites" (and corner precedents) the 2020 Order cites as allowing class-wide presumptions of price injury from alleged market manipulations.

Order Flow. Kraft's analysis of the new CME data confirmed that ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████. This ████

████████████████████████████████████████████████████████████████

█████████████████████████████, and did not show anything close to the kind of "public misrepresentation" that *Basic* requires for class certification. *Id.* at Facts 38, 41.

Large Long Position Holders. The new CME data Kraft obtained in 2021 revealed that several of the large long position holders in the December 2011 "order flow" are what Plaintiffs call "real players," Ex. 15 at Fact 25: ████████████████████████████████████

████████████████████████████████████████████████. Ex. 14 at Fact 38. Moreover, Plaintiffs admit ████████████████████████████████████████

████████████. *Id.* at Fact 40. And ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████. *Id.* at 40–41. Pirrong admits these long positions ████████████████████████████████████████████████████

███. Dkt. 532 at 20; Ex. 15 at Fact 25. But Plaintiffs voluntarily removed only Cargill from their class definition in May 2018 because they conceded that its trading activities ████████ ████████████████████████████████████████████████████████████████ were a "cause . . . of the artificial inflation" they challenge in this case. Ex. 13 at Fact 39. The other entities above remain in the certified classes. *See id.* And they are just some of the members who had long positions that Pirrong admits could make class members ███████████ █████████████████ because ████████████████████████████████ █████████████████████ Ex. 3 ¶¶ 628–29.

<u>Large Bull Spread Position Holders.</u> The current record also shows that a number of class members held the same "bull spread position" (the combination of a long December position and short March position) that Plaintiffs say Kraft allegedly used to generate approximately $5.4 million in trading gains from the price artificiality supposedly caused by Kraft's "false signals" of "economic" demand for futures wheat. Dkt. 71 ¶ 78; Ex. 2 ¶¶ 17, 289, 532, 565. Kraft's experts studied ████████████████████████████████████ ███████████████████████ Ex. 7 at Ex. 17. These entities appear to ██████████ ████████████████████████████████████████████████████████████████ ███████████████████. App. A. And an initial analysis of their trades suggests they are █████ ████████████████████████████████████████████████████████████████ ███████████████████████ Ex. 3 ¶ 629.

This analysis confirms that, contrary to the 2020 Order's assumption, Ex. 1 at 23, merely *purchasing* a contract during the Class Period is *not* a proxy for the injury Rule 23 and *Basic* require for class certification. Many class members who purchased contracts during the Class Period held long or spread positions that contributed to the price inflation Plaintiffs challenge. And even class members who simply bought and sold contracts during the Class Period profited

from the increased inflation in Pirrong's model. These facts explain why the experts for both parties estimated that the certified classes contain so many uninjured members. They also explain why the experts agree that the only way to determine which class members suffered redressable harm is to conduct the fact-intensive, individualized analysis of trading records they performed for the named parties. *See* App. A.

    <u>Deliveries</u>. The current record likewise shows that Pirrong's damages studies do not provide the information *Basic* requires even during the delivery portion of the Class Period. Plaintiffs argued that, ███████████████████████████████████████████████████ ██████████████████████████████████████████████. Ex. 14, at Facts 25, 29, 30-32 (arguing that "[n]one" of the other longs "received shipping certificates" through Kraft's broker, *id.* at Fact 41, or took "uneconomic" deliveries due to █████████████████ *id.* at Fact 25). But even taking these allegations as true, they do not provide the evidence *Basic* requires for class certification. Notably, Pirrong's event studies do not associate these signals with any "public misrepresentations," or with the trade timing or price movements required to support class certification under Rule 23. He addresses only deliveries on Kraft's non-public long futures position, and never identifies the revelation of "truth" or "back-end price drop" *Basic* requires to validate inferences of "front-end inflation" even in cases where there is a clear public misrepresentation to the market. *Goldman*, 141 S. Ct. at 1961 (citing *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015)).

    Here, even assuming Kraft's (generic and anonymous) long position sent a "false signal" of "economic demand" for futures wheat to at least some class members, the truth of Kraft's "uneconomic" delivery position was revealed in mid-December, after it liquidated its position and got certificates at locations down river from its mill. But unlike the delivery-stage regressions in *Detecting Manipulation* and the other studies Pirrong relies upon, his studies here do not show that

the market price Kraft allegedly inflated "collapsed" after Kraft liquidated its position. Dkts. 506-2 at 35–36, 506-4 at 57; Ex. 14 at Fact 29.[4]  Instead, they show that futures price inflation *increased*. *Id.* Pirrong said this increase reflected ███████████████████████ ████.  *See id.*  But he does not identify any evidence of such expectations, much less the kind of "public misrepresentation" or price movements *Basic* requires. *Goldman,* 141 S.Ct. at 1957.

Deliverable Supply.  Fact and expert discovery since 2020 also confirms this case is fundamentally different from the corner and squeeze scenarios in *Kohen* and *Detecting Manipulation. See* Dkt. 452, Ex. 2 ¶ 116; Dkt. 452, Ex. 9 ¶ 25; Dkt. 532 at 13, 17, 27–28.  Unlike the alleged manipulators in those precedents, Kraft did *not* control "virtually all of the deliverable stock" available for futures deliveries, Dkt. 506-2 at 52, or attempt to acquire such control by using its long position to demand deliveries in excess of that supply. *Kohen,* 571 F.3d at 674*;* Dkt. 506-2 at 38, 50-52, 54.  Nor could it, because Plaintiffs admit that Kraft's allegedly "uneconomic deliveries" totaled only ███████████ Ex. 15 at Fact 92–93, at a time when there "█████ ████████████████████████████████████████████████████ Ex. 14 at Fact 65, and "██████████" at Pirrong's CTD location, Ex. 15 at Facts 76.  Kraft's load-out thus constituted just ████ of warehouse stocks, and about ████ of available CTD supply.

***Plaintiffs' Expert Rebuttals, Depositions, and Kraft's Sur-Rebuttal (July – August 2021).***

In July 2021, Pirrong responded to the new evidence above by reframing his theory of Kraft's alleged "fraud on the market."  As relevant here, he opined that Kraft's alleged ██████ *accurately conveyed* what Kraft would do and did do" with its wheat futures position, and that

---

[4] The absence of such evidence, which *Basic* requires for class certification, is particularly notable because Pirrong says that when other long positions holders who contributed to price "artificiality" earlier in the Class Period liquidated their positions, Dkt. 532 at 20; Ex. 15 at Fact 25, the price "artificiality" associated with those positions "'disappeared.'" Ex. 14 at Fact 51 (quoting Dkt. 452, Ex. 4 ¶ 96); *see also* Ex. 14 at 38–41; Ex. 15 at 64.

"market participants received and *accurately interpreted* these signals." Ex. 11 at 126:7–8; Ex. 3 ¶ 94.  Pirrong insisted, ███████████ Ex. 3 ¶ 94. He elaborated that Plaintiffs' "false signaling" theory is therefore *not* that Kraft ███████████ but rather that Kraft ███████████ *Id.* ¶ 171. Pirrong then asserted that because Kraft's small (165,000 bushel) mid-December delivery supposedly turned out to be "uneconomic" due to shipping costs, *id.*, Kraft "*knew or should have known*" on *November 1* that any delivery on its entire 15 million bushel long position would be "uneconomic" (and thus a "false signal" of demand for futures wheat). Dkt. 453 at 218; Dkt. 465 at 13; *see also* Ex. 11 at 126–27, 146–47, 151, 240–41. But as discussed below, this opinion is precisely the one the Court excluded under *Daubert*. Dkt. 561 at 15-16.

### C. *Daubert* Litigation and Rulings

**Daubert *Proceedings*.** The parties completed merits expert discovery in August 2021, and in October 2021 Kraft moved to exclude Pirrong's opinions and exclude portions of Robinson's analysis, Dkts. 450, 465-66, 532 (Pirrong); 451, 447, 511 (Robinson).[5] As relevant here, Kraft challenged Plaintiffs' expert evidence as unreliable or unhelpful to resolving this "fraud on the market" case, Dkt. 466 at 1, because it could "misleadingly suggest[] to [a] jury that a sophisticated statistical analysis proves the impact of [an] alleged fraud" when the observed impact "could very well have been caused by other information," *id.* at 26. In developing this challenge, Kraft focused on: (i) Pirrong's improper scienter opinions; (ii) his failure to tie his "artificiality" estimates to the "public misrepresentation(s)" and revelation of "truth" *Basic* requires, Dkt. 465 at 18, 21, 25; and (iii) his failure to identify any relevant antitrust "market" here, or any evidence of the "form of

---

[5] Plaintiffs did not challenge any of Kraft's experts, but requested that the parties file *Daubert*-stage Rule 56.1 Statements of Facts addressing record evidence. *See* Dkts. 441; 504; 503; 513.

monopoly" addressed in *Detecting Manipulation* and *Kohen*. *Id.*; 532 & App. A.

These issues came to a head at the *Daubert* hearing last July, when Kraft repeatedly identified as a "red flag," Ex. 12 at 12:5–15:5, 48:10–22, the failure of Plaintiffs' "event study" to tie its "artificiality" estimates to the kind of defendant-specific "public misrepresentations" and revelation of "truth" that *Basic* requires. *See id.* In response, Plaintiffs admitted "*you can't call this . . . a fraud on the market case,*" Ex. 12 at 32:4-5, and fell back on the argument that Kraft "did the same thing Ferruzzi did in the *Detecting Manipulation* article. They uneconomically withheld their liquidation orders." *Id.* at 32:20–22.[6] But as Kraft explained, this case does not fit that pattern either, because Kraft did not have the large ("great white" sized, Ex. 12 at 17:2–4) position ("market power") in the *physical* commodity that defined the positions in *Detecting Manipulation* and *Kohen*. *Id.* at 17-23; Dkt. 465 at 32; Dkt. 532 App. A. Accordingly, and as Pirrong ultimately admitted, this case does not fit any recognized theory of liability on Plaintiffs' claims. It is ███████████████████████████████████████████████ ███████████ which is why he had "to *devise* an analytical framework" for it rather than deliver on the 2020 Order's expectation of the kind of study *Basic* requires for class certification. Dkt. 452, Ex. 2 ¶ 116.

***October 2022** Daubert **Order.*** The Court's *Daubert* order excludes Pirrong's opinions on Kraft's knowledge and intent, Dkt. 561 at 16, and specifically Pirrong's opinion that "[w]hat made [*Kraft's*] signals 'false'" is that Kraft "*knew or should have known*" that shorts would deliver so far from its mill that futures deliveries would be "uneconomic." Dkt. 453 at 218; Dkt. 465 at 13. The Order holds that Pirrong's analysis of Kraft's allegedly false signals must be based on

---

[6] Plaintiffs initially responded by citing securities "leakage" studies like *Glickenhaus* and Jarrell in which information comes out in "dribs and drabs." Ex. 12 at 40:25–41:16. But all of those studies adhere to the *Basic* framework affirmed in *Goldman*, slip. at 8 (citing *Glickenhaus*, 787 F.3d at 415).

"objective information" about the economics of Kraft's "objective behavior." Dkt. 561 at 14-15. Subject to this limitation, the Order admitted Pirrong's "event study" based on certain (distinguishable) precedents,[7] and held that "many of Defendants' arguments"—including those concerning the "application of [Pirrong's] event study methodology in the present case," *id.* at 17—would "more appropriately be made" at trial because "exclusion of expert testimony 'is the exception rather than the rule'" even for "shaky" expert work. *Id.* at 6.[8]

## LEGAL STANDARDS

Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). These requirements differ from *Daubert* standards in two important respects.

*First*, the Supreme Court presumption is reversed. *Daubert* instructs that exclusion of expert evidence is the "exception not the rule." But under *Dukes* and Rule 23, class certification is the "exception to the usual rule" of individual litigation. *Dukes*, 564 U.S. at 348; *see also, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (vacating certification where district court "confused the *Daubert* standard . . . with the 'rigorous analysis' standard" for Rule 23 certification). That is why, even on a motion for decertification, Plaintiffs have the "burden" of satisfying all Rule 23 requirements by a "preponderance of the evidence." *Messner*, 669 F.3d at 811. It is also why the Court has a "continuing duty" to "reassess" this evidence as the record

---

[7] *Compare* Dkt. 466 at 12; 532 at 1 *with* Dkt. 561 at 4, 8-9 (citing *Detecting Manipulation* and cases addressing expert "'latitude' in their selection of variables'"); *id.* at 17 (citing Justice Brennan's pre-*Daubert* partial concurrence in *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

[8] Kraft respectfully reserves its objections to the regression's admission under circuit precedent, including cases recognizing the *Daubert* presumption but holding that where an expert opinion rests on a scientific method "designed for use [in one situation but] has never been used [in the present circumstances]," exclusion is warranted because a "jury is not equipped to evaluate scientific innovations." *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996). That said, for Rule 23 purposes, Kraft fully accepts the admitted expert evidence as part of decertification record.

develops. *Howard*, 989 F.3d at 599; *Santiago*, 19 F.4th at 1016-18; *Ellis*, 657 F.3d at 982. And it is why the foregoing and other cases decertified classes *after* expert models were admitted under *Daubert*, but Rule 23 analysis showed that they failed to meet the "higher standard" for class certification. *Rail Freight II*, 934 F.3d at 624–25; *Comcast,* 569 U.S. at 33-34.

*Second*, and relatedly, Rule 23 class issues cannot be deferred to trial, especially where (as here) certification is tied to a "fraud on the market" presumption that requires Plaintiffs to establish certain "prerequisites" on the record "*before* class certification." *Goldman*, 141 S. Ct. at 1959. In "reassessing" whether Plaintiffs have carried their Rule 23 burden, the Court must "judg[e] the persuasiveness of the evidence presented," even if it is subject to a so-called "battle of the experts" on work admitted under Rule 702. *Ellis*, 657 F.3d at 982. Specifically, the Court must assess "the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments" and the elements of each of Plaintiffs' claims. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014); *Santiago,* 19 F.4th at 1018. The Court cannot defer this assessment on the ground that "whether the evidence and the methodology are sound and convincing is a question going to the strength of the plaintiffs' case and should be postponed to summary judgment proceedings or trial." *Parko,* 739 F.3d at 1087. Nor may it "duck hard questions by observing that each side has some support." *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010). Instead, those "[t]ough questions must be faced and squarely decided" on the record presented under Rule 23. *Id.*; *Comcast*, 569 U.S. at 35–36.

## ARGUMENT

The 2020 Order was entered without the record evidence summarized above, and before the Supreme Court and Seventh Circuit decisions in *Goldman*, *TransUnion*, *Howard*, and *Santiago*. These record and legal developments upend the 2020 certifications, which depend on *Basic* proof Plaintiffs admit they do not have. The current record also precludes certification under

any alternative theory of class liability. These barriers to certification cut across the holdings in the 2020 Order, which address Rule 23(a), Rule 23(b)(3), and ascertainability requirements Plaintiffs cannot meet.

## I.    THE 2020 CLASSES MUST BE DECERTIFIED UNDER RULE 23(a)

The current record requires decertification on the Rule 23(a) requirements (typicality, adequacy, and commonality) addressed in the first part of the 2020 Order. The typicality and adequacy factors require evidence that the "claims and defenses of the representative parties are typical of the claims or defenses of the class," and "arise[] from the same event or practice" on the "same legal theory" and have the "same essential characteristics." *Howard*, 989 F.3d at 605. Commonality requires evidence that Plaintiffs' claims are "'capable of classwide resolution— which means that determination of [their] truth or falsity' can be resolved by adjudicating elements for all class members '*in one stroke*.'" *Id.* at 596 (quoting *Dukes* at 350). The current record does not satisfy any of these requirements for certification.

### A.    The Current Record Shows That The Named Plaintiffs Are Neither Typical Nor Adequate Class Representatives

The 2020 Order concluded that Plaintiffs are typical and adequate class representatives based on 2019 allegations that "the claims of the named Plaintiffs are identical, both legally and factually, to those of the proposed class members," and there is "nothing that distinguishes" them. Ex. 1 at 6–7. The Court must now "reassess" and "reanalyze" these conclusions, *Howard*, 989 F.3d at 606; *Santiago*, 19 F.4th at 1018, and determine whether the named Plaintiffs really are "'part of the [certified] class[es] and possess the same interest and suffer the same injury as the class members.'" *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)). In doing so, it must "reassess" whether "the named plaintiffs [have] materially weaker [or stronger] evidence than some of the class members" on the same "legal theory." *Howard* at 606. And it must determine if any differences

27

raise only a "trivial level of intra-class conflict," *id.*, with respect to "specific elements of the [class] claims," *Santiago*, 19 F.4th at 1019. The current record requires decertification on all of these grounds.

*First*, the record confirms that no named Plaintiff is "part of the [options] class" here, *Conrad*, 869 F.3d at 539, because none of the named Plaintiffs traded options. Ex. 4 at 191-92. The named Plaintiffs thus lack both the ability and incentive to represent that class, which seeks to recover for the same futures price "artificiality" as the contract class, but on terms that Plaintiffs admit are more "complicated" than the contract purchases and sales addressed above. Ex. 7 ¶¶ 381–83 (citing Dkt. 456-2 (Ex. 47) ¶ 328). The current record likewise contains no evidence that any named Plaintiff (or class member) was a "competitor or consumer" in the "CTD" market that Pirrong's admitted expert analysis identifies as "relevant" to Plaintiffs' antitrust claims. *Carpenter*, 459 U.S. at 539. Accordingly, no named Plaintiff is a typical or adequate class representative on the options or antitrust claims in this case. *See, e.g.*, *Santiago*, 19 F.4th at 1019 (decertifying class).

*Second*, the record shows that the named Plaintiffs' positions present exactly the representative and intra-member "conflicts" the Seventh Circuit identified as intolerable in *Howard* and *Santiago*. To start, the record shows that ████████████████████████ ████████████████████████████████████████████████████████ ████████████████. Ex. 4 at Ex. 5-A. And they did so based on a mix of purchases and sales of contracts that appear to be within the class definitions, but that both sides' experts had to assess individually, Ex. 4 at 148-49, and would not be common or mechanical for other class members.[9]

---

[9] In some *Basic* cases injured class members can be identified based on when they traded in relation to bookends of falsity and truth, and a computer or econometric model can sort the records. But the connection must be tight even where the bookends exist, which here they do not.

That is obvious from the "battle of the experts" over whether named ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████. Ex. 6 ¶ 227. But

Robinson says that ████████████████████████████████████████████

██████████████████ Ex. 4 at 148:5. Either way, the dispute confirms that the core injury

alleged in this case requires individualized inquiry to prove, and is subject to "substantial

defense[s]" that cannot be adequately represented by any of the named Plaintiffs, even "by

[creating] sub-classes." *Santiago*, 19 F.4th at 1018.

    The record with respect to the remaining five named Plaintiffs confirms this. It shows that

one ████████████████████████████████████████████████████

████████████████████████████████████████████████. And for the

others, Plaintiffs have no evidence at all (much less class-wide or common proof) that their

purchases resulted in ██████████████████ which is the only trading result that could be redressed

by the judgment they seek in this case. Three of these four named Plaintiffs (██████████████

███████) are intra-day traders who do not merely have "weaker" evidence than many class

members. *Howard*, 989 F.3d at 606. They have *no* evidence capable of proving the alleged harm

in this case, because they never held the overnight positions Pirrong's model requires to measure

alleged price "artificiality." *See* Ex. 6 ¶¶ 226–229; Ex. 5 ¶ 16 & Ex. 5. Because his regression

identifies artificiality in the price of wheat futures on a *day-by-day* basis using end-of-day close

prices, Plaintiffs admit it is ████████████████████████████████. *See* Ex. 5 at

Ex. 4; Ex. 6 ¶¶ 91–92. And Plaintiffs have presented no evidence of ████████████████ for named

Plaintiff ████████

    This record disposes of the 2020 Order's conclusion that "nothing … distinguishes the

claims of the proposed representatives from those of the rest of the class." Ex. 1 at 6. And it establishes that none of the named Plaintiffs is a "typical" representative who can "adequately protect the interests of the [certified] class[es]" going forward. Fed. R. Civ. P. 23(a)(3), (4). Rule 23(a) typicality is not present where, as here, "[e]ven as between" the "named Plaintiffs, there is sufficient heterogeneity to indicate that proof that one Plaintiff was overcharged is not probative of whether other class members were." *Allied Ortho. Appl., Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007). And there is no possibility of adequate representation where, as here, the differences among the named Plaintiffs reflect positional conflicts that pervade the class. *See Santiago*, 19 F.4th at 1018-19; *Howard*, 989 F.3d at 609; *Johnson v. Yahoo! Inc*, 2018 WL 835339, at *3-4 (N.D. Ill. Feb. 13 2018); *Messner*, 669 F.3d at 824. The differences between the named Plaintiffs and class members here on options trading, contract positions, and relationship to the alleged antitrust ("CTD") market are exactly the type of "structurally antagonistic interests" that require decertification under Rule 23(a). *Shields v. Fed. Int'l de Natation*, 2022 WL 425359, at *7 (N.D. Cal. Feb. 11, 2022); *Santiago*, 19 F.4th at 1019.

**B.     The Current Record Also Shows a Lack of Rule 23(a) Commonality**

Decertification is also required under Rule 23(a)'s commonality requirement because the current record shows that Plaintiffs cannot use "common evidence" or "a common methodology" to establish liability on any of their claims. *Messner*, 669 F.3d at 819; *Comcast*, 569 U.S. at 37; *Howard*, 989 F.3d at 600-05 (decertifying for lack of commonality). The 2020 Order assumed that Plaintiffs could use common proof (Kraft's trading records, emails, and Pirrong's study) to show that Kraft sent "false" signals of demand for futures wheat that harmed "all" class members under *Basic's* "fraud on the market theory." Dkt. 3, 9-12, 19-23. But the current record negates that assumption. It also precludes Plaintiffs from relying on the alternative ("corner and squeeze") theory of liability they invoked at the *Daubert* hearing after they admitted you "can't call this . . . a

30

fraud-on-the-market case" as the 2020 Order requires. Ex. 12 at 32:3–5. As the Seventh Circuit just reiterated in *Santiago*, Rule 23 requires district courts to "decide which issues are common, individual, and predominant" only after "circumscribing the claims and breaking them down into their constituent elements." 19 F.4th at 1018. Here, the CEA claims certified in 2020 require proof of "*actual damages resulting from*" the alleged manipulation, 7 U.S.C. § 25(a)(1), (2), and Plaintiffs' Sherman Act claim likewise requires proof of class-wide harm to "personal business or property *by reason of*" Kraft's alleged monopoly, 15 U.S.C. § 15(a). But the current record does not contain the common proof of these harms the 2020 Order assumed it would, nor does it offer any substitute proof sufficient to satisfy Rule 23(a).

1.     <u>There Is No Common Proof of Class-Wide Injury</u>

As noted, the Plaintiffs' own expert analyses show that *an estimated 38% to 44%* of class members *profited* from the price "artificiality" they challenge because they took positions on *Kraft's side* of the futures contract that Kraft allegedly manipulated. (Dkt. 441 at 12 (sealed)). The Court's *Daubert* order notes that "Plaintiffs 'dispute'" this statistic. Dkt. 561 at 20 n.10. But this dispute does not help Plaintiffs under Rule 23(a). A class is improper if "it is apparent that it contains a *great many* persons who have suffered no injury at the hands of the defendant." *Kohen*, 571 F.3d at 677. In *Kohen*, this had "*not yet* been shown," and there was "*no reason*" for the Court "to believe" that many class members were "*net gainers* from the alleged manipulation." *Id.* at 678. Here, the record *does* show this barrier to certification. Plaintiffs' own expert admitted that

████████████████████████████████████████████████

███████████████████ Ex. 3 ¶ 627; *Howard*, 989 F.3d at 597. That is a "great many" by any standard. *Kohen,* 571 F.3d at 677; *see also Rail Freight II*, 934 F.3d, at 623–24. And Plaintiffs cannot avoid decertification by "disputing" their own expert's number now, because *they* are the

31

ones who must satisfy Rule 23 with "evidentiary proof," *Comcast*, 569 U.S. at 33, and all experts agree the certified classes contain large (double-digit) percentages of uninjured members.

In any event, resolving this "dispute" would require precisely the "individualized inquiry" Rule 23 forbids. It would require the parties' experts to analyze each class member's trades to see if "net artificiality" was "paid" or "received" just as they did for the named parties. *See* Dkt. 561 at 24-25 (admitting Robinson because this analysis requires "interpretation" of individual "brokerage statements"); Ex. 4 at 148:4-9 (Robinson admitting he would have to ███████ ██████████████████████████████████████████). This evidence alone compels decertification under Rule 23(a). *See Howard*, 989 F.3d at 597; *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) ("Since benefits must be offset against losses, it is clear that widespread injury to the class simply cannot be proven through common evidence.").

### 2. There Is No Common Proof of *Basic* Liability

The 2020 Order did not have the record above when it certified the current classes on the assumption that Plaintiffs would prove *Basic's* "fraud on the market" theory of class-wide reliance and injury. But the record now is clear. Plaintiffs do not have common proof of actual class-wide injury, nor of any of the "*Basic* prerequisites" the Supreme Court and Rule 23 require to presume such injury for "class certification." *Goldman*, 141 S. Ct. at 1958; *see* Ex. 1 at 9, 13. Accordingly, the foundation for the 2020 certifications is gone. As noted, the *Basic* presumption they invoked applies *only* if Plaintiffs have common proof that: (i) identifies a "*public misrepresentation*" by Kraft; and (ii) relates class trades to both "the time the [alleged] public misrepresentation was made" *and* "when the truth was revealed." *Goldman*, 141 S. Ct. 1958 at 3 (quoting *Basic*, 485 U.S. at 248; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014)). And even then, it is rebutted where (as here) the record shows that certain traders suffered no actual harm or were not deceived.

32

*No Public Misrepresentation*. Even today, Plaintiffs cannot identify any "public misrepresentation" (or trading position) that was unique to Kraft, much less the sole cause of six weeks of inflation in an "informationally efficient" market. *Goldman*, 141 S. Ct. at 1957, 1960. Kraft's December 2011 long position (which it acquired in September 2011 and did not change) was *not* public. And Plaintiffs' theory that Kraft's position created some "unexpected" and measurable "imbalance" in public "order flow" comprised of hundreds of other positions, Ex. 2 ¶¶ 201, 323, has been refuted by new CME data and expert discovery. The 2021 CME data show that ██████████████████████████████████████████████████████████████ in two ways fatal to the 2020 certifications. First, Kraft never made any specific statement at all (it just held a non-public long position). Second, many class members contributed the same positions to the relevant "order flow." Plaintiff's *Basic* case thus stumbles out of the blocks. *See Goldman*, 141 S. Ct. at 1961 (even where there is a "public misrepresentation," the "generic nature of [the] misrepresentation often will be important evidence of a lack of price impact" fatal to class certification). And it only gets worse from there.

Following the discovery above, Plaintiffs *disclaimed* the "public misrepresentation" theory that underpins the 2020 Order. Specifically, they asserted that their theory is no longer (as the 2020 Order said, Ex. 1 at 8-10) that the market was "misled" by Kraft's "signal" that it would take 15 million bushels in futures deliveries. Ex. 11 at 126:20–127:1; Ex. 3 ¶ 94 (██████████████████ ██████████████████████████████████████). Instead, they said Kraft's position ██████ ██████████████████████████████████████ in December 2011, Ex. 3 ¶ 171, and market ██████████████████████████████████████ them. Ex. 11 at 126:7–8; Ex. 3 ¶¶ 3, 94.) This theory of Kraft's position is obviously not consistent with *Basic's* "public misrepresentation" requirement. So Plaintiffs tried to bring it back in line by arguing that what "made [Kraft's accurate] signals 'false'" is "that they did not represent signals of *legitimate* economic demand,"

*id.*, because Kraft "*knew or should have known*" that shorts would deliver so far from its mill that deliveries would be "uneconomic." Ex. 2; Dkt. 453 at 218; Dkt. 465 at 13. In so doing, Plaintiffs tied their entire case on "falsity" to Pirrong's opinions about Kraft's state of mind. But the Court explicitly *excluded* those opinions in the October *Daubert* order, and said Pirrong's analysis of the connection between Kraft's alleged "signals" and class injury must focus on "objective information" about Kraft's position. Dkt. 561 at 15.

That holding is the final nail in the coffin of Plaintiffs' *Basic* "public misrepresentation" claim, because the "objective information" available to Kraft about delivery logistics (which Plaintiffs admit are set at contract expiration and Kraft did not control) was equally (if not more) available to class members. The Toledo mill's location is ubiquitously public, as are CME grain reports, rules about delivery locations, and commercial shipping rates. Further, December 2011 delivery locations were better to known to some class members (notably the grain merchants who controlled deliverable wheat supply) than to Kraft. Indeed, some of these class members discussed Kraft's position before finalizing their own. Notably, ███████████ emailed about Kraft's behavior before they ████████████████████████████████████████. *See* Ex. 2 ¶¶ 27(b), 39. The same is true, Pirrong says, ████████████████████████████████ ████████████████████████████████████████████████████████ ███████████. Ex. 3 ¶¶ 260–65. Pirrong did not analyze the "economics" of these other positions. But if Plaintiffs' "false signals" theory is correct, these class members were aware of the facts that supposedly made Ohio deliveries uneconomic and thus were (a) aware of what Kraft was doing and (b) were sending "false signals" too.

This record alone requires decertification because Plaintiffs bear the burden of proving the *Basic* elements the 2020 Order relies upon, but the current record does not show the first one: namely, a "public misrepresentation" by Kraft that Plaintiffs' expert study associates with price

inflation over the Class Period and cross-checks against a revelation of truth and associated price decline. *Ellis*, 657 F.3d at 427, 430; *Howard* at 606. Indeed, this case is a much stronger candidate for rejecting the *Basic* presumption required for class certification than *Goldman* itself, because the alleged signal here is even more attenuated than the "generic" statements in *Goldman* about the bank's adherence to compliance policies. *See id.* The alleged "public misstatement" here is a common, non-public futures position that at most sent a generic demand signal through aggregated and anonymous public order flow filled with the same signals from *class members*. *See* Ex. 7 ¶¶ 221–31. Pirrong's claim that Kraft could "consume" wheat does not narrow the field by tying any "signal" (much less any "public" or "false" signal) to Kraft as opposed to the other "consumers" who held large long positions during the Class Period. Ex. 2 ¶¶ 187, 473. And Pirrong's claim that Kraft's long position was "uneconomic," Ex. 2 ¶ 140, also does not help because the delivery information that supposedly made the position "uneconomic" (and Kraft's demand signal allegedly "false"), Ex. 3 ¶ 94, was equally—or more—available to class members than it was to Kraft. *See* Ex. 2 ¶ 456; Ex. 3 ¶ 261.

For all of these reasons, the current record shows the opposite of a "fraud on the market" that deceived all class members. It shows at most a generic, non-public trading position that Plaintiffs say sent allegedly false signals about delivery economics to many class members who knew the truth. Such evidence cannot support a *Basic* certification. *Basic*, 485 U.S. at 249; *In re Kalobios*, 258 F. Supp. 3d 999, 1008 (N.D. Cal. 2017) (no presumption of reliance on an alleged fraud on the market where "*the truth had actually been made available*").

_No Common Evidence of Trade "Timing" in Relation to "Truth."_  The absence in Pirrong's admitted regression model of the second *Basic* bookend—*i.e.*, common evidence of when the "truth" of the alleged "fraud on the market" was "revealed," *Goldman*, 141 S. Ct. at 1958—confirms the need to decertify. That bookend is necessary to establish the presumption of

injury on which the 2020 Order relies, Ex. 1 at 8-10, because merely "purchasing" a security at a price allegedly "inflated" by a claimed "misrepresentation," Ex. 1 at 12, does *not* show the "injury" *Basic* requires. *Goldman*, 141 S. Ct. at 1958; *Dura Pharm.*, 544 U.S. at 342. It is only after the truth starts to "leak out" and the price starts to fall that injury can occur. *See id.*

Here, Pirrong's study does not provide any common method for measuring such harm. *Compare Glickenhaus*, 787 F.3d at 415. Nor could it, because even assuming Kraft's position was a public signal of economic demand for futures wheat, the record now shows that discerning which class members were exposed to the "truth" of the economics around Kraft's position (and when) would require individualized inquiry just like discerning which class members were economically injured by the contract purchases in the class definitions. The parties and their experts would presumably have to look at individual emails and trading accounts as they did for Kraft, █████, ███████, the named Plaintiffs, and Cargill. *See* Dkt. 561 at 24-25. And even then, Pirrong's model identifies no "back-end price drop" against which the parties or Court could compare these trades or cross-check the "front-end inflation" Plaintiffs associate with Kraft's allegedly "false" signals. *Goldman*, 141 S. Ct. at 1961 (citing *Glickenhaus*, 787 F.3d at 415).

*No Common Evidence of "Sever the Link" Defenses*. Rule 23(a) decertification is also required here because the evidence above about individual class members' trading profits, as well as their exposure to the truth of Kraft's delivery economics, "severs the link between" the signals Plaintiffs challenge and these class members' trading decisions. *Basic*, 485 U.S. at 248. Even where there is a clear public signal, the *Basic* presumption of detrimental reliance on an alleged "fraud on the market" is rebutted by evidence that individual traders were aware of the allegedly "false" signal or "artificial[]" market price *but chose to trade anyway. Id.* at 249. The record before the Court is replete with such evidence that would negate the *Basic* presumption even if Plaintiffs could establish it, which they cannot. *See supra* (discussing emails from the Andersons

and Cargill).  If these and other class members *knew* what Kraft was doing (as Plaintiffs and Pirrong suggest) and used that knowledge to trade for a *profit* (which they did), then Kraft would obviously have defenses against their claims in this case.  Plaintiffs conceded as much when they removed Cargill from the class because it █████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ Ex. 2 ¶ 283.  Discerning how many more Cargills █ ███████████ are in the class (█████████████████████████████████████████████ █████ ) would require individualized inquiries that independently prohibit certification under Rule 23(a).  *See Dukes*, 564 U.S. at 367 (a "class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims").[10]

Decertification is required for all the foregoing reasons.  Like the "ambient harassment" theory in *Howard*, the *Basic* theory of the 2020 Order here has become unproveable and admittedly "peripheral" to this case.  *Howard*, 989 F.3d at 603 (quoting *Dukes*, 564 U.S. at 350).  *Howard* decertified a federal statutory class after discovery revealed that the original certification theory "overlook[ed] meaningful distinctions among the class members' individual experiences."  *Id.* at 603.  And it ordered decertification rather than modification because Plaintiffs "said essentially" that the certified theory was no longer "the centerpiece of their case."  *Id.*  That is exactly the situation here.  The 2020 Order allowed certification "in light of the fraud on the market theory" in *Basic*.  Ex. 1 at 9, 13.  But as Plaintiffs rightly conceded at the *Daubert* hearing, "you can't call this… a fraud-on-the-market case."  Ex. 12 at 32:4-5.  That statement was a candid reaction to

---

[10] Plaintiffs have long contended that this case would require "Phase II" proceedings on damages, *see* Dkt. 364; Dkt. 357 Ex. A, but have suggested such proceedings could be handled "mechanically" through a "computer" or a non-judicial claims administrator.  Ex. 1 at 14.  The current record forecloses this argument.  The injury (not merely damages) issues in this case raise fact and expert disputes that Kraft has a due process and Seventh Amendment right to try to a jury. *Dukes*, 564 U.S. at 367; *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015).

evidence that Pirrong's model does *not* have any of the features a *Basic* "event study" requires, and as a result measures "artificiality" that Plaintiffs "have not demonstrated" was "manifested in the same way across all parts of the" certified classes. *Howard*, 989 F.3d at 604. Under *Goldman* and *Howard*, this record alone compels Rule 23(a) decertification of the classes in the 2020 Order.

3. There is No Common Proof of *Kohen* Liability

Plaintiffs' effort to reorient this case from *Basic* to Pirrong's *Detecting Manipulation* study, Ex. 12 at 32:20–23, cannot save the 2020 certifications or satisfy Rule 23. Rule 23(a) requires Plaintiffs' regression (stripped of the improper scienter opinions the Court excluded) to provide common proof of harm caused by some "false" signal *specific to Kraft* that all class members presumptively relied upon. The reason the 2020 Order invoked *Basic* in the first place is that this case does *not* involve the "corner and squeeze" position that Pirrong described in *Detecting Manipulation*, and that the Seventh Circuit recognized as supporting *prima facie* injury to "net shorts" in *Kohen*, 571 F.3d at 678-79. Again, both of these precedents involved a distinct, delivery-period *combination* of a large long futures position and similarly large ("great white"-sized Ex. 12 at 17:2–4) physical position that is not present here. *Kohen*, 571 F.3d at 679; Dkt. 506-2 (*Detecting Manipulation*) at 37-38, 50-52; Dkt. 504, Ex. 14 at 11-12, 22, 65-66; Dkt. 503, Ex. 15 at Fact 124; *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *8-9 (S.D.N.Y. Sept. 30, 2020).

In this case, Kraft held a non-public long futures position facially indistinguishable from a number of class member positions for the reasons above. Ex. 7 ¶ 221-31. And Kraft had nowhere near the large physical position that distinguished the positions in *Detecting Manipulation* and *Kohen*. Kraft's allegedly "uneconomic deliveries" totaled only ██████████ Ex. 15 at Facts 92–93, at a time when the record shows there ██████████████████████████████████ ████████████████████████████████████ Ex. 14 at Fact 65, class members controlled most of

the deliverable supply (███████████████████████████████████, Ex. 8 at 112-13), and there were ███████████████ at Pirrong's CTD location, Ex. 15 at Fact 76. Accordingly, Kraft did not have the power to squeeze "net shorts" under the reasoning of *Detecting Manipulation* and *Kohen*.[11]   And in any event, identifying any "net short" position holders in the certified classes here would require individualized inquiry for all the reasons above.

### 4.   There Is No Common Proof of Antitrust Liability

The certifications on Plaintiffs' antitrust claims also fail Rule 23(a) commonality, first and foremost because they depend on proof "coterminous" with the evidence above.   Dkt. 452, Ex. 2 ¶¶ 401, 405, 423, 425.   But Rule 23 requires decertification of Plaintiffs' monopoly claim for several other reasons specific to the statutes that govern it.   The relevant Sherman and Clayton Act provisions require Plaintiffs to:   (1) define the "relevant market" Kraft allegedly monopolized, *Ohio*, 138 S. Ct. at 2285, and (2) "demonstrate that the element of *antitrust impact*"—*i.e.*, actual harm from the *competitive* restraint—"is capable of proof at trial through evidence that is common to the class."   *Messner*, 669 F.3d at 818; 15 U.S.C. § 15(a).   These two requirements for antitrust certification go together, because "[c]ommon proof of actual injury to each class member requires that all class members operate in the *same relevant market*, otherwise they could not be affected in a common manner by the challenged conduct."   *Exhaust Unltd., Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004).

As noted, monopolization claims require power over the relevant market that is so "substantial" that it causes harm to *competition*.   *Hannah's Boutique, Inc.*, 2015 WL 4055466, at

---

[11] *Compare Kohen*, 571 F.3d at 679; *see also Cotton*, 2020 WL 5849142, at *19 (quoting Frank H. Easterbrook, *Monopoly, Manipulation, and the Regulation of Futures Markets*, 59 J. of Bus. S103, S106 (1986)) (explaining how the combination of a large long futures position and substantial control of physical supply allows the long position holder to raise prices by restraining competition among suppliers of physical stocks to shorts); Dkt. 506-2 (*Ferruzzi*) at 38, 50-52, 54 (same).

*4; *Ohio*, 138 S. Ct. at 2288. The classic example is OPEC. The cartel controls so much oil that it can withhold supply (and thus create scarcity that inflates prices) without fear that competing suppliers will fill the gap at a lower price. Plaintiffs do not—and cannot—allege that Kraft had OPEC-style power over the supply of December 2011 futures contracts. Their monopoly claim and expert reports say only that Kraft had the "market power" that any trader has, *i.e.*, the power to move market prices by purchasing contracts (what Vellturo and Kraft's *Daubert* briefs termed "pizza shop" power). *See* Ex. 3 ¶ 607 (Pirrong admission that under Plaintiffs' theory of monopoly power, any trader who purchases a futures contract "adds another monopolist" to the market). The 2020 Order assumed this was a viable theory for a class antitrust claim in the futures "market" in which all class members purchased contracts. Ex. 1 at 20–21. But the current record rebuts that conclusion.

In response to Kraft's expert reports, Pirrong abandoned his reliance on Kraft's high "share" of December 2011 "open interest" (and other irrelevant statistics about contract positions, Dkt. 532 at 26-27 & n.27) as evidence of monopoly power, Ex. 15 at Fact 94. The reason is that these contract shares did *not* provide Kraft with the kind of power "relevant" to a monopoly, or substantively different than the power associated with class members' large long positions, *Comcast*, 569 U.S. at 33. Even Kraft's entire position (█████████) was just a fraction of ████████████████████████████████████████████████. *See* Ex. 13 at Fact 65. And other long position holders had larger positions than Kraft did, or liquidated even later. *Id.* at Fact 41.

The version of Pirrong's opinions the Court admitted in October tried to address these issues by redefining the allegedly monopolized "market" as the "CTD location" for December deliveries, which Pirrong identified as ████████████████████████████████████████ ████████████████████████████████████████████████. Ex. 2 ¶¶ 80-81,

40

390, 456; Ex. 15 at Fact 87. This definition departs from Pirrong's own precedents (including *Detecting Manipulation*) and CME contract rules, both of which treat deliverable supply as encompassing wheat at *all* authorized contract locations (█████████████████). Ex. 16, App. A; Ex. 7 ¶¶ 47-49. Further, and regardless, Plaintiffs' new ████████████ is fatal to the 2020 antitrust certifications for two reasons. *First*, to the extent the December 2011 "CTD location" qualifies as a market at all, it is *precisely* the market the 2020 Order *rejected* for class certification because "there is no repository of who actually bought or sold deliverable wheat at the Mississippi River region during the delivery period." Ex. 1 at 14. This point alone requires decertification because plaintiffs can proceed with monopoly claims "only by showing anticompetitive effects in the relevant market where" they traded. *Deslandis*, 2021 WL 3187668, at *13. *Second*, even if there were records of who participated in the "CTD" market (which was transient and chosen by short position holders, not Kraft), participation in this "market" would require individualized inquiry to discern. Discovery is closed, and Plaintiffs have no evidence of which class members (if any) were "consumer[s] or competitor[s]" in the "CTD" market Pirrong describes along the "Mississippi or Ohio rivers." Ex. 2 ¶¶ 390, 456. This Court has recently decertified antitrust classes that suffer from such evidentiary problems. *See Deslandis*, 2021 WL 3187668, at *13 (decertifying because evidence of relevant market participation would "vary by plaintiff," and as a result a key liability question is "not a question that can be answered with common evidence"); *In re NorthShore Univ. Healthsys. Antitrust Litig.*, 2018 WL 2383098, at *4 (N.D. Ill. Mar. 31, 2018) (similar).

For all of these reasons, the current record takes a wrecking ball to the *Basic* foundation of the 2020 Order, and requires Rule 23(a) decertification of Plaintiffs' claims.

## II. THE 2020 CLASSES MUST ALSO BE DECERTIFIED UNDER RULE 23(b)(3)

Rule 23(b)(3) also requires decertification of the 2020 classes. Kraft respectfully submits

that here, as in *Howard*, "liability is not a common question" for the reasons above, so there is "no occasion to ask whether it predominates over individual questions," 989 F.3d at 609.[12] But even if some aspects of Plaintiffs' claims in this case could be considered common, they could never "predominate" over the individual issues above, or render litigation by the certified classes a "superior" method of adjudication under Rule 23(b)(3). *Comcast*, 569 U.S. at 34.

The predominance and superiority requirements in Rule 23(b)(3) involve a "far more demanding" inquiry than "Rule 23(a)'s commonality requirement," *Amchem*, 521 U.S. at 624, and require proof of much more than an "overarching dispute" that subsumes a host of discrete inquiries. *Id.*; *see also Comcast*, 569 U.S. at 33-34; *Santiago*, 19 F.4th at 1017 (vacating order that "organized its analysis around potential common questions rather than the claims at issue"). Here, Plaintiffs' "overarching" assertion that Kraft's position caused artificial and anticompetitive price inflation is beset with individualized inquiries that will predominate over any superficially common questions. The reason is that Rule 23(b)(3) "train[s] on the legal or factual questions that qualify each class member's case as a *genuine controversy*," and looks to whether a "*prima facie* showing" on those questions would require "evidence that varies from member to member." *Santiago*, 19 F.4th at 1018. The current record shows that such individualized evidence will be necessary on falsity, reliance, antitrust market participation, and actual injury, *all* of which are necessary for Plaintiffs' claims to present a genuine controversy under Article III and the CEA and Sherman Act. *Id.*; *see also TransUnion*, 141 S. Ct. at 2203-07. In contrast, even compelling

---

[12] Here, such individual questions would include the "overwhelm[ing]" individualized damages inquiries that Plaintiffs have improperly sought to defer to post-trial proceedings, Dkt. 364; Dkt. 357 Ex. A, and that *Comcast* describes as sufficient to defeat predominance under Rule 23(b)(3), 569 U.S. at 34. But under the reasoning in *Howard*, these issues would first preclude certification under Rule 23(a). As *Howard* explains, even where a defendant's conduct "pervades" the environment relevant to plaintiffs' claims, Rule 23(a) prevents certification where, as here, "plaintiffs have not demonstrated that the [conduct] manifeste[d] in the same way across all parts of [that environment], such that [its influence] could be a common question for the class." *Id.*

evidence of nominally common issues like manipulative intent or monopoly power would *not* create a "genuine controversy," because Article III confers only the power to "redress harms that defendants cause plaintiffs." *TransUnion*, 141 S. Ct. at 2205, 2207–08 & n.4; *Moss*, 2021 WL 5902917, at *2 n.7. The CEA and antitrust statutes echo this jurisdictional limit in private suits by requiring proof of actual injury for liability. But here, Plaintiffs have no class-wide evidence of such injury on any of their claims. Further, after evaluating the "realism of" their evidence as *Parko* instructs, 739 F.3d at 1086, Plaintiffs' proof on any nominally common issues is so thin that it does not even register against the overwhelming individual issues on the predominance scale.

## A.    Individualized Issues Will Predominate on Plaintiffs' CEA Claims

As noted, the predominance problem in this case goes well *beyond* the prohibition on Rule 23(b)(3) certification where "[q]uestions of individual damages calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34; *Howard*, 989 F.3d at 607; *Yahoo! Inc.*, 2018 WL 835339, at *1 (N.D. Ill. Feb. 13, 2018); *Ellis*, 217 F.R.D. at 419–20. The current record shows that this case will require individual "mini-trials" on multiple *liability* elements even on the manipulation claims of contract class members. *See, e.g.*, *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022); *Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101 (6th Cir. 2022). And it shows that these trials would be necessary before the Court could even do the "labyrinthine individual calculations" required to assess actual damages. *Comcast*, 569 U.S. at 32.

The 2020 Order did not have to contend with these issues because it assumed that discovery would reveal common evidence of a "fraud on the market." Ex. 1 at 9-23. But discovery is closed, and the current record negates that assumption. Lead Plaintiff ███ trades across twelve different accounts exemplify the individualized issues that would pervade liability litigation in this case even if Plaintiffs had viable common evidence of a public signal or monopoly power (which

they do not). *See* Appendix A.[13] And the record confirms that the same individualized analysis would be required for all class members, who would also be subject to the individual falsity and reliance defenses above. Accordingly, Plaintiffs' Rule 23(b)(3) case here runs aground on all the predominance precedents the Supreme Court just reaffirmed in *Goldman*. As the Court reiterated, *Basic* provides a vehicle for class certifications that Rule 23(b)(3) would normally forbid: "without the *Basic* presumption, individualized issues of reliance ordinarily would defeat predominance and preclude certification of a securities-fraud class action." *Goldman*, 141 S. Ct. at 1958–59 (citing *Amgen Inc. v. CT Ret. Plans & Trust Funds*, 568 U.S. 455, 466–68 (2013), *Halliburton II*, 573 U.S. at 279 and *Basic*, 485 U.S. at 241–47). But the *Basic* exception to the reliance bar on class certification of fraud cases cannot be allowed to swallow the rule. Accordingly, for a "fraud on the market" certification to survive under Rule 23(b)(3), the "*Basic* prerequisites—publicity, market efficiency, and market timing—must be satisfied by plaintiffs before class certification." *Goldman*, 141 S. Ct. at 1959.

Like many pleading-stage certification rulings, the 2020 Order effectively put the *Basic* cart before these prerequisite horses on the assumption they would come out of the discovery barn. One of the reasons Rule 23(b)(3) requires decertification now is that discovery is over and the barn door is shut, but Plaintiffs still have no horses. The record here does not establish any of the above "prerequisites" for a "fraud on the market" certification of Plaintiffs' CEA claims. Instead, it shows that those claims turn on the very definition of Rule 23(b)(3) "individual question[s]":

---

[13] For example, and as detailed in the appendix, Robinson had to separate ███████ accounts into two different groups to try to come up with some proof of injury, because summing the results from all the accounts shows a net profit. One of the groups that Robinson broke out shows a ██. Ex. 4; App. A. But Robinson testified that ███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████ App. A; Ex. 17 ¶ 8.

namely, questions "for which members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452-53 (2016); *Messner*, 669 F.3d at 818.[14] As the D.C. Circuit recently explained in *Rail Freight II*, where that is so—and particularly where plaintiffs' own expert model shows that individualized injury issues affect many class members (there, "12.7 percent")—Rule 23(b) "preclude[s] a finding of predominance" because the "need" to "determine which [members] were actually injured" will overshadow all other issues. *Rail Freight II*, 934 F.3d at 623-24.

### B. Individualized Issues Will Also Predominate on Plaintiffs' Monopoly Claim

The same and other Rule 23(b)(3) problems require decertification of Plaintiffs' monopoly claim, which again is actionable only through Section 4 of the Clayton Act's provision for suits by persons "injured in [their] business or property *by reason of*" antitrust violations. 15 U.S.C. § 15(a). Focusing the Rule 23 inquiry on this and other "elements" of the claim "crystallizes" the need for decertification. *Santiago*, 19 F.4th at 1018. Antitrust injury typically does *not* arise where a plaintiff is neither "a consumer nor a competitor in the market in which trade was restrained." *Carpenter*, 459 U.S. at 539. Accordingly, where individualized issues about these or other aspects of antitrust injury pervade a class, they will predominate over common issues like monopoly power and preclude certification "for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35; *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018); *Rail Freight II*, 934 F.3d at 623–24. There are several reasons for this rule, all of which are relevant here.

First, the "simple possession of monopoly power, or the pursuit of it, is not itself illegal*.*" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020). Private plaintiffs can pursue

---

[14] *See also, e.g.*, *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022) (even if defendant's valuation practices presented a common question, individual class members could not show injury if they *benefited* from any miscalculation, which presented a predominance issue).

Section 2 claims only where they can show that the defendant acquired or used "monopoly power" to "exclud[e] competitors" or otherwise cause competitive injury to plaintiffs' "business or property." *Id.*; 15 U.S.C. § 15(a). Accordingly, common proof of alleged monopoly power cannot predominate over individualized issues of antitrust injury where, as here, the record shows that a significant number of class members suffered no economic (much less competitive) harm.[15] The same rule applies to common evidence of the "relevant geographic and product market[]." *Hannah's Boutique*, 112 F. Supp. 3d at 772–73. Such evidence is necessary for antitrust certification, but cannot predominate over individualized questions about who participated in that market. That barrier to certification is particularly clear in cases like this one, where such questions are as rudimentary as whether certain class members were "consumers" or "competitors" in the relevant market. *Carpenter*, 459 U.S. at 540 (explaining that proof of such relationships is critical to showing that any financial injury was a "direct" result of the allegedly anticompetitive conduct); *Viamedia*, 951 F.3d at 482.

All of the foregoing predominance barriers would require decertification of Plaintiffs' monopoly claim here even if they had common evidence of a relevant market in which Kraft possessed monopoly power, which they do not. For years they alleged that the relevant antitrust market in this case was "coterminous" with the futures market. But when discovery exposed that theory as legally and factually unsupported, they asserted the same transient "CTD" market (chosen by short position holders at the end of the Class Period) the 2020 Order rejected as unascertainable. Accordingly, they have no "realis[tic]" common evidence of a relevant market Kraft could have monopolized. *Parko*, 739 F.3d at 1086; *Honda*, 600 F.3d at 815. And even if

---

[15] *Compare Messner,* 669 F.3d at 810, 826 (class action by hospital consumers, only "2.4 percent of whom" did not pay higher prices after a hospital merger the FTC found "violated the law"); *Kleen Prods., LLC v. Int'l Paper Co.*, 831 F.3d 919, 927, 930 (7th Cir. 2016) (class action by direct containerboard purchasers subject only to a "smattering of individual contract defenses").

they did, they have no common proof of which class members participated in that market, or how

their interests were "served or disserved by" the "competition" Kraft allegedly stifled. *Carpenter*,

459 U.S. at 539. Plaintiffs do not even say which class members (if any) were competitors or

consumers in that market, what products or prices were affected, or what "business or property"

was harmed. What the record does show is that the answers to these questions would vary by class

member. *See* Appendix A (█████████████████████████████████████████

████████████████████████████████████████████████████████████

██████). That may explain why, unlike class plaintiffs in typical antitrust class actions, the

Plaintiffs here have said they █████████████████████████████████ Ex. 11 at

353:20–21; *compare Kleen*, 919 F.d at 929. That is a telltale sign that common issues will not

predominate on their antitrust claim, which fails Rule 23(b)(3) for reasons beyond those fatal to

their CEA claims. *Asacol*, 907 F.3d at 53–54 (where evidence shows uninjured antitrust class

members, the "need to identify those individuals will predominate and render [class] adjudication

unmanageable").

## III. THE 2020 CLASSES ARE NOT ASCERTAINABLE AND VIOLATE *COMCAST*

Last but certainly not least, the current record compels decertification because it negates

the 2020 Order's findings on "ascertainability." Ex. 1 at 21-22. This "addition to Rule 23," Ex. 1

at 21, requires class definitions to be "clear[] and based on objective criteria" so courts can

ascertain the "particular group, [allegedly] harmed during a particular time frame, in a particular

location, in a particular way" as a result of the defendants' conduct, *id.* For the reasons above,

the class definitions in this case fail this test and are fatally "overbroad." *Howard*, 989 F.3d at

605. Like the definitions in *Howard*, *Santiago*, and *Yahoo*, they do not identify an ascertainable

group of plaintiffs who could use common evidence to prove "only those damages attributable to"

either the theory of liability the 2020 Order "accepted for class-action treatment," or to any other

common theory of the claims here. *Comcast,* 569 U.S. at 35; *Santiago*, 19 F.4th at 1018 (decertifying class); *Howard*, 989 F.3d at 610 (same); *Yahoo! Inc.*, 2018 WL 835339, at *2 (same).

That is the problem that invalidated the certification in *Comcast* itself. *See* 569 U.S. at 36; Ex. 1 at 9-12; 19-22. Indeed, the problem here is even worse, because Plaintiffs' common proof admittedly does not fit the *only* theory of liability ("fraud on the market") in the 2020 Order. Nor does the record here fit the *Detecting Manipulation* or *Kohen* theory of "corner" liability on Plaintiffs' manipulation and monopoly claims. Nor does it fit any recognized theory of antitrust injury under the Sherman and Clayton Acts. These fundamental problems with Plaintiffs' case explain why a "great many" class members "were not" harmed during the Class Period, Ex. 1 at 19, and "could not have been" harmed for purposes of the claims here. *Id.*

The 2020 Order does not refute this conclusion. Its determination that all class members "could have been harmed" by the "artificiality" Plaintiffs allege, Ex. 1 at 23, was based on the assumption that Plaintiffs would be able to prove a common injury under *Basic*, and that such injury could double as proof of antitrust injury under *Kohen* and *Messner*, *see id.* But those assumptions have been overtaken by the record and the controlling decisions in *Comcast*, *TransUnion*, *Goldman*, *Howard*, and *Santiago*. Ex. 1 at 23. The 2020 Order's conclusion that "all" class "traders *could have* been harmed" by Kraft's alleged "false signals" because they all "*purchased* wheat futures at the allegedly inflated prices" Kraft supposedly caused, *id*. at 23, is now contradicted by new trading data and expert analyses from both parties, as well as *Goldman's* restatement of the legal requirements *Basic* certifications, *see* 141 S. Ct. at 1958. And the 2020 Order's assumption that Kraft's use of its long position could constitute proof of market manipulation and monopolization under *Kohen*, Ex. 1 at 12, 20-22, is likewise foreclosed by the current record on Kraft's positions and Plaintiffs' theory of the relevant antitrust market.

These problems with Plaintiffs' claims go beyond the elements of their statutory claims,

*Santiago*, 19 F.4th at 1018, to their Article III roots, *TransUnion*, 141 S. Ct. at 2205. Even if Plaintiffs had common evidence of certain elements, this case could not proceed as a class action because the record does not contain common proof of any class-wide "physical, monetary, or cognizable intangible harm" caused by the alleged legal violations. *Id.* at 2206. Class actions cannot include plaintiffs who are "not seeking to remedy any harm" to themselves, but are merely seeking to enforce "a defendant's compliance" with the law and "obtain some money via [a] statutory damages" provision. *Id.* Yet that is exactly what this case currently does. The certified classes include members whose damages are not "the result of the wrong" Plaintiffs allege, as well as members whose claims are not justiciable at all. *Comcast*, 569 U.S. at 37; *Rail Freight II*, 934 F.3d at 623–24. When Kraft previewed these points in its *Daubert* challenge, Plaintiffs expressly abandoned the *Basic* "liability theory" that defines the 2020 certifications, Ex. 1 at 9–10; Ex. 12 at 40:23–31:16, and embraced Pirrong's effort to ██████████████████ for this suit because it is ████████████████████████████████████████████████ ████████ Dkt. 452, Ex. 2 ¶ 116. The *Daubert* order deferred Kraft's concerns about this novel approach to the statutory claims here. But Rule 23 does not allow that. *Parko*, 739 F.3d at 1086.

Once an expert model has been admitted, it must be reexamined under the "higher" standard of reliability Rule 23 and *Comcast* require for certification. *Rail Freight II*, 934 F.3d at 623–24 (citing *Comcast*, 569 U.S. at 36-38). The reason, as the Seventh and D.C. Circuits have recently reiterated, is that the legal standard Plaintiffs' Rule 23 proof must meet is *not* what is "alleged" in their complaint or what their expert says. *Santiago*, 19 F.4th at 1018; *Rail Freight II*, 934 F.3d at 623–24.[16] It is the standard of proof required by Article III and the statutory elements

---

[16] *See also Messner*, 669 F.3d at 811 (under Rule 23 "a court may not simply assume the truth of the matters as asserted by the plaintiff"); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723-24 (7th Cir. 2011) (Rule 23 "[a]nalysis" must be "rigorous, particularly where (as here) certification could expose a defendant to a very large potential liability").

of their claims. *TransUnion*, 141 S. Ct. at 2203; *Santiago*, 19 F.4th at 1018; *Moss,* 20 F.4th at 379 n.7. The 2020 Order did not certify the current classes based on the novel proof and theories Plaintiffs offered in the *Daubert* proceedings last year. And Kraft is aware of no case that has granted Rule 23 certification on such a record. This Court should not be the first to do so, because Plaintiffs' common evidence in this case does not satisfy Rule 23 standards for certification. And where that is what the post-certification and *Daubert* record shows, decertification is required.

## CONCLUSION

This case is not an academic experiment. It is a federal statutory action in an Article III court that seeks extraordinary liability against a company that has due process and other legal rights Rule 23 exists to protect. Rule 23 imposes a heavy burden for litigating such cases as class actions. And Plaintiffs cannot meet that burden by offering a made-up expert model as common proof of a "fraud on the market" presumption the record conclusively rebuts on their CEA claims, and that has no application to their antitrust claims. Nor can they litigate such claims on behalf of an options class no named Plaintiff represents, or on behalf of contract and antitrust claimants whose status as injured class members will require highly individualized inquiries into their trading records, emails, and testimony. These are not technical issues that can be fixed or deferred to merits adjudication. They are fundamental flaws that result from Plaintiffs' unprincipled approach to this case, their unjustifiably long class period, and their facially overbroad class definitions. Now that Kraft has had the chance to explore these theories in discovery and *Daubert* proceedings, the record shows that all of these flaws require immediate decertification. Plaintiffs' evidence, including their admitted expert work, does not meet the requirements for *Basic* or any other common theory of Rule 23 certification. Accordingly, the record shows that no part of this case can properly be resolved through the "adventuresome innovation" of a Rule 23(b)(3) class. *Comcast*, 569 U.S. at 34.

Dated:  March 1, 2023

Respectfully submitted,

MONDELĒZ GLOBAL LLC and
KRAFT FOODS GROUP, INC.


/s/ *Elizabeth P. Papez*

Elizabeth Papez

Elizabeth Papez
Helgi C. Walker
Joshua Lipton
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8608
epapez@gibsondunn.com

Christopher Joralemon
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave.
New York, NY 10166
(212) 351-2668 (phone)

Dean Panos
J. Kevin McCall
Nicole A. Allen
Thomas Quinn
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
dpanos@jenner.com
jmccall@jenner.com
nallen@jenner.com
tquinn@jenner.com

*Attorneys for Defendants Mondelēz Global LLC*
*& Kraft Foods Group, Inc.*

**APPENDIX A – Excerpts and Summaries of Record Evidence Concerning Injury to Class Members**

**Named Plaintiffs**

| Plaintiff | Alleged Profit or Loss[1] | Details |
|---|---|---|
| Richard Dennis | $ ████ | |
| White Oak Fund LP | $ ████ | |
| Budicak, Inc. | $ ████ | ████ |
| Harry Ploss | | |
|    Aggregated | $ ████ | ████ |
|    Individual Accounts | $ ████ | ████████<br>████████<br>████ Ex. 5, Robinson<br>Reb. Rpt. ¶ 9.<br><br>████████<br>███████<br>████████<br>████ Ex. 4, Robinson<br>8/17/21 Tr. at 148:1–17 (emphasis added). |
| Kevin Brown | ████ | ████████ Dkt. 454,<br>Ex. 3, Robinson 12/07/18 Tr. at 10:8–12. |
| Joseph Caprino | ████ | ████████ Dkt. 454,<br>Ex. 3, Robinson 12/07/18 Tr. at 10:8–12. |
| Robert Wallace | ████ | ████████ Dkt. 454,<br>Ex. 3, Robinson 12/07/18 Tr. at 10:8–12. |
| Nathan Wallace | ████ | ████ |

**Ploss Account Detail**

| Account | Plaintiff | Dec 11 | Mar 12 | Aggregate |
|---|---|---|---|---|
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ |

---

[1] Ex. 5, Robinson Rpt. Ex. 5A. Negative (-) numbers represent net artificiality paid (alleged injuries). Positive (+) numbers represent profits (no injury).

[2] Shading indicates accounts aggregated by Mr. Robinson to reach net loss conclusion.

**Percent of Uninjured Class Members**



| Dr. Chris Vellturo | Dr. Craig Pirrong & Charles Robinson |
|---|---|
| **Methodology** | **Methodology** |
| | Ex. 11, Pirrong 8/31 Tr. at 360:13–362:4 |
| Ex. 6, Vellturo Rpt. ¶¶ 230–31. | |
| **Results** | **Results** |
| Ex. 6, Vellturo Rpt. ¶ 232. | Ex. 3, Pirrong Reb. Rpt. ¶¶ 627–29 |



**Discussion**

Ex. 6, Vellturo Rpt. ¶¶ 233–34.

**Discussion**

Ex. 4, Robinson 8/17 Tr. at 186:4–187:16

**Long Position Holders and Bull Spread Traders[3]**



[3] Ex. 7, Overdahl Rpt. Exhibits 2B and 17.

iii



**Summary:** Many large, sophisticated entities held large long or bull spread positions (like Kraft), although they had a degree of variation in overall strategy in terms of the size of the relative legs, when the positions were entered and exited, the degree of fluctuation, and the pace of liquidation. However, applying Dr. Pirrong's artificiality estimates to their non-anonymized positions shows that each of these entities profited from the alleged manipulation.

As explained by Dr. Pirrong, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 3, Pirrong Reb. Rpt. ¶¶ 628–29. Although Dr. Pirrong claims that ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████ Ex. 3, Pirrong Reb. Rpt. ¶ 629, for those entities with bull spread positions, the extraordinarily high inflation Dr. Pirrong finds at the end of the December contract results in gains from selling December positions that tend to overwhelm any alleged losses these parties incurred closing out their March positions.

<strong>Other Large Traders and Class Members</strong>

| Trader | Summary of Trades | Notes |
|---|---|---|
| ████ | Changed from net short to net long during the delivery period, with a maximum long of 820 contracts, and | ████████████████████████████ ████████████████████ ████████████████████ |

| | | |
|---|---|---|
| | exited on December 8, 2011.  Ex. 7, Overdahl Op. Rpt. ¶ 222. | ███████████████████████████<br>███████████████████████████<br>██████████████████████████<br>██████████████████ Ex. 3, Pirrong Reb. Rpt. ¶ 261. |
| ████████ | Switched from a net short December to a net long December on November 10, and maintained that into the delivery period.  It liquidated December 13.  Ex. 7, Overdahl Op. Rpt. ¶ 228. | |
| ████<br>████████ | Started net short until November 4, when it switched to net long (so a bull spread against its short March position).  They held a long position of 264 contracts in the delivery period, which they exited on December 6.  Ex. 7, Overdahl Op. Rpt. ¶ 223. | ███████████████████████████<br>███████████████████████████<br>██████████████████████████<br>████████████████████████████<br>████████████████████<br>██████████████████████████<br>████████████████████████████<br>██████████████████████████<br>████████████████████████████<br>Ex. 2, Pirrong Op. Rpt. ¶ 27(b).<br><br>███████████████████████████<br>███████████████████████████<br>███████████████████████████<br>Ex. 2, Pirrong Op. Rpt. ¶ 183.<br><br>███████████████████████████<br>███████████████ ████████████<br>████████████████████████████<br>██████████████ Dkt. 442<br>Ex. 40, MJ Anderson 8/25/17 Tr. at 31:15–25. |
| ████████ | Entered delivery period over 1,000 long, and switched net short on December 2 (maximum of 580 contracts).  Switched back to net long on December 9, up to a maximum 236 contracts on December 12, exiting on the last day of the contract.  Ex. 7, Overdahl Op. Rpt. ¶ 230. | ███████████████████████████<br>███████████████████<br>███████████████████████<br>█████████████████████ Ex. 3, Pirrong Reb. Rpt. ¶ 283.<br><br>███████████████████<br>████████████ Ex. 2, Pirrong Op. Rpt. ¶ 175.<br><br>███████████████████████████<br>████ Ex. 17, Pirrong Class Cert. Op. Rpt. ¶ 8.<br><br>██████████████████████<br>███████████████████████<br>███████████████████████████ |

---

[4] Excluded from class.

| | | |
|---|---|---|
| | | ███████████ Ex. 17, Pirrong Class Cert. Op. Rpt. ¶ 43. |
| ██████ ██████ | Switched between being net long and short December during November, and on the first day of the delivery period, closed its short position and went net long 209 contracts. It reduced the position to 60 contracts on November 30, and liquidated that position on December 7. Ex. 7, Overdahl Rpt. ¶ 225. | ████████████████████████ Ex. 2, Pirrong Op. Rpt. ¶ 171 (emphasis added) (quoting CFTC Shaffer Dep. Ex. 35, PLOSS-DEF-00234037-234039). |
| ██████ | Switched from net long to net short on November 15, which it held into the delivery period (953 contracts). It eventually went net long on December 6, and liquidated on December 8. Ex. 7, Overdahl Op. Rpt. ¶ 227. | ███████████████████ ████████████ Ex. 2, Pirrong Op. Rpt. ¶ 175. ███████████████████ ███████████████████ ███████████████ Ex. 9, Jeff Wilson Tr. at 169:14–23. |
| ██████ | Started the period net short but switched to net long November 4, increasing to a maximum long position larger than Kraft's on November 11, which it liquidated by December 2. Net short March throughout the period (Creating a bull spread), which was still open as of December 14. Ex. 7, Overdahl Rpt. Ex. 17. | ██████████████████ ████████████████ Ex. 2, Pirrong Op. Rpt. ¶ 161 (citing PLOSS-DEF-00053285-53292). |
| ██████ ██████ | Changed from a short December to a long December on October 20 and held it throughout the delivery period, with a maximum position during the delivery period of 189 contracts. It liquidated on December 13. Ex. 7, Overdahl Rpt. ¶ 226. | ██████████████████ ███████████████████ ███████████████ Ex. 2, Pirrong Op. Rpt. ¶ 161. |
| ██████ | Changed from net short to net long December on October 24, increasing to a maximum long position larger than Kraft's on November 10, liquidated by November 30. Net short March throughout the period (creating a bull spread), which was still open as of December 14. Ex. 7, Overdahl Rpt. Ex. 17. | ██████████████████ ██████████████████ ███████████████████ ███████████████████ ██████████████ ███████████████ Ex. 3, Pirrong Reb. Rpt. ¶ 346. |

**Summary:** These sophisticated traders employed a variety of strategies for a variety of reasons, all relying on similar information that Kraft had during the period. Some of them, in fact, Dr. Pirrong claims did rely directly on signals from Kraft (unlike any of the named Plaintiffs) and, according to Dr. Pirrong, utilized that information to make trades that were ultimately profitable for them. Applying Dr. Pirrong's artificiality estimates to their non-anonymized positions confirms that several of these entities were successful in receiving rather than paying net artificiality.

**ERRATA**

| Page | Original | Revised | Reason |
|---|---|---|---|
| 5 | you "can't call this [a] fraud on the market case" | you "can't call this a fraud on the market case" | Quotation Clarification |
| 8 | "And now they are stuck with it" | "And now they are stuck with them" | Grammatical |
| 16 | "sold contract positions with more alleged[] 'artificiality' during the Class Period than they bought. | "sold contract positions with more alleged[] 'artificiality' during the Class Period than they bought." | Quotation Clarification |
| 19, 34 | Mennell | Mennel | Spelling |
| 20 | that Plaintiffs say Kraft [allegedly] used to generate [approximately $7 million in] trading gains from the price artificiality supposedly caused by Kraft's "false signals" of "economic" demand for futures wheat. Dkt. 71 ¶ 61; Pirrong Report ¶¶ 17, 289, 532, 565. | that Plaintiffs say Kraft allegedly used to generate approximately $5.4 million in trading gains from the price artificiality supposedly caused by Kraft's "false signals" of "economic" demand for futures wheat. Dkt. 71 ¶ 78; Ex. 2. ¶¶ 17, 289, 532, 565. | Grammatical; Citation Clarification; Corrected Citation |
| 22 | "his study here does not show" | "his studies here do not show" | Grammatical |
| 23 | See Dkts. 441 (Kraft SOF); 504 (Plaintiffs' SOF ("PRSOF"); 503 (Plaintiffs' Supp. ("PASOF"); 513 (Kraft Response ("KRSOF"). | See Dkts. 441; 504; 503; 513. | Citation Clean Up |
| 24 | Dkt. 465; 532 & App. A. | *Id.*; 532 & App. A. | Citation Clarification |
| 24 | Tr. 12-15, 22-23, 48 | Ex. 12 at 12:5–15:5, 48:10–22 | Citation Clarification |
| 24 | "did the same thing Ferruzzi did in the Detecting Manipulation article—uneconomically withheld their liquidation orders." *Id.* | "did the same thing Ferruzzi did in the Detecting Manipulation article. They uneconomically withheld their liquidation orders." *Id.* at 32:20–22. | Quotation Clarification; Citation Clarification |
| 24 | Ex. 12 at 16:21 | Ex. 12 at 17:2–4 | Corrected Citation |
| 24 | Tr. 41 | Ex. 12 at 40:25–41:16 | Citation Clarification |

| 24 | you "can't call this [a] fraud on the market case" | you "can't call this . . . a fraud-on-the-market case" | Quotation Clarification |
|---|---|---|---|
| 26 | *Rail Freight* | *Rail Freight II* | Citation Clean Up |
| 27 | that determination of [their] truth or falsity can be resolved | that determination of [their] truth or falsity' can be resolved | Quotation Clarification |
| 27 | 'same legal theory" | "same legal theory" | Quotation Clarification |
| 28 | "specific elements of the [the class] claims," | "specific elements of the [class] claims," | Quotation Clarification |
| 29 | that he paid | than he paid | Clarification |
| 31 | you "can't call this [a] fraud on the market case" | you "can't call this . . . a fraud-on-the-market case" | Quotation Clarification |
| 31 | Tr. 51 | Ex. 12 at 32:3–5 | Corrected Citation |
| 31 | Dkt. 561 | Dkt. 561 at 20 | Corrected Citation |
| 32 | Dkt. 9–12, 19–23. | Citation Omitted | Citation Clarification |
| 38 | presumption it invoked | presumption they invoked | Grammatical |
| 33 | informationally efficient market. *Goldman*, 141 S. Ct. at 1957. | "informationally efficient" market. *Goldman*, 141 S. Ct. at 1957, 1960. | Quotation Clarification; Citation Correction |
| 38 | [a] fraud on the market case." | a fraud-on-the-market case." | Quotation Clarification |
| 38 | Tr. 16-21) | Ex. 12 at 17:2–4) | Corrected Citation |
| 38 | PRSOF at 11-12 | Ex. 14 at 11-12 | Citation Clean Up |
| 38 | PASOF 124 | Ex. 15 at Fact 124 | Citation Clean Up |
| 38 | Dkt. 503; PASOF 92–93 | Ex. 15 at Facts 92–93 | Citation Clean Up |
| 39 | Dkt. 504; PRSOF 65 | Ex. 14 at Fact 65 | Citation Clean Up |
| 39 | Dkt. 503; PASOF 76 | Ex. 15 at Fact 76 | Citation Clean Up |
| 39 | *Amex, supra* | *Ohio*, 138 S. Ct. at 2285 | Corrected Citation |
| 39 | *Kohen*, supra | *Kohen*, 571 F.3d at 679 | Citation Clarification |
| 40 | *Hannah's Boutique, Inc. v. Surdej*, 2015 WL4055466, at *4 (N.D. Ill. July 2, 2015); *Ohio v. Am. Express Co.*, 138 S. Ct. at 2288. | *Hannah's Boutique, Inc.*, 2015 WL 4055466, at *4; *Ohio*, 138 S. Ct. at 2288 | Citation Clarification |
| 40 | PASOF 94 | Ex. 15 at Fact 94 | Citation Clean Up |
| 40 | *Comcast*, 569 U.S. 33 | *Comcast*, 569 U.S. at 33 | Citation Clarification |
| 40 | Citation Unintentionally Omitted | *See* Ex. 13 at Fact 65. | Citation Clarification |
| 40 | Citation Unintentionally Omitted | *Id.* at Fact 41 | Citation Clarification |
| 41 | PSOF 87 | Ex. 15 at Fact 87 | Citation Clean Up |
| 43 | 739 F.3d at 1086 Plaintiffs' | 739 F.3d at 1086, Plaintiffs' | Grammatical |

| 44 | must all be satisfied by plaintiffs before class certification." *Id.* | must be satisfied by plaintiffs before class certification." *Goldman*, 141 S. Ct. at 1959. | Quotation Correction; Citation Clarification |
| 46 | Citation Unintentionally Omitted | 15 U.S.C. § 15(a) | Corrected Citation |
| 47 | *Santiago* and *Yahoo* | *Santiago,* and *Yahoo* | Grammatical |
| 49 | The Court's *Daubert* order | The *Daubert* order | Maintain Original Paragraph Break |
| 49 | Ex. 12 at 51 | Ex. 12 at 40:23–31:16 | Corrected Citation |
| 49 n.16 | 723-24 (7th Cir. 2011) Rule 23 "[a]nalysis" | 723-24 (7th Cir. 2011) (Rule 23 "[a]nalysis" | Citation Clarification |
| 50 | Plaintiffs evidence | Plaintiffs' evidence | Grammatical |

## CERTIFICATE OF SERVICE

I, Elizabeth Papez, an attorney, certify that on March 1, 2023, I caused **Defendants'**

**Corrected Memorandum of Law in Support their Motion to Decertify the 2020 Classes** to

be served on all counsel of record listed via the Court's ECF system.


/s/ *Elizabeth P. Papez*
Elizabeth Papez