**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____

|   |   |   |
|---|---|---|
| | x | |
| HARRY PLOSS, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | No. 15-cv-2937 |
| *-against-* | : | |
| | : | Honorable John F. Kness |
| KRAFT FOODS GROUP, INC. and | : | |
| MONDELĒZ GLOBAL LLC, | : | |
| | : | |
| Defendants. | : | |
| | x | |

_____

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' JANUARY 18, 2023 MOTION (ECF No. 571)**


CORRECTED COPY

**Errata - Memorandum**

| Page No. | Change |
|---|---|
| 1 | Change "See" to "*See*" |
| 2 | Change "every transactions" to "every transaction" |
| 2 | Change "Plaintiff's" to "Plaintiffs'" |
| 2 | Change "Daubert approved" to "Daubert-approved" |
| 2 | Change "See e.g.," to "*See e.g.,*" |
| 2, fn. 6 | Change " '6 6 " to " '6 " |
| 2, fn. 6 | Change "… Dec" to "… Dec." |
| 3 | Insert ":" after "by" |
| 3 | Change "29th" to "29," |
| 3 | Change "See" to "*See*" |
| 3 | Change "opinions by Dr. Pirrong further shows" to "opinions by Dr. Pirrong further show" |
| 4 | Change "direction from which that which" to "direction from that which" |
| 4 | Change "December March" to "December-March" |
| 4 | Change "its December December/March/May futures positions" to "its December/March/May futures positions" |
| 4 | Change "Appendix ¶ 19" to "Appendix ¶ 19." |
| 4, fn. 7 | Change "23(f) stated" to "23(f) petition stated" |
| | Change "trial ready" to "trial-ready" |
| 7 | Change "(as Kraft's suggests)" to "(as Kraft suggests)" |
| 9 | Insert "(emphasis added)" |
| 10 | Change "March contract" to "March Contract" |
| 10 | Change "December 2011 contract, March 2012 March contract" to "December Contract, March Contract" |
| 13 | Deleted "net damages is required for standing" |
| 13, fn. 12 | Corrected TransUnion cite. |
| 14 | Change "Plaintiffs' favor on that Kraft" to "Plaintiffs' favor that Kraft" |
| 16 | Change "against" to "by" |
| 17 | Insert "*Cf.* Brief of Appellant, *Kohen v. PIMCO,* No. 08-1075, ECF No. 20-1, at 34-35 (7th2d Cir. Sep. 16, 2008) (defendant argued that aggregate damages model "wildly overstated" estimated damages because the class supposedly included "net gainers")." |
| 18 | Change "Ploss II" to "*Ploss II*" |
| 19 | Change "Case and" to "Case, and" |
| 19 | Change "As set forth in the Statement of Facts" to "As set forth in the Appendix hereto" |
| 19 | Change "December 2011 and March 2012" to "December and March" and change "December 2011" to "December" |
| 19 | Change "PR ¶¶ 13-15" to "Ex. 1 ¶¶ 13-15" |
| 19 | Change "… efforts, Mark Haar, pointed out…" to ""… efforts, pointed out…" |
| 20 | Change "might have still been" to "might well still have been" |

| 20 | Change "6(c)1)" to "6(c)(1)" |
|---|---|
| 21 | Change "6(a)(1) to "6(c)(1)" |
| 21 | Change "fully distinguishable case law—and this, even when one ignores the great difference between the mere misrepresentation context of such securities cases, and the misleading conduct, *e.g.*, market power/omission to disclose, aspects of Plaintiffs' 6(c)(1) claim" to "fully distinguishable case law—even when one ignores the great difference between the mere public misrepresentation context of such securities cases, and the misleading conduct, *e.g.*, the market power signaling conduct aspects of Plaintiffs' 6(c)(1) claim" |
| 21 | Update *Goldman* cite. |
| 22 | Change "… yet Kraft does not present any impact evidence." to "… yet Kraft fails to present any evidence showing lack of impact." |
| 24 | Change "Plaintiffs theory of falsity" to "Plaintiffs' theory of falsity" |
| 24, fn. 21 | Update Halliburton cite. |
| 25 | Change "*Ploss*" to "*Ploss I*" |
| 25, fn. 23 | Change "Kraft Br." to "Motion," |
| 27 | Change "signal of demand" to "signals of demand" |
| 27 | Change "December 2011" to "December" |
| 30 | Insert "(emphasis added)" |
| 30 | Change "P.56.1"" to "Ex. 38 (P.56.1)" |
| 31 | Change "December 2011 and March 2012" to "December and March" |
| 31 | Change "However, Kraft ignores" to "Kraft ignores" |
| 32 | Change "statistically amount" to "statistically significant amount" |
| 32 | Change "December contract" to "December Contract" |
| 32 | Change "686." to "686)." |
| 33 | Change "2011 December" to "December", and "March 2012 Contract" to "March Contract", and "2011 December and 2012 March" to "December and March". |
| 37 | Insert "(emphasis added)" |
| 37 | Insert Because Dr. Pirrong defines the CTD market as the relevant market in his class certification report and defines the CTD market as a relevant market in his merits report, Dr. Pirrong's use of the CTD market is not "new." *Compare* Ex. 1 ¶ 390, *with* Ex. 6 ¶ 307. Dr. Pirrong opines in his merits report that the CTD market, the December futures contract market and the March futures market are "inextricably linked," such that the latter two are relevant markets as well. Ex 1., ¶¶389-396. For purposes of this motion, Plaintiffs address Kraft's arguments directed at Dr. Pirrong's CTD relevant market definition. |
| 38 | Change "an requirement" to "a requirement" |
| 39 | Change "March contract" to "March Contract" and change "i.e.," to "*i.e.*," |
| 41 | Changed "futures contracts" to "Contracts" and changed "contracts, Plaintiffs" to "contracts. Plaintiffs" |
| 45 | Change "each Class members' damages" to "each Class member's damages" |

| 45 | Change "each Plaintiffs' damages estimate" to "each Plaintiff's damages estimate" |
|---|---|
| 45 | Change "each Class members' trades" to "each Class member's trades" |
| 47 | Change "Kraft's suggestion it extremely difficult to determine" to "Kraft's suggestion it is extremely difficult to determine" |
| 47 | Change "Kraft asserts, there are" to "Kraft asserts there are" |
| 51, n. 36 | Change "at static" to "at a static" |
| 52 | Change "Here Plaintiffs" to "Here, Plaintiffs" |
| 53 | Change "Kraft Br." to "Motion," |
| 53 | Change "Plaintiff's" to "Plaintiffs'" |
| 54 | Change "other Class may have" to "other Class members may have" |
| 56 | Change "… class certification, Daubert litigation and Kraft recently filed a Rule 56 motion…" to "… class certification and Daubert litigation, and Kraft recently filed a Rule 56 motion…"" |
| 56 | Change "March contracts" to "March Contracts" |
| 57 | Change "any of other three" to "any of the other three" |

# TABLE OF CONTENTS

I.     FACTUAL BACKGROUND……………………………….…………………………1

    A.     Common Class-Wide Evidence of Kraft's Scheme Artificially Inflated December And March Contract Prices On Each And Every Day Of The Class Period…………………………………………………………………………1

    B.     Procedural History……………………………………………………….,……4

II.    KRAFT HAS FAILED TO MEET THE STANDARDS FOR DECERTIFICATION..…5

III.   THE CURRENT RECORD PROVIDES AN EVEN STRONGER BASIS FOR THE COURT'S FINDINGS THAT EVERY RULE 23 PREREQUISITE IS SATISFIED……………………………………………………………………………6

    A.     Rule 23(a)(2): Commonality Remains Satisfied…………………………………6

        1.     Dr. Pirrong's Admissible Event Study is Common Class-Wide Evidence of Injury and Kraft Remains Unable To Identify A Single Class Member Who Could Not Have Been Harmed……..……..7

        2.     Each Class Member Suffered A Concrete Monetary Harm By Overpaying to Purchase One or More Wheat Futures or Options Contracts……………………………………………….…….12

        3.     Kraft's "*Basic* Liability" Arguments Concern Only Plaintiffs' CEA Section 6(c)(1) Claim, Are Contrary to the Law of the Case and Otherwise Fail……………………………………………………..19

            (a)     *Goldman* Addressed a Legal Question Regarding the Generic Nature of Alleged Misstatements That is Not At Issue Here…………………………………………………..21

            (b)     Kraft's Arguments Ignore Critical Aspects of the Court's Prior Rulings……………………………………………..24

            (c)     Kraft Has Failed to Address *Any* of Plaintiffs' Evidence of Price Impact……………………………………………..27

            (d)     Kraft Has Failed to Rebut *Any* of Plaintiffs' Evidence of Price Impact……………………………………………..28

                (i)     Kraft's "back-end price drop" argument fails…………28

(ii)    Kraft Rehashes the Same Loss Causation Arguments Rejected by the Court, and Still Fails to Address Dr. Pirrong's Causation Analyses……………...…..,,,,,,,,32

(iii)    Kraft's Speculation About Individual Class Members' Awareness of Kraft's Delivery Economics Does Not Rebut the Presumption that Market Participants Relied on Market Prices To Signal True, Rather than Manipulative, Demand………………34

4.    Kraft's False Choice Between A "Classic Corner" and "Fraud on the Market" Fails………………………………………..…………..35

5.    Plaintiffs Have Common Class-Wide Evidence for Their Sherman Act Claim…………………………………………….…………37

B.    Rule 23(a)(3)-(4) Typicality and Adequacy Remain Satisfied…………………40

C.    Rule 23(b)(3) Predominance: Predominance Remains Satisfied and Kraft's Attempts to Manufacture Individualized Issue Fail……………………………48

1.    Contrary to Kraft, Rule 23(b)(3) Does Not Require Common Proof of Damages for Class Certification………………………………48

2.    In Order To Manufacture Individualized Issues, Kraft Has Improperly Attempted To Transform Article III Standing, Damages And Other Issues Into "Liability" Issues……………………51

3.    Common Issues Continue to Predominate on Plaintiffs' CEA Claims……………………………………………………..53

4.    Common Issues Continue to Predominate on Plaintiffs' Sherman Act Claims…………………………………………………54

D.    Rule 23(b)(3) Superiority: Superiority Remains Satisfied and Kraft's Attempts to Argue Against Its Prior Concession That Superiority Is Satisfied Fail………………………………………………………………56

E.    Ascertainability: The Class Definition Has Not Changed and The Class Continues to Be Ascertainable…………………………………………………57

F.    *Comcast*: Kraft's *Comcast* Arguments Fail Again………………….…………..58

CONCLUSION………………………………………………………………………60

## TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........................................................................... 34

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
2021 WL 3776297 (2d Cir. Aug. 26, 2021) ...................................... 23, 28

*Barner v. City of Harvey*, No. 95 C,
3316, 2000 WL 1369636 (N.D. Ill. Sept. 15, 2000) ........................... 5, 41

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................... 22

*Bell v. Farmers Ins. Exch.*,
115 Cal. App. 4th 755 (2004) ............................................................ 17

*Bell v. PNC Bank, Nat. Ass'n*,
800 F.3d 360 (7th Cir. 2015) .............................................................. 9

*Caremark, Inc. v. Coram Healthcare Corp.*,
113 F.3d 645 (7th Cir. 1997) .............................................................. 33

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) .............................................................. 50

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ......................................................................... 58, 59

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) ............................................................... 15

*DeSlandes v. McDonald's USA, LLC*,
No. 17 C 4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021) ................. 40

*Driver v. AppleIllinois, LLC*,
739 F.3d 1073 (7th Cir. 2014) .............................................................. 5

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................... 30, 51

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ........................................................................... 32

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
  No. 16 CIV 5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)................................. 15

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ......................................................................................... . 30

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
  141 S. Ct. 1951 (2021) ..................................................................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)…………………………………………………………………………24

*Howard v. Cook Cnty. Sheriff's Off.*,
  989 F.3d 587 (7th Cir. 2021) .................................................................................11, 18, 31

*In re Allstate Corp. Sec. Litig.*,
  966 F.3d 595 (7th Cir. 2020) ......................................................................................... 28

*In re Amaranth Nat. Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ............................................................................. 6, 10, 50

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012)................................................................................. 39

*In re Nat. Gas Commodities Litig.*,
  231 F.R.D. 171 (S.D.N.Y. 2005) ............................................................................. 6, 10, 50

*In re Nat. Gas Commodities Litig.*,
  358 F. Supp. 2d 336 (S.D.N.Y. 2005)................................................................................ 25

In *re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd* 934 F.3d 619 (D.C. Cir. 2019) ................................ 10

*In re Sumitomo Copper Litig.*,
  182 F.R.D. 85 (S.D.N.Y. 1998) ...................................................................................... 44

*In re Sumitomo Copper Litig.*,
  194 F.R.D. 480 (S.D.N.Y. 2000) ...................................................................................... 6

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) ..................................................................................... 28

*In re Term Commodities Cotton Futures Litig.*,
  No. 12-CV-5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) ................................. 52

iv

*In re Term Commodities Cotton Futures Litig.*,
   No. 12-CV-5126 (ALC), 2022 WL 485005 (S.D.N.Y. Feb. 17, 2022) ...................................... 6

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
   702 F.3d 364 (7th Cir. 2012) ........................................................................................ 43

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
   244 F.R.D. 469 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir. 2009)................................ *passim*

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ................................................................................... 39, 56

*Long v. Trans World Airlines, Inc.*,
   761 F. Supp. 1332 (N.D. Ill. 1991)…………………………………...………………………..17

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012)...................................................................................... *passim*

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ............................................................................................. 12

*Parish v. Sheriff of Cook Cnty.,* No. 07 C,
   4369, 2016 WL 1270400 (N.D. Ill. Mar. 31, 2016) ..................................................... 5

*Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp., Inc.*,
   431 F. Supp. 3d 1003 (N.D. Ill. 2020)...................................................................... *passim*

*Ploss v. Kraft Foods Grp., Inc.*,
   197 F. Supp. 3d 1037 (N.D. Ill. 2016)...................................................................... *passim*

*Ploss v. Kraft Foods Grp., Inc.*,
   No. 15-CV-02937, 2022 WL 16540179 (N.D. Ill. Oct. 28, 2022) ..................................... *passim*

*Sanner v. Bd. of Trade of City of Chicago*,
   62 F.3d 918 (7th Cir. 1995) ..................................................................................... 14, 39

*Santiago v. City of Chicago*,
   19 F.4th 1010 (7th Cir. 2021) ............................................................................11, 12, 47

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010)........................................................................ 8, 29, 30, 32, 51

*Srail v. Vill. of Lisle*,
   249 F.R.D. 544 (N.D. Ill. 2008) ............................................................................. 44

*Strobl v. New York Mercantile Exch.*,
    582 F. Supp. 770 (S.D.N.Y. 1984) ............................................... 8

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ............................................... 9, 13

*TCS John Huxley Am., Inc. v. Sci. Games Corp.*,
    No. 19 C 1846, 2020 WL 1678258 (N.D. Ill. Mar. 20, 2020) ................... 56

*Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*,
    736 F. Supp. 511 (S.D.N.Y. 1990) ............................................. 52

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................... 13, 14, 15

*Tyson Foods, Inc. v. Bouaphake*o, ,
    136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) ........................... 45, 49, 50

*United States Parole Commission v. Geraghty*,
    445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) ........................ 14

*Wachala v. Astellas US LLC*,
    No. 20 C 3882, 2022 WL 408108 (N.D. Ill. Feb. 10, 2022) ................... 43

*Wagner v. NutraSweet Co.*,
    95 F.3d 527 (7th Cir. 1996) ............................................... 40

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................... 6, 40, 48

*Wiesmueller v. Kosobucki*,
    513 F.3d 784 (7th Cir. 2008) ............................................. 14

**Statutes**

7 U.S.C. § 25(a)(1) .......................................................... 52

**Rules**

Fed. R. Civ. P. 23 .................................................... 52, 58

Fed. R. Civ. P. 23(a)(2) ............................................... 1, 6

Fed. R. Civ. P. 23(a)(3) ................................................. 40

FED. R. CIV. P. 23(a)(3)-(4) ........................................................................... 40

FED. R. CIV. P. 23(b)(3) ............................................................... 48, 49, 50, 56

FED. R. CIV. P. 23(b)(3)(D) ............................................................................ 57

FED. R. CIV. P. 23(c)(2)(B) ............................................................................. 57

FED. R. CIV. P. 23(f) ............................................................................. 4, 12, 42

## Other Authorities

2 Newberg and Rubenstein on Class Actions § 4:54 (6th ed.) .................... 49

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice &
Procedure § 1784 (2009) ....................................................................... 51

13A Charles A. Wright & Arthur Miller, FED. PRAC. & PROC. JURIS. 3d § 3531.4
(3d ed. & 2014 Supp.) ............................................................................ 16

Plaintiffs[1] respectfully submit this memorandum and supporting materials[2] to demonstrate that this Court should deny Kraft's motion (ECF Nos. 571-75 "Motion") because (a) Kraft has woefully failed to carry its burden to show that a motion for reconsideration is appropriate now, and (b) the Class fully satisfies the requirements of Fed.R.Civ.P. 23 such that reversal of this Court's January 3, 2020 Memorandum Opinion & Order certifying the Class is wholly unwarranted. *Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003 (N.D. Ill. 2020) ("*Ploss II*"), *petition for review denied*, No. 20-8001 (7th Cir. 2020). *See infra* (definition of the Class).[3]

Kraft has failed its burden to identify any material change in circumstances that warrant altering the Court's rigorous analysis certifying the Class. Instead, Kraft repeats previously rejected arguments, makes arguments based on facts known and in the original class certification record and boldly withdraws its prior concessions that Rule 23(a)(2) commonality and Rule 23(b)(3) superiority are satisfied. P*loss II,* 431 F. Supp. 3d at 1011, n. 4.

The one change since the Court certified the Class is that the Court denied Kraft's *Daubert* motions. *Ploss v. Kraft Foods Grp., Inc.*, No. 15-CV-02937, 2022 WL 16540179 (N.D. Ill. Oct. 28, 2022) ("*Ploss III*"). Now, with their *Daubert* arguments largely rejected, Kraft has decided to re-litigate class certification. However, the current record provides an even stronger basis for Class Certification.[4]

## I.    FACTUAL BACKGROUND
### A.  Common Class Wide Evidence That Kraft Artificially Inflated December And March Contract Prices On Each And Every Day Of The Class Period.

---

[1] Plaintiffs are Harry Ploss, Robert Wallace, Kevin Brown, Joseph Caprino, Richard Dennis, White Oak Fund, LP, and Budicak, Inc.  Defendants are Kraft Foods Group, Inc. and Mondelēz Global LLC (collectively "Kraft").

[2] Submitted concurrently herewith is the Declaration of Peter Demato, Esq. ("Demato Decl.") and accompanying exhibits.

[3] As explained in Section III.B, *infra*, there is only one Class.

[4] Kraft previously conceded Rule 23(a)(1) numerosity and Rule 23(a)(4) adequacy of Class counsel are satisfied. *Ploss II*, 431 F. Supp. 3d at 1011 n.4. Kraft again concedes each remains satisfied.

As a result of extensive work by the Parties and Court, the record on the instant motion now provides much stronger support for class certification than that presented in *Ploss II*. **First**, in his now *Daubert*-approved expert work, Plaintiffs' economist, Professor Craig Pirrong ("Pirrong"), opines that:



(a) ████████████████████████████████████████████ ████████████████████████████████ between November 1 and December 14, 2011 inclusive ("Class Period");

(b) ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ; and

(c) Kraft caused both ████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

Accordingly, now trial-ready evidence exists which is sufficient to establish that each and every member of the Class necessarily paid artificially inflated prices to make each and every transaction which qualifies them for Class membership.

**Second**, also in his now *Daubert*-approved work, Dr. Pirrong repeatedly opines that Kraft caused ████████████████████████████████████████████████ ██████████ In essence, Kraft acquired such market power by flouting the important norms that are the basis for trading in an orderly manner in commodity futures contracts. *See e.g.,* Appendix ¶¶7-16 (specifying such market norms; and explaining why they have been critical to the orderly

---

[5] The Chicago Board of Trade ("CBT") December 2011 Soft Red Wheat ("SRW") ("December Contract") the CBT March 2012 SRW Contract ("March Contract").
[6] All citations to "Ex. _" are to the exhibits to the Demato Dec.

trading in futures contracts which has made the CME and Chicago the futures trading capital of the world). For example, Kraft flouted essential norms of futures trading to obtain market power by:

(a) ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

(b) ██████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

(c) ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

(d) ██████████████████████████████████████████
████████████████████████████████████████████

Third, Pirrong's *Daubert*-approved opinions and credentials further show that Kraft's conduct includes substantial conduct that was uneconomic in various respects. *See* Appendix ¶¶ 13-18. Thus, Kraft's ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

Substantial additional trial-ready opinions by Dr. Pirrong further show that ██████████
████████████████████████████████████████████████
████████████████████████████████████████████████

That is, Kraft's extensive uneconomic conduct 

Given this trial-ready evidence that Kraft had the market power to force the December-March spread to compress at exactly the time when it should have expanded, it is clear that, but for its manipulation,

Appendix *passim* for numerous further facts and questions which are common to all Class members.

### B. Procedural History

The foregoing trial-ready evidence confirms what the class certification record indicates: that each and every Class member overpaid for its transactions qualifying it for membership in the Class; and that this Court, on January 3, 2020, and after more than three years of fact and expert discovery, properly certified the Class. *Ploss II*, 431 F. Supp. 3d at 1022. The Court conducted a rigorous analysis of the record and controlling Rule 23 standards and held that Rule 23(a) and (b)(3) were satisfied by a preponderance of the evidence. *Id.* On February 21, 2020, the Seventh Circuit issued a mandate denying Kraft's Fed. R. Civ. P. 23(f) petition. ECF No. 345.[7]

---

[7] Defendants' Rule 23(f) petition stated: "Defendants do not question that Plaintiffs' showing at class certification was sufficient to justify class adjudication of their CEA claims for wheat futures transactions from November 29-December 9." Petition for Permission to Appeal from Class Certification, at 9, *Ploss v. Kraft Foods Group, Inc.*, No. 20-8001 (7th Cir. Jan. 1, 2020), ECF No. 1 ("Kraft's 23(f) Pet.").

On May 18, 2020, the parties jointly submitted a Rule 16 scheduling order. ECF Nos. 357, 364. The parties agreed and the Court ordered that there will be certain "post-trial proceedings" concerning damages and other issues if Plaintiffs prevail at trial. *Id*. The parties exchanged merits expert reports following the close of fact discovery on October 21, 2020. *Id.* On October 28, 2022, the Court substantially denied Kraft's *Daubert* motions. *See Ploss III*.

## II. KRAFT HAS FAILED TO MEET THE STANDARDS FOR DECERTIFICATION

A decertification motion is a request for "reconsideration of a previous ruling." *See Driver v. Apple Illinois, LLC*, 739 F.3d 1073, 1077 (7th Cir. 2014). Unless the movant (here Kraft) demonstrates a material change in circumstances such as new *controlling* case law that "substantially alters the legal landscape" or new facts that were "not known" at the time the class was certified, a motion for decertification should not even be considered. *Parish v. Sheriff of Cook Cnty.*, No. 07 C 4369, 2016 WL 1270400, at *1–2 (N.D. Ill. Mar. 31, 2016) (absent "materially changed or clarified circumstances or changes in the law requiring decertification," "courts should not condone a series of rearguments of class issues by the opponent of the class"); *Barner v. City of Harvey*, No. 95 C 3316, 2000 WL 1369636, at *1 (N.D. Ill. Sept. 15, 2000) (holding "defendants' motion to decertify would only be considered if based upon new case law that substantially alters the legal landscape, or new facts that were not known" and finding "defendants have failed to raise any new controlling law or facts to support their argument that Judge Coar's ruling as to class certification was in clear error"). Transfer of a case to a new judge "does not open the door for a party to twice bite the apple" due to "law of the case principles." *Barner*, 2000 WL 1369636, at *2; *Parish*, 2016 WL 1270400, at *1–2.

Kraft has not demonstrated any change in the Rule 23 standards, any change in controlling law or any material change in the fact record.

5

## III.  THE CURRENT RECORD PROVIDES AN EVEN STRONGER BASIS FOR THE COURT'S FINDINGS THAT EVERY RULE 23 PREREQUISITE IS SATISFIED

### A.  <u>Rule 23(a)(2)</u>: Commonality Remains Satisfied

Fed. R. Civ. P. 23(a)(2) requires that: "there are questions of law or fact common to the class." Commonality has been described as "a low hurdle that is easily surmounted." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 476 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir. 2009).

Kraft previously conceded Rule 23(a)(2) commonality was satisfied. *Ploss II*, 431 F. Supp. 3d at 1015 ("The parties agree that, based on the elements of those claims, there are two common questions in this case: (1) whether Kraft engaged in the alleged long wheat futures scheme; and (2) whether that scheme inflated futures prices in the marketplace."). The Court held the foregoing questions were capable of class-wide resolution through common proof. *Id.*

These overarching common questions remain undisputed. The questions continue to be "capable of class-wide resolution" because they are "central" to Plaintiffs' claims and can be resolved "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The questions can be resolved through common class-wide proof—including Kraft's internal communications and records, Kraft's futures positions, and Plaintiffs' expert opinions—and the answers will not vary by Class member. *Ploss II*, 431 F. Supp. 3d at 1014–16.

*Ploss II* recognized that actions concerning price manipulation under the CEA and Sherman Act turn on common questions and are routinely certified under Rule 23.[8] *Ploss II*, 431 F. Supp. 3d at 1014. The Court recently denied Kraft's *Daubert* motions and held the impact of Kraft's

---

[8] *Kohen*, 244 F.R.D. 469; *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126, 2022 WL 485005 (S.D.N.Y. Feb. 17, 2022), *petition for review denied*, 22-472 (2d Cir. 2022); *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366 (S.D.N.Y. 2010), *petition for review denied*, 10-4110-mv (2d Cir. 2010); *In re Nat. Gas Commodities Litig.*, 231 F.R.D. 171 (S.D.N.Y. 2005), *petition for review denied*, (2d Cir. 2006); *In re Sumitomo Copper Litig.*, 194 F.R.D. 480 (S.D.N.Y. 2000), *petition for review denied*, 262 F.3d 134 (2d Cir. 2001).

manipulation can be tested through Dr. Pirrong's event study, which "if credited by a jury . . . would support a finding that Kraft caused artificially high prices in the December 2011 and March 2012 wheat futures markets." *Ploss III*, 2022 WL 16540179, at *1.

Against the backdrop of Kraft's prior concessions, *Ploss II*, and *Ploss III*, Kraft raises a series of "commonality" arguments that were previously rejected or waived.

### 1. Dr. Pirrong's Admissible Event Study is Common Class-Wide Evidence of Injury and Kraft Remains Unable To Identify A Single Class Member Who Could Not Have Been Harmed

Kraft's headline argument for decertification is "a great many persons" in the Class are supposedly "uninjured." *E.g.*, Motion, at 2, 4, 31-32, 48. Kraft's argument fails spectacularly.

Kraft points to "new" Chicago Mercantile Exchange ("CME") large trader position data as the basis for its "uninjured" Class member argument. Motion, at 19-22.[9] There are two preliminary issues with Kraft's large trader data analysis. First, CME large trader position data is not new. Plaintiffs obtained CME large trader position data from the CME *prior* to class certification. Indeed, Plaintiffs' *and Kraft's* class experts both analyzed and opined on large trader position data in their class certification expert reports. *See* Ex. 6 (Class Cert. Report of Dr. Pirrong), at Ex. C; Ex. 7 (Class Cert. Report of James Overdahl) ¶ 75.[10] Even if the data could be considered "new" because Kraft delayed obtaining it until *after* the Class was certified, the data does not change anything because it does not identify (as Kraft suggests) a single Class member who was not injured by Kraft's scheme, as explained below. Second, like in every case, the determination of "net damages" depends upon the proof and outcome of trial, as the parties have acknowledged. ECF No. 357, at 10 (Rule 16 scheduling order stipulated to by the parties provided for post-trial

---

[9] "Large traders" are traders who hold futures positions equaling or exceeding reporting levels.

[10] The large trader position data the CME produced to Plaintiffs "masked" the identities of the large traders with unique numerical identifiers. The data Kraft obtained was "unmasked."

claims-based damage procedures and stated "Kraft's position is that the proposed trial should address class-wide liability and the existence and amount of daily artificiality, if any, on a per futures contract basis"); *Strobl v. New York Mercantile Exch.*, 582 F. Supp. 770, 779 (S.D.N.Y. 1984) (jury was not required to accept plaintiffs' expert's testimony concerning price artificiality but was entitled to do so and holding jury's finding of more price artificiality than expert estimated was not unreasonable).

Kraft's merits expert used the CME data to calculate whether ████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ In order to do so, Kraft's expert adopted and applied the common methodology proposed by Plaintiffs' experts ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████

Kraft's uninjured Class member argument is a total repeat of an argument Kraft raised in opposition to class certification. In 2019, Kraft cited *Kohen* and argued a "great many members [] have suffered no injury." ECF No. 263, 47-50. The Court thoroughly considered and squarely rejected Kraft's argument:

> At best, though, Kraft's argument is again that some class members' claims will fail on the merits if and when damages are decided, "a fact generally irrelevant to the district court's decision on class certification." *See Messner*, 669 F.3d at 823; *see also Schleicher*, 618 F.3d at 687 ("The chance, even the certainty, that a class

will lose on the merits does not prevent its certification.") . . . **There is a difference between a class including members who could not have been harmed at all by the defendant's conduct, and those who ultimately were not harmed.** The former, but not the latter, can preclude certification. *See Messner*, 669 F.3d at 824 ("[A] class is defined too broadly" if it "include[s] a great number of members who for some reason *could not* have been harmed by the defendant's allegedly unlawful conduct.") . . . .

*Ploss II*, 431 F. Supp. 3d at 1019 (emphasis added). The "critical" distinction the Court identified between members who "could not have been harmed" and those that "were not harmed," has been consistently repeated by the Seventh Circuit. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 380 (7th Cir. 2015) ("A class will often include persons who have not been injured by the defendant's conduct, but this possibility or, indeed inevitability, does not preclude class certification . . . . If, however, a class [includes] a great number of members who . . . could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification."); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) ("If the court thought that no class can be certified until proof exists that every member has been harmed, it was wrong."); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) ("[A] class is defined too broadly" if it "include[s] a great number of members who for some reason *could not* have been harmed by the defendant's allegedly unlawful conduct."); *Kohen*, 571 F.3d at 677 ("if the [class] definition is so broad that is sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad").

In 2019, Kraft argued intraday and hedging traders *could not* have been harmed by Kraft's scheme because any price artificiality they paid would supposedly be cancelled out by offsetting benefits, but the Court rejected that argument. *Ploss II*, 431 F. Supp. 3d at 1019 ("these traders could have been harmed—they purchased wheat futures at the allegedly inflated prices. And just because Ploss might not be able to later prove that hedging traders suffered a net loss or that

9

Pirrong's model can calculate an intraday trader's injury does not mean that the class definition is overbroad."). The only difference now is that Kraft points to certain large traders instead of "hedger" and "intraday traders." The result, however, is the same. Each large trader Kraft identifies—like all Class members—overpaid to purchase at least one December or March Contract at prices artificially inflated by Kraft and were thereby injured. *Id.*

Thus, it remains the case that Kraft is unable to present any evidence showing a single Class member "could not have been harmed." The reason for this is simple. Dr. Pirrong's event study found Kraft's conduct ████████████████████████████████████ ████████████████████████████████████████████████████ As a result, every Class member purchased at least one contract at an inflated price and was thereby injured. *Ploss II*, 431 F. Supp. 3d at 1019.

Courts have consistently held that the purchase of a commodity futures contract at a manipulated price is sufficient to establish injury. *See, e.g.*, *Kohen*, 244 F.R.D. at 474–76 (plaintiff alleged injury because it "purchased one or more June Contracts during the class period and was injured as a result of defendants' manipulative conduct"); *In re Amaranth Natural Gas Commodities Litigation*, 269 F.R.D. at 379–80 & n. 97-99 (S.D.N.Y. 2010) (same); *In re Natural Gas Commodities Litigation*, 231 F.R.D. at 179 & n. 1 (S.D.N.Y. 2005) (same). Kraft's own case, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 136 (D.D.C. 2017) *("Rail Freight")* similarly held "even a single overcharge is sufficient to show injury" under the antitrust laws. *Id.* at 136.

Unable to identify any reason to upend the Court's ruling in *Ploss II*, or any change in the law of this Circuit, Kraft simply argues for a new standard for which it has no authority— purchasing a wheat futures contract at a price artificially inflated by Kraft is not sufficient to

demonstrate injury. Instead, Kraft asserts that *all* relevant transactions by a Class member must be analyzed to determine injury, and if that net result does not result in net damage, then that Class member is (according to Kraft) "uninjured." Motion, at 38-41.

Kraft's "net damages" standard is contrary to *Ploss II* and controlling law of the Seventh Circuit, which confirm the Court was not required to determine which Class members have damages before certifying the Class. *Ploss II*, 431 F. Supp. 3d at 1019–20 ("just because Ploss might not be able to later prove that hedging traders suffered a net loss . . . does not mean that the class definition is overbroad") (*citing Messner* 669 F.3d at 823) ("this is at best an argument that some class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification")). Indeed, none of the prior decisions that certified Rule 23(b)(3) classes in cases alleging manipulation of commodity futures contracts required a showing of Class member net damages as a prerequisite for certification.

Although not new or controlling, Kraft's reliance on *Rail Freight* further demonstrates why Kraft's net loss arguments fail. In *Rail Freight*, defendants (like Kraft) tried to equate injury with net loss. The district court concluded "even a single overcharge is sufficient to show injury," regardless of whether the totality of the transactions generated a net benefit. *Id.* at 137, *aff'd* 934 F.3d 619 (D.C. Cir. 2019). However, in *Rail Freight*, class certification was defeated because it was undisputed that 12.7% of the class had **zero** overcharges, because they were operating under legacy contracts that predated the alleged conspiracy. *Id.* at 138.[11] The D.C. Court of Appeals

---

[11] Kraft asserts *Rail Freight* held expert opinions that satisfy *Daubert* must also meet the "higher standard" for class certification. Motion, at 8, 26. However, in *Rail Freight* the D.C. Circuit explicitly declined to reach this issue. *Rail Freight*, 934 F.3d at 623. Kraft also incorrectly suggests that *Howard*, *Santiago* address "decertification" of classes after expert models were admitted under *Daubert*. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 592 (7th Cir. 2021) (reversing class certification pursuant to Fed. R. Civ. P.

decision affirming the district court focused **only** on the 12.7% of the class that had zero overcharges (*i.e.*, class members that could not be harmed). 934 F.3d at 623–24. Unlike *Rail Freight*, here Kraft has identified **0.0%** of the Class that did not overpay to purchase at least one wheat futures or option contract during the Class Period.

The Ninth Circuit, sitting *en banc*, recently reiterated the "could have been" versus "were not" distinction from the Seventh Circuit's *Messner* decision. The Ninth Circuit held that a class could be certified under Rule 23(b)(3) even where the class "potentially includes more than a de minimis number of uninjured class members," so long as common issues still predominate. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (certifying a class where there was evidence that 28% of the class suffered no net damages), *cert. denied*, 143 S. Ct. 424 (2022). In *Olean*, as here, the presence of class members without recoverable damages did not prevent certification because common evidence would establish liability and, if plaintiff's expert was credited at trial, the method "for calculating damages is a straightforward process of applying the class-wide overcharge to the Tuna Purchasers' net sales records." *Id.* at 681–82 n.31.

### 2. Each Class Member Suffered A Concrete Monetary Harm By Overpaying to Purchase One or More Wheat Futures or Options Contracts

Tellingly, Kraft never raised any Article III standing concerns when it opposed class certification in 2019 (ECF No. 267) or when it sought Rule 23(f) review in 2020 (Kraft's 23(f) Pet.) even though Kraft argued then (like it does now) the Class included "uninjured" members. ECF No. 267, at 50. Kraft nevertheless begins its Motion by asserting the Class supposedly includes hundreds of "scarecrows" who lack Article III standing. Motion, pp. 1, 8. Kraft's Article

---

23(f)); *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021) (reviewing a grant of class certification pursuant to Rule 23(f)).

III argument is a double down on Kraft's "uninjured" Class member argument and fails for all the same reasons detailed above. Kraft's argument is also refuted by its own "recent" Supreme Court case *TransUnion* (which did not change the "fundamental" law concerning the test for Article III standing), multiple Seventh Circuit decisions and *Kohen*, a decision heavily relied on by Kraft.

Preliminarily, Kraft's (new) suggestion Plaintiffs are required to demonstrate every Class member has Article III standing in order to satisfy Rule 23 is contrary to controlling law. Motion, at 43-49. The Seventh Circuit held in *Kohen*: "as long as **one member** of a certified class has a plausible claim to have suffered damages, the requirement of [Article III] standing is satisfied." *Kohen*, 571 F.3d at 676; *Suchanek*, 764 F.3d at 757 ("If the court thought that no class can be certified until proof exists that every member been harmed, it was wrong."); *Ploss II*, 431 F. Supp. 3d at 1019 (citing *Messner*, 669 F.3d at 823) ("[T]hat some class members' claims will fail on the merits if and when damages are decided [is] a fact generally irrelevant to the district court's decision on class certification.")).[12] Kraft concedes at least two Plaintiffs have net damages (based on Dr. Pirrong's artificiality estimates) and thus have standing even under Kraft's own (incorrect) standard. Motion, at 15, 28.

*Kohen* in fact rejected the same exact standing argument Kraft makes here:

PIMCO challenges the definition on the ground that it includes persons who lack "standing" to sue because they did not lose money in their speculation on the June Contract. For example, some of the class members might have taken both short and long positions (in order to hedge—that is, to limit their potential losses) and made more money in the long positions by virtue of PIMCO's alleged cornering of the market than they lost in their short positions . . . .

PIMCO argues that before certifying a class the district judge was required to determine which class members had suffered damages. But putting the cart before the horse in that way would vitiate the economies of class action procedure; in

---

[12] *TransUnion* did not hold that all Class members must be shown to have Article III standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 n.4 (2021) ("We do not here address the distinct question whether every class member must demonstrate standing *before* a court certifies a class.").

effect the trial would precede the certification. It is true that injury is a prerequisite to standing. But as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied. *United States Parole Commission v. Geraghty,* 445 U.S. 388, 404, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980); *Wiesmueller v. Kosobucki*, 513 F.3d 784, 785–86 (7th Cir. 2008).

*Kohen*, 571 F.3d at 676.

Even though not required for certification, Plaintiffs and all Class members have Article III standing and can demonstrate it through common proof (including Dr. Pirrong's admissible event study). To have Article III standing to sue in federal court, a plaintiff must demonstrate "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct.at 2203 .

In *TransUnion*, the Supreme Court explained "certain harms readily qualify as concrete injuries under Article III.  The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 2204. Here, Plaintiffs and each Class member overpaid to purchase at least one December or March futures contract or option contract at a price inflated by Kraft. Thus, each Class member suffered what the Supreme Court referred to as one of the "**most obvious**" types of harm that qualifies as a concrete injury under Article III—a monetary harm. *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 924 (7th Cir. 1995) (holding the district court did not err "in determining that the farmers who sold soybeans at allegedly depressed prices suffered an injury sufficient to confer standing under Article III."). Dr. Pirrong's event study has been determined to be relevant and reliable and the Court held that, if accepted by the jury, it would support a finding that Kraft caused artificially high wheat futures prices. *Ploss III*, 2022 WL 16540179, at *3. The injury here (a concrete monetary overpayment) is redressable. If the jury finds in Plaintiffs' favor that Kraft artificially inflated the prices of wheat futures contracts in violation of the CEA and

Sherman Act, then the overpayments made by Plaintiffs and the Class to purchase such contracts will be redressed—Kraft will responsible for compensating Plaintiffs for those overpayments.

Nevertheless, Kraft suggests the Article III standing analysis must consider **both** the concrete injury and any potential **benefits**. On this basis, Kraft suggests Class members later shown to have no net damages do not have a "redressable" injury. Motion, at 29. However, the test for Article III standing set by the Supreme Court quoted above focuses on "injury." *TransUnion*, 141 S. Ct. at 2203-04. The plain language of the test clearly does not even require quantification of the injury, let alone consideration of potential benefits, netting of any potential benefits, nor does it require a showing of net damages. This is because the determination of the threshold issue of standing does not require a calculator, it is not an accounting exercise.

Indeed, Kraft does not cite any case holding Article III standing disappears in the presence of potentially offsetting benefits. Motion, *passim*. On the contrary, when considering plaintiffs' standing, courts do not, as a matter of law, "offset" injuries with alleged potential benefits from a violation. This is because while offsetting "benefits" may ultimately defeat a claim for damages, such offsets do *not* negate standing or injury. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) ("the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing."); *Kohen*, 571 F.3d at 677 (standing not defeated on the basis that class members both bought and sold at manipulated prices); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2017 WL 3600425, at *9 (S.D.N.Y. Aug. 18, 2017) ("alleged manipulation, at different times, may have both hurt and helped plaintiffs' [trades] . . . does not mean that plaintiffs lack constitutional standing"). As the leading treatise explains:

> Once injury is shown, no attempt is made to ask whether the injury is outweighed
> by benefits the plaintiff has enjoyed from the relationship with the defendant.

> Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury.

13A Charles A. Wright & Arthur Miller, FED. PRAC. & PROC. JURIS. 3d § 3531.4 (3d ed. & 2014 Supp.).

Kraft's distorted view of Article III standing and offsetting benefits would lead to "absurd" results and have the trial precede a threshold showing of standing. *Kohen*, 571 F.3d at 677. It would mean a plaintiff with a concrete injury likely caused by a defendant has **no forum** to even adjudicate that harm if it is possible the harm might be offset by potential benefits. It would also mean district courts, at the outset of a case, must speculate about the possible outcomes of a trial to determine if the court has jurisdiction to even hear the dispute. As *Kohen* recognized, this improperly puts the cart before the horse. *Kohen*, 571 F.3d at 676.

Kraft's assertions it is being subjected to "*in terrorem*" litigation by uninjured Class members ring hollow for reasons beyond Kraft being unable to identify a single Class member that was not injured. Motion, at 7-8. Kraft has not run to the settlement table in fear since class certification. On the contrary, Kraft has continued to vigorously litigate this case. Regardless, Kraft has no reason to fear "uninjured" Class members. As explained below, Plaintiffs have proposed a common methodology for calculating damages for each Class member. Plaintiffs' admissible methodology ███████████████████ is capable of quantifying the amount of net damages (if any) each Class member suffered. *Id.* Class members who are later determined to not have net damages will not be entitled to any recovery. *Id.* Thus, Kraft is not subject to and need not fear being held responsible for one penny of damages it did not cause.

In this regard, Kraft's reliance on *Kohen*'s discussion of "net gainers" and "random samples" is misguided. Exactly the opposite of *Kohen*, Plaintiffs here (as Kraft concedes) have **not** proposed to pursue a class-wide aggregate damages model or proposed that damages be awarded

on an aggregate basis. *Compare Kohen v. PIMCO*, 08-1075, ECF No. 20-1, pp. 34-35 (2d Cir.) (defendant argued that aggregate damages model "wildly overstated" estimated damages because the class supposedly included "net gainers"). Instead, Plaintiffs have proposed (and the parties stipulated to) a *claims-based procedure*. ECF No. 357. In an aggregate damages situation, there could be (depending on the facts of the case) a potential risk of allocating damages to class members who were not damaged. However, there is **zero such risk** in a claims-based procedure, which applies the daily price impact findings of the jury to each Class member's daily trades. This procedure ensures no damages are awarded to any Class member determined to not have net damages based on the jury's findings.

As the cases cited by *Kohen* reflect, the import of a "random sample" in an aggregate damages context is to quantify the percentage of a class that may not be shown to have damages (the "net gainers") in order to determine if the class-wide aggregate damages model is appropriately calibrated. *Kohen*, 571 F.3d at 679 (*citing, e.g., Bell v. Farmers Ins. Exch.,* 115 Cal. App. 4th 715, 755 (2004), *as modified on denial of reh'g* (Mar. 9, 2004) (discussing sampling of class members in the context of proof of aggregate damages); *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1332 (N.D. Ill. 1991) (same)). However, Dr. Pirrong's admissible event study

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████ like in

*Kohen*. Plaintiffs (and the parties) have accounted for any "net gainers" through the claims-based procedures and the common methodology for calculating Class member damages proposed by Plaintiffs, which operate to ensure Kraft will not be responsible for one penny of damages to any "net gainers." Subject to the final determination of price impact by the jury, any net gainers will not be entitled to receive any payment.

"Lost Money." Kraft states the Court "assumed" Dr. Pirrong's event study would show all Plaintiffs "lost money." Motion, p. 14. As detailed above, that is exactly what Dr. Pirrong's admissible event study shows for all Class members (a monetary overpayment). Kraft misinterprets the phrase "lost money" to mean Plaintiffs will each have "net damages." But this interpretation is contrary to *Ploss II* and fails for all the same reasons Kraft's "uninjured" Class member argument fails.

*Howard*. Kraft relies heavily on *Howard* as a "recent" decision. Motion, *passim*. Although decided after the Court's order, *Howard* did not change any Rule 23 standards, did not even involve any of the claims at issue here and involved factual and legal circumstances that are not present here. *Howard*, a Title VII hostile work environment class action brought by female employees of the Cook County jail system, did not change any Rule 23(a) standards and the facts and claims at issue in *Howard* are highly distinguishable. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 604 (7th Cir. 2021). The hostile work environment claims at issue in *Howard* are "fact intensive" and "turn on the frequency, severity, character, and effect of the harassment." *Id.* As a result, the claims involved "worker-specific inquiries" of the thousands of female employees that worked in many different locations and had different job assignments. *Id.* The plaintiffs conceded the frequency of harassment varied by location and was "heavily concentrated within a few residential divisions where a fraction of class members and named plaintiffs work." *Id.* Thus, no common question existed because "plaintiffs cannot demonstrate that class members working in disparate parts of the massive jail complex have experienced the same work environment." *Id.* at 605. The facts here are the opposite. Plaintiffs and all Class members traded the exact same standardized futures contracts, in the exact same centralized futures market and experienced the exact same injury (an overpayment).

**3.** **Kraft's "*Basic* Liability" Arguments Concern Only Plaintiffs' CEA Section (6)(c)(1) Claim, Are Contrary to the Law of the Case, and Otherwise Fail**

As set forth in the Appendix hereto, the record on this class decertification motion shows in detail extensive evidence indicating that Kraft systematically flouted important market norms unique to futures trading, and did so in order to ███████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████

█████████████ █████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ █████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[13] Ex. ███████████████████████████████ Ex. 11 ████████████████████

[14] Ex. 21 ████████████████████████

[15] Ex. 23 ██████████████████████████████



Plaintiffs contend that Kraft's foregoing conduct has also provided Plaintiffs with good grounds to add to its core claim of market power manipulation by Kraft in violation of Section 9(a)(2). Unable to respond to class certification of the 9(a)(2) claims based on the elements of the 9(a)(2) claim, Kraft extensively argues that the claim under Section 6(c)(1) should be decertified. However, here Kraft relies on securities cases, the factual context of which is extraordinarily

---

[16] Ex. 22 ███████████████████████
[17] Ex. 25 ███████████████████; Ex. 1 ████████████
[18] Ex. 42 ████████████████
[19] Ex. 25 ██████████████████ Ex. 1 █████████████

different from here. Among others, the accused in those cases was not acquiring the market and monopoly power to push prices around, and did not flout the critical norms of the market in order to obtain such monopoly/market power. Although the standards in the federal securities law cases on which Kraft relies were created in a crucially different and sometimes factually opposite context, Plaintiffs now demonstrate that Kraft's claimed reasons for decertifying the Class on the Section 6(c)(1) claim are wholly unsupported by Kraft's fully distinguishable case law—even when one ignores the great difference between the mere public misrepresentation context of such securities cases, and the misleading conduct, *e.g.*, market power signaling conduct aspects of Plaintiffs' 6(c)(1) claim.

* * *

### (a) *Goldman* Addressed a Legal Question Regarding the Generic Nature of Alleged Misstatements That is Not at Issue Here

Kraft's Motion tries to use the Supreme Court's decision in *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021) ("*Goldman*") to attempt to rebut the fraud on the market ("FOTM") theory that this Court held was applicable to Plaintiffs' CEA Section 6(c)(1) claims. *See Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1059 n.11 (N.D. Ill. 2016) ("*Ploss I*"); *see also Ploss II*, 431 F. Supp. 3d at 1012–13. Other than demonstrating that Kraft cannot meet its burden, *Goldman* is distinguishable in nearly every respect.

The core issue in *Goldman* was whether the district court needed to consider the generic nature of the defendants' alleged misstatements in assessing price impact. *See Goldman*, 141 S. Ct. at 1961 . Here, Kraft made no such argument in opposing class certification. Nor could they. While Kraft's Motion attempts to engraft the element of reliance onto Plaintiffs' claims, the Court had ruled that reliance is *not* an element of Plaintiffs' Section 9(a)(2) or Sherman Act claims, *Ploss II*, 431 F. Supp. 3d at 1012 n.6, and that "an explicit misrepresentation is not required for Section

6(c)(1) claims, which may be based on market activity that sends a false signal to the market." *Ploss I*, 197 F. Supp. 3d at 1057. The presumption applicable to Plaintiffs' Section 6(c)(1) claims simply means "that the market relies on the transactions to signal true, rather than manipulative, demand—that is all that is necessary." *Ploss I*, 197 F. Supp. 3d at 1059 n.11. Nothing in *Goldman* addresses the FOTM theory applicable to market manipulation claims where, as here, no misstatement (or mere "front-end" price impact) and no corrective disclosure (or discrete "back-end" price drop) is alleged.

As the Court explained, the applicable presumption is that "class members relied on 'misrepresentations' that were baked into the market price at the time of their transactions." *Ploss II*, 431 F. Supp. 3d at 1013. The Court quoted "misrepresentations" to distinguish that Plaintiffs' Section 6(c)(1) claims are "based on how Kraft's conduct affected the market as a whole, *rather than any overt misrepresentation*", and are based on "the market transmit[ing] information in the form of the market price." *Id.* at 1012–13 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988)) (emphasis added). Thus, as the Court held, "if Kraft manipulated the prices in the wheat futures market, then *all* of the class members bought and sold contracts at manipulated prices." *Id.* The issue, therefore, as the Court made clear, does not concern reliance, as such, but Plaintiffs' evidence of price impact which, if established, *necessarily* means that class members purchased futures contracts at prices impacted by Kraft's conduct. *Id.* Quite plainly, the concern in *Goldman* about a potential "mismatch between the contents of the [generic] misrepresentation and the corrective disclosure" is not implicated here. *Goldman*, 141 S. Ct. at 1961.

Kraft's Motion also fails on the merits. *Goldman reaffirmed* that defendants "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence," *id.* at 1958, yet Kraft fails to present any evidence showing lack of impact. *Goldman* is thus

distinguishable for the additional reason that, unlike Kraft, the defendants in *Goldman* submitted an event study "to show that [their] alleged misrepresentations had no price impact." *See Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 2021 WL 3776297, at *2 (2d Cir. Aug. 26, 2021). By contrast, here, Kraft has not submitted an event study or other evidence to rebut Plaintiff's evidence of price impact.

Instead of presenting any evidence to prove lack of price impact, Kraft challenges what it believes are factual elements giving rise to the FOTM presumption in the first place. Thus, Kraft states that the Court "assumed" evidence would eventually show Kraft made at least "one public misrepresentation",[20] *Motion* at 14; falsely claims that there was a shift in Plaintiffs' theory of falsity which "negates the fraud on the market theory," *see id.* at 14, 19, 30, 43; and portrays the evidence of its signals as "generic" and "anonymous," *id.* at 35. On this basis, Kraft argues that because there was no "back-end price drop" when Kraft liquidated its position on December 9, evidence of the continued impact of Kraft's signals *after* December 9—when Kraft took steps to consume the CME wheat, *e.g.*, by loading-out and shipping it to Toledo—should be disregarded. Finally, Kraft rehashes its failed argument that because the same grain merchants who Kraft *unsuccessfully* argued at class certification "certainly knew what Kraft was doing," suggest the possibility that other market participant also could have known what Kraft was doing. *Id.* at 34, 36-37. Kraft's arguments, which mischaracterize the record, flout this Court's prior rulings, and resort to rank speculation, are not proper rebuttal under *Goldman*.

---

[20] The Court obviously made no such assumption as confirmed by its explicit rulings that a misrepresentation is **not** required for a CEA Section 6(c)(1) claim. *Ploss I*, 197 F. Supp. 3d at 1055; *Ploss II*, 431 F. Supp. 3d at 1012 n.6.

As demonstrated below, Kraft applies inapposite principles in rehashing a series of highly factual arguments that the Court already considered and rejected, has identified no new law[21] or evidence to merit reexamination of the Court's class certification order, and entirely fails to rebut the presumption the Court held applicable to Plaintiffs' Section 6(c)(1) claims.

### (b) Kraft's Arguments Ignore Critical Aspects of the Court's Prior Rulings

Kraft falsely asserts that Plaintiffs' and Dr. Pirrong's "theory of falsity" has shifted, and that this shift was occasioned by production of "new" trading data from the CME that "negates" the "fraud on the market" theory. *See* Motion at 14, 19, 30, 43. Kraft argues that Plaintiffs' theory of falsity "is no longer . . . that the market was 'misled' by Kraft's 'signal,'" *id.* at 33, which Kraft states is "not consistent with *Basic's* 'public misrepresentation' requirement," and that Plaintiffs have "disclaimed the public misrepresentation theory that underpins the 2020 Order," *id.* According to Kraft, the only basis on which Dr. Pirrong has concluded that Kraft's signals to the market were "false" is on the basis of an opinion as to Kraft's state of mind. *Id.* at 34. Each of these contentions is *verifiably false*.

As an initial matter, Kraft does not mention that the "new" CME trading data simply identifies the same CME large traders that Dr. Pirrong analyzed at class certification.[22] Further, the Court's motion to dismiss opinion completely belies Kraft's mischaracterization that Plaintiffs' theory of falsity has changed. The Court expressly held that Kraft sent "a false signal through its

---

[21] *Goldman's* holding concerning generic misrepresentations and corrective disclosures is *not* "new law" relevant to a Section 6(c)(1) claim. Nor are the applicable burdens new, as *Goldman* "conclude[d]" that the framework established in *Basic* already assigned the burden of persuasion to show lack of price impact to defendants, and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) already held "*plaintiffs need not directly prove price impact* in order to invoke *Basic* presumption." *Goldman*, 141 S. Ct. at 1962-63 (emphasis added).

[22] *See* Ex. 37 ██████████████████ ¶¶ ████; Ex. 1 ¶¶ ████; Ex. 3 ¶¶ ████ ███████████

market behavior that Kraft *intended to source its wheat from the futures market*". *Ploss I*, 197 F. Supp. 3d at 1059 (emphasis added). This is the same causal theory that Dr. Pirrong tested at class certification: that Kraft sent signals of demand for futures wheat; market participants received and accurately interpreted these signals; and prices moved accordingly. *See generally* Ex. 1 ¶¶217-309. And this is the exact theory which the Court discussed in granting class certification. *See Ploss II*, 431 F. Supp. 3d at 1012. As the Court specifically recognized, the alleged falsity in Kraft's demand signal does not relate to whether it would take delivery and consume some of the deliveries. *See id.; see also Ploss I*, 197 F. Supp. 3d at 1058. Instead, the falsity relates to whether Kraft's actions of taking delivery represented commercial, economic conduct—or alternatively were uneconomic. *See Ploss I*, 197 F. Supp. 3d at 1059.

In this regard, the Court has explicitly rejected Kraft's contention that Dr. Pirrong based his opinion as to "falsity" on Kraft's state of mind:

> [W]hen Pirrong concludes Kraft took "actions that lacked a legitimate economic motive," he is not offering information about Kraft's psychological motivations; rather, he is expressing his opinion as to whether there was any "legitimate commercial or economic reason" for Kraft's behavior. [*Ploss III*, 2022 WL 16540179, at *7.]

What Kraft contends is the requisite "falsity" in Kraft's signals reflects Kraft's effort to shoehorn falsity into a traditional fraud on the market framework—*i.e.*, where fraud is a false statement that inflates prices, followed by a disclosure of the truth that causes prices to decline. This argument, which pervades Kraft's Motion, is a vestige of Kraft's failed argument that manipulation requires a misrepresentation.[23] *Ploss I*, 197 F. Supp. 3d at 1057 ("an explicit misrepresentation is not required for a Section 6(c)(1) claim . . . .").

---

[23] Kraft misleadingly cites *In re Nat. Gas*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) for the proposition that "Plaintiffs' Section 6 claim requires proof that Kraft used a *manipulative or deceptive* device to make *public* statements . . ." Motion, at 9 n.2. But *Natural Gas* did not address claims under Section 6(c)(1) (which had not yet been codified), but claims under Section 9(a) of the CEA, and held that a "flexible Rule

In a transparent effort to reduce its burden on this Motion, Kraft contends that "[t]he alleged 'public misstatement' here is a common, non-public futures position that at most sent a generic demand signal through aggregated and anonymous order flow filled with the same signal from other class members." Motion at 35. Kraft's narrow counter-factual account collides with the facts in the record regarding its signals, *see* Ex. 3 ¶ 23, the Court's prior rulings, as well as Kraft's own litigation statements. At class certification, Kraft similarly argued that Plaintiffs "did not identify a particular 'signal' that the market as a whole received and interpreted in a uniform way." *See Ploss II*, 431 F. Supp. 3d at 1016. Critically, in rejecting Kraft's argument, the Court determined that Dr. Pirrong's "event study [i] *does not look at one particular event or 'signal'; instead, he* [ii] *analyzes the impact of the flow of information*," because "[iii] *analyzing the effect of just one event tends to underestimate the full impact of the flow of information* because [iv] *some of the flow of information occurs before the actual event being analyzed*." *Ploss II,* 431 F. Supp. 3d at 1016 (emphases added). On the basis of this ruling, the Court explained that "it makes little sense to pinpoint one particular signal . . . ." *Id.*

In its *Daubert* motion, Kraft again argued that "Pirrong's event studies . . . fail to isolate any specific or public signal as the cause of the price 'artificiality' they describe." *Ploss III*, 2022 WL 16540179, at *7 (quoting Dkt. 465 at 17). The Court again rejected Kraft's characterization of its signals, finding that Dr. Pirrong "considers Kraft's *statements and observable behavior, other wheat market participants' reactions to those statements and behavior, and the prices of*

---

9(b) standard … [is] applicable to market manipulation claims," because "'such claims *do not necessarily involve affirmative misrepresentations*'." 358 F. Supp. 2d at 343 (citation omitted) (emphasis added).

*wheat during the relevant periods.*" *Id.* at *3 (emphasis added). That Kraft resorts to mischaracterizing the record, yet again—after the Court rejected Kraft's prior argument as "*underestimat[ing] the full impact*" of its signals, *Ploss II,* 431 F. Supp. 3d at 1016 (emphasis added)—speaks volumes to Kraft's failure to meet its burden under *Goldman*.

Kraft simply ignores the essential facts regarding its signals of demand on which Dr. Pirrong relies in forming his opinions, *see* Ex. 1 ¶¶ 159-215; Ex. 3 ¶¶24-46; *see also* Ex. 38 ¶¶ 1, 21-35, 38-47, 49-55, 59-64, 66-72, 91; and attempts to jettison a record replete with evidence of its signals, including: ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Indeed, it was on the basis of evidence of Kraft's conduct and statements that the Court determined that "it is not surprising that the class will be able to rely on common evidence in its endeavor to prove that Kraft engaged in the scheme." *Ploss II*, 431 F. Supp. 3d at 1015.

### (c) Kraft Has Failed to Address *Any* of Plaintiffs' Evidence of Price Impact

In *Goldman*, the Supreme Court cautioned that the "mere production of some evidence relevant to price impact" cannot rebut the *Basic* presumption; a defendant's rebuttal evidence must "'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff." *Id.* at

1962–63. Here, as the Court found, Dr. Pirrong's application of his event study methodology is "both tested and testable," *Ploss III*, 2022 WL 16540179, at *8; and yet, very notably, *none* of Kraft's experts constructed their own regressions from November 1 that might show there are no statistically significant results. Nor did Kraft's experts perform their own regression analyses to test Kraft's alternative theories concerning other large traders, whereas Dr. Pirrong did. Courts regularly rule that parties who fail to submit an event study to rebut the event study findings of the opposing party should have their arguments rejected. *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 137–38 (S.D.N.Y. 2019); *cf. Arkansas Teacher Retirement System*, 2021 WL 3776297, at *2. Kraft's failure to do so underscores the sheer *absence* of Kraft's price impact evidence. *See Goldman*, 141 S. Ct. at 1960 ("In assessing price impact at class certification, courts should be . . . aided by a good dose of common sense.") (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020).

Kraft states that "for Rule 23 purposes, Kraft *fully accepts the admitted expert evidence*", Motion at 25 n.8, and does not in any way address Dr. Pirrong's regression analyses which, in fact,

████████████████████████████████████████████████████

████████████ l. Ex. 1 ¶¶ ████████████

### (d) Kraft Has Failed to Rebut *Any* of Plaintiffs' Evidence of Price Impact.

Even if the Court were to put aside Kraft's efforts to reduce its burden on this Motion, and Kraft's complete failure to address *any* of Plaintiffs' impact evidence, and were to consider Kraft's remaining "rebuttal" arguments, Kraft fails to identify a lack of price impact.

### (i) Kraft's "back-end price drop" argument fails.

Kraft argues that, under *Goldman*, Dr. Pirrong's model "does *not* show the 'injury' *Basic* requires" because it fails to identify a "back-end price drop" when Kraft liquidated its futures position on December 9. Motion, at 36. Kraft's argument is: (i) based on a complete misreading

28

of *Goldman*, (ii) mischaracterizes the causal theory that Dr. Pirrong hypothesizes and tests (*i.e.*, that Kraft sent signals of *consumption*), and (iii) ignores Plaintiffs' evidence of the continued impact of Kraft's signals of consumption, which did not end on December 9.

*First*, in *Goldman*, the Supreme Court says that to invoke the *Basic* presumption, among other things, it must be shown that "the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *See Goldman*, 141 S. Ct. at 1960. The Court does not say that a price drop is necessary to invoke the presumption, but that a price drop *is not sufficient* to measure the impact of an "earlier misrepresentation," "when there is a mismatch between the misrepresentation and the corrective disclosure." *Id.* at 1961. When the earlier misrepresentation is generic and the latter corrective disclosure is specific, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop.

*Second*, Kraft's focus on a "back-end price drop" as required to show injury under *Basic* is predicated on a corrective disclosure which is *not* alleged here, and which ignores that, as the Seventh Circuit has explained, the "truth can come out, and affect the market price, *in advance* of a formal announcement"—*i.e.*, in advance of corrective disclosure. *Schleicher v. Wendt*, 618 F.3d 679, 686-87 (7th Cir. 2010) (emphasis added). Here, as the Court addressed (*Ploss II*, 431 F. Supp. 3d at 1016), Dr. Pirrong analyzed █████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[24] *See* Ex. 1 ¶¶ ███████████████████████████████████████████
 *see also* Ex. 38 ¶¶ ████

As the Court recognized, these events reasonably suggested there would be leakage of the signal; and "analyzing the effect of just one event *tends to underestimate the full impact of the flow of information because some of the flow of information occurs before the actual event being analyzed*", *Ploss II,* 431 F. Supp. 3d at 1016 (emphasis added)—including because Kraft ███████ ████████████████████████ *See* Ex. 38 (P.56.1) ¶¶ 29-35, 37-59, 61-66.

The recognition that "some of the flow of information occurs before the actual event being analyzed", *id.*, is consistent with the teachings of the Supreme Court and Seventh Circuit. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015) (approving district court's decision to send expert evidence regarding leakage to jury: "the Supreme Court has generally recognized that the truth can leak out over time. *See Dura [Pharms., Inc. v. Broudo*, 544 U.S. 336,] at 342 [(2005)] . . . So have we."); *see also Schleicher*, 618 F.3d at 686–87. In *Glickenhaus*, the Seventh Circuit took care to explain: "One problem with the specific-disclosure model is that the information contained in a major disclosure event often leaks out to some market participants before its release." 787 F.3d at 416. "If this happens, the model will understate the truth's effect on the price and thus the amount that the stock was overpriced before the truth became known." *Id.* This is because the specific-disclosure model only measures price changes on the identified disclosure days and not the effect of more gradual exposure of the fraud. *Id.* A leakage model, on the other hand, calculates the difference between predicted returns and actual returns during the class period, assuming an efficient market reaction to more gradual information diffusion. *Id.*

Kraft's own economist, Professor Irwin, similarly writes: ████████████████████ ████████████████████████████████████████████████████████

████████████████████████ Ex. 5 ¶ ███. It was precisely this distinction that Plaintiffs' counsel

was making at the oral argument on Kraft's *Daubert* motion:

> The case here is not . . . a pure simple fraud-on-the-market where things happen and then there's a correction in the price after the truth comes out … and Dr. Irwin acknowledges that this is one of the reasons why you would use the *Detecting Manipulation* article, *in which the dribs and drabs of Kraft's uneconomic conduct and the manifestation that its signal is happening during November, come out slowly over time*. . . . It's totally wrong to have a securities fraud thing where there's a[] [corrective] announcement, … and the next day the price falls. So, sure, in those cases they use that method. *But it's totally inappropriate here*. This follows a totally different type of event study, your Honor.

*See* July 26, 2022 Hearing Tr., at 40:23-41:16, ECF No. 554 (emphasis added). What counsel

stated to be "totally inappropriate," which Kraft now disingenuously claims was a disavowal of

the FOTM theory, was Kraft's effort to shoehorn falsity into a traditional FOTM framework.[25]

Finally, Kraft argues that, under *Basic*, when "the truth of Kraft's 'uneconomic' delivery

position was revealed in mid-December, after it got certificates at locations down river from its

mill" (Motion at 21), market prices should have "collapsed", *id.* at 22. However, Kraft's focus on

a "back-end" price drop incorrectly presumes that Kraft's actions relevant to the pricing of the

December and March Contracts ended ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ In other words, there was no "corrective disclosure" as the market was not apprised

of Kraft's ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[25] Needless to say, Kraft's effort to liken this case to the certification order remanded in *Howard* is equally disingenuous, *see* Motion at 37, as plaintiffs in *Howard* essentially acknowledged that the certified theory was no longer "the centerpiece in their case." 989 F.3d at 603.



**(ii) Kraft rehashes the same loss causation arguments rejected by the Court, and still fails to address Dr. Pirrong's causation analyses.**

Next, Kraft argues that Dr. Pirrong does not "narrow the field by tying any 'signal' . . . to Kraft" as opposed to other large traders. Motion at 35. This is the same loss causation argument that Kraft made in its motion to dismiss, at class certification and again in its *Daubert* briefing that the Court each time rejected. *See Ploss I*, 197 F. Supp. 3d at 1057; *see also Ploss II*, 431 F. Supp. at 1021 ("a plaintiff need not actually prove loss causation in order to obtain class certification.") (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812–13 (2011), and *Schleicher*, 618 F.3d at 686). As the Court stated, "*Haliburton* explicitly rejected foisting on plaintiffs a requirement to prove loss causation in order to obtain certification." *Id.* (citations omitted). And in

*Goldman*, the Supreme Court was again clear that "plaintiffs need not directly prove price impact." *Goldman*, 141 S. Ct. at 1955.[26]

Nevertheless, here, Dr. Pirrong has performed an event study, and has undertaken other robust analyses, ████████████████████████████████████████████ ████████████████████████████████████████████████████ Dr. Pirrong's regression analyses showed that the ████████████████████████████████████████ analyses showed that the ████████████████████████████████████ Dr. Pirrong's event study ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

Dr. Pirrong also specifically addressed Kraft's argument that ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[26] In any event, even where loss causation applies, the burden does not, in the Seventh Circuit, rest with Plaintiffs to apportion and quantify which part of their alleged loss is attributable to Kraft and which part might be attributable to other factors. *See Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997) ("Such a burden would be far more stringent than the common law tort requirement upon which the requirement is based and would impose a burden on the plaintiff [s]pecifically forbidden by our case law.").



### (iii) Kraft's Speculation About Individual Class Members' Awareness of Kraft's Delivery Economics Does Not Rebut the Presumption that Market Participants Relied on Market Prices To Signal True, Rather than Manipulative, Demand

Further contradicting its own claim that the only signal Kraft sent was an anonymous and generic order flow signal, Kraft argues that ████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████

████ Motion at 34. Kraft's argument regarding grain merchants here is nearly identical to the failed statute of limitations argument that Kraft attempted to advance at class certification with respect to grain merchants who Kraft claimed "certainly knew" what Kraft was doing during the delivery period. *Ploss II*, 431 F. Supp. 3d at 1017.[28] As the Court stated, "but Kraft does not explain how this evidence is indisputable proof that those three members knew or should have known they had manipulation claims at that time." *Id.* So too here, Kraft does not point to any evidence that any

---

[27] Kraft's statement that Dr. Pirrong ██████████████████████████████████████████████████████ ██████████████████████████ Dr. Pirrong *did not* identify factors that impacted artificiality independent of Kraft's manipulation. Instead, Dr. Pirrong identified how market-wide factors accounted for by control variables responded to Kraft's manipulation. Ex. 6 ¶¶23-24.

[28] Kraft's argument is also a thinly-veiled "truth-on-the-market" defense that the Supreme Court has held cannot be decided at class certification. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 481–82 (2013).

market participant knew of Kraft's internal economics regarding consumption of CME wheat, or explain how these grain merchants knew that Kraft's positions were uneconomic or manipulative. Kraft, in fact, had taken delivery on the September 2011 Contract, continued to send signals that it could take delivery on the December 2011 Contract, and predicted that the market would react, and then confirmed that the market did react, to Kraft's signals. Kraft speculates: "*If* these and other class members knew what Kraft was doing … *then* Kraft would obviously have defenses against their claims in this case." Motion at 37 (emphasis added). Kraft's argument, thus, comes down to speculation, which offers no basis on which to dispute any of this record evidence or of Plaintiffs' evidence of impact, much less meet any rebuttal burden of persuasion under *Goldman*.

### 4. Kraft's False Choice Between A "Classic Corner" and "Fraud on the Market" Fails

Kraft argues Plaintiffs' CEA claims must demonstrate either Kraft "cornered" or "squeezed" the market or satisfy the fraud on the market prerequisites in *Basic v. Levison*. Motion, at 43-45. This is a false choice between two options that are independently false. The Court rejected Kraft's argument Plaintiffs must allege a corner or squeeze and recognized courts have avoided defining manipulation in crabbed parameters. *Ploss I*, 197 F. Supp. 3d at 1061. Plaintiffs' CEA claims are also not required to meet the requirements in *Basic v. Levison* for all the reasons discussed above.

Kraft's related arguments fail for additional reasons. Kraft argues Dr. Pirrong's event study is supposedly not able to serve as common proof of harm because, unlike the alleged manipulator in the *Detecting Manipulation* case study, ████████████████████████████████ ████████████████████ Motion, at 6-7.[29] Dr. Pirrong's reliance on *Detecting Manipulation*

---

[29] This is the same "great white" shark argument Kraft raised at the *Daubert* hearing and which was not accepted by the Court when it denied Kraft's *Daubert* motions. Motion, at 6, 24, 38.

for his event study analysis is nothing new—his event study has been based on *Detecting Manipulation* since 2018. Ex. 3 ¶¶ 7-9. In any event, Dr. Pirrong's *Detecting Manipulation* methodology is not limited to analyzing corners or squeezes as the very title of the article suggests. This Court recently held "Pirrong is qualified to assess alleged commodity futures manipulation and monopolistic conduct, and his event study is a 'scientifically reliable' methodology **for testing the manipulation alleged in this case**." *Ploss III*, 2022 WL 16540179, at *1 (emphasis added). Further, in the related (now settled) enforcement action brought against Kraft by the Commodity Futures Trading Commission ("CFTC") Kraft, through its economic expert, Professor Scott Irwin,

Kraft also asserts it did not have the power to squeeze the shorts because it did not have a substantial position in the physical wheat market. Motion, at 38-39. This is a merits argument, which also happens to be incorrect. The Court already rejected Kraft's argument it did not have the ability to influence prices because Kraft did not control the physical wheat supply. *Ploss I*, 197 F. Supp. 3d at 1062. Kraft's ability to influence prices is a common question and Plaintiffs have substantial common evidence capable of demonstrating Kraft had the ability to influence prices, including all the common evidence the Court relied on to find Plaintiffs plausibly alleged Kraft had the ability to influence prices. *Id.* at 1058–59.

certain CME warehouses. Motion, at 38-39. Kraft's comparison of deliveries to CME stocks is totally irrelevant and Kraft cites no authority to support it.

### 5. Plaintiffs Have Common Class-Wide Evidence for Their Sherman Act Claim

Kraft argues Rule 23(a) commonality is not satisfied as to Plaintiffs' antitrust claims based on arguments concerning the definition of "relevant market" and "participation" in the relevant market. Kraft's arguments fail.

<u>Relevant Market</u>. Contrary to Kraft, the Court previously held monopoly power may be demonstrated through "direct evidence" of anticompetitive effects without the need for a relevant market analysis. *Ploss I*, 197 F. Supp. 3d at 1071. Here, Dr. Pirrong's admissible event study is direct and common evidence of Kraft's anticompetitive effects. *Ploss III*, 2022 WL 16540179, at *8–9. The Court also held the "relevant market definition is generally a **merits question of fact** that is reserved for the jury." *Ploss II*, 431 F. Supp. 3d at 1020 (emphasis added). In any event, the definition of the relevant market is a common class-wide issue capable of class-wide resolution through common proof, including (as Kraft acknowledges) Dr. Pirrong's admissible opinions concerning the relevant market. In order to manufacture something "new" in the record, Kraft falsely asserts Professor Pirrrong's definition of the relevant market as the "CTD" market is "new." Motion, at 41. Because Dr. Pirrong defines the CTD market as the relevant market in his class certification report and defines the CTD market as a relevant market in his merits report, Dr. Pirrong's use of the CTD market is not "new." *Compare* Ex. 1 ¶ 390, *with* Ex. 6 ¶ 307. Dr. Pirrong opines in his merits report that the CTD market, the December futures contract market and the March futures market are "inextricably linked," such that the latter two are relevant markets as

well. Ex 1., ¶¶389-396.[30]   For purposes of this motion, Plaintiffs address Kraft's arguments directed at Dr. Pirrong's CTD relevant market definition.

Kraft argues Dr. Pirrong's definition of the relevant market as the CTD market is "fatal" to the Court's certification Order. Motion, at 41. Kraft asserts *Ploss II* supposedly rejected the CTD market as the relevant market because there is no repository of who transacted in physical wheat in the CTD market. *Id.* This is a total distortion of the Order.  In opposition to certification, Kraft argued—and the Court rejected—that the Class should be defined as persons who participated in the CTD market, not the futures market. *Ploss II*, 431 F. Supp. 3d at 1020.  Indeed, Kraft is just citing to the Court's recitation of Kraft's own position. *Ploss II*, 431 F. Supp. 3d at 1020. The Court rejected Kraft's arguments and should do so again. *Id.*

"Participation" in Relevant Market.  Kraft argues "participation" in the CTD market is required and, on that basis, asserts there is no common evidence of the who participated in that market such that participation would "require individualized inquiry to discern." Motion, at 41. Kraft's "participation" in the relevant market argument fails for additional reasons. First, the Court already held Plaintiffs have common class-wide evidence of antitrust impact, Dr. Pirrong's admissible event study. *Ploss II*, 431 F. Supp. 3d at 1018.[31]   Second, this is a re-hash of Kraft's prior argument that the Class should be limited to persons in the CTD market. *Ploss II*, 431 F.

---

[30] Kraft asserts that Dr. Pirrong's definition of the relevant market is contrary to Dr. Pirrong's *Detecting Manipulation* article and CME rules that supposedly treat "deliverable supply" as all CME supplies. Motion, at 41.  This merits argument fails for numerous reasons. First, Dr. Pirrong's relevant market opinions have been found to be relevant, reliable and admissible. *Ploss III*, 2022 WL 16540179, at *8. Second, Kraft is confusing "deliverable supply" with relevant market. Moreover, "deliverable supply" is not defined as all supplies in all exchange warehouses.

[31] Kraft (incorrectly) asserts the Court assumed "common evidence of futures price inflation would double as evidence of antitrust injury in a relevant geographic and product 'market' under the Sherman Act." Motion, at 14. The Court assumed nothing of the sort. It addressed Kraft's antitrust impact arguments and specifically held Dr. Pirrong's event study was common class-wide proof capable of demonstrating antitrust injury for all Class members.  *Ploss II*, 431 F. Supp. 3d at 1018.

Supp. 3d at 1020. Third, participation in the CTD market is not a requirement. The basis for Kraft's contention that it is a requirement is *Exhaust Unltd., Inc. v. Cintas Corp.*, 223 F.R.D.506, 513 (S.D. Ill. 2004). However, in addition to not being new or controlling law, *Exhaust* did not hold participation in the relevant market is required. Kraft quotes *Exhaust* as stating that "[c]ommon proof of actual injury requires that all class members operate in the same relevant market," *id.*; but Kraft misleadingly omits the very next sentence of the opinion which states, "[t]he potential class members [here] are in *many locations across the country and geographically diverse* and, consequently, in *various* 'relevant' markets." *Id.* at 513 (emphasis added).

Courts in this Circuit have consistently upheld the standing of plaintiffs who transact in futures and options contracts or related physical commodities to enforce the antitrust laws when anticompetitive conduct affects either the physical or exchange market, or both. In *Sanner*, 62 F.3d at 926–29, the Seventh Circuit held that injury to sellers of physical soybeans, who were forced to sell their crop at artificially low levels due to defendants' conduct in related futures, was "sufficiently direct," it was "clear that '[w]hen the futures market experiences a significant price change, the prices of that commodity in the cash market will usually experience a similar movement.'" *Id.* at 928–29; *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002) ("Here . . . **we have a conspiracy to rig prices for the entire physical market, accomplished through manipulation of the . . . futures market**."), *rh'g en banc denied* (Jan. 30, 2003) and *cert. denied*, 539 U.S. 903 (2003); *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 56 (S.D.N.Y. 2012) (same).

Kraft's ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

███ *See* Ex. 17. Likewise, Dr. Pirrong opined that ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ Ex. 1 ¶¶ 439-40.

Kraft's reliance on *Deslandes*, which is not controlling, does not support Kraft's argument. In *DeSlandes v. McDonalds USA, LLC*, No. 17 C 4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021), the Court declined to certify a national class of plaintiffs alleging an anticompetitive restraint of trade who did not sell their labor in a national market, but in different local geographic markets that "*vary by plaintiff*." 2021 WL 3187668, at *13 (emphasis added). This meant each plaintiff would need to establish that the restraint was anticompetitive in the market in which she sold her labor. Here, all Class members were impacted by Kraft's anticompetitive conduct in a single market, the centralized futures market where all Class members transacted and where Plaintiffs and Kraft were competitors.

**B.**     **Rule 23(a)(3)-(4) Typicality and Adequacy Remain Satisfied**

Rule 23(a) typicality and adequacy require "the claims or defenses of the representative parties are typical of the claims or defenses of the class" and "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(3)-(4). The Court held Plaintiffs were both typical and adequate representatives of the Class because they seek redress under the same laws, based on the same legal theories and based on Kraft's same common course of manipulative conduct that caused artificially high prices in wheat futures contracts that were paid by Plaintiffs and all Class members. *Ploss II*, 431 F. Supp. 3d at 1011–12. This remains true. The undisputed common questions recognized by the Court (*Ploss II*, 431 F. Supp. 3d at 1014) are further evidence typicality and adequacy are satisfied. *Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5.

In 2019, Kraft raised a **single** argument against typicality and adequacy—a supposed "unique defense." *Ploss II*, 431 F. Supp. 3d at 1020; *see also Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) ("Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members."). The Court considered and rejected Kraft's argument. *Id.* at 1012–13. Kraft now (improperly) raises numerous additional arguments based on facts concerning the Plaintiffs' trading that were **all known and in the class certification record** when the Court found Plaintiffs typical and adequate representatives of the Class. Kraft's arguments are improper "second bite of the apple" arguments and not a valid basis for its Motion. *Barner*, 2000 WL 1369636, at *2.

Options.   Kraft argues no Plaintiff is able to represent the "options class" because no Plaintiff traded options.  Motion, at 28. This fact—which was known when the Court certified the Class—does not defeat typicality or adequacy.[32] The "options" in the Class definition are option contracts on the December and March Contracts. That is, the options derive their value from the December and March futures. Thus, Kraft's same exact common course of misconduct that impacted the prices of the December and March Contracts also impacted prices of the options contracts for the same December and March Contracts. Plaintiffs therefore have the exact same incentive to represent the interests of Class members who traded futures and options—by establishing Kraft inflated the prices of the December and March Contracts. Plaintiffs will also show that Kraft's same conduct impacted the prices of options contracts on such futures contracts.

---

[32] Plaintiffs' trading records were produced to Kraft prior to class certification. Kraft deposed each Plaintiff. The trading records did not reflect any options trading. Confirming same, the class certification expert report of Charles Robinson that analyzed Plaintiffs' trading did not reflect or schedule any options trading. *See* Ex. 36.

Plaintiffs' interests and the interest of members of the Class who traded options are completely aligned.

Kraft's entire "options" argument is premised upon attempting to exploit what is (at best) an ambiguity in the Court's class certification order concerning whether the Court certified a single "class" or two "classes." Kraft seizes on three limited references to "classes" in the Order (compared to the many more times the Order refers to a single "class") to suggest the Court certified both an options class and a futures class and that no Plaintiff is a member of the "options class" because none traded options. Kraft's new argument (raised for the first time for purposes of its motion), is contrary to Plaintiffs' class motion, the class record, a fair reading of the Court's order certifying the Class and is also contrary to Kraft's own conduct before and after the Class was certified. Plaintiffs' class motion and reply submissions sought certification of a *single* "Class," not two classes. ECF Nos. 237, 311. Kraft's opposition to Plaintiffs' class motion opposed a single "class," not two classes. ECF No. 267. The Court's three references to "classes" each states Plaintiffs "sought" or "proposed" certification of two classes. *Ploss II*, 431 F. Supp. 3d at 1010, 1021–22. Again, however, Plaintiffs sought certification of a single Class. ECF Nos. 237, 311.

Following the Court's Order, Kraft's Rule 23(f) petition continued to reference a single "class," not two classes. ECF No. 345. Similarly, the parties *stipulated* to, and the Court approved, a class notice that identified a single "Class" of futures and options traders certified by the Court, not two separate classes. ECF Nos. 379, 398. More than 18 months after the Court's class certification Order, and even as Kraft was raising "decertification," Kraft continued to acknowledge Plaintiffs sought certification of a single class and that the Court certified a "class," not two classes. ECF 416, at 2-3.

"CTD" Market/Physical Wheat.  Kraft argues Plaintiffs were not participants in the CTD market for physical wheat—again, a fact known when Kraft opposed classification[33]—such that the Plaintiffs are supposedly not typical or adequate representatives for purposes of the antitrust claims herein. Motion, at 27-30. However, Kraft offers no explanation why Plaintiffs (who participated in and were harmed in the futures market) must have also been participants in the relevant antitrust market (the CTD market) in order to be a typical and adequate representative of a Class of persons who, **exactly like Plaintiffs**, also participated in and were harmed in the futures market. There is no such requirement. This argument is a rehash of Kraft's argument the Class should be defined as persons who traded in the CTD market, not the futures market, which argument the Court rejected. *Ploss II*, 1010, 431 F. Supp. 3d at 1019–20. This argument is also premised on the incorrect legal assertion Plaintiffs must have participated in the relevant market in order to demonstrate antitrust impact.

Plaintiffs' Trading and Net Damages Estimates.  Kraft makes a series of arguments concerning Plaintiffs' futures positions and individual estimates of net damages. Motion, at 28-30. These facts were known and part of the class certification record, including prominently in Mr. Robinson's class certification expert report. Ex. 36 ¶¶ 13-20; *id.* at Exhibits 3A-5 (scheduling Plaintiffs' trades).[34]

Kraft asserts Plaintiffs held different futures positions that resulted in "net artificiality paid" for certain Plaintiffs but not others, which supposedly results in "positional conflicts." Motion, at

---

[33] Kraft also asserts the "current record likewise contains no evidence that any named Plaintiff (or class member)" traded in the physical wheat CTD market. Motion, at 28. But, the 2018 record showed the same thing—no evidence Plaintiffs traded physical wheat in the CTD market.

[34] Kraft asserts Plaintiffs fail to provide a position analysis for Nathan Wallace. Motion, at 15. However, Nathan Wallace was not included as a plaintiff in the Amended complaint (ECF No. 71) and was *not* a proposed Class representative in Plaintiffs' class motion.  ECF No. 237.

29-30. This does not render the Plaintiffs atypical or inadequate because "differences in entitlements [to relief]" do not create conflicts of interest between Class members. *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012); *see also Wachala v. Astellas US LLC*, No. 20 C 3882, 2022 WL 408108, at *5–8 (N.D. Ill. Feb. 10, 2022) (finding "typicality and adequacy" where the named plaintiffs, "were subject to the same course of conduct that gives rise to the claims of other members of the . . . Class, and their claims are based on the same legal theory[.]"); *Kohen*, 571 F.3d at 677–79 (rejecting argument that a class representative with offsets to a loss would render him atypical of a class member who did not have offsets); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92–93 (S.D.N.Y. 1998) *("Sumitomo I")* ("factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class certification"). This Court rejected Kraft's arguments that differences in "when class members traded wheat futures" supposedly defeated class certification. *Ploss II*, 431 F. Supp. 3d at 1016.

Moreover, a "conflict" needs to be "fundamental" in order to potentially defeat adequacy. *Srail v. Vill. of Lisle*, 249 F.R.D. 544, 555 (N.D. Ill. 2008) (J. Kennelly) ("A conflict or potential conflict alone will not . . . necessarily defeat class certification—the conflict must be 'fundamental.'"). There is no fundamental conflict here because the Plaintiffs and Class members held different futures positions and may have differences damages, which is true of each of the many CEA manipulation cases which have been repeatedly certified. Plaintiffs and Class members have the same exact incentives to prove each element of each claim against Kraft regardless of when they traded.

Second, Kraft asserts the Plaintiffs who have net artificiality received (instead of net artificiality paid) and the Plaintiffs who only traded intra-day, supposedly have no class-wide

evidence of harm such that "proof that one Plaintiff was overcharged is not probative of whether other class members were." Motion, at 30. Kraft is (again) confusing class-wide injury (which results from Kraft's artificial inflation of futures contract prices paid by all Class members) with individual Plaintiff and Class member damages. Plaintiffs have common class-wide evidence of the overpayment harm, including Dr. Pirrong's admissible event study and Kraft's ███████████████████████████████████████████████ Plaintiffs also have a common class-wide methodology for establishing the amount artificiality caused by Kraft (namely Dr. Pirrong's admissible event study) and an admissible common class-wide methodology for calculating each Class member's damages.

Third, Kraft argues the parties' experts had to assess each Plaintiff's damages estimate "individually" and such assessment would supposedly "not be common or mechanical for other class members." Motion, at 28. Kraft made this same argument in 2019 when it opposed Class certification. ECF No. 267, at 41-42. The Court rejected Kraft's argument and should do so again now. *Ploss II*, 431 F. Supp. 3d at 1016 (*citing Tyson Foods, Inc.*, 136 S. Ct. at 1045). Individual issues as to the calculation of Class member damages do not defeat class certification. Moreover, Plaintiffs have proposed a common methodology for calculating Class member damages that can be applied in the same way to each Class member's trades regardless of their trading pattern. The fact that a Plaintiff's or individual Class member's calculation of net damages will be done on an individual basis—which was true in every prior certified CEA class action—does not operate to defeat adequacy, typicality or predominance.

Fourth, Kraft argues there is a "dispute" concerning whether Ploss has net damages because it is supposedly unclear how to combine ███████████████████ Motion, at 43-44. Kraft asserts that this account netting dispute supposedly shows "the core injury alleged in this case

requires individualized inquiry to prove and is subject to "substantial defense[s]." Motion, at 29. Kraft's argument fails for several reasons. The "core injury" here is an overpayment to purchase wheat futures contracts artificially inflated by Kraft and Dr. Pirrong's event study is common proof of this injury. Proof of this injury does not require **any** individualized proof (including any netting of multiple accounts).

Kraft suggests the dispute over how to net Ploss' accounts in order to determine whether he has net damages will supposedly result in 'substantial defenses." Motion, at 29. Kraft does not say what the "substantial defenses" supposedly are in this context or why such a defense would be "substantial." *Id.* Any such defense concerning how to net accounts is not a dispute relating to an element of any claim and instead relates to the calculation of damages.

In any event, the netting of Ploss' accounts is an issue Kraft has greatly exaggerated and it is not even much of a "dispute," let alone a substantial one. The actual account statements produced in this case specifically identify the owner ███████████████████████████████████ ██████ Kraft has not offered any explanation for why it would make any sense to ██████████ ████████████████████████████████████████████████████████████ ██████████████████████ Ex. 43.

Kraft repeatedly asserts Plaintiffs' expert Mr. Robinson testified ████████████████ ███████████████████████████████████████████████████████ Motion, at 15, 29, 32, 44. Kraft's clip quotes of Mr. Robinson's testimony are misleading. Mr. Robinson ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

46



Kraft ignores the foregoing testimony and opinions concerning the Ploss account netting by account name for good reason. ████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████

Finally, Kraft asserts there are "antagonistic interests" due to options trading, participation in the CTD market or futures contract positions. This is wrong for the reasons set forth above. The Plaintiffs and Class members' interests in proving that Kraft's conduct caused wheat futures prices to be artificial during the Class Period remain totally aligned. None of the stale facts identified by Kraft changes this one bit.

*Santiago*.    Kraft relies heavily on *Santiago* as a "recent" decision. Motion, *passim*. However, Santiago did not change any Rule 23 standards, did not even involve any of the claims at issue here and involved factual and legal circumstances that are not present here. *Santiago*, a class action challenging the constitutionality of the City of Chicago's towing, impoundment, and disposal of motor vehicles policies, was remanded by the Seventh Circuit because the district court failed to conduct a "rigorous analysis" of the adequacy or predominance prerequisites of Rule 23.

*Santiago*, 19 F.4th at 1019–1020. In no way did *Santiago* change any Rule 23 law or standard. The "rigorous analysis" standard cited and relied on by the Seventh Circuit in *Santiago* is the same standard Kraft cited in 2019 when it opposed class certification and the same standard applied by the Court in *Ploss II*. *Compare* ECF Nos. 267, at 14-28, *with* Motion, at 5, 25-26, 50.

## C. Rule 23(b)(3) Predominance: Predominance Remains Satisfied and Kraft's Attempts to Manufacture Individualized Issues Fail

The Court held Rule 23(b)(3) predominance was satisfied by a preponderance of the evidence. *Ploss II*, 431 F. Supp. 3d at 1018. The Court "began" its analysis with the elements of Plaintiffs' claims. *Id.* The Court found there are two central questions common to the Class—the existence of the scheme and whether it inflated prices—that are capable of class-wide resolution. *Id.* The Court addressed and rejected each of Kraft's five arguments against predominance, finding that "none of Kraft's arguments on lack of predominance are persuasive." *Id.* The Court has also recognized Rule 23(b)(3) certification is frequently satisfied in cases alleging price manipulation under the CEA and Sherman Act. *Id.* at 1014. Indeed, courts have routinely certified Rule 23(b)(3) classes in cases (like this one) alleging manipulation of commodity futures contracts. Since certification, this Court held Dr. Pirrong's event study, if accepted by a jury, could demonstrate Kraft caused artificially high wheat futures prices. *Ploss III*, 2022 WL 16540179, at *3.

Kraft attempts to demonstrate the undisputed overarching common class-wide questions central to Plaintiffs' claims somehow do not predominate over certain "individual" issues manufactured by Kraft. Motion, at 41-47. Kraft's arguments fail.

### 1. Contrary to Kraft, Rule 23(b)(3) Does Not Require Common Proof of Damages for Class Certification

In 2019, Kraft argued "if Plaintiffs' proposed class is certified, determining the class' damages would be time-consuming, fact-intensive, and individualized." ECF No. 267, at 41-42. The Court did not accept this argument and found predominance satisfied. *Ploss II*, 431 F. Supp.

3d at 1017–18. Kraft now repeats its argument that individualized issues concerning damage calculations supposedly defeat predominance. Motion, at 41-42.

It has long been settled that Rule 23(b)(3) does not require common proof of damages. *See, e.g., Messner*, 669 F.3d at 815; *see also Wal-Mart Stores, Inc.*, 564 U.S. at 362 (it is "clear that individualized monetary claims belong in Rule 23(b)(3)."); 2 Newberg and Rubenstein on Class Actions § 4:54 (6th ed.) ("[P]redominance requirement is satisfied despite the need to make individualized damage determinations."). As the Supreme Court stated in *Tyson*:

> When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) ***even though other important matters will have to be tried separately, such as damages . . . peculiar to some individual class members***."

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (2016).

<u>Common Damages Methodology</u>.   Contrary to Kraft, Plaintiffs are **not** required to demonstrate every Class member has damages for purposes of Class certification. Plaintiffs' experts have proposed a common (now admissible) methodology for calculating Class member damages.  Ex. 3 ¶¶ 654-656; Ex. 8 ¶ 22. Kraft's own expert ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ There are only two inputs to the common methodology: (1) daily estimates of price artificiality in the December and March contracts (if any) found by the jury and (2) each Class member's trades in those contracts. Kraft has not offered a competing methodology.

Unable to refute the availability of a common damages methodology, Kraft has tried to create Mount Everest out of a mole hill by pointing to Ploss' ███████████████████

██████████████████████████████████████████

████████████████████████████████████    The issue of account netting will

apply (if at all) only to Class members who submit claims that concern more than one trading

account, of which Kraft has identified exactly one (Ploss).  Also, the "individualized" issues Kraft

has tried to create concerning accounting netting is a damages issue (not liability issue) and does

not operate to defeat predominance. *Ploss II*, 431 F. Supp. 3d at 1016 (*citing Tyson*).

Post-Trial Proceedings.  In an effort to transform "damages" issues into a liability issues,

Kraft asserts Plaintiffs have "improperly" sought to defer damages issues to post-trial proceedings.

Motion, at 42 n.12. Kraft's assertion is contrary to substantial caselaw.  *See* below.  Kraft also fails

to acknowledge Kraft itself **stipulated** to a Rule 16 schedule entered by the Court that specifically

included post-trial procedures for damages. ECF No. 357, at 9-10; *see also* ECF No. 364.

As set forth in the agreed Rule 16 schedule, Plaintiffs (and Kraft) proposed that there first

be a trial in which the jury verdict establishes the daily amounts of price artificiality caused by

Kraft. ECF No. 357, at 9. Then, if Plaintiffs are successful, there will be a claims procedure in

which Class members submit verified proofs of claims establishing their transactions in the

December and March contracts. ECF No. 364, at 2. Kraft has not identified any basis (let alone a

valid basis) for seeking to undo the stipulated procedures it agreed to in 2020, after the Class was

certified. Motion, *passim*. Regardless of Kraft's reversal on this issue for purposes of its Motion,

the law continues to support the post-trial procedures the parties previously agreed upon.

Cases certifying commodity futures manipulation claims for Rule 23(b)(3) class treatment

have repeatedly relied upon this type of claims procedure in order to find that there is a

predominance of common questions under Rule 23(b)(3).[35] The Seventh Circuit recognized as follows in *Kohen*:

> If PIMCO is found to have cornered the market in the June Contract, then each member of the class will have to submit a claim for the damages it sustained as a result of the corner. *Carnegie v. Household Intl, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1784 (2009). Some of the class members, discovering that they were not injured at all, will not submit a claim, and others will submit a claim that will be rejected because the claimant cannot prove damages, having obtained off-setting profits from going long.

*Kohen*, 571 F.3d at 676.

Pursuant to the above procedure, Class members whose verified submissions demonstrate transactions which result in entitlement to a payout under the artificiality numbers determined by the jury, will receive damages. Class members whose verified proofs of claims do not demonstrate transactions which qualify for a payout under the artificiality numbers found by the jury, will not receive a payment. Kraft is thus not exposed to a single penny of damages for any "uninjured" class members.

### 2. In Order To Manufacture Individualized Issues, Kraft Has Improperly Attempted To Transform Article III Standing, Damages And Other Issues Into "Liability" Issues

Kraft raises numerous arguments concerning Article III standing, actual injury, antitrust injury and asserts these issues require individualized inquiries. Kraft's arguments fail.

<u>Article III Standing/Injury</u>. Plaintiffs are not required to demonstrate all Class members have standing. Again, standing inquiries do not require a calculator and injury is not an accounting

---

[35] *See Sumitomo I*, 182 F.R.D. at 92 (finding arguments that go to conflicts and damages can be "dealt with by the Court" at a later point in time, *i.e.*, after the liability stage of trial); *In re Natural Gas Commodities Litigation*, 231 F.R.D. at 180–81 (same); *In re Amaranth Natural Gas Commodities Litigation*, 269 F.R.D. at 385, n. 133 (same).

exercise that requires "calculation of losses," offsets due to benefits and other inquiries. These are damages issue that do not operate to defeat predominance.[36]

Actual Injury/Actual Damages.  Like "manipulation," the CEA does not define "actual damages." 7 U.S.C. § 25(a)(1). "Actual damages" means that only damages to assets subject to transactions in the commodity futures and options markets may be considered. *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 736 F. Supp. 511, 522–23 (S.D.N.Y. 1990) & n. 15 (S.D.N.Y. 1990) (review of legislative history of Section 22 shows that "actual damages" provision was intended "to limit a plaintiff's recovery to damages to assets which are traded on a commodities market"). In *Ploss I*, the Court held that trading futures contracts at an artificial price was sufficient to allege actual damages.  *Ploss I*, 197 F. Supp. 3d at 1068; *see also Kohen*, 571 F.3d at 676 (actual damages satisfied where plaintiffs purchased a futures contract at a manipulated price). Here, Plaintiffs and all Class members overpaid to purchase one or more wheat futures contracts at artificially high prices caused by Kraft and were thereby injured. No individual inquiries are necessary to establish "actual damages."

Actual injury has been held to be comparable to the injury in fact analysis for Article III standing. *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL

---

[36] Kraft cites *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)—a securities fraud misrepresentation, as opposed to market manipulation, case—and argues when a purchaser of a security buys and sells a share of stock in the equity markets at a static artificial price there is "no loss."  Motion, at 11, 16.  However, *Dura's* "pure logic" that, until a "corrective disclosure" occurs, in-and-out traders are not injured because the artificial price of the stock has not changed, does not apply to market manipulation in which there is no "corrective disclosure" and truth leaks out over time. *See Ploss,* 431 F. Supp. 3d at 1016; *see also Schleicher*, 618 F.3d at 686-8.  Moreover, in the futures markets, the open interest and defendant's signals of demand are changing daily—as reflected in Dr. Pirrong's price artificiality estimates which are not static. Further, *Dura* addressed loss causation. *See PIMCO*, 244 F.R.D. at 475 (holding that *Dura* was not controlling in analyzing injury requirement for class certification under the CEA); and as this Court held, "a plaintiff need not actually prove loss causation in order to obtain class certification." *See Ploss II*, 431 F. Supp. at 1021; *See also Kohen*, 571 F.3d at 679 (defendants' "obsessive" citation "to irrelevant securities law causation cases … suggests desperation").

5849142, at *37–39 (S.D.N.Y. Sept. 30, 2020). Actual injury in CEA cases can be established by showing a plaintiff transacted in a commodity futures contract at an artificial price and the artificial price was to their detriment. *Id.* Again, Plaintiffs and Class members purchased at least one wheat futures or option contract at a price inflated by Kraft and that purchase was to their detriment because they overpaid to purchase such contracts.

<u>Antitrust Injury</u>. The Court already held Plaintiffs can establish antitrust impact through the common class-wide evidence of Dr. Pirrong's event study. *Ploss II*, 431 F. Supp. 3d at 1018. In order to manufacture an individualized issue, Kraft asserts that Plaintiffs must also demonstrate each Class member participated in the relevant market defined as the CTD market. Motion, at 40-41. This is incorrect.

### 3. Common Issues Continue to Predominate on Plaintiffs' CEA Claims.

Kraft's argument that individual issues will predominate on issues of falsity and reliance fails for the same reasons Kraft's commonality arguments fail. *See* Motion, at 43-45. Kraft applies the same inapposite legal principles, based on the same distorted reading of *Basic* and *Goldman*, to the same patently false characterizations of the record—*e.g.*, concerning Plaintiffs' and Dr. Pirrong's theory of falsity and the nature of Kraft's signals. Again, while Kraft argues that the record negates the "fraud on the market presumption," Motion, at 43, Kraft ignores that reliance is not an element of Plaintiffs' Section 9(a)(2) or Sherman Act claims, and that the presumption applicable to Plaintiffs' Section 6(c)(1) claims simply means "that the market relies on the transactions to signal true, rather than manipulative, demand". *Ploss I*, 197 F. Supp. 3d at 1059 n.11. This means that "if Kraft manipulated the prices in the wheat futures market, then *all* of the class members bought and sold contracts at manipulated prices." *Ploss II*, 431 F. Supp. 3d at 1013. Kraft states that "for Rule 23 purposes, Kraft fully accepts the admitted expert evidence", Motion,

at 25 n.8; and, as demonstrated above, Kraft has failed to rebut the presumption that *all* Class members purchased futures contracts at prices impacted by Kraft's conduct.

As to "falsity," here again, Kraft's factual challenges to what it believes to be the predicate elements for application of the fraud on the market theory are based on Kraft's distorted characterizations of Plaintiffs and Dr. Pirrong's causal theory and Kraft's false portrayal of the evidence of Kraft's signals on which the Court's opinions and each of Dr. Pirrong's reports have been based. To the extent that Kraft speculates that if certain Class members "knew" Kraft's positions were uneconomic, other Class members may have similarly known, Motion, at 37, Kraft does not meet its rebuttal burden under *Goldman*; and, indeed, this argument fails for the same reasons the Court rejected it as a statute of limitations argument at class certification. *Ploss II*, 431 F. Supp. 3d at 1017. That is, Kraft has adduced no evidence to indicate that any individual Class member knew of Kraft's internal economics or knew that Kraft's positions were manipulative. But even aside from the absence of any evidence to support Kraft's speculation, as the Court explained, "Ploss's theory of liability is based on how Kraft's conduct affected the market as a whole." *Id.* at 1012–13. "So it is unimportant … whether any of the named Plaintiffs had direct and specific knowledge of Kraft's conduct or futures positions." *Id.* at 1014.

### 4. Common Issues Continue to Predominate on Plaintiffs' Sherman Act Claims

Kraft's arguments that common issues will not predominate on Plaintiffs' antitrust claims due to relevant market and antitrust impact issues fail. These are both common issues that do not require any individual inquiry to resolve.

Relevant Market/Participation. Again, the Court has held the relevant market is not required if (like here) there is direct evidence of anticompetitive effects, and that the relevant market definition is a merits question reserved for the jury. In any event, the relevant market definition is a common class-wide question. Plaintiffs have common class-wide expert testimony

concerning the scope of the relevant market that is admissible. *Ploss III*, 2022 WL 16540179, at

*8. The relevant market (the CTD market) is the same for all Class members. There are no

individual issues concerning the relevant market.

Kraft argues there is a new definition of relevant market. This is false. Kraft argues the

Court rejected the CTD market as unascertainable. Motion, at 46. This is an extreme misstatement

of the Order and the Court also rejected Kraft's argument that the Class should be limited to

persons who participated in the CTD market. Kraft argues individualized issues about who

participated in that market and which products or prices were affected. However, participation in

the relevant market is not a requirement and the products and prices affected (prices of wheat

futures and options) do not vary by Plaintiff or require individual inquiry. Kraft engineered this

argument to manufacture individual issues. *Id.* The Court already rejected Kraft's argument the

Class should be limited to persons who participated in the CTD market. *Ploss II*, 431 F. Supp. 3d

at 1020.

Kraft also argues Plaintiffs do not have common evidence of a relevant market in which

Kraft possessed market power. Motion, at 46-47. This is a merits argument that is also wrong.

Professor Pirrong's expert opinions, including ████████████████████████████

████████████████████████████ are all common evidence that, if accepted by a

jury, could support a finding that Kraft's anticompetitive conduct in the CTD market inflated prices

of the December and March contracts. *Ploss III*, 2022 WL 16540179, at *3.

Antitrust Injury. Antitrust injury requires a plaintiff's injuries be "of the type the antitrust

laws were intended to prevent and reflect the anticompetitive effect of either the violation or of

anticompetitive acts made possible by the violation." *Compare Ploss II*, 431 F. Supp. 3d at 1018

*with* Motion, p. 39 (antitrust impact requires harm from a competitive restraint). The competitive

restraint here is Kraft's monopolization of the CTD market and the direct impact from the restraint is the resulting inflation of wheat futures prices. These issues do not require individualized inquiry and do not vary by Class member. The Court already held "Ploss has satisfied this requirement: he proposes to use common evidence—Pirrong's event study—to prove that Kraft's alleged scheme injured the members of the class." *Id.*

Kraft also argues there is no antitrust injury where a plaintiff is not a competitor or consumer in the market in which trade was restrained. This is a merits argument that is wrong as a matter of law. Courts in this Circuit have recognized that a plaintiff need not be a "consumer or competitor" in the market where the alleged misconduct or manipulation occurs to have standing or allege antitrust injury resulting from that misconduct. *Loeb Industries, Inc.*, 306 F.3d at 481–82, 487, 489 (upholding antitrust claims against alleged manipulator of copper futures prices brought by purchasers of physical copper pursuant to contracts which incorporated the manipulated futures contract price into the contract formula that determined the price of the physical copper sold under their contracts); *TCS John Huxley Am., Inc. v. Sci. Games Corp.*, No. 19 C 1846, 2020 WL 1678258, at *6–*7 (N.D. Ill. Mar. 20, 2020) (rejecting defendants' argument that plaintiffs lacked antitrust standing to assert a Section 2 claim because they are neither "consumers or competitors" in the relevant market). In any event, all Class members were competitors of Kraft in the futures market, which is the same futures market where Kraft's restraint of trade artificially inflated prices of December and March Contracts purchased by Plaintiffs and the Class.

**D.**    <u>**Rule 23(b)(3) Superiority**</u>: **Superiority Remains Satisfied and Kraft's Attempts to Argue Against Its Prior Concession That Superiority Is Satisfied Fail**

Kraft previously **conceded** Rule 23(b)(3)'s superiority requirement. 431 F. Supp. 3d at 1011 n.4. Kraft now appears to withdraw its prior concession but without identifying any change in controlling law or any new facts. Each of the four factors in Rule 23(b)(3)(A)-(D) continue to

support superiority.[37] There have been no substantial difficulties in managing the case over the last eight-plus years. The parties have completed fact discovery, expert discovery, class certification and *Daubert* litigation, and Kraft recently filed a Rule 56 motion for summary judgment. The Court has expended substantial time and resources resolving many different motions, including motions to dismiss (*Ploss I*), class certification (*Ploss II*) and *Daubert* motions (*Ploss III*). The Rule 23(c)(2)(B) notice of the pendency of this Class action has been approved by the Court, sent to the Class and only two Class members requested exclusion. ECF No. 434, ¶ 2. The CBOT futures exchange is in this District. No other litigation concerning this controversy has been brought by a Class member.

Kraft mentions superiority twice and seems to suggest a class action is no longer superior because of the existence of what Kraft refers to as "individual issues" and "discrete disputes." Motion, at 42-43. This argument presumably relates to the fourth factor in Rule 23(b)(3)(D), *i.e.*, "likely difficulties in managing a class action." Kraft does not mention or contest any of the other three factors in Rule 23(b)(3)(D) (Motion, *passim*) and each of those factors continue to support superiority. In terms of "difficulties in managing a class action," no such difficulties have appeared since 2015 and Kraft has not identified any. Motion, *passim*. The difficulties Kraft *speculates* may appear *in the future* (such as individual damages inquires) will not result in this action being unmanageable. Courts routinely find superiority satisfied in cases involving claims of commodity futures manipulation.

---

[37] FED R. CIV. P. 23(b)(3) provides that the "matters pertinent" to superiority include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Moreover, the procedures here will make the case extremely manageable. If Plaintiffs prevail at trial, the jury will find that Kraft caused artificial prices in certain amounts during the Class Period. Those artificiality amounts can be applied to each Class members' trading using Robinson's admissible common damages methodology. ████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████

**E.**     <u>Ascertainability</u>**: The Class Definition Has Not Changed and The Class Continues to Be Ascertainable**

Kraft has not identified any change in the law or new facts concerning ascertainability. The Class definition—which has not changed—remains ascertainable. *Ploss II*, 431 F. Supp. 3d at 1018–20. It identifies a particular group (purchasers of wheat futures and options on wheat futures), harmed during a particular time frame (November and December 2011) and in a particular location (on the CBOT futures exchange). *Ploss II*, 431 F. Supp. 3d at 1018–20. All Class members were harmed in the same exact way: overpaying to purchase one or more December or March futures contracts or options on such contracts at an inflated price caused by Kraft. *Ploss II*, 431 F. Supp. 3d at 1019.

Kraft argues the Class definition "does not identify an ascertainable group who can use common evidence to prove" damages attributable to Plaintiffs' theory of liability. Motion, at 47. This argument is, again, a re-hash of Kraft's "uninjured" Class member argument the Court considered and rejected (*Ploss II*, 431 F. Supp. 3d at 1020) and fails for all the reasons above. Contrary to Kraft, the Class definition does indeed identify a group harmed in a particular way— it identifies persons who overpaid to purchase one or more wheat futures or options contracts at prices artificially inflated by Kraft and Dr. Pirrong's admissible event study is common proof of that harm.

**F.** _Comcast_**: Kraft's _Comcast_ Arguments Fail Again**

Kraft argues _Comcast Corp. v. Behrend_, 569 U.S. 27, 37–38 (2013) supports reversal of the Court's class certification Order.  Motion, at 47-50. _Comcast_ is not new law, the Court already correctly held _Comcast_ is inapposite to the facts of this case and the Court previously rejected Kraft's _Comcast_ arguments. _Ploss II_, 431 F. Supp. 3d at 1017–18.

In _Comcast_, the plaintiffs alleged four theories of liability but only one was accepted as a theory of antitrust impact subject to class-wide proof. _Id._, 569 U.S. at 31–34. However, plaintiffs' damages expert estimated the extent of the damages premised on the assumption that _all_ four liability theories had been established, leaving their only damages evidence improperly untethered from their claims. _Id._ Unlike in _Comcast_, Plaintiffs' claims were sustained (and certified) in their entirety. In rejecting Kraft's Comcast arguments, the Court held:

> Unlike the plaintiff in _Comcast_, however, Ploss asserts only _one_ theory of liability that cuts across the entire class, and it is the theory of liability on which Pirrong based the event studies. So proof of the damages caused by the scheme will either fail or succeed on a class-wide basis. Like much of its opposition to the class-certification motion, Kraft is really making a merits argument against the damages model.  [_Ploss II_, 431 F. Supp. 3d at 1018.]

Plaintiffs have a single theory of causation that Kraft acted pursuant to its manipulative and anticompetitive scheme from August 2011 forward with the purpose of artificially inflating wheat futures prices and artificially deflating cash market prices for wheat.  _Id._  Dr. Pirrong's event study painstakingly analyzes what happened to prices as a result of Kraft's scheme. Ex. 1. Contrary to Kraft's "_Comcast_" arguments, Dr. Pirrong's reliable, admissible event study does indeed fit "the manipulation alleged in this case." In fact, the Court recently held: "if credited by a jury, Pirrong's testimony would support a finding that Kraft caused artificially high prices in the December 2011 and March 2012 wheat futures markets." _Ploss III_, 2022 WL 16540179, at *3.

Thus, Dr. Pirrong's opinions are common proof capable of supporting a finding "Kraft caused artificially high prices." *Id.*

Kraft also asserts Dr. Pirrong's event study subjects Kraft to liability for damages "that are not the result of the wrong" because "new" CME data supposedly shows "a great many" Class members were not injured. Motion, at 7, 31. This is another "double down" on Kraft's repeated "uninjured" Class member argument that was rejected by the Court (*Ploss II*, 431 F. Supp. 3d at 1018–19) and which fails for reasons discussed above. That certain Class members may later be shown to not have "net damages" does not create any *Comcast* concerns. Any Class members who are determined to not have "net damages" will not be entitled to a recovery. Again, there is no aggregate or class-wide damages model here. *Id.*

<div align="center">

**CONCLUSION**

</div>

Kraft's request that this Court revisit its Opinion & Order certifying the Class should be denied in all respects and with prejudice.

Dated: March 15, 2023

<div align="center">Respectfully submitted,</div>

| | |
|---|---|
| */s/ Christopher McGrath* | */s/ Vincent Briganti* |
| Christopher Lovell | Vincent Briganti |
| Christopher McGrath | Raymond P. Girnys |
| **LOVELL STEWART HALEBIAN** | Johnathan Seredynski |
| **JACOBSON LLP** | Peter Demato |
| 500 Fifth Avenue, Suite 2440 | **LOWEY DANNENBERG, P.C.** |
| New York, New York 10110 | 44 South Broadway, Suite 1100 |
| Telephone: (212) 608-1900 | White Plains, New York 10601 |
| | Telephone: (914) 997-0500 |
| | |
| *Class Counsel* | *Class Counsel* |

Appendix

**Errata - Appendix**

| Paragraph / Exhibit No. | Change |
|---|---|
| 1(a) | Change "D-Dec. 38, Ex. 17" to "Demato Decl. ("D-Dec."), Ex. 17." |
| 1(b) | Change "march" to "March" |
| 1(b) | Change "*Id.*" to "*Id.*, Ex. 18." |
| 1(d) | Change "-37.5" to "-35.75." |
| 1(d) | Change "Ex. 16." to "*Id.*, Ex. 16; Ex. 1, ¶187." |
| 1(d) | Change "D-Dec Ex. 38, Ex. 25 (PLOSS-DEF-00234200-234201)" to "*Id.*, Ex. 16; Ex. 1, ¶187." |
| 1(e) | Change "Contract" to "Contracts" |
| 1(e) | Change "(subject line "Dec delivery")," to "(subject line "Dec delivery"):" |
| 1(e) | Change "D-Dec Ex. 38, Ex. 25" to "*Id.*, Ex. 25." |
| 3 | Change "Ex. 2" to "Ex. 2 (Appendix ("Appx.")" |
| 5 | Change "Ex. 2" to "Ex. 2 (Appx.)" |
| 6 | Change "Ex. 2" to "Ex. 2 (Appx.)" |
| 7 | Change "21(a)" to "21(b)" |
| 8 | Change "Ex. 2" to "Ex. 2 (Appx.)" |
| 11 | Change "…¶21(c)" to "…¶¶21(c), 33" |
| 11 | Change "…¶¶23(f)…" to "…¶¶23(f)-(g)…" |
| 12 | Change "…¶¶ 34, 198" to "…¶¶ 34, 148-150, 198" |
| 12 | Change "…¶¶ 21(d), 310-327" to "…¶¶ 21(d), 187, 196-204, 310-327" |
| 13 | Change "D-Dec. Ex. 2, ¶¶28-30" to "D-Dec., Ex. 1, ¶¶ 127, 188-190, 424, 441, 498 and n. 187, 441-450, 453, 560; D-Dec. Ex. 2 (Appx.), ¶¶25, 28-30, 35, 53-54; D-Dec., Ex. 3, ¶¶741, 752; D-Dec., Ex. 6, ¶¶22, 147-149" |
| 14 | Change "D-Dec. Ex. 37, ¶¶329-330." to "D-Dec., Ex. 1, ¶¶ 127, 188-190, 413, 453, 556; D-Dec., Ex. 6, ¶¶ 90-144; D-Dec. Ex. 37, ¶¶ 20, 53-55, 143, 151, 318, 325, 329-330." |
| 15 | Change "Dec. Ex. 1, ¶190; D-Dec. Ex. 3, ¶265" to "D-Dec. Ex. 1, ¶¶ 188-190; D-Dec. Ex. 3, ¶¶ 23(g)-(h), 265; D-Dec. Ex. 37, ¶¶ 20(B), 53-55, 143, 151" |
| 16 | Change "Dec. Ex. 1, ¶ 188; D-Dec. Ex. 3, ¶265; D-Dec. Ex. 37, ¶20, 143, 151" to "D-Dec. Ex. 1, ¶¶ 188-190; D-Dec. Ex. 3, ¶265; D-Dec. Ex. 26; D-Dec. Ex. 27; D-Dec. Ex. 37, ¶20, 143, 151." |
| 17 | Change "D-Dec. Ex. 8, ¶¶26-29, 30-32" to "D-Dec. Ex. 8, ¶¶26-29, 30-32; D-Dec. Ex. 30; D-Dec. Exs. 31-32; D-Dec. Exs. 33-34; D-Dec. Ex. 35." |
| 18 | Change "D-Dec. Ex. 38, ¶ 1; D- Dec. Ex. 8, ¶¶26-29, 30-32" to "D-Dec. Ex. 30; D-Dec. Exs. 31-32; D-Dec. Exs. 33-34; D-Dec. Ex. 35; D-Dec. Ex. 38, ¶¶ 1, 118-125; D- Dec. Ex. 8, ¶¶26-29, 30-32; D-Dec. Ex. 39, 109:10-120:4." |


1.      During October and November, 2011, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*E.g.*:

    a.  On October 19, 2011, ████████████████████



"Demato Decl. ("D-Dec."), Ex. 17.

    b.  On October 20, 2011 ████████████

*Id.*, Ex. 18.

    c.  On December 2, 2011, Kraft, ████████████████████

*Id.* Ex. 20.

    d.  From November 1 until November 9, the December – March SRW futures spread narrowed from -35.75 cents to -19.25 cents. *Id.*, Ex. 16; Ex. 1, ¶187. It then narrowed in half again from -19.25 cents to -9 cents per bushel by November 22nd. *Id.*, Ex. 16; Ex. 1, ¶187.

    e.  In the context of the foregoing narrowing spread between the prices of the December and March Contracts, ████████████████████

████████████████████████████████████

*Id.*, Ex. 25 (PLOSS-DEF-00234200-234201).

2

      f.   That is, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ *Id.*

2. Unlike perpetual existence instruments (such as common stock and other securities of corporations), futures contracts have a defined termination date. For the December Contract, all trading ended on December 14, 2011. D-Dec. Ex. 6, ¶ 254.

3. Because the expiring contract (here the December Contract) tends to be the most actively traded contract until during or just before the liquidation month, the open interest in the December 2011 Contract on the first day of the Class Period, November 1, was 175,800 contracts. D-Dec. Ex. 3, ¶ 594, n. 122; D-Dec. Ex. 2 (Appendix ("Appx.")), ¶ 63. But by the last day of trading on December 14, the open interest had almost entirely liquidated and was, by definition, zero contracts because all trading was over.

4. This 100% liquidation of 175,800 contracts reduction is fairly representative of the huge transformation which CME physical delivery futures markets must cooperate to effectuate in order to achieve orderly commodity trading in CME futures.

5. Specifically, the open interest is the amount of open contracts in a futures contract. D-Dec. Ex. 1, ¶ 194; D-Dec. Ex. 2 (Appx.), ¶ 56. Each contract in the open interest has a long side and a short side. D-Dec. Ex. 1, ¶ 13; D-Dec. Ex. 2, ¶¶48, 62. The short sides makes delivery if it does not liquidate. D-Dec. Ex. 1, ¶ 13; D-Dec. Ex. 2, ¶62. The long side takes delivery if it does not liquidate. D-Dec. Ex. 1, ¶ 13; D-Dec. Ex. 2, ¶ 48.

6. To liquidate through trading, the short (which is the seller of a futures contract), simply buys back the contract in a futures trading market. D-Dec. Ex. 1, ¶ 13; D-Dec. Ex. 2, ¶¶ 47, 62. Likewise the long (which is the buyer of a futures contract), simply sells the contract in the futures trading market. Ex. 1, ¶ 13; D-Dec. Ex. 2 (Appx.), ¶¶ 48, 62. Accordingly, both sides of the market (long and short) need to cooperate to facilitate orderly, complete liquidation of the open interest.

7. An important market norm for futures markets to function, is that market participants on both sides of the market (long and short) typically enter orders to liquidate their positions during the liquidation month, here, during the month of November 2011. D-Dec. Ex. 1, ¶¶ 21(b), 187.

8. Such cooperation in entering orders to liquidate provides the needed trading liquidity which facilitates the liquid trading in an orderly manner which allows market participants from throughout the world to participate in CME physical delivery markets such as the SRW contract. See D-Dec. Ex. 2 (Appx.), ¶¶28-31, 47, 61.

9. Such orderly liquidations of the expiring futures contracts are important to the success of physical delivery contracts. *Id.*

10. ████████████████████████████████████████████

████████████████████ D-Dec. Ex. 1, ¶¶16, 33, 200 and Fig. 2; D-Dec. Ex. 3, ¶¶23(f), 55, 585.

11. 

████████████████████████████████████████ D-Dec. Ex. 1, ¶21(c), 33; D-Dec. Ex. 3, ¶¶23(f)-(g), 55, 585.

12.     Another market norm is that the order flow in futures contracts constitutes publicly available information and, especially in the very highly traded CME SRW contracts, the order flow information is publicly available. D-Dec. Ex. 1, ¶¶ 34, 148-150, 198. ███████████████

███████████████████████████████████████████████████ D-Dec. Ex. 1, ¶¶ 21(d), 187, 196-204, 310-327.

13.     The delivery process in numerous futures contracts, including the CME/CBT SRW wheat futures contract begins with the issuance of a delivery notice by the short. If it is uneconomic to take delivery or start to pay storage on the wheat represented by the delivery notice, market participants typically retender the notice. D-Dec., Ex. 1, ¶¶ 127, 188-190, 424, 441, 498 and n. 187, 441-450, 453, 560; D-Dec. Ex. 2 (Appx.), ¶¶25, 28-30, 35, 53-54; D-Dec., Ex. 3, ¶¶741, 752; D-Dec., Ex. 6, ¶¶22, 147-149.

14.     Another important market norm is that market participants do not make uneconomic stops of delivery notices and also, where participants do stop a delivery notice, they do not make uneconomic loadouts of the commodity. D-Dec., Ex. 1, ¶¶ 127, 188-190, 413, 453, 556; D-Dec., Ex. 6, ¶¶ 90-144; D-Dec. Ex. 37, ¶¶ 20, 53-55, 143, 151, 318, 325, 329-330.

15.     ███████████████████████████████████████████████

D-Dec. Ex. 1, ¶¶ 188-190; D-Dec. Ex. 3, ¶¶ 23(g)-(h), 265; D-Dec. Ex. 37, ¶¶ 20(B), 53-55, 143, 151.

16.     ███████████████████████████████████████████████

█████████████████ D-Dec. Ex. 1, ¶¶ 188-190; D-Dec. Ex. 3, ¶265; D-Dec. Ex. 26; D-Dec. Ex. 27; D-Dec. Ex. 37, ¶20, 143, 151.

17.     ███████████████████████████████████████████████

█████. D-Dec. Ex. 8, ¶¶26-29, 30-32; D-Dec. Ex. 30; D-Dec. Exs. 31-32; D-Dec. Exs. 33-34; D-Dec. Ex. 35.

18.     Kraft ███████████████████████████. D-Dec. Ex. 30; D-Dec. Exs. 31-32; D-Dec. Exs. 33-34; D-Dec. Ex. 35; D-Dec. Ex. 38, ¶¶ 1, 118-125; D- Dec. Ex. 8, ¶¶26-29, 30-32; D-Dec. Ex. 39, 109:10-120:4..

19.     (a) In a separate economic analysis, ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

                                        *Id.*

███████████████████████████████████████████████████████

(b) Because ███████████████████████████████████████████

███████████████████████████████████████████████████████