**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HARRY PLOSS, et al., | ) | Case No. 15-cv-2937 |
| | ) | |
| Plaintiffs, | ) | Judge John F. Kness |
| | ) | |
| v. | ) | |
| | ) | |
| KRAFT FOODS GROUP, INC. and | ) | |
| MONDELĒZ GLOBAL LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' CORRECTED REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF THEIR MOTION TO DECERTIFY THE 2020 CLASSES**

Dean Panos
J. Kevin McCall
Nicole A. Allen
Thomas Quinn
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
dpanos@jenner.com
jmccall@jenner.com
nallen@jenner.com
tquinn@jenner.com

Elizabeth Papez
Helgi C. Walker
Joshua Lipton
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8608
epapez@gibsondunn.com
hwalker@gibsondunn.com
jlipton@gibsondunn.com

Christopher Joralemon
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave.
New York, NY 10166
(212) 351-2668
cjoralemon@gibsondunn.com

*Attorneys for Defendants Mondelēz Global LLC & Kraft Foods Group, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………II

INTRODUCTION ...................................................................................... 1

SUMMARY OF ARGUMENT ................................................................... 3

LEGAL STANDARDS ............................................................................ 10

PLAINTIFFS' MISSTATEMENTS OF FACTS AND PROCEDURAL HISTORY ................ 11

    I.    PRE-CERTIFICATION RECORD AND THE RULE 12 ORDER (*PLOSS I*) ............................................................... 12

    II.    CLASS BRIEFING AND THE 2020 ORDER (*PLOSS II*) ..................... 14

    III.    POST-CERTIFICATION DEVELOPMENTS ....................................... 15

ARGUMENT .......................................................................................... 18

    I.    *TRANSUNION* REQUIRES DECERTIFICATION BECAUSE THE RECORD SHOWS THAT OVER HALF THE CLASS HAS NO REDRESSABLE INJURY ............................................. 18

    II.    *COMCAST* REQUIRES DECERTIFICATION BECAUSE PLAINTIFFS' ONLY COMMON PROOF IS NOT CONSISTENT WITH THEIR LIABILITY THEORIES ....................... 21

    III.    *AGC* REQUIRES DECERTIFICATION BECAUSE PLAINTIFFS DO NOT HAVE COMMON PROOF OF ANTITRUST INJURY ....... 24

    IV.    RULE 23(A) REQUIRES DECERTIFICATION BECAUSE PLAINTIFFS CANNOT SHOW TYPICALITY, ADEQUACY, AND COMMON PROOF OF LIABILITY ......................................... 25

        A.    The Named Plaintiffs Are Not Typical or Adequate Class Representatives ........................................................ 25

        B.    The Current Record Fails Rule 23(a) Commonality Requirements ............................................................... 27

    V.    RULE 23(B)(3) REQUIRES DECERTIFICATION BECAUSE PLAINTIFFS CANNOT SHOW PREDOMINANCE AND SUPERIORITY ................................................................. 33

CONCLUSION ....................................................................................... 35

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Adashunas v. Negley*,
626 F.2d 600 (7th Cir. 1980) ................................................................... 20

*Am. Honda Mot. Co., Inc. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ..................................................................... 9

*In re Amaranth Natural Gas Commodities Litigation*,
269 F.R.D. 366 (S.D.N.Y. 2010) ............................................................. 20

*Andrada v. Atherogenics*,
2005 WL 912359 (S.D.N.Y. Apr. 19, 2005) ............................................ 26

*Andrews v. Chevy Chase Bank*,
545 F.3d 570 (7th Cir. 2008) ................................................................... 34

*Associated General Contractors v. California State Council of Carpenters*,
459 U.S. 519 (1983) ............................................................... 6, 8, 24, 33

*Barner v. City of Harvey*,
2004 WL 2092009 (N.D. Ill. Sept. 15, 2004) .......................................... 11

*Basic v. Levinson*,
485 U.S. 224 (1988) ................................................................................. 2

*Bell v. PNC Bank, Nat. Ass'n*,
800 F.3d 360 (7th Cir. 2015) ................................................................... 19

*Casillas v. Madison Ave. Assocs., Inc.*,
926 F. 3d 329 (7th Cir. 2019) ................................................................... 2

*Comcast v. Behrend*,
569 U.S. 27 (2013) .......................... 1, 3, 7, 8, 9, 11, 12, 21, 24, 33, 34

*Conrad v. Boiron, Inc.*,
869 F.3d 536 (7th Cir. 2017) ................................................................... 26

*Culver v. City of Milwaukee*,
1999 WL 962393 (7th Cir. Oct. 15, 1999) .............................................. 10

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006), 19 ........................................................ 20, 21

*Deslandes v. McDonalds USA, LLC*,
2021 WL 3187668 (N.D. Ill. July 28, 2021) ...................................... 24, 27

ii

*Driver v. AppleIllinois, LLC*,
    739 F.3d 1073 (7th Cir. 2014) ........................................................................ 10

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................................ 27

*In re Elan Corp. Sec. Litig.*,
    2009 WL 1321167 (S.D.N.Y. May 11, 2009) .................................................. 26

*Ellis v. Elgin Riverboat Rest.*,
    217 F.R.D. 415 (N.D. Ill. 2003) ........................................................... 1, 10, 11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) (*Halliburton I*) ............................................................... 4

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004) ..................................................................... 24

*Gilbert v. Ill. State Bd. of Educ.*,
    591 F.3d 896 (7th Cir. 2010) .......................................................................... 10

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    141 S. Ct. 1951 (2021) ..................................................................... 1, 5, 27, 30

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
    29 F.4th 839 (7th Cir. 2022) ............................................................................ 1

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) .......................................................................... 33

*In re Groupon, Inc. Sec. Litig.*,
    2015 WL 1043321 (N.D. Ill. 2015) ............................................................ 4, 27

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ......................................................................................... 4

*Howard v. Cook Cnty. Sheriff's Off.*,
    989 F.3d 587 (7th Cir. 2021) .............................................................. 1, 10, 11, 32

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) ................................................................ 3, 19, 20

*Lipton v. Chattem, Inc.*,
    289 F.R.D. 456 (N.D. Ill. 2013) .................................................................... 35

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) .................................................................... 24, 33

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
   332 F. Supp. 3d 885 (S.D.N.Y. 2008) ........................................................ 24

*Messner v. Northshore Univ. Health System*,
   669 F.3d 802 (7th Cir. 2012) ........................................................ 10, 19, 35

*Moss v. United Airlines, Inc.*,
   20 F.4th 375 (7th Cir. 2021) ........................................................ 1, 19

*In re NorthShore Univ. HealthSystem Antitrust Litig.*,
   2023 WL 2138971 (N.D. Ill. Feb. 20, 2023) (Chang, J.) ........................ 11

*Ohio v. Am. Exp. Co.*,
   138 S. Ct. 2275 (2018) ........................................................ 24, 32

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ........................................................ 20

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014) ........................................................ 9

*Pastor v. State Farm Mut. Auto. Ins. Co.*,
   487 F.3d 1042 (7th Cir. 2007) ........................................................ 34

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   934 F.3d 619 (D.C. Cir. 2019) ........................................................ 33

*Sanner v. Board of Trade of City of Chicago*,
   62 F.3d 918 (7th Cir. 1995) ........................................................ 24, 33

*Santiago v. City of Chicago*,
   19 F.4th 1010 (7th Cir. 2021) ........................................ 1, 9, 10, 11, 12, 26, 27

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ........................................................ 4, 19, 27

*In re Soybean Futures Litig.*,
   892 F. Supp. 1025 (N.D. Ill. 1995) ........................................................ 3

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) ........................................................ 19

*In re Sulfuric Acid Antitrust Litig.*,
   847 F. Supp. 2d 1079 (N.D. Ill. 2011) ........................................................ 10

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ........................ 1, 2, 3, 6, 7, 18, 19, 20, 21, 25, 26, 30

*Verizon Commc'ns, Inc. v. Law Offs. of Curtis v. Trinko, LLP*,
  540 U.S. 398 (2004) .................................................................................... 32

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ...................................................................... 32

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................. 11, 33

## STATUTES

7 U.S.C. § 25(a)(1), (2) ............................................................................... 12

7 U.S.C. § 25(c) ........................................................................................... 12

15 U.S.C. § 15(a) ......................................................................................... 12

**INTRODUCTION**

This Court "must assure itself at all stages of the litigation that a certified class meets the requirements of Rule 23." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 599 (7th Cir. 2021); *Comcast v. Behrend*, 569 U.S. 27, 36 (2013). Plaintiffs' brief confirms that the classes in the 2020 Order must be decertified, and that the record does not support a Rule 23(b)(3) damages class on any of their claims. In responding to "a motion for decertification," Plaintiffs bear the burden of "producing a record demonstrating the continued propriety of maintaining the class." *Ellis v. Elgin Riverboat Rest.*, 217 F.R.D. 415, 419-40 (N.D. Ill. 2003). Plaintiffs misstate this burden, Opp. 1,[1] and ignore *Ellis* because it reveals their shade on the legal standard. But they at least concede that decertification is proper if the record "demonstrates a material change in circumstances such as new controlling case law that substantially alters the legal landscape, or new facts that were not known at the time the class was certified." Opp. 5. Kraft's motion presents both. It is filled with new facts that require decertification under controlling law and the terms of the 2020 Order. And it explains why the current record cannot satisfy Rule 23 under two new Supreme Court decisions (*TransUnion* and *Goldman*) and at least four new Seventh Circuit decisions (*Howard*, *Santiago*, *Gorss*, *Moss*).[2]

The new facts are game changing. Plaintiffs' admitted expert studies show that **at least 57 percent** of certified class members **cannot** prove redressable injury on the record now before the Court.[3] That remains the "headline," Opp. 7, because Plaintiffs cite **no case** that has knowingly sent

---

[1] Plaintiffs' brief ("Opp."), Dkt. 637, responds to Kraft's motion to decertify the Rule 23(b)(3) classes in the Court's January 2020 Order, Dkts. 617 ("Mot."), 572-1 ("2020 Order").

[2] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021); *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021); *Santiago v. City of Chicago*, 19 F.4th 1010 (7th Cir. 2021); *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839 (7th Cir. 2022); *Moss v. United Airlines, Inc.*, 20 F.4th 375 (7th Cir. 2021).

[3] This figure represents the sum of the "approximately *38 percent* of [interday] Class Members [who] benefited" from the prices Plaintiffs challenge, Dkt. 605 (Ex. 35) ¶ 627 (Pirrong), and the additional class members who made only intraday trades not captured by Plaintiffs' studies, *see* Dkt. 573-1 ¶ 474.

1

such a class to trial. Nor will they find one going forward, because the Supreme Court held in 2021 that entering a verdict for such a class would be unconstitutional. *See TransUnion*, 141 S. Ct. at 2208. The reason is that "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, *not* a freewheeling power to hold defendants accountable for [alleged] legal infractions." *Id.* at 2205. *TransUnion* applied this rule to hold that federal courts cannot enter verdicts in favor of classes filled with plaintiffs who did not suffer any "injury that the defendant caused and the court can remedy" with an "actual damages" award. *Id.* (citing *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). Yet that is exactly what Plaintiffs now ask this Court to do while ignoring the expert admissions that give rise to the stunning percentages of uninjured class members above. These new—and now undisputed—facts alone compel decertification.

But there are several more. The 2020 Order granted certification on the "fraud on the market" theory of liability the Supreme Court recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Dkt. 332, *Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1016 (N.D. Ill. 2020) (*Ploss II*). But Plaintiffs' brief confirms that they did not do the expert studies *Basic* requires, or the "aggregate damages" study they promised in 2019. In addition, they now admit that the main "market" they consider "relevant" to their monopoly claim is *not* the "futures market" where they paid high contract prices. Opp. 39. It is the "CTD market" for *physical* delivery of contract wheat, which existed only at the *end* of the class period, and in which *no* Plaintiff "participated." *Id.*

Plaintiffs insist none of this matters and assert that there is no "material change in circumstances that warrant[s] altering" the 2020 Order. Opp. 1. That blinks reality, as does their argument that the "recent" Supreme Court and Seventh Circuit cases Kraft cites, Mot. 1, are not really "new," Opp. 1. As detailed below, these arguments "fail[] spectacularly" for many reasons, *id.* at 7, all of which compel decertification under the controlling law—new and old—in Kraft's motion.

## SUMMARY OF ARGUMENT

The current record requires decertification for numerous reasons, all of which relate to the connection between the new facts above and Rule 23 standards for damages class actions. The new facts are all "material," Opp. 1, because they show that Plaintiffs have not done what Rule 23 and this Court's orders require to proceed as a class: develop "evidentiary proof" that links Kraft's alleged statutory violations to class-wide injury. Mot. 32 (quoting *Comcast*, 569 U.S. at 33). That is clear from three controlling Supreme Court cases (*TransUnion*, *Comcast*, and *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*")), and also from "reassessing" the certified class claims as *Howard* and *Santiago* instruct. Mot. 5.

**Class Claims.** The certified manipulation claims are based on allegations of futures price manipulation Plaintiffs copied from a 2015 regulatory filing. Dkt. 1. But private plaintiffs do not have standing to sue for manipulation unless they can show that it caused actionable harm to them. So Plaintiffs' complaint says Kraft's alleged manipulation caused "artificial" price inflation in 2011 wheat futures prices that was also "anticompetitive" and harmed all class members in violation of the Commodity Exchange Act (CEA) and the Sherman Act. But that is not enough for a class case. As the Court's orders explain, Plaintiffs also needed a "theory of liability" they could prove with common evidence that would connect these alleged violations to class-wide harm. *Ploss II* at 1013.

***Class Theories of Liability for Manipulation and Monopoly.*** The 2016 Order (*Ploss I*) acknowledged that the "classic" theory of liability for the type of claims here is a "corner" or "squeeze" theory. *Ploss I* at 106; *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1032 (N.D. Ill. 1995). In corner/squeeze cases, it is the combination of the futures position and "control of deliverable supply" that makes the defendant stand out from other traders, and allows courts to conclude that the defendant had the market

3

(and monopoly) power to cause "above-market prices" that damaged an entire class of futures contract holders. *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1061 (N.D. Ill. 2016) (*Ploss I*). Crucially, however, the 2016 order notes that this case does "*not allege*" that "Kraft controlled the physical wheat supply or that Kraft exploited a supply shortage." *Id*. at 1062. Instead, Plaintiffs allege that Kraft used only a long futures position to manipulate futures prices that all class members paid. *See id*. The 2016 order described these allegations as a "*false signals*" theory of liability for market manipulation. *Id*. at 1062. And it said the related theory of liability for "*futures market monopolization*" was that Kraft "exerted monopoly power by '[buying] up all of the available long positions'" in the December 2011 futures contract. *Id*. at 1071.

**The 2020 Order Certifying the Class Claims.** Plaintiffs' class claims for manipulation and monopoly survived Rule 12 dismissal solely on the "false signals" and "futures market" theories above. Accordingly, these are the only theories of liability on which Plaintiffs sought Rule 23 certification, and the only theories of liability the 2020 Order accepted for class treatment. In seeking certification, Plaintiffs' class papers relied on traditional securities fraud cases and promised that their expert could connect Kraft's alleged "false signals" to "aggregate damages" to the class. *See* Dkt. 238 at 12 (citing *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *11 (N.D. Ill. 2015)); Dkt. 314 at 33 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011) (*Halliburton I*)). The 2020 Order took Plaintiffs at their word, and concluded that Plaintiffs' "false signal" claims could satisfy Rule 23 if they were certified on the "fraud on the market" theory "often invoked in securities-fraud cases," and specifically the Supreme Court's decision in *Basic*. *Ploss II* at 1016; *see id*. at 1021–22 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280 (2014), *Schleicher*, and *Groupon*).

4

***Plaintiffs' Basic Promise.*** Plaintiffs' promise to connect Kraft's alleged "false signals" to class-wide harm under *Basic* is the glue that holds the 2020 Order's certifications together under Rule 23. *Basic* prescribes a specific method for proving that a defendant's alleged "false signals" caused market price inflation that harmed all members of a class who traded at the market price. It requires common evidence (usually an expert "event study") that shows: (i) the alleged "false signals" were "public" enough to affect prices in an efficient public market (here, the futures market); (ii) the falsity inflated market prices until the truth was revealed and the price dropped; and (iii) the plaintiff class suffered a common injury caused by the alleged fraud because they bought their securities at the inflated prices and sold after the price dropped. Mot. 5, 11; *Goldman*, 141 S. Ct. at 1957–58. The 2020 Order relied entirely on this theory to hold that Kraft's alleged "false signals" of demand caused "artificial[]" inflation to be "baked into" the price of every contract the class plaintiffs purchased. *Ploss II* at 1012–18. And it credited Plaintiffs' promise to use a *Basic* model to prove that: (i) their claims "are identical, both legally and factually, to those of the proposed class members"; and (ii) "[a]s a result of the artificial prices allegedly caused by [Kraft's] scheme, all of the Plaintiffs that transacted in [the relevant futures contracts] lost money." *Id.* at 1011–12.

***New and Material Post-Certification Facts.*** After the 2020 Order certified Plaintiffs' class claims based on the Rule 23 theories above, Kraft took the discovery that upended the 2020 Order's conclusion that all class member claims are "identical" and "all of the Plaintiffs that transacted in [the relevant contracts] lost money." *Ploss II* at 1011–12. These revelations forced Plaintiffs to *abandon* the 2020 Order's *Basic* theory of certification last year, and *disclaim* the *Basic* and "aggregate damages" studies they promised in 2019. *Compare* Dkt. 238 at 11 *with* Opp. 16-17; *see also* Dkt. 573-10 at 126:20–127:1; Dkt. 573-2 ¶ 94. Further, and critically, the new discovery forced Plaintiffs to concede that up to 57% of class members could not prove *any actual or common injury*

under the replacement studies Plaintiffs admitted in October 2022. *Supra* at 1 & n.3. These game-changing developments are what the Court must "reassess" under Rule 23 now.

**Grounds for Decertification.** Plaintiffs' brief confirms that the material record developments above compel decertification for several reasons that directly align with new and controlling Supreme Court and Seventh Circuit cases, as well as the elements of Rule 23 itself. The extraordinary new facts about class members' lack of injury and abandonment of the 2020 Order's *Basic* theory of liability provide a fast-track to decertification under *TransUnion*, *Comcast*, and *AGC*. The new record also compels decertification under the "rigorous" Rule 23 analysis the Court must now conduct under the new Rule 23 decisions in *Goldman*, *Howard*, *Santiago*, and *Gorss*. The difference is just pathway. The fast-track routes to decertification are available here simply because the current record breaks from so many Rule 23 requirements that the decertification question is not even close.

**TransUnion.** The first fast-track route to decertification is *TransUnion*'s constitutional prohibition on federal class trials that include a large number of members who the Court *knows* have no *redressable injury*. *TransUnion*, 141 S. Ct. at 2211. Unlike the record in 2019, the record now establishes that at least 57% of current class members cannot prove a redressable monetary loss caused by their payment of more price "artificiality" than they received on the contract purchases in the class definition. On this record, sending any aspect of Plaintiffs' class claims to trial would directly violate *TransUnion*. Plaintiffs' brief confirms this. It does not identify any evidence of actual injury that could avoid *TransUnion*'s decertification mandate. Instead, it says all class members can go to trial because they "*could have*" been damaged by their "*initial*" contract purchases, Opp. 9, 12, 33, even though the record now *shows* that many members actually *profited* from these purchases, *id*. at 51-52. This argument violates *TransUnion*'s holding that where a "risk of future harm *does not materialize*," the individual who faced that risk "cannot establish a concrete harm

6

sufficient for standing," and thus *cannot* obtain trial relief on any issue under cover of a class action. *TransUnion*, 141 S. Ct. at 2211. Plaintiffs' only response is a parade of horribles about how this logic could affect *pre*-certification cases. Opp. 16. But these concerns do not apply to the *decertification* question here, which *TransUnion* itself separates from the "*distinct question* whether every class member must demonstrate standing *before* a court certifies a class." 141 S. Ct. at 2208 n.4.

**Comcast**. The second fast-track route to decertification is *Comcast*'s mandate that a class model of causation and price injury must be "consistent" with the "theory of liability" the Court "accepted for class-action treatment," *and* must "measure only damages attributable to" that "theory of liability." *Comcast*, 569 U.S. at 35. As noted, Plaintiffs' own class papers promised an "aggregate damages" model under the *Basic* framework, and the only "theory of liability" the 2020 Order "accepted for class-action treatment" was the "fraud on the market theory" from *Basic*. *Ploss II* at 1013. But Plaintiffs' brief confirms they did not do the *Basic* study the 2020 Order and their own cases require, Opp. 29–30; they have "no aggregate or class-wide damages model" at all, Opp. 60; and they have disclaimed the 2020 Order's "fraud on the market" framework as "totally inappropriate" for this case, Opp. 31. These admissions alone require decertification under *Comcast*. And the evidence Plaintiffs submitted in place of a *Basic* study confirms that. Plaintiffs concede that their new studies rely on the corner/squeeze theory of liability described in *Detecting Manipulation*. Opp. Ex. 4. But that is *not* the *Basic* theory the 2020 Order "accepted for class action treatment." *Comcast*, 569 U.S. at 36. It is the theory of liability the Court's Rule 12 order said Plaintiffs do not even "*allege*" here because it requires control over wheat supply that Kraft did not have. *Ploss I* at 1062. Accordingly, Plaintiffs' only "common proof" of "price impact" (their 2022 expert studies) is not "consistent" with *any* recognized "theory of liability" in this case, *Comcast*, 569 U.S. at 35, as Plaintiffs confirm in asking to go to trial on the "price impact" of Kraft's "*flout[ing]. . . market*

7

*norms.*" Opp. 2–3, 19. There is no such cause of action anywhere in their complaint or in the U.S. Code. And even if there were, studying the "price impact" of such conduct, Opp. 17, is the province of academics and regulators. The Court cannot wave a Rule 23 wand and turn plaintiffs into regulators, or their novel academic study into proof of class-wide injury on their statutory claims. Yet that is what they request in seeking a trial on "flout[ing]" of "market norms." Opp. 2–3. *This* request—not Kraft's motion—"ignore[s] critical aspects" of the Court's prior rulings as well as Rule 23. Opp. 24.

**AGC.** The third fast-track route to decertification is *AGC*'s requirement that antitrust injuries must be a "*direct*" result of the "competitive" violations alleged, and are thus generally available only to "consumers or competitors" in the primary market "relevant" to the antitrust claim. *AGC*, 459 U.S. at 539. Plaintiffs' certified theory that Kraft "monopolized" the "futures market" by buying up "all the long positions," *Ploss I* at 1071, collapsed in discovery. So their monopoly claim now focuses on a different market: the "cheapest to deliver" ("CTD") market for physical wheat deliveries on their futures contracts. Dkt. 573-1 ¶¶ 390–96. But the current record contains no Rule 23 evidence about how the alleged monopolization of the "CTD market" in December 2011 caused the class "direct" antitrust injury in the "futures market" in November 2011. And Plaintiffs' argument that such evidence is not "required," Opp. 17, violates their own cases, *id.* 10–12, and the controlling *AGC* decision that Kraft cited, Mot. 13, 28, 45–46, but Plaintiffs never mention.

**Rule 23**. The "local" route to decertification arrives at the same place through a rigorous analysis of post-certification evidence against each of Plaintiffs' statutory claims and Rule 23 factors. Mot. 1–7, 27–47. The record shows that five of the eight named Plaintiffs lack standing to proceed in their own right, and the remaining three are not representative or typical of—much less "identical" to, *Ploss II* at 1012—other class members. The reason is that Plaintiffs did not develop

8

the "evidentiary proof"—and particularly the *Basic* study— their certified claims require. *Comcast*, 569 U.S. at 33. As a result, they lack the "common evidence" of causation and injury Rule 23 requires for them to pursue a class damages case. Plaintiffs admit as much in conceding that every damages claim would require individual "post-trial" proceedings that would clearly "predominate" over common issues, *id.* at 34, as evidenced by their squabble about ███████████████

████████████████████ Opp. 46; Mot. 43. In an attempt to obscure these problems, Plaintiffs' brief organizes its Rule 23 arguments around purportedly "overarching common questions" about whether Kraft engaged in a manipulative "scheme," and whether the scheme "inflated prices." Opp. 6, 9. But that is exactly the approach the Supreme Court has long rejected, *Comcast*, 569 U.S. at 33–34, and the Seventh Circuit's new decertification cases eschew, *see Santiago*, 19 F.4th at 1017 (vacating certification that "organized its analysis around potential common questions rather than the claims at issue"); *Eddlemon v. Bradley Univ.*, 2023 WL 2904685, at *3 (7th Cir. Apr. 12, 2023) (same).

Plaintiffs nonetheless urge the Court to ignore these cases and send their claims to trial. The Court cannot do that. Courts must assess "the realism of the plaintiffs' injury and damage model" *before* trial, *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014), and "[t]ough questions must be faced and squarely decided" *before* submitting the case to a jury, *Am. Honda Mot. Co., Inc. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010). Fortunately, the record here provides clear answers, all of which require decertification on grounds Plaintiffs do not even attempt to solve. That may be because they know any attempt to "fix" their overbroad class definitions would be futile given the flawed and inherently individualized nature of their claims, or because any class-wide theory of 2011 injury would trigger the same limitations bar as the 2020 Order's *Basic* certification, Dkt. 621 at 23–25, or simply because they want to maximize potential damages and fees. Whatever the

reason, the 2020 classes fail Rule 23. And any doubt would support entering the required decertification order now, so Plaintiffs can seek Rule 23(f) review of the claims—if any—that survive summary judgment. Kraft would not oppose such an appeal, which would simply provide a chance for this case to join the legion of recent appellate decisions decertifying classes where, as here, the post-certification record clearly does not satisfy Rule 23.

## LEGAL STANDARDS

Plaintiffs say "Kraft has woefully failed to carry its burden to show that a motion for reconsideration is appropriate now." Opp. 1. They have the law backwards. Their leading Seventh Circuit case confirms that they bear the "burden" of satisfying Rule 23 by a "preponderance of the evidence." *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 811 (7th Cir. 2012). This burden applies "on a motion for decertification." *Ellis*, 217 F.R.D. at 419–20. And in responding to such a motion, *Plaintiffs* bear the burden of "producing a record demonstrating the *continued* propriety of *maintaining* the class." *Id.* at 419. To meet this burden in a damages case, the "party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23" by presenting "evidentiary proof" of all the elements in Rules 23(a) and (b)(3).

Plaintiffs cannot discharge this burden simply by relying on "law of the case." Opp. 5. The point of the decertification analysis is to "reassess" and "reanalyze" the prior certification in light of new facts and law. *Howard*, 989 F.3d at 599; *Santiago*, 19 F.4th at 1018. "Law of the case principles," *Gilbert v. Ill. State Bd. of Educ.*, 591 F.3d 896, 902 (7th Cir. 2010), do not vitiate the court's "'continuing responsibility' to determine that Rule 23's requirements are satisfied." *Kramer v. Am. Bank & Tr. Co., N.A.*, 2018 WL 4052162, at *4 (N.D. Ill. Aug. 24, 2018) (quoting *Culver v. City of Milwaukee*, 1999 WL 962393, *4 (7th Cir. Oct. 15, 1999)); *In re Sulfuric Acid Antitrust*

*Litig.*, 847 F. Supp. 2d 1079, 1082 (N.D. Ill. 2011).[4]  Accordingly, where—as here—the certification record has evolved through "new evidence and pretrial litigation," *Ellis*, 217 at 420, the Court must "reassess" the certified claims under Rule 23.  *Howard*, 989 F.3d at 599; *Santiago*, 19 F.4th at 1018; *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 2023 WL 2138971, at *3 (N.D. Ill. Feb. 20, 2023) (Chang, J.).  None of Plaintiffs' cases holds otherwise.[5]

### PLAINTIFFS' MISSTATEMENTS OF FACTS AND PROCEDURAL HISTORY

Before addressing Plaintiffs' arguments, it is necessary to correct certain misstatements and obfuscations in their brief that obstruct reassessment of the certification record in two ways.  First, their brief ignores new developments—such as their experts' admissions on uninjured class members—that are critical to a proper Rule 23 analysis.  Second, it falsely portrays new developments as "factual arguments that the Court already considered and rejected" in earlier rulings that did no such thing.  Opp. 23, 36, 38, 52, 54–55, 58.  Some of these representations are false simply because the relevant facts did not exist when the Court issued the 2020 Order.  Others affirmatively misrepresent rulings on pleading-stage allegations as purportedly adverse factual findings.  Opp. 36.  Those arguments cannot stave off decertification.  *Comcast*, 569 U.S. at 33 (Rule 23 "does not set forth a mere pleading standard"); *Eddlemon*, 2023 WL 2904685 at *2 (reversing Rule 23 decision that

---

[4] Nor would a decertification order "revers[e]" the Court's "prior decisions."  Opp. 1, 23–24, 58.  It would simply reflect a determination that Court is *not* "assure[d]" that the previously "certified class meets the requirements of Rule 23" on a more developed record.  *Howard*, 989 F.3d at 599.  Decertification also would not constitute "reconsideration of a previous ruling" under the *Driver* case Plaintiffs cite.  Opp. 5 (citing *Driver v. AppleIllinois, LLC*, 739 F.3d 1073, 1077 (7th Cir. 2014)).  *Driver* addressed the scope of *interlocutory appellate review* on a *second Rule 23(f) petition*, not the standard for decertification in a district court.

[5] Indeed, the 2000 *Barner* decision Plaintiffs cite, Opp. 9, 43—which declined to decertify a class nearly a decade before *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)—was overtaken four years later by a decision *granting* decertification on a fuller record.  *Barner v. City of Harvey*, 2004 WL 2092009, at *1–2 (N.D. Ill. Sept. 15, 2004) (citing *Ellis*, 217 F.R.D. at 419).  And *Parish v. Sheriff of Cook County*—which predates the Seventh Circuit's decisions in *Howard, Santiago, Eddlemon*, and *Moss*—accords.  2016 WL 1270400, at *1–2 (N.D. Ill. Mar. 31, 2016); *see* Opp. 5.

credited "pleadings" over facts). And Plaintiffs' use of the shorthand "*Ploss I*, *II*, *and III*" obscures the context of many citations in their brief. The context matters—and shows how the record supports Kraft. The Rule 12 order ("*Ploss I*") is relevant to understanding the "theory of liability" on which certification was granted, and how the 2020 Order ("*Ploss II*") is inconsistent with the current record and with Plaintiffs' damages case. The *Daubert* ruling ("*Ploss III*") defines what evidence the Court can (and cannot) consider under Rule 23. And as detailed below, all Plaintiffs won on that ruling is the admission of studies that compel decertification now. Mot. 23–25.

## I.  PRE-CERTIFICATION RECORD AND THE RULE 12 ORDER (*PLOSS I*)

*Plaintiffs' 2015 Statutory Claims.* Plaintiffs' initial complaint was filed in April 2015, and did not reflect any diligence specific to the 2011 damages class in this case. It copied allegations from a regulatory action filed the day before. Dkt. 1. Plaintiffs' amended (operative) complaint then relied on those allegations to plead the manipulation and monopoly claims the Court certified in the 2020 Order. Dkt. 71; *Ploss II*. This history is important because Rule 23(b)(3) requires a "rigorous analysis," *Santiago*, 19 F.4th at 1019, of the "elements" of Plaintiffs' class damages claims under the CEA and the Sherman and Clayton Acts. Mot. 8–12. As relevant here, these claims differ from the regulatory claims Plaintiffs copied in three ways.

*First*, Plaintiffs' claims require proof of *causation, injury, and damages* that regulatory claims do not. Specifically, *all* of Plaintiffs' CEA claims require "*actual damages* resulting from" the alleged manipulation. 7 U.S.C. § 25(a)(1), (2). And Plaintiffs' monopoly claim is actionable only through Section 4 of the Clayton Act, which requires "direct" proof of competitive "injur[y]" to "personal business or property by reason of" the alleged monopoly. 15 U.S.C. § 15(a); Mot. 31, 46. *Second*, Rule 23(b)(3) certification requires "evidentiary proof" of liability—including causation and injury—that is not just *common* under Rule 23(a), but also *predominant* over individual

issues under Rule 23(b)(3), *Comcast*, 569 U.S. at 34–36, *and* complies with the two-year limitations period the CEA imposes on private (but not regulatory) claims for manipulation, 7 U.S.C. § 25(c). These standards posed a formidable barrier to this suit from the moment it was filed. Plaintiffs had to develop a 2015 theory of 2011 class injury that: (i) could be proved through common and pre-dominant evidence of a 2011 statutory violation; *and* (ii) avoid the limitations bar the 2020 Order recognized as a class-wide issue. *Ploss II* at 1106–17. The record shows there is no such theory.

**2016 Rule 12 Opinion (*Ploss I*).** Plaintiffs cite the Court's 2016 Rule 12 decision *passim* in their brief, and claim that it "*expressly held* that *Kraft sent 'a false signal* through its market behavior that Kraft intended to source its wheat from the futures market.'" Opp. 24 (quoting *Ploss I* at 1059). The opinion did no such thing. *Ploss I* at 1058 (just quoting what Ploss "alleged"). But it is helpful in explaining why Plaintiffs' inability to prove either *Basic* "fraud on the market" *or* a "classic" corner is *not* the "false choice" they assert, Opp. 35–36, but rather a legal consequence of their attempt to transform regulatory claims into a class damages case.

As *Ploss I* explains, the futures positions at issue in this case are regulated by CME and CFTC rules, and are the frequent subject of regulatory actions. *Ploss I* at 1059, 1061. But because private actions must meet standing and damages requirements regulatory actions need not, private class claims for manipulation are typically confined to "classic" corner or squeeze cases that present the kind of facts necessary to *connect* an alleged long position manipulation (or other deviation from CME rules or "market norms") to price injury for an entire class of futures holders. *Id.* at 1061. In both scenarios, it is the long position holder's *actual* (not perceived or intended) "*control of the deliverable supply*" of the commodity that confers the "market power" all of Plaintiffs' precedents treat as the *link* between the defendant's acts and class injury. *Id.* at 1061, 1065. The Court's Rule 12 opinion acknowledges this in explaining that control over "deliverable supply" is what gave the

13

long position holders in *Soybeans* and *Kohen* the "market power" to "*force*" their counterparties (shorts) into transactions at "*above-market prices*" that harmed an entire plaintiff class. *Id.* at 1061.

The opinion then notes that the claims here are *unusual* because they do "*not* allege" this "classic form[]" of manipulation based on control over "deliverable supply." *Id.* at 1061. The Court nevertheless held that Plaintiffs' claims of "non-traditional manipulation" could, taken as true, "still sustain a CEA violation" (and a derivative monopoly claim in the "futures" market) because they alleged that Kraft sent "*false signals*" of demand to that market that caused class-wide price injury. *Id*. at 1062, 1070. Contrary to Plaintiffs' revisionist history, Opp. 21–22, this alleged "false signals" theory of liability—*not* of "market power" or "flouting of market norms"—is the *only* theory that survived Rule 12 dismissal.[6] And it is the only theory the 2020 Order certified.

## II.  CLASS BRIEFING AND THE 2020 ORDER (*PLOSS II*)

*Plaintiffs' Class Briefs.* Although Plaintiffs dwell on 2019, *see, e.g.*, Opp. 24, 40, 45, 47–48, they conspicuously ignore their own class filings, which show that *they* are the ones who tried to "shoehorn" this case into the "traditional fraud on the market framework" as a way to connect the "false signal" claims that survived Rule 12 to the market prices that class members paid for futures contracts. Dkt. 238 at 7 n.1, 12; Dkt. 314 at 31, 33, 38, 71.

*The 2020 Order (Ploss II)*. Like the Rule 12 opinion in *Ploss I*, the 2020 Order (*Ploss II*) relied on "the allegations in the Complaint"—and specifically, the "false signals" theory of liability that survived Rule 12—to define the manipulation and monopoly claims suitable "for class action treatment." Mot. 13–14. It then relied on *pre-certification securities cases* from Plaintiffs' class briefs, *see supra* at 10–11, to conclude that the proposed class "could have" been harmed by the

---

[6] The Court's statement that the alleged "false signals" did not need to be in the "form of a misstatement or omission," *id*. at 1062, did not endorse a liability claim with no "false signals" at all.

alleged "false signals" under a *Basic* "fraud on the market" theory. *Ploss II* at 1013. In granting certification on this theory, the Court necessarily assumed that Plaintiffs would submit expert studies that complied with *Basic* by: (i) tying the futures price "inflation" that supposedly harmed the class to some "public" and "false signal" by Kraft; (ii) showing that the inflation reversed when the "truth" of Kraft's position was revealed; and (iii) placing class member trades in the "zone of injury" by showing they purchased at inflated prices and sold after that inflation disappeared (*i.e.*, after the truth was revealed). The Court also "assumed" these studies would be able to show "antitrust injury for all Class members." Opp. 38 n.31. But since certification, the ground has shifted under Plaintiffs' feet.

## III.   POST-CERTIFICATION DEVELOPMENTS

*May 2020 Post-Certification Schedule.* Plaintiffs say the "parties agreed" in May 2020 to the phased jury trial and unspecified "claims" proceedings they urge in their current brief. Opp. 5. That is incorrect. The May 2020 schedule referenced "post-trial proceedings," Dkt. 357 Ex. A, because it was entered on the heels of the 2020 Order that Plaintiffs obtained by promising to construct an "aggregate damages" model, Dkt. 238 at 11, that would enable the kind of "mechanical" claims proceedings that occur in traditional securities cases, *Ploss II* at 1016. But when it became clear in 2021 that they could not deliver on this promise, Kraft *specifically objected* to the earlier proposed trial protocol. Dkt. 423.

*Post-Certification "False Signals" Discovery*. The post-certification discovery record that dismantled Plaintiffs' case also dismantles every argument in their brief. They spend pages arguing that the 2020 Order "rejected" the same "false signals" defenses in Kraft's motion, Opp. 53–54, and that the 2020 Order and preceding Rule 12 decision "rejected" the "same loss causation" argument Kraft makes now, Opp. 32. But as detailed above, those orders did no such thing. Nor could they,

because in January 2020 Plaintiffs had *not even identified* what the alleged "false signals" *were*, much less explained how they moved market prices in ways that caused redressable harm to Plaintiffs' class. Indeed, in December 2020—nearly a year *after* the 2020 Order issued—Plaintiffs *still would not say* ███████████████████████████████████████████████████ Dkt. 573-9 at 9. They deferred the entire issue of "falsity" to their experts. *Id.* at 21.

     *Merits Expert Reports.* When Plaintiffs finally served their expert reports, their expert (Professor Craig Pirrong) opined ████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ Dkt. 573-1 at ¶¶ 158, 323–33. Pirrong said this "false" demand signal caused "artificial" prices that actually harmed all class members. But these theories collapsed around a simple discovery request. *Id.* at ¶ 215. Kraft subpoenaed the CME for the names of 2011 traders to see: (i) if other large long positions were held by wheat "consumers" (mills or exporters) who could have "signaled" the "load out" threat that supposedly inflated 2011 prices, as Kraft was alleged to have done; and (ii) if class members' trading data would show the losses Plaintiffs claimed. Mot. 19–22.

     *New "Unmasked" CME Data.* Plaintiffs' brief whistles past the graveyard in asserting that the "CME large trader position data is not new," and relegating to a footnote the fact that the data Kraft obtained in 2021 was "*unmasked*"—*i.e.*, large position holders' names were identified along with class member trading accounts—while Plaintiffs' class certification data was "masked." Opp. at 7 & n.10. But the bodies of their class case are buried in that footnote for two reasons that compel decertification now.[7] *First*, the "unmasked" data show ████████████████████████

---

[7] Plaintiffs' assertion that *Kraft* improperly delayed in getting this information, Opp. 7, is false. It is *Plaintiffs'* burden to support class certification, but they refused to request the data necessary to assess their claims.

████████████████████████████████████████████████████—*just like Kraft*.

*See* Mot. 19–20. This revelation eviscerated Plaintiffs' theory that *only* Kraft's long position could have sent a "false signal" of consumption demand that corrupted "publicly observable" 2011 CME "order flow." Dkt. 573-1 ¶ 198. That was a huge problem for them, because without a "public" and "false signal" unique to Kraft, Plaintiffs had no signals to study under *Basic*.[8] *Second*, the unmasked data is, critically, what allowed Kraft (and later Pirrong) to examine class members' accounts and determine whether those members actually suffered any injury—or whether, instead, they profited from any artificiality by selling more than they bought. This data produced the bombshell injury statistics that require decertification now.

**Daubert *Proceedings and Order (Ploss III).*** Last year, the Court admitted the portion[9] of Plaintiffs' expert work purporting to show price movements associated with the kind of "market power manipulation" observed in corner and squeeze cases. *Ploss III* at *7–9. But as Plaintiffs have previously conceded, Dkt. 573-1 ¶ 116, this case does *not* involve the facts these precedents require. Mot. 6. The Rule 23 problem for Plaintiffs now is that they have no evidence of *either* theory of liability this Court recognized as necessary for class damages claims. The *Basic* "fraud on the market" theory the 2020 Order endorsed was a pig in a poke, because the post-discovery record contains no *Basic* studies. *Ploss II* at 1012–13. And Plaintiffs' replacement studies were modeled on studies of corner and squeeze conduct that Plaintiffs do not (and cannot) allege in this case. So their Rule 23 proof is the Frankenstein's monster of class models: an amalgam of

---

[8] Because Kraft's long position was indistinguishable from others in the 2011 "order flow," the alleged "false signals" here, Opp. 3, 27, are even more "generic" than those in *Goldman*, which were traceable to the bank.

[9] Plaintiffs' statement that the Court "denied Kraft's *Daubert* motions," Opp. 1, is inaccurate. The Court granted in part the motion to exclude Pirrong's testimony. *Ploss v. Kraft Foods Grp., Inc.*, 2022 WL 16540179, at *11 (N.D. Ill. Oct. 28, 2022). The "market power" studies that were admitted, *id.* at 16–21, require decertification for the reasons herein, and the Court's exclusion of other opinions support summary judgment for Kraft, Dkt. 621 at 33–36.

methodologies that, admitted or not, is a dysfunctional caricature of the work it purports to apply. That is fatal to class certification because Rule 23 standards are different than *Daubert*. Mot. 7–8, 23–24. Rule 23 is not about whether a study should be admitted for challenge at trial. Rule 23 is about whether an admitted study provides the type of proof necessary for a class case to get to trial.

## ARGUMENT

The current record fails every Article III and Rule 23 test for class litigation.

**I.** *TRANSUNION* **REQUIRES DECERTIFICATION BECAUSE THE RECORD SHOWS THAT OVER HALF THE CLASS HAS NO REDRESSABLE INJURY**

*TransUnion*'s holding is simple. Class certification is like a tarp under which large numbers of plaintiffs are sometimes permitted to litigate in federal court. But if a court looks under the tarp before trial and sees that the class is full of members who suffered no individual justiciable injury, the class cannot proceed to trial under cover of the certification to obtain judicial relief on any issue. *TransUnion*, 141 S. Ct. at 2203–04. The reason is that any judgment for the uninjured plaintiffs would violate Article III, as well as the defendant's due process (and, here, Seventh Amendment) rights to be held liable only for justiciable harm it actually caused. Mot. 1–4. The most "material" development since the 2020 Order is the admission by Plaintiffs' own experts that the 2020 certifications here cover a class full of scarecrows, more than half of whom cannot prove a justiciable injury on the record now before the Court. *See supra* at 1 & n.3. Plaintiffs do not—and cannot— dispute these expert admissions. Indeed, in 60 pages, they do not say one word about their own experts' testimony that at least "38 percent of Class Members *benefited* from" the very price "artificiality" they purport to challenge. Instead, they make up an injury that violates decades of Supreme Court precedent and bears no relation to any statutory claim or "theory of liability" in their complaint or the U.S. Code. They say this case presents "trial-ready" proof of class-wide injury from Kraft's "*flout[ing] of market norms*" because all class members "*could have*" lost money on

18

their "initial" 2011 contract purchases even if the record now shows many of them actually profited. Opp. 2-3, 19-21.

The obvious litmus test for whether these newly minted theories can survive *TransUnion* is whether a verdict in their favor would "redress" the "injury" they assert. 141 S. Ct. at 2203–04. The answer is no for the reasons Plaintiffs' own experts admit: ███████████████████████

███████████████████████████████████████████████████

███████████ Dkt. 573-3 at 173:23–174:19, 187:10–16. This point distinguishes all of Plaintiffs' "netting" arguments about whether "damages" on one position or security need or should be "offset" by profits on another. Opp. 15, 45–46, 49. Here, the profit and loss is all on the *same* prices and *same* purchases that define the class. *See* Dkt. 573-5 ¶¶ 225–29. The 2011 and 2012 unmasked data on net "artificiality" in this case also dispose of Plaintiffs' existential arguments about whether class members "could have" been harmed under *pre*-certification precedents and standards that Plaintiffs admit apply "at the outset" of a Rule 23 case. Opp. 16. This case is no longer "at the outset," and both parties now agree that an enormous percentage of the class came out ahead (at least 38%) *even if all of Plaintiffs' "artificiality" allegations are true*. *Id.* at 9–12, 16.

None of Plaintiffs' authorities can save this case from decertification on this record. Opp. 9–10, 48–50. To start, all of these authorities pre-date *TransUnion* and the Seventh Circuit's decision in *Moss*, which says "the advent of *TransUnion* sets the stage for a renewed examination of the intersection of the demands of Article III and the requirements of Rule 23." *Moss*, 20 F.4th at 379 n.7. Indeed, many of Plaintiffs' authorities pre-date the Supreme Court's 2011 decision in *Dukes* that clarified the class action limits that compel decertification here. Opp. 13–15, 29 (citing *Kohen*, 571 F.3d at 676–77 and *Schleicher*, 618 F.3d at 686–87). Further, even the cases decided after *Dukes*—notably *Messner*, 669 F.3d 802, *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir.

2014), and *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir. (2015)—cite *pre*-certification standards that Plaintiffs admit (in a footnote) *TransUnion* itself describes as "*distinct*" from the *decertification* posture at issue here. Opp. 13 n.12; *see also id.* 8–15. And in any event, these cases still recognize that certification is improper if it becomes "*apparent* that [the class] contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen*, 571 F.3d at 677. That problem may not have been "apparent" here in 2020, but it is undisputed now.

Plaintiffs' response to this watershed of Supreme Court and Seventh Circuit authority in Kraft's favor is a Ninth Circuit decision that upheld *initial* certification of a class that "'*potentially* include[d] more than a *de minimis* number of uninjured class members'"—specifically, "28%" who may have "suffered no net damages." Opp. 12 (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022)). But *Olean* supports Kraft, not Plaintiffs. As Plaintiffs' own quotes make clear, the Ninth Circuit said the initial certification in *Olean* could survive *only* "so long as common issues *still predominate[d]*" on liability *and* "damages" litigation of the single "class-wide overcharge to the Tuna Purchaser[]" plaintiffs. Opp. 12 (quoting *Olean*, 31 F.4th 651, 669, 681–82 n.31). In other words, the opinion concedes that the class should *not* remain certified where, as here and in *TransUnion*, the post-certification record *shows* that the number of undamaged class members skyrockets beyond "28%."

Plaintiffs' other out-of-circuit cases also present no basis for avoiding decertification here. *See* Opp. 10 (citing the pre-*Dukes*, pre-certification S.D.N.Y. decision in *In re Amaranth Natural Gas Commodities Litigation*, 269 F.R.D. 366, 379–80 & n. 97–99 (S.D.N.Y. 2010) for the proposition that "the purchase of a commodity futures contract *at a manipulated price* is sufficient to establish injury"). Indeed, the Second Circuit decision in *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006), supports Kraft. Opp. 15. Citing Seventh Circuit law, *Denney* agrees that "*no*

20

*class may be certified that contains members lacking Article III standing*." *Id.* (citing *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (affirming a district court's refusal to certify a class that was "so amorphous and diverse" that it was not "reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting some relief")).[10] The prior rulings in this case accord. *See Ploss I* at 1075 ("[T]he CEA's provision for private rights of action *does* require actual damages."); *Ploss II* at 1017–18. As Plaintiffs concede, this Court's orders allowed their claims past initial Rule 12 and Rule 23 determinations because Plaintiffs "alleged" that they represented a class of traders who "all … lost money" as a result of prices "caused by Kraft." Opp. 52. Plaintiffs' observation that the "CEA does not define actual damages," Opp. 51, is irrelevant because they admit the Supreme Court says such damages must be "redress[able]" by a judgment in claimant's favor, *id*. But Plaintiffs' own studies do not show such damages for a vast portion of their class. Accordingly, they lack the Rule 23 proof required for a private damages class action.

## II.   *COMCAST* REQUIRES DECERTIFICATION BECAUSE PLAINTIFFS' ONLY COMMON PROOF IS NOT CONSISTENT WITH THEIR LIABILITY THEORIES

The grounds for decertification here go beyond the Article III issues in *TransUnion*.[11] Rule 23 requires decertification if class evidence of causation and damages is *not* "consistent with [plaintiffs'] liability case," and does *not* prove "only those damages attributable to" the liability theory "accepted for class-action treatment." *Comcast*, 569 U.S. at 36. This test is met here for reasons

---

[10] Plaintiffs cite *Denney* for the proposition that "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." Opp. 15. But in *Denney* the class members still faced the actionable "risk" described in *TransUnion*: namely, the risk of an actual harm that could still "materialize" (in *Denney* in the form of a tax "penalty"). 443 F.3d at 265. Plaintiffs' reliance on *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, a Rule 12 decision, fails for the same reason: harm could still have materialized. 2017 WL 3600425, at *9 (S.D.N.Y. Aug. 18, 2017); Opp. 15. That possibility is not present here, where class members' risk of harm from their 2011 contract purchases "materialized"—or not—by the spring of 2012.

[11] Plaintiffs' argument that Kraft did not make "standing" arguments in 2019 or 2020, Opp. 12, fails for the reasons above. Justiciability issues cannot be waived, and Kraft did not have the current record—or *TransUnion*—in 2019 or 2020. That is the point of *decertification* review. Opp. 5, 23, 36, 38, 52, 54-55, 58.

even stronger than in *Comcast* itself. The only "liability case" the 2020 Order "accepted for class-action treatment," *Comcast*, 569 U.S. at 35–36, is the "fraud on the market" theory from *Basic*. *Ploss II* at 1013. But Plaintiffs *disclaimed* that theory, and abandoned any *Basic* study, last year. Dkt. 573-10 at 126:20–127:1; Dkt. 573-2 ¶ 94. Decertification is thus required under *Comcast*.

In an attempt to avoid this result, Plaintiffs' brief tries to walk back their *Basic* disclaimers and say the studies they admitted last year *did* do some version of a "fraud on the market" (FOTM) study, just not one that had to comply with the requirements that the Supreme Court laid out in *Basic* itself and reaffirmed in *Goldman* in 2021. Opp. 21–22. Specifically, they say "[n]othing in *Goldman* addresses the FOTM theory applicable to market manipulation claims where, as here, no misstatement (or mere 'front-end' price impact) and no corrective disclosure (or discrete 'back-end' price drop) is alleged." Opp. 21–22. This argument turns the law (and 2020 Order) on its head. There is no such thing as a "FOTM theory" that can connect "market manipulation claims" to class-wide price injury *without* the misstatement-related price evidence Plaintiffs describe. This Court's orders and the Supreme Court's cases explain why. To connect the alleged manipulation (here "false signals") to the inflated price class members allegedly paid for their futures contracts, Plaintiffs need to show that they paid a contract price inflated by Kraft's alleged signals *and* that they were actually harmed by the purchase because they paid more price "artificiality" on the contract than they received when they sold it. *See id*. That is the "simple logic" the 2020 Order and the Supreme Court's cases (in *Basic*, *Dura* and *Goldman*) say a *Basic* study must reflect. Mot. 11 (citing cases).

Plaintiffs cannot avoid *Comcast* decertification by relying on new expert studies that abandon these *Basic* requirements. Plaintiffs sought—and won—certification under the "traditional" *Basic* fraud-on-the-market theory for a reason. Dkt. 311. Their class claims require them to prove that Kraft's alleged "false signals" were the *cause* of the "artificial prices" at which class members

"transacted" futures contracts "*to their detriment*." Opp. 52; *Ploss II* at 1009–11; Dkt. 502 at 17–19. But they did "not allege" (and cannot prove) that Kraft had the kind of "classic" supply-based "market power" from which courts in corner and squeeze cases can *infer* that the defendant's position caused "above market prices" that injured the class. *Ploss I* at 1061–63. The "traditional" *Basic* study of the alleged "false signals" addressed in the 2020 Order was the only way to prove that connection. But that is exactly the proof Plaintiffs concede the current record does *not* contain. Opp. 18–21; 50; 59. The "*Daubert*-admitted studies" they extoll in their brief use methods adapted from precedents that test "classic" corner and squeeze conduct that Plaintiffs do not allege here, did not attempt to certify under Rule 23, and cannot prove as a factual matter. As a result, their only common evidence of class injury (their admitted event study) is not "consistent" with any viable— much less certified—theory of liability in this suit, and certainly does not measure only actual and redressable "damages attributable" to the *Basic* theory the 2020 Order actually "accepted."

The *Comcast* problem with Plaintiffs' monopoly claim is equally clear. Plaintiffs' complaint-stage allegation that Kraft monopolized the "futures contract market" was at least theoretically consistent with monopoly law in alleging that the "market" Kraft allegedly monopolized (the "futures market") was the same market where the class experienced price injury. But that theory fell apart in discovery. *See* Dkt. 573-6 ¶¶ 221–31. So Plaintiffs switched to the idea that Kraft's futures position allowed it to "monopolize" supply in the CTD market for physical contract deliveries during the last two weeks of the class period. This theory has many fatal problems. But the *Comcast* problem is that Plaintiffs do not have any common proof of antitrust injury that is "consistent" with this theory of monopoly. They have no record of who traded in the "CTD market," or how prices or competition were harmed in that market, or how any monopoly in that market caused the class to suffer direct antitrust damages in the "futures market."

### III.  *AGC* REQUIRES DECERTIFICATION BECAUSE PLAINTIFFS DO NOT HAVE COMMON PROOF OF ANTITRUST INJURY

For the reasons above, Plaintiffs have no choice but to argue that the market "relevant" to their monopoly claim is the "CTD market," but the market in which they claim "damages" is the "futures market."  Dkt. 573-15 ¶ 307; Opp. 38–43.  Plaintiffs say that is acceptable because their "participation" in the "CTD market" is not "a requirement" for recovering antitrust damages in the "related" futures market.  Opp. 38.  But that argument is foreclosed by *AGC* and other cases holding that prices in "related" markets require specific analysis of their relationships to address the antitrust injury *element* of a monopoly claim under Rule 23.  *AGC*, 459 U.S. at 534–35; *see also Ohio v. Am. Exp. Co.*, 138 S. Ct. 2275, 2285 (2018); *In re London Silver Fixing, Ltd. Antitrust Litig.*, 332 F. Supp. 3d 885, 908 (S.D.N.Y. 2008) (rejecting antitrust liability based on injury to traders in related markets).  Plaintiffs do not cite a single case to the contrary.  Opp. 38–40 (misrepresenting *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) and *Deslandes v. McDonalds USA, LLC*, 2021 WL 3187668 (N.D. Ill. July 28, 2021)).[12]  This mismatch between their relevant market and proof of antitrust injury presents another ground for decertification under *AGC* as well as *Comcast*, which stressed that "any model" of class injury "must be consistent with its liability case, *particularly with respect to the alleged anticompetitive* effect of the [alleged] violation."  569 U.S. at 33.

---

[12] Both of these cases required proof that plaintiffs *participated* in markets the defendants allegedly monopolized.  *Exhaust* merely found that the *monopoly existed* in multiple *geographic* markets for the product in issue, 223 F.R.D. at 513, but Plaintiffs do not (and cannot) show any "monopoly" in the "futures" market here.  *Deslandes* was a Rule 23 case that directly supports decertification here, and denied even initial certification because the many geographic markets in which the plaintiffs participated were *too diverse* to support class adjudication of an antitrust claim.  *See* 2021 WL 3187668, at *13.  *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918 (7th Cir. 1995) and *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) are likewise distinguishable because they involved "related" (futures and cash, not futures and "CTD") markets linked by price and participation facts that Plaintiffs do not have on the CTD market here.  Opp. 39.

24

## IV.    RULE 23(A) REQUIRES DECERTIFICATION BECAUSE PLAINTIFFS CANNOT SHOW TYPICALITY, ADEQUACY, AND COMMON PROOF OF LIABILITY

Rule 23(a) and new Seventh Circuit cases applying it also require decertification here.

### A.    The Named Plaintiffs Are Not Typical or Adequate Class Representatives

Plaintiffs do not dispute that the 2020 Order was mistaken in concluding that "the claims of the named Plaintiffs are identical" to "those of the proposed class members," *Ploss II* at 1012, or that it was mistaken that "all of the Plaintiffs" in the class "lost money" on their futures contracts, *Id*. at 1009, 1011.  They also do not dispute that *five of the eight* named plaintiffs have no proof of redressable injury, and thus have no standing to proceed under *TransUnion,* which holds that plaintiffs must "maintain their personal interest in the dispute at all stages of litigation." *TransUnion*, 141 S. Ct. at 2208.  Plaintiffs instead argue that at least the representatives who claim contract "losses" can try this case on behalf of the class.  *See* Opp. 43–47.  But that argument fails for at least three reasons.

*First*, it violates *TransUnion*'s holding that a named plaintiff who has standing cannot lawfully represent a class full of *uninjured* class members at trial, even on claims that (*unlike* the claims here) authorize "statutory" as well as "actual damages."  141 S. Ct. at 2208.  The Supreme Court held that such a trial would run afoul of Article III before even getting to the threshold Rule 23 issue of "typicality."  *Id.*  Plaintiffs ignore this and just cite the *pre*-certification statement in *Kohen* that "as long as one member of a certified class has a *plausible claim* to have suffered damages, the requirement of [Article III] standing is satisfied."  Opp. 13.  But this standard, which *Kohen* applied only in the *pre*-certification posture *TransUnion* expressly describes as "distinct" from the posture here, cannot overcome *TransUnion's* prohibition on the scarecrow class trial Plaintiffs now seek.

*Second*, there is no "typical" claim on which even the allegedly damaged named Plaintiffs could represent current class members.  The named Plaintiffs have disclaimed reliance on any of

Kraft's alleged "signals." *Ploss II* at 1016. They did not do the *Basic* model they said would connect Kraft's alleged "false signals" to class-wide losses on futures contracts (no Plaintiff had options). *Compare Ploss II* at 1017–18 *with* Dkt. 573-10 at 353:20–21 *and* Dkt. 573-10 at 126:20–127:1. The new studies they submitted do not provide that connection as evidenced by the number of uninjured members they sweep into the case  And the record does not contain any common evidence that they suffered antitrust injuries that are typical of those that could be caused by the "CTD market" monopoly they allege. Accordingly, they have no claims that are "typical" of class members.

     *Third*, the facts above highlight the inherent conflicts and individual "substantial defense[s]" that prevent the named Plaintiffs from adequately representing the certified classes. *Santiago*, 19 F.4th at 1018. These conflicts go well beyond the individualized injury and damages defenses that compel decertification under *TransUnion*. *See* Opp. 44 (conceding the named Plaintiffs held "different futures positions and may have differences [sic] damages" than the class members they purport to represent). To the extent Plaintiffs still allege "false signals" (rather than "flout[ing] of market norms"), their theory of "falsity" is that Kraft "knew" something about December 2011 delivery locations that class members did not, which raises individual defenses even among futures holders. Dkt. 573-1 ¶¶ 44, 116, 121, 124; *see* Mot. 10, 18, 34.[13] Further, Plaintiffs admit ███████████ ██████████████████████████, Dkt. 573-6 ¶¶ 381–83 (citing Dkt. 456-2 (Ex. 47) ¶ 328). And even accepting that any "options" within the class definition "derive[d] their value from . . . futures," Opp. 41, Plaintiffs do not show how they "'possess the same interest and

---

[13] In real *Basic* cases, the "false" signals concern information that is known to the defendant, but not to the market. That is what allows courts to presume that if the statement or signal was "public," the market relied on the falsity by paying the market price. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 429 (7th Cir. 2015). The "internal" information Plaintiffs cite here, Opp. 6, 9, is *not* like that. They say Kraft's signals of "economic" demand for wheat delivered from contract silos was "false" because Kraft somehow "knew" in November where its counterparts would deliver in December. Mot. 10; *see* Opp. 24–25. But Kraft had no better information about that than class members. Mot. 10, 18, 34–35 (citing sources).

suffer[ed] the same injury as" options holders. *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997); Dkt. 453-10 ¶¶ 7-13. Even in securities cases that include options representatives, courts have found them "atypical and inadequate" where their positions would "introduce factual issues irrelevant to stockholder class members, like strike price, duration, maturity, volatility and interest rates, and [thus] subject the class to unique defenses, causing unnecessary conflict." *In re Elan Corp. Sec. Litig.*, 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009); *Andrada v. Atherogenics*, 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005). That is the case here. *See* Mot. 27–30. And the same type of conflicts would prevent the named Plaintiffs from adequately representing class members on monopoly claims that focus on a "CTD market" that existed during a portion of the class period when they had no positions at all. *See* Part III *supra*; Mot. 27–30; *Santiago*, 19 F.4th at 1019. Plaintiffs' pursuit of a class trial despite these obvious problems raises the same "adequacy" issues as the cases in the motion, Mot. 27–30, and that this Court cited in *Deslandes*, 2021 WL 3187668, at *14–15.

### B. The Current Record Fails Rule 23(a) Commonality Requirements

Plaintiffs' brief also confirms that the record fails Rule 23(a)'s commonality requirements.

#### 1. There Is No Common Proof of Class-Wide Injury

Plaintiffs' claims require decertification because the only common "injury" they now cite— an "overpayment" at the moment of contract purchase, Opp. 14, 18 & App. 3—is not justiciable for the reasons above, and because it violates the Supreme Court's definition of injury in *Basic* itself: buying high and selling low on either side of a "public" false signal to the market. *Goldman*, 141 S. Ct. at 1957–58; *Dura*, 544 U.S. at 342–45.

#### 2. There Is No Common Proof of *Basic* Liability

Decertification is independently required because the current record does *not* provide

common proof that Kraft sent "false signals" to the "futures market" that were both non-"generic" and "public" enough to support the inference that they caused price movements that harmed the class. *Ploss II* at 1012–13. The common proof that Rule 23 and the 2020 Order required was the "traditional" *Basic* study in Plaintiffs' own cases. *Id.* (citing *Schleicher*, 618 F.3d at 684*; Groupon*, 2015 WL 1043321, at *8–9); Dkt. 238 at 12 (citing *Schleicher*, 618 F.3d at 684; *Groupon*, 2015 WL 10343321, at *11); Opp. 30 (citing *Dura*, 544 U.S. at 342; *Glickenhaus*, 787 F.3d at 422; *Schleicher*, 618 F.3d at 686–87). And as the 2020 Order makes clear, it expected Plaintiffs' expert to show that "the **scheme artificially inflated futures prices**" based on a ***Basic*-style "event study"** that tied market prices to "pertinent **publicly reported events**." *Ploss II* at 14.

Plaintiffs spend pages arguing that other "common" evidence—mostly their admitted expert studies but also the catalogue of various "signals" on pages 3 and 27 of their brief and the cherry-picked emails they quote on pages 19 to 21—can make up for their failure to do the *Basic* study above. But they cannot, because none of this evidence does the substantive work that a *Basic* study would do to connect the alleged statutory violations here to class-wide injury. The "signals" Plaintiffs discuss, Opp. 3, 27, are not remotely "public" or non-"generic" enough to allow a jury to find that they caused the global market price inflation that serves as the starting point for Plaintiffs' standing and damages claims. That is obvious if the "signals" are compared to the defendant-specific and public signals set forth in the jury verdict forms from the "leakage" cases Plaintiffs cite. Opp. 29–30 (citing *Glickenhaus*, 787 F.3d at 422 ).[14] Further, Plaintiffs concede that their admitted

---

[14] *Glickenhaus* involved a "leakage model" of "14 separate disclosure events" used to measure the "cumulative net [price] effect" of alleged false statements. *Glickenhaus*, 787 F.3d at 416, 422. The Seventh Circuit upheld the study of multiple *identifiable and public disclosures* (of falsity and truth) under *Basic*, but remanded for a new trial because the model did not "adequately account[] for the possibility that firm-specific, nonfraud related information may have affected the [price]." *Id.* at 423. *Schleicher* similarly applied *Basic's* test to leakage disclosures. 618 F.3d at 686–87.

studies do *not* contain the benchmarks of truth, falsity, and trade timing, *id.* 29–30, that *Goldman* and every other *Basic* case requires to show what the Supreme Court defines as "actual damages." Mot. 11, 36. And Plaintiffs cannot cure that with a word salad of cites to different liability theories:

> The case here is not . . . a pure simple fraud-on-the-market where things happen and then there's a correction in the price after the truth comes out . . . and Dr. Irwin acknowledges that this is one of the reasons why you would use the *Detecting Manipulation* article, in which the dribs and drabs of Kraft's uneconomic conduct and the manifestation that its signal is happening during November, come out slowly over time.

Opp. 31 (ellipses in original; quoting Dkt. 554 at 40:23-41:16). To start, and as detailed above, the 2020 Order certified the claims here under the "traditional" FOTM theory set forth in the cases in *Plaintiffs' own class briefs*. *See supra* at 14–15; *Ploss II* at 1015, Dkt. 238 at 12 (citing *Schleicher*, *Groupon*); Dkt. 314 at 33 (citing *Halliburton I*). Further, this Court's orders make clear that Plaintiffs had to rely on *Basic* because they did not even plead the "classic" (corner or deliverable-supply based) theories of liability that *Detecting Manipulation* and Irwin address, and that *Plaintiffs* "disingenuous[ly]" mix into the quote above. *Ploss I* at 1061; *cf.* Opp. 31 & n.25. The upshot of their argument appears to be that the Court should rely on a theory of liability ("classic" market power) that Plaintiffs did **not** plead or get certified (*see Ploss I* at 1062; *Ploss II* at 1013) in order to excuse their failure to satisfy the only theory (*Basic* "false signals") they **did** plead and get certified. Opp. 35–37. That makes no sense, and Plaintiffs cite no authority for such a bait-and-switch now.

In any event, they obtained *Daubert* admission of their studies because the studies employ methods from *Detecting Manipulation* and other corner/squeeze cases. *Ploss III* at *2. But such studies do not satisfy Rule 23 here, because they support a connection between long futures manipulation and class injury *only* where the defendant held "a large long futures position" while "*simultaneously*" acquiring a very large ("great white" sized) share of "market power in the deliverable supply of the underlying good." Mot. 24 (quoting sources); *Ploss I* at 1061. Those facts are not

present in this case. And Plaintiffs cite no precedent for applying market power studies as Rule 23 proof without such facts, *i.e.*, where the studies just measure market prices coincident with allegedly "uneconomic" futures conduct based on "signals" that are common to many large long positions. This Court cannot be the first to do so for a simple reason: Plaintiffs' studies generate prices that benefitted so many class members that crediting them under Rule 23 would result in an unconstitutional trial just like *TransUnion*.

Plaintiffs' other arguments similarly seek to turn water into wine. Their brief is filled with versions of the claim that they can prove a "FOTM theory applicable to market manipulation claims" *without* the benchmarks *Goldman* requires. Opp. 22. But as discussed above, not even the most expansive "leakage" precedents support this argument for an obvious reason: the "*Basic* prerequisites" for "class certification" are not technicalities. *See Goldman*, 141 S. Ct. at 1959. As *Goldman* and the 2020 Order explain, they are necessary to ensure the *causal connection* federal law requires between allegedly "false signals" to a public market and a presumption that traders relied on the "fraud" because it was "baked into" a market price they bought high (due to the fraud) and sold low (after the truth leaked out). *Ploss II* at 1102–13; *see also Goldman*, 141 S. Ct. at 1957–58.[15]

Plaintiffs cannot avoid decertification on the above or other grounds by slicing and dicing the claims covered by the 2020 Order's *Basic* certifications. Opp. 19–21, 53 (arguing that "Kraft's '*Basic* Liability' Arguments Concern Only Plaintiffs' CEA Section (6)(c)(1) because the Court had ruled that reliance is not an element of Plaintiffs' Section 9(a)(2) or Sherman Act claims").[16]

---

[15] Plaintiffs' focus on *Goldman*'s statement that "plaintiffs need not **directly** prove price impact," Opp. 36, is a red herring. The point is that a proper *Basic* model obviates the need for "directly prov[ing] price impact." *Id*. But where plaintiffs have no such model, their failure to provide **either** "direct" **or** "indirect" proof of class-wide injury does not warrant a trial. It warrants judgment for the defendant. So, too, where a plaintiff's evidence is so deficient it does not even get to the "mismatch" issue (between misrepresentation and disclosure) addressed in *Goldman*, 141 S. Ct. at 1955. Opp. 22; Mot. 5, 11, 16, 21-26, 32–36, 44, 48.

[16] Plaintiffs also miss the mark in arguing that Kraft made no *Goldman*-like "generic" statement objections in 2019, Opp. 21, when Kraft did not have *Goldman* or the unmasked data showing its signals were generic.

Plaintiffs' own filings—including their *Daubert* brief—confirm that their "false signal" allegations and the 2020 Order's "fraud on the market" certifications apply to ***all*** of their manipulation claims. *See* Dkt. 502 at 17–19. Specifically, they confirm that the *Basic* certifications apply to the Section 9 claim that Kraft caused "artificial prices" by sending "'a *false signal* through its *market behavior* that Kraft intended to source its wheat from the futures market.'" Dkt. 502 at 17. As Plaintiffs admitted last year, this is the "*same exact theory which the Court discussed in granting class certi-fication*." *Id.* That is because "artificial" price claims "based on market activity rather than overt misrepresentations" still require proof that the "market relies" on the activity "to signal *true,* rather than manipulative, demand." *Ploss I* at 1059 n.11; Dkt. 502 at 18–19 (same). Accordingly, to create "artificial" price inflation, demand signals for the underlying commodity must be "*false*." *Ploss I* at 1055. That was the theory the 2020 Order certified for all of Plaintiffs' manipulation claims, and that required the *Basic* study the Order also cited as common proof of monopoly. *Ploss II* at 1015–16.[17] For all of these reasons, the record here (even more than in *Howard*) shows that the common evidence of the certified "theory of liability"—the *Basic* "glue" of the 2020 Order, *Ploss II* at 1012–13—has become "peripheral" or dissolved altogether, Mot. 37.

### 3.     Plaintiffs' Brief Confirms There Is No Common Proof of *Kohen* Liability

Plaintiffs cannot make up for their failure to provide common evidence of the only "theory of liability" (*Basic* fraud on the market) in the 2020 Order, *Ploss II* at 1018, by relying on expert studies that apply "classic" market power methodologies that do not fit the facts or theory of liability

---

[17] Plaintiffs argue that their failure to provide *Basic* (or other) evidence "actually *prov[ing]* loss causation" is excusable because such evidence is not necessary "in order to *obtain* class certification." Opp. 32. They miss the point. *Decertification* is required here because the record *shows* that Plaintiffs have no evidence even "capable" of satisfying the Rule 23 test for connecting Kraft's actions to class-wide injury.

in this case, *see Ploss I* at 1062;[18] Dkt. 573-14, App. A; Dkt. 573-6 ¶¶ 47–49. Plaintiffs do not dispute these distinctions. Instead, they say requiring them to provide common evidence of either a *Basic* or *Kohen* theory of class certification is "a false choice between two options that are independently false." Opp. 36. But it is not. It is a consequence of their attempt to turn regulatory allegations into a damages class action. As this Court's orders make clear, the *Basic* and *Kohen* theories above are the only two theories of liability that allow damages plaintiffs to connect alleged manipulation to actual injury to entire classes of futures traders. The other theories the 2016 order discussed—and Plaintiffs now channel in accusing Kraft of "flout[ing] market norms," Opp. 2, 17, 19, 22–23, 27–30—are reserved for regulatory cases. *Ploss I* at 1061–62 (citing CFTC cases).

### 4. Plaintiffs' Brief Confirms There Is No Common Proof of Antitrust Liability

Class monopoly claims require even more than the *Basic* proof Plaintiffs do not have. They require common evidence of direct and redressable harm resulting from *competitive restraints* that a monopolist foists on a relevant market. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 474-75 (7th Cir. 2020); *Verizon Commc'ns, Inc. v. Law Offs. of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004). Plaintiffs admit they have no Rule 23 proof of the "form of monopoly" the Seventh Circuit recognized in *Kohen*. Opp. 36; Mot. 6, 22, 28–41. But they cite *Ploss I* to say Kraft still had "the ability to influence prices." Opp. 36 (citing *Ploss I*). The allegations in *Ploss I* (at 1071–73) concern "futures market" monopolization Plaintiffs no longer assert. Instead, their operative theory of liability is that Kraft monopolized the "CTD" market for physical wheat deliveries, *i.e.*, the "market" for contract deliveries at locations chosen by *short position holders* that the CME matched with Kraft only at the *end* of the class period. Mot. 10. But Plaintiffs have no common proof of antitrust

---

[18] Plaintiffs' brief contains a half-hearted footnote that disputes whether "deliverable supply" refers to all commodity stock available in CME-approved warehouses. Opp. 37 n.30. It does. Mot. 22, 38–41. And Plaintiffs' contrary arguments about Pirrong's "market definition" do not change that fact.

injury to any class members in this market. *See Ohio*, 138 S. Ct. at 2285 (requiring class to provide common proof of antitrust injury by linking prices to competitive restraints in a relevant geographic and product market).[19] Nor do they explain how purported monopolization of a physical delivery market in *December* could impact futures traders in *November* who were neither buyers nor sellers in that December "CTD market." Plaintiffs respond with vague arguments about "related markets," Opp. 39, that run squarely into *AGC's* prohibition on antitrust claims based on "ripples of harm." 459 U.S. at 534. And Plaintiffs' own cases on "related market" injuries do not help them, because all of those cases involved information about prices and participation in both "related" markets that Plaintiffs do not have about the CTD market here. In fact, Plaintiffs: (i) concede there is no "repository" of information about the "CTD market," *Ploss II* at 1020; Dkt. 573-1 ¶¶ 390, 456, and (ii) admit it is ███████ to study now. Dkt. 573-10 at 326:24–327:17. These points distinguish all of their cases, Opp. 39 (citing *Sanner*, 62 F.2d at 926–29; *Loeb*, 306 F.3d at 484), which require such Rule 23 proof to do "case-by-case analysis of [each] plaintiffs' harm, the alleged wrongdoing by the defendants, and the relationship between them" to determine whether the connection between the alleged "CTD" monopoly and "futures" prices is "too attenuated" to qualify as antitrust injury. *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395–396 (7th Cir. 1993); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 621, 623–24 (D.C. Cir. 2019) (such evidence goes to "essential elements of" antitrust liability).

## V.  RULE 23(B)(3) REQUIRES DECERTIFICATION BECAUSE PLAINTIFFS CANNOT SHOW PREDOMINANCE AND SUPERIORITY

---

[19] Plaintiffs try to sidestep this issue by citing the 2020 Order's observation that market definition is "generally" a question "reserved for the jury." Opp. 37. But that is beside the point, because the Rule 23 problem here is not proof of market definition. It is Plaintiffs' lack of Rule 23 evidence "*capable*" of proving all elements of their monopoly claim, including antitrust injury and damages, on a class-wide basis at trial. *Howard*, 989 F.3d at 599. Plaintiffs' insistence that their (unpled) CTD market definition is not "new," Opp. 37, does not change the Rule 23 problems with it on the record now. *Ploss II* at 1015.

Rule 23(b)(3) imposes "far more demanding" standards for class certification than Rule 23(a). *Amchem*, 521 U.S. at 624. Its predominance and superiority requirements demand an especially "close" look at the evidence, *Comcast*, 569 U.S. at 34, and go beyond common questions to assess the record's "*capacity . . . to generate common answers*," *Dukes*, 564 U.S. at 350, that make the class "*sufficiently cohesive* to warrant adjudication by representation," *Amchem*, 521 U.S. at 623. Applying this test, the Supreme Court has held that decertification is required if "[q]uestions of individual damages calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34. That is plainly the case here. Ignoring the elephant in the room (their experts' admissions on uninjured members), Plaintiffs say Rule 23(b)(3) is satisfied because they "have proposed a common methodology for calculating damages for each Class member" that is "capable of quantifying the amount of net damages (if any) each Class member suffered." Opp. 16. But *Comcast rejected* a class that presented damages assurances far stronger than these.

In *Comcast*, the plaintiffs said "if they can prove antitrust impact, the resulting damages are capable of measurement and will ***not*** require labyrinthine individual calculations." *Comcast*, 569 U.S. at 37. Here, Plaintiffs have ***no*** "methodology" for calculating damages for large segments of their class ("CTD" market participants, options holders, intraday traders), and to the extent they do have a method for overnight futures contract positions, individual calculations will be "labyrinthine" and require discovery. *See* Dkt. 572-3 at 5; Opp. 48–51. Both their own experts' work, Dkt. 573-4 at Ex. 5, and Vellturo's sample, Opp. 8, show that ███████████████████████ ████ will be highly individualized. Mot. 29; Dkt. 573-3 at 148–49; Opp. 45–46. Contrary to Plaintiffs' assertion, every damages assessment required experts to decipher brokerage statements and other trading data on an individualized basis. Dkt. 573-5 ¶¶ 231–32. And even then, Kraft's expert was able to estimate net losses (*not* collectible damages) only after account specific reviews

34

*without* an assessment of any defenses that Kraft would have to litigate. *See id.*

For all of these reasons, even if the initial "overpayments" Plaintiffs cite could qualify as common harm, "individual" questions about which class members incurred redressable "damages" would still "overwhelm questions common to the class." *Comcast*, 569 U.S. at 34. It is clear that the undefined "post-trial proceedings" Plaintiffs suggest, Opp. 49–50, would *not* be mechanical or administrable without a Court or jury. They would instead require a protracted string of mini-trials that would outweigh any efficiency of further class litigation. *See Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) (reversing "class certification [that] only serve[d] to give rise to hundreds or thousands of individual proceedings"); *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007) ("[W]hen a separate evidentiary hearing is required for each class member's claim, the aggregate expense may . . . swamp the benefits of class-action treatment.").

Plaintiffs' only response is to reprise stale and inapposite procedural arguments. They say Kraft did not object to Rule 23(b)(3) superiority in 2019, Opp. 56, and it is a "speculative" concern now, Opp. 57. But Kraft did not focus on superiority in 2019 because Plaintiffs promised to provide the "aggregate damages" model, Dkt. 238 at 11, they now disclaim, Opp. 59. And the current record provides concrete proof that class litigation would "not be superior to other methods of adjudication" because "the claims of the absent putative class members would require separate evidentiary hearings to establish liability." *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 462–63 (N.D. Ill. 2013). Further, Plaintiffs' brief confirms there is no way to fix this problem, because the Seventh Circuit's prohibition on "fail-safe" classes makes it "improper" to define a class "so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner*, 669 F.3d at 825.

## CONCLUSION

For the reasons above and in Kraft's prior filings, class decertification is required.

35

Dated:  May 11, 2023

Respectfully submitted,

MONDELĒZ GLOBAL LLC and
KRAFT FOODS GROUP, INC.

/s/ *Elizabeth Papez*
Elizabeth Papez

Elizabeth Papez
Helgi C. Walker
Joshua Lipton
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8608
epapez@gibsondunn.com

Christopher Joralemon
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave.
New York, NY 10166
(212) 351-2668 (phone)

Dean Panos
J. Kevin McCall
Nicole A. Allen
Thomas Quinn
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
dpanos@jenner.com
jmccall@jenner.com
nallen@jenner.com
tquinn@jenner.com

*Attorneys for Defendants Mondelēz Global LLC
& Kraft Foods Group, Inc.*

36

## ERRATA

| Page | Original | Revised | Reason |
|---|---|---|---|
| 1 | 2020 order | 2020 Order | Grammatical |
| 2 | Citation Unintentionally Omitted | Dkt. 332, | Citation Clarification |
| 2 | "new." | "new," | Grammatical |
| 3 | *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) | *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), | Citation Clarification |
| 4 | (*Halliburton II*) | Parenthetical omitted | Citation Clarification |
| 5 | 11, *with* | 11 *with* | Grammatical |
| 6 | The first fast-track lane | The first fast-track route | Clarification |
| 7 | Opp. 29–30, | Opp. 29–30; | Grammatical |
| 7 | Opp. 60, | Opp. 60; | Grammatical |
| 7 | that those | that their new | Clarification |
| 8 | violations alleged—and | violations alleged, and | Grammatical |
| 9 | . *See* | , *see* | Grammatical |
| 11 | It also | Decertification also | Clarification |
| 12 | the "liability" theory | "theory of liability" | Quotation Clarification |
| 12 | They copied | Plaintiffs copied | Clarification |
| 13 | = *passim* | *passim* | Grammatical |
| 13 | "*a false signal* | 'a false signal | Grammatical |
| 13 | market." | market.'" | Grammatical |
| 14 | AND 2020 | AND THE 2020 | Clarification |
| 14 | prices class members paid | prices that class members paid | Clarification |
| 14 | omission, *id.* at 1062–63, | omission," *id.* at 1062, | Citation Clarification |
| 15 | addressed in Kraft's motion | defenses in Kraft's motion | Clarification |
| 19 | record shows | record now shows | Clarification |
| 19 | also disposes | also dispose | Grammatical |
| 19 | The current record fails every Article III and Rule 23 test for class litigation. | Omitted Due to Unintentional Repetition in Original | Deletion |
| 20 | 269 F.R.D. at 379–80 | 269 F.R.D. 366, 379–80 | Citation Clarification |
| 21 | ) | )) | Grammatical |
| 21 | . *Id.* | , *id.* | Grammatical |
| 22 | Mot. *Ploss II* | *Ploss II* | Citation Clarification |
| 22 | inflated the price | the inflated price | Clarification |
| 22 | this "traditional" | the "traditional" | Clarification |
| 23 | "cheapest to deliver" ("CTD") | CTD | Clarification |
| 24 | under *Comcast* | under *AGC* as well as *Comcast*, | Citation Clarification |
| 24 | in market | in markets | Clarification |

| 25 | 141 S. Ct. at 2201, 2208. | 141 S. Ct. at 2208 | Citation Clarification |
|---|---|---|---|
| 25 | *Id.* at 2208. | *Id.* | Citation Clarification |
| 26 | "false" statements or signals | "false" signals | Clarification |
| 26 | But the "internal" information Plaintiffs cite here, Opp. 6, 9, is not like that. They say Kraft's signals of "economic" demand for wheat delivered from contract silos was "false" because Kraft somehow "knew" in November where its counterparts would deliver in December. Mot. 10; see Opp. 24–25. | The "internal" information Plaintiffs cite here, Opp. 6, 9, is not like that. They say Kraft's signals of "economic" demand for wheat delivered from contract silos was "false" because Kraft somehow "knew" in November where its counterparts would deliver in December. Mot. 10; see Opp. 24–25. But | Clarification |
| 26 | deliver. | deliver in December. | Clarification |
| 26 | *See* Mot. 35 (citing Dkt. 573-1 ¶ 456; Dkt. 573-2 ¶ 261). | Mot. 10, 18, 34–35 (citing sources). | Citation Clarification |
| 27 | Mot. 28–29. | Mot. 27–30. | Citation Clarification |
| 27 | Mot. 28–29. | Mot. 27–30. | Citation Clarification |
| 27 | Citation Unintentionally Omitted | Mot. 27–30 | Citation Clarification |
| 28 | a proper *Basic* case would | a *Basic* study would | Clarification |
| 28 | Opp. 27, | Opp. 3, 27, | Citation Clarification |
| 29 | of references | of cites | Clarification |
| 29 | (quoting | (ellipses in original; quoting | Citation Clarification |
| 30 | applying them | applying market power studies | Clarification |
| 30 | without | *without* | Emphasis |
| 30 | for a simple reason | for an obvious reason | Clarification |
| 30 | grounds slicing | grounds by slicing | Clarification |
| 30 | ***directly*** prov[ing] | directly prov[ing] | Emphasis |
| 31 | on the | of the | Clarification |
| 31 | the *Basic* "glue" of the 2020 Order—has become "peripheral" or dissolved altogether. *Ploss II* at 1012–13; Mot. 37. | the *Basic* "glue" of the 2020 Order, *Ploss II* at 1012–13—has become "peripheral" or dissolved altogether, Mot. 37. | Citation Clarification |
| 32 | . *See* | , *see* | Grammatical |
| 32 | *See Ploss I* | *Ploss I* | Citation Clarification |
| 32 | Mot. 40–41. | Mot. 22, 38–41. | Citation Clarification |
| 32 | 951 F.3d 429, 451 (7th Cir. 2020) (quoting *Verizon Commc'ns, Inc. v. Law Offs. of Curtis v.* | 951 F.3d 429, 474-75 (7th Cir. 2020); *Verizon Commc'ns, Inc. v. Law Offs. of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004). | Citation Clarification |

|  | *Trinko, LLP*, 540 U.S. 398, 407 (2004)). |  |  |
|---|---|---|---|
| 33 | "related markets" that run | "related markets," Opp. 39, that run | Citation Clarification |
| 33 | RULE 23(b)(3) | RULE 23(B)(3) | Clarification |
| 33 | HAVE FAILED TO DEMONSTRATE | CANNOT SHOW | Clarification |
| 34 | require | demand | Clarification |
| 34 | ." *Amchem* | ," *Amchem* | Grammatical |
| 34 | Opp. 8, calculating | Opp. 8, show that calculating | Clarification |

## <u>CERTIFICATE OF SERVICE</u>

I, Elizabeth Papez, an attorney, certify that on May 11, 2023, I caused **Defendants' Corrected Reply Memorandum of Law in Further Support their Motion to Decertify the 2020 Classes** to be served on all counsel of record listed via the Court's ECF system.


/s/ *Elizabeth Papez*
Elizabeth Papez