**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HARRY PLOSS, as Trustee for the HARRY PLOSS TRUST DTD 8/16/1993, on behalf of himself and a proposed class, ROBERT WALLACE, NATHAN WALLACE, KEVIN BROWN, JOSEPH CAPRINO, RICHARD DENNIS, WHITE OAK FUND, LP, BUDICAK,<br><br>Plaintiffs,<br><br>v.<br><br>KRAFT FOODS GROUP, INC. and MONDELĒZ GLOBAL LLC,<br><br>Defendants. | No. 15 C 2937<br><br>Judge John F. Kness |

**MEMORANDUM OPINION AND ORDER**

This case arises from allegations that Defendants Kraft Foods and Mondelēz executed a "long wheat futures scheme" in late 2011, amassing a significant long position in December 2011 wheat futures while simultaneously shorting March 2012 contracts. Plaintiffs contend the strategy was not about securing wheat for Kraft's mills but was meant to send a false signal of intended delivery to drive up nearby futures, depress cash prices, and profit from a narrowed spread.

Named Plaintiffs sued under the Commodity Exchange Act, the Sherman Antitrust Act, and state law for the alleged price distortions. In 2020, the Court (by the previously-assigned judge) granted class certification, finding that Plaintiffs had satisfied Rule 23's requirements based on their expert's common price-impact theory.

The order defined two classes of traders in December 2011 and March 2012: wheat futures and options.

Two motions now frame the dispute: Defendants seek to decertify both classes, and they seek summary judgment on the merits. (Dkt. 571; Dkt. 588.) For the reasons that follow, the Court agrees the classes must be decertified and that Plaintiffs' CEA claims are time-barred. But the Court declines to grant summary judgment on Plaintiffs' Sherman Act claim.

In short, decertification is compelled because discovery has revealed that Plaintiffs' expert methodology does not provide a common answer to who was injured: it both fails to provide any answer on injury for a substantial number of absent class members (at least 30%), and when it does provide an answer, it is apparent that up to 44% of class members actually profited from the alleged price distortions.

Accordingly, this court decertifies both classes (as they rely on the same insufficient evidence) for failing to meet the requirements of Rule 23 of the Federal Rules of Civil Procedure. In that same vein, Plaintiffs Kevin Brown, Joseph Caprino, Robert Wallace, Nathan Wallace, and Budicak Inc. are dismissed for lack of standing. Plaintiffs have declined to propose an alternative class definition, and the Court declines to offer one itself. If the remaining Plaintiffs wish to bring forward their claims as a class action, they must propose a class definition that meets the requirements of Rule 23.

Summary judgment is warranted for Defendants regarding Plaintiffs' CEA claims—Plaintiffs brought suit after the CEA's two-year statute of limitations

expired. But summary judgment is not warranted for Plaintiffs' Sherman Act claim because genuine disputes of material fact pervade the record. Whether Kraft's market power and behavior crossed the line from licit to illicit must be decided at trial, not on summary judgment.

## I. BACKGROUND

This Opinion assumes familiarity with the facts that have been addressed at length in previous opinions. Those opinions explained in detail the contours of the wheat futures market, the alleged scheme, and the competing factual disputes between the parties. (Dkt. 113) (motion to dismiss); (Dkt. 332) (class certification order); (Dkt. 560) (order on admissibility of testimony from Plaintiffs' experts). In brief, Plaintiffs, who participated in the wheat futures market, allege that Defendants manipulated the market and attempted to influence prices by purchasing a large number of wheat futures. (Dkt. 71.)

### A. The Parties and the Alleged "Long Wheat Futures Scheme"

Defendants Mondelēz Global LLC and Kraft Foods Group, Inc. (collectively "Kraft") make up one of the largest food and beverage conglomerates in North America. Kraft requires a substantial amount of wheat for its food products; it processes that wheat primarily at its flour mill in Toledo, Ohio. (Dkt. 689 ¶ 14.) This mill is one of the largest in the world for soft wheat and can store up to four million bushels of wheat. (*Id.* ¶¶ 14, 101.) Kraft sources its wheat primarily from cash markets, rather than the futures markets.[1] (*Id.* ¶ 10) ("Kraft ended a 9 year absence

[1] A futures contract is an agreement to buy or sell a commodity at some point in the future at a predetermined price. (Dkt. 71 ¶ 27.) Traders who purchase a futures contract have a

from taking deliveries on CME/CBT SRW futures contracts."). Physical deliveries from futures trades are rare because traders often close their positions by making an offsetting trade. For example, a trader holding a long position (buyer of one futures contract) liquidates by taking a short position (becoming a seller). (*Id.* ¶¶ 48–50.) At the beginning of December 2011, Kraft's mill had an inventory of over three million bushels of wheat. (*Id.* ¶ 101.)

But in late 2011, with cash prices comparatively higher, Kraft bought 15 million bushels of wheat from the December 2011 wheat futures contracts, refused to liquidate its long position in the months leading up, and stopped buying wheat in the cash market.[2] (Dkt. 689 ¶¶ 21, 44, 52, 95.) According to Plaintiffs, who traded in the futures market at all relevant times, this sent a signal that Kraft was going to accept delivery from the futures market—driving the price of December 2011 wheat futures up and cash prices for wheat down. (*Id.* ¶¶ 14–15, 19, 25, 70.) Yet Kraft only accepted partial delivery from the futures contracts, with the remaining delivery being satisfied from the now cheaper cash markets. (*Id.* ¶¶ 69, 71–76, 95.) Kraft profited beyond cost-savings from the cash market from these trades. Having held substantial

"long" position and are obligated to take delivery and pay for the commodity at the future date. (*Id.* ¶¶ 27–28.) On the other hand, traders who sell a futures contract have a "short" position and are obligated to make delivery of the commodity at the future date. (*Id.*)

[2] Chicago Board of Trade wheat futures expire in March, May, July, September, and December of each year, and, by the date of expiration, a party must close out or satisfy its futures obligations. (Dkt. 71 ¶ 30, 33.) Traders may meet their obligations by either physically accepting or delivering the goods. (*Id.* ¶ 18.)

amounts of the open interest[3] in wheat features for December 2011, Kraft offset its long positions and simultaneously shorted March 2012 futures creating a profitable spread for Kraft.[4] (Dkt. 689 ¶ 71.) In Plaintiffs view, Kraft improperly used its substantial market power to inflate the futures price of wheat and profit from a narrowed spread between December and March.

### B. Procedural History

Plaintiffs initially brought suit alleging seven counts: (1) manipulation under Section 9(a)(2) of the Commodity Exchange Act (CEA) for the long wheat futures scheme; (2) manipulation under Section 6(c)(1) of the CEA for the long wheat futures scheme; (3) principal-agent liability under Section 2(a)(1)(B) of the CEA for the long wheat futures scheme; (4) manipulation under Section 9(a)(2) of the CEA for the wash trading scheme[5]; (5) manipulation under Section 6(c)(1) of the CEA for the wash trading scheme; (6) monopolization under section 2 of the Sherman Antitrust Act; and (7) unjust enrichment. (Dkt. 71.) Plaintiffs also sought to certify a class of all

---

[3] The total number of futures contracts that a trader has entered into but has not yet liquidated by an offsetting transaction is called the "open interest." (Dkt. 71 ¶ 31; Dkt. 689 ¶ 48.)

[4] Traders may profit from changes in "spreads," which are essentially price differentials between futures contracts that expire on different dates. (Dkt. 689 ¶ 4.) Plaintiffs argue that Kraft created a profitable narrowed spread by driving the price of December futures up while driving down the price of March futures. (Dkt. 71 ¶ 89; Dkt. 689 ¶ 71.)

[5] Plaintiffs alleged Defendants engaged in a "wash trading scheme" by causing inaccurate trading information to be published to the wheat market. (Dkt. 113 at 47–51.) A wash trading scheme occurs when an investor simultaneously buys and sells a financial instrument in order to give the false appearance of higher trading volume. (*Id.*) This creates the illusion of higher demand for the instrument. (*Id.*)

futures and options traders who purchased futures and options contracts during the specified class period. (*Id.*)

This Court previously dismissed Plaintiffs' claims ("*Ploss I*") for the wash trading scheme because Plaintiffs, among other things, did not allege "how the [] transactions impacted futures prices . . . and how the Plaintiffs were harmed." (Dkt. 113 at 47–51.) The dismissal was without prejudice, but Plaintiffs never sought leave to file an amended complaint. Plaintiffs' remaining claims for the Long Wheat Futures Scheme nonetheless survived the motion to dismiss because Plaintiffs had alleged "they were harmed from trading in December 2011 and March 2012 futures contracts as a result of Kraft's long wheat futures scheme." (*Id.* at 50.)

In support of Plaintiffs' motion for class certification, Plaintiffs submitted the opening expert report of Dr. Craig Pirrong, who opined that Defendant caused Plaintiffs' injury from artificially high prices. (Dkt. 332 at 3.) Relying on this initial report, this Court then entered an order ("*Ploss II*") certifying two nationwide classes, encompassing those who purchased futures and options contracts during the class period. (*See* Dkt. 332.) The Court accepted Plaintiff's "fraud-on-the-market" theory of liability. The theory posits that "if Kraft manipulated the prices in the wheat futures market, then *all* of the class members bought and sold contracts at manipulated prices." (*Id.* at 9.) ("In other words, the class members relied on 'misrepresentations' that were baked into the market price at the time of their transactions, rather than explicit misrepresentations directed at them specifically.") Within this fraud-on-the-

market theory, the Court found that Defendants could satisfy the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. (*Id.*)

Since *Ploss II*, the parties undertook factual discovery and then exchanged further expert reports. (*See* Dkt. 645 at 16.) Discovery revealed, that under Dr. Pirrong's model, up to 38% of class members profited from the price distortions. (Dkt. 605 ¶ 627; Dkt. 661 ¶ 132.) And a further 30% of class members' purported injuries are not captured by Dr. Pirrong's model. (Dkt. 693 at 7 n.3; Dkt. 605 ¶ 474.) Defendants now ask the Court to decertify the classes because, they argue, the current record shows that many of the Plaintiffs did not suffer harm, and those that did cannot prove their claims with common evidence. (Dkt. 617 at 12.)

Defendants also move for summary judgment. (Dkt. 588.) Defendants argue that Plaintiffs' evidence is insufficient to support their claims. (Dkt. 620 at 1–7.) Defendants contend that Kraft's actions were not deceptive and that the alleged manipulation did not cause the claimed damages. (Dkt. 620 at 2–5.) Defendants further argue that Plaintiffs' CEA claims are time-barred, that their evidence fails to prove the essential elements of their claims under the CEA and antitrust law, and that Plaintiffs' monopolization claim lacks evidence showing that Kraft had monopoly power or caused direct competitive harm. (Dkt. 620 at 5–7.) Defendants thus assert that the record does not present any genuine or material disputes of fact, and that they are entitled to judgment as a matter of law. (Dkt. 588.)

## II. DISCUSSION

This opinion proceeds in three parts. *First*, Article III is a jurisdictional requirement that "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof [] with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The undisputed record evidence reveals that a majority of named Plaintiffs and absent class members cannot show injury in fact. Claims by uninjured named Plaintiffs must therefore be dismissed.

*Second*, Article III standing for absent class members must be considered when assessing class certification under Rule 23. Plaintiffs fail to meet their burden that injury in fact is provable through common evidence. Class decertification is therefore proper. The Court declines to certify an alternative class because Plaintiffs have not provided any alternative class definition.

*Third*, Defendants are entitled to summary judgment against the remaining Plaintiffs as to their CEA claims. But they are not so entitled as to Plaintiffs' Sherman Act claim because that claim involves genuine issues of material fact which require fact-finding by a jury.

### A. Article III Standing Is Lacking for Most Named Plaintiffs

This section first outlines the legal standard for Article III standing. It then turns to discussing how mere price inflation for commodities in this case is insufficient to establish a concrete and particularized injury in fact. The section concludes by dismissing claims brought by uninjured named Plaintiffs.

*1. Legal standard for Article III standing*

To establish Article III standing, a plaintiff must show an injury in fact that is concrete and particularized and actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. Congress may identify and elevate legally cognizable harms, but it cannot wave away concreteness. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42 (2016); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–35 (2021). And standing is not dispensed "in gross": each plaintiff must have it for each claim and each form of relief. *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (citations omitted).

A plaintiff seeking damages must demonstrate a real-world, historically cognizable injury. *TransUnion*, 594 U.S. at 424–25. Monetary loss readily qualifies, but a mere statutory violation does not when it is "divorced from any concrete harm." *Id.* at 440; *Spokeo*, 578 U.S. at 341–42. Indeed, plaintiffs seeking damages that are no poorer because of the alleged conduct have no Article III stake at all. *See Thole v. U.S. Bank N.A.*, 590 U.S. 538, 541 (2020) (plaintiff had no standing where plaintiffs would receive "not a penny less" and "not a penny more," win or lose).

At summary judgment a plaintiff must bring forth evidence establishing standing. The party invoking federal jurisdiction "bears the burden of establishing" standing, and its elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case," which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof [] with the

manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

As the Supreme Court has held, Article III "does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion*, 594 U.S. at 431 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)). Accordingly, when a class definition includes individuals who could not have suffered injury, it is too broad. *Moss v. United Airlines, Inc.*, 20 F.4th 375, 379 n.7 (7th Cir. 2021) (citing *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)). A district court "must assure itself at all stages of the litigation that a certified class meets the requirements of Rule 23." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 599 (7th Cir. 2021) (citing *Fonder v. Sheriff of Kankakee Cnty.*, 823 F.3d 1144, 1147 (7th Cir. 2016)).

2. *Mere price inflation for commodity traders is insufficient to establish Article III standing because injury must be concrete and particularized*

The concrete harm in this case follows from "historical or common-law analogue[s]": a pocketbook loss. *TransUnion*, 594 U.S. at 424–25 (courts should ask "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury."). The law has long required actual harm, not abstract "inflation." *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–47 (2005) (analyzing common-law roots of securities fraud actions and stating that inflated purchase price by itself is not loss; plaintiff must show economic harm caused by the wrong) (citing *Pasley v. Freeman,* 3 T.R. 51, 65, 100 Eng. Rep. 450, 457 (1789) (if "no injury is occasioned by

the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action")); *see also Thole*, 590 U.S. at 541 (no standing where plaintiffs would receive "not a penny less" and "not a penny more," win or lose).

Seventh Circuit precedent supports the point that mere inflation for a traded commodity is insufficient to establish an Article III injury. *See, e.g.*, *Daneshrad v. Trean Grp.*, LLC, 57 F.4th 587, 590 (7th Cir. 2023) ("[F]raud also meant that the shares could be sold at the inflated price, so the investor did not lose anything." (citing *Dura*, 544 U.S. at 342)); *Kohen*, 571 F.3d 672 ("[N]et gainers from the alleged manipulation . . .  were not injured."); *Eike v. Allergan, Inc.*, 850 F.3d 315, 318 (7th Cir. 2017) (holding plaintiffs had no standing where plaintiffs alleged only that eye-drop bottles could have been designed to be cheaper; without a concrete injury—physical or financial—there's just "disappointment," not a cognizable loss).

Plaintiffs allege that the Article III injury here is identical to a classic overcharge case. (Dkt. 645 at 21–23.) Namely, that Defendants artificially inflated the price of CBOT futures. But a classic overcharge case, such as overpaying for gas or medicine, has always presupposed a pocketbook harm—a concrete financial injury where the buyer lost money by paying "more for the [product] than [he] would have" absent the wrong. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 695–96 (7th Cir. 2015) (quoting *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011)). Every purchaser pays more than the lawful price, so injury naturally follows purchase.

As the Supreme Court has made clear, the analysis is different in a market manipulation or fraud case. In *Dura*, the Court rejected the idea that price inflation by itself constitutes loss; the law requires actual economic loss caused by the wrongdoing. An investor is not injured merely because the purchase price was artificially high at the time of purchase. 544 U.S. at 342–47. This is because "as a matter of pure logic, the moment the transaction takes place, the plaintiff has suffered no loss because the inflated purchase price is offset by ownership of a share that possesses equivalent value at that instant." *Id.* at 343.

That logic applies directly to a commodities futures market manipulation case. Traders who profited from the alleged December 2011 to March 2012 price effects did not suffer any traditionally recognized harm. Instead, they participated in the market and made money from it. *Daneshrad*, 57 F.4th at 590.

The Seventh Circuit has reaffirmed the application of netting the initial purchase price against the final sale price to the Article III analysis for commodities. *Kohen*, 571 F.3d 672. As the Seventh Circuit recognized in a commodities manipulation case, "net gainers from the alleged manipulation . . . were not injured." *Id.* at 679. And as Plaintiffs point out, the Seventh Circuit distinguished "injury" from "harm" declaring that this is not a "statutory standing" issue as seen in other cases. (Dkt. 645 at 25) (citing *Kohen*, 571 F.3d at 676.) Instead, netting is applied as part of Article III analysis for cases such as this. If an individual buys a commodity at an inflated price and sells it for even more, they suffered no concrete harm and thus have no standing to sue.

The record in this case allows the standing and injury questions to be resolved with arithmetic. Plaintiffs' own expert produced a daily, contract-specific artificiality series—a number that details for each day and for each of the December 2011 and March 2012 wheat futures how far the traded price sat above (positive artificiality) or below (negative artificiality) the but-for level. (Dkt. 573-1 ¶¶ 64–65.) Using that series, every qualifying trade can be mapped to the artificiality in effect at execution and assigned a positive or negative quantity (buys and buy-to-covers are positive while sells and sell-to-opens are negative). (Dkt. 617 at 61.) Trade-level impact is artificiality multiplied by the number of signed contracts, then multiplied again by 5,000 bushels/contract. (Dkt. 573-1 ¶¶ 15, 24.) Adding up those impacts across the episode for each beneficial owner yields Net Artificiality Paid (NAP). (Dkt. 689 ¶ 104.) If NAP is greater than zero, the trader paid artificiality on net (a real pocketbook loss). If NAP equals zero, the trader broke even. (*Id.*) If NAP is less than zero, the trader received artificiality on net (a benefit from the episode alleged). (*Id.*)

This explains why inflation alone does not necessarily create an injury here. In a standard overcharge case—such as paying $3.40 for gasoline when the competitive price is $3.20—every purchaser is uniformly worse off by 20¢ per gallon; there is nothing to "receive" or net out. *See Arandell Corp. v. Xcel Energy, Inc.*, 149 F.4th 883, 895 (7th Cir. 2025) ("antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset" and rejecting defendant's arguments that injury from the initially overinflated gas prices were

offset from market manipulation that later drove gas prices down (quotations omitted)).[6]

But a futures market is different: The same upward artificiality that harms a short covering a position helps a long liquidating one. (Dkt. 573-1 ¶ 428) (Plaintiffs' expert Pirrong asserting that the long position "profits by liquidating contracts at an artificially high price."). The same tightening of a December to March spread that harms a short-December or long-March position helps a long-December or short-March position. (*Id.* ¶ 355.) And options traders likewise are affected by artificiality because options "derive their value from . . . futures." (Dkt. 645 at 52.)

Some traders therefore pay artificiality on some fills and receive it on others within the same episode. (Dkt. 573 ¶ 596–97) (Plaintiffs' expert opining that "[i]mportant aspects of economics and finance involve the net exposure and net results of one's transactions[;] the net offset should be deducted from the Class member's injury."). Only the net of those ins and outs provides an accurate measure of harm. That is the point the Supreme Court made in the securities context: an "inflated purchase price" is not, by itself, a compensable loss—the law requires actual economic loss caused by the wrongdoing. *Dura*, 544 U.S. at 342–47. So too here. That a trader acted during an artificially influenced period does not establish injury.

Take as an example a hypothetical trader drawn from the current class definition whose numbers are grounded in Pirrong's artificiality analysis. (*See* Dkt.

[6] It is relevant that the plaintiffs in *Arandell* were "consumers of natural gas" rather than traders in the commodity market. *Arandell*, 149 F.4th at 887–88.

573-1 ¶ 64.) On November 30, Trader A buys 20 CBOT December 2011 wheat futures at an inflation increased price of 35.5 cents/bu (each contract equals 5,000 bushels, so 100,000 bushels total). Plaintiffs say Kraft's conduct pushed prices up during the first half of December. So on December 13, with that upward pressure still in the market, the screen shows inflation of 39.4 cents/bu, and she sells by obtaining an offsetting position. She books a $0.039/bu gain, i.e., +$3,900.

In the example, Trader A benefited from the challenged price effect. She has suffered no redressable harm from it. Paying Trader A "damages" would compensate a person who landed on the right side of the market and won, not redress a loss. *See Daneshrad*, 57 F.4th at 590 (asking "for an outcome in which, as of the liquidation date, [plaintiffs] could gain but not lose from market movements [is] doubtless an investor's ideal outcome, but not one provided by any plausible theory of damages."). Economically the net gainers benefited from the alleged manipulation; legally they have no injury in fact and cannot recover damages. *Id.* That principle applies here: traders who received artificiality-based gains came out ahead because of the very distortion they challenge and therefore lack Article III standing to seek money damages.

Plaintiffs cite non-binding Second Circuit dictum that "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." (Dkt. 645 at 26 (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006)).) But *Denney* presupposed the existence of a concrete injury. Every class member there, "by definition," had already paid allegedly

excessive fees for tax advice, incurred costs to unwind the shelters, or foregone legitimate tax benefits—pocketbook harms that satisfied Article III before any balancing of countervailing benefits. *Denney*, 443 F.3d at 265.

*Denney* thus stands for the narrow proposition that an already-existing injury is not erased because it may be offset by other advantages. It does not authorize suits by persons who suffered no injury at all. *See id.* ("The class members all incurred fees and other costs as a result of entering into the transactions," and thus "all members of the class have Article III standing.") But in a commodities case, "as a matter of pure logic, the moment the transaction takes place, the plaintiff has suffered no loss because the inflated purchase price is offset by ownership of a share that possesses equivalent value at that instant." *Dura*, 544 U.S. at 343.

*3. Plaintiffs Kevin Brown, Joseph Caprino, Robert Wallace, Nathan Wallace, and Budicak Inc. are dismissed for lack of standing*

As the Supreme Court has made clear, the class device "adds nothing to the question of standing"; each named representative must personally show injury in fact, traceability, and redressability, and cannot borrow injuries from others. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976); *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972); *O'Shea v. Littleton*, 414 U.S. 488, 494–95 (1974). Standing in a money-damages suit requires a concrete economic loss, and at this stage, Plaintiffs must come forward with evidence establishing it. *See Lujan*, 504 U.S. at 561; *Spokeo*, 578 U.S. at 338–39. In a damages class action, every class member "must have Article III standing in order to recover individual damages." *TransUnion*, 594 U.S. at 431.

Defendants raised standing issues in their class decertification brief (Dkt. 617 at 9–10) and their summary judgment reply (Dkt. 690 at 16). The appropriate disposition based on undisputed record evidence is to dismiss all claims for lack of Article III standing as to any named claimant who has not shown they lost money over the certified windows. *See Lujan*, 504 U.S. at 561; *TransUnion*, 594 U.S. at 431.

Plaintiffs anchor their theory of injury in Dr. Pirrong's regression analyses. Those studies purport to measure, on a day-by-day basis from November 1 through December 14, 2011, the dollar value of "artificiality" in the prices of wheat futures. (Dkt. 573-1.) Pirrong opines that by applying these daily estimates to individual trading records, one can calculate "the amount of economic injury for each class member." (*Id.* ¶ 67.) Plaintiffs' other expert, Charles Robinson, carried out that exercise for the named plaintiffs: using Pirrong's artificiality figures, he determined the "net artificiality" each representative either "paid" (a loss on their trades) or "received" (a gain on their trades). (Dkt. 573-4 at 24.)

Applying this method, Plaintiffs and Defendants both agree that Dennis and White Oak "clearly suffered net losses." (Dkt. 574 at 23 ¶ 1.) Moreover, Defendants admit that actual damage is in dispute for Ploss. (Dkt. 690 at 7; 693 at 14 (requesting dismissal for all "but three named Plaintiffs," which excluded Ploss)). Defendants do not seek, nor will the Court grant, dismissal against these three Plaintiffs.

But Defendants argue dismissal is proper as to the remaining five named Plaintiffs. There is no dispute that Kevin Brown, Joseph Caprino, and Robert Wallace are day traders (meaning they bought and sold their positions within the same day).

(Dkt. 645 at 20–21; Dkt. 573-4 ¶ 16.) Pirrong's model, however, only shows artificiality for overnight positions. (*Id.*) As such, Plaintiffs have not, nor can they, produce any evidence of loss for these Plaintiffs based on Pirrong's model. Similarly, for Nathan Wallace, Plaintiffs offer no net position analysis. (*See id.* at 54 n.34.) Finally, Plaintiff's expert Robinson concluded that Plaintiff Budicak actually profited from the alleged artificial prices. (Dkt. 617 at 23; Dkt. 573-4 at 21–24.)

Plaintiffs offer no evidence to contest this. Instead, Plaintiffs argue that showing actual loss, rather than merely the purchase of artificially inflated prices, is a damages question rather than a jurisdictional issue. (Dkt. 645 at 61.) For the reasons provided earlier, the Court disagrees with Plaintiffs. The requirements of Article III apply at all stages of the proceeding, with each successive stage requiring the evidentiary proof necessary to establish injury in fact. *Lujan*, 504 U.S. at 561. Although Plaintiffs' pleadings of loss may have sufficed for earlier rulings (*Ploss II*), at the summary judgment phase, defendants must produce evidence establishing a genuine issue of material fact.[7] *Id.*; *Kohen*, 571 F.3d at 679 (instructing the district court judge to consider at later stages of proceedings "how many were net gainers from the alleged manipulation and therefore were not injured"). Plaintiffs' failure to offer any evidence that some named Plaintiffs paid artificiality on net (e.g., lost rather

[7] Plaintiff cites a few district court decisions that reached a similar holding as this Court in *Ploss II*. (Dkt. 739) (citing *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 20-cv-4577, 2025 WL 1744895 (N.D. Ill. June 24, 2025) (Shah, J.); *Dennis v. The Andersons, Inc.*, 20-cv-4090, 2025 WL 1331795 (N.D. Ill. May 7, 2025) (Gettleman, J.); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 18-cv-2521, 2024 WL 3509668 (N.D. Ill. July 22, 2024) (Pallmeyer, J.)). But these cases are unavailing: although the Plaintiffs made a prima face showing that they suffered an injury, the present record that many of the Plaintiffs have suffered no injury at all.

than gained money from the market episodes) warrants dismissal of all claims brought by Kevin Brown, Joseph Caprino, Robert Wallace, Nathan Wallace, and Budicak Inc.

Because standing is jurisdictional, dismissals on this ground are without prejudice and are not merits judgments. *See Mains v. Citibank, N.A.*, 852 F.3d 669, 678 (7th Cir. 2017). To the extent that Defendants argue that "netting" or actual loss is a merits issue under both the CEA and Clayton Act (Dkt. 690 at 9–11), they are incorrect. In *Kohen*, the Seventh Circuit treated the issue of economic loss and "net gainers" as an "Article III" issue rather than a "statutory standing" case. *Kohen*, 571 F.3d at 677. Article III requires that courts ensure there is a live "Case" or "Controversy." And although bare statutory violations may not provide the injury, statutes may offer or dictate what the remedy is. *Spokeo,* 578 U.S. at 341–42. Indeed, the CEA limits recovery to actual damages only; the Clayton Act permits up to treble damages. *Compare* 7 U.S.C. § 25(a)(1) *with* 15 U.S.C. § 15(a). Article III concerns whether there was an injury in the first place (e.g., pocketbook loss); and the statutes define how those injuries are redressed (e.g., actual versus treble damages).

Having addressed the named Plaintiffs who have failed to show injury, the Court now turns to the issue of absent class members and class certification.

### B. Class Certification

In the 2020 certification order (*Ploss II*), the Court noted that "[a]ll class members, including the named Plaintiffs, bought December 2011 and March 2012 wheat futures and allegedly lost money because of the artificial prices caused by the

scheme." (Dkt. 332 at 6.) But now with the benefit of a developed record, the Court the undisputed numbers paint a different picture.

Plaintiff's expert, Dr. Pirrong, admits that "approximately 38 percent of class members benefitted" from Defendants' actions (Dkt. 573-2 ¶ 627), and for a further 30 percent, Plaintiffs cannot show whether the individuals were harmed or benefited. (*See* Dkt. 573-3 at 39 ¶ 154 (when Plaintiff's expert Dr. Robinson was asked whether "artificiality" affected intraday traders he responded, "the methods we have at the moment do not measure this."); Dkt. 605 ¶ 474.) Defendants' expert, Dr. Vellturo, gave unchallenged testimony that, in a random sample of class members, 44 percent benefited from Defendants' conduct. (Dkt. 593-5 ¶ 232.) It is appropriate for the Court to review the propriety of class certification in the light of this new evidence. *See Ellis v. Elgin Riverboat Rest.*, 217 F.R.D. 415, 420 (N.D. Ill. 2003); *Kohen*, 571 F.3d at 679.

The following begins by discussing how Rule 23 intersects with Article III standing. It then explains how Plaintiffs' inability to provide common evidence for detecting injury defeats their classes under Rule 23. The section concludes with a discussion about why decertification is the proper remedy for failing to meet the requirements of Rule 23 (especially when Plaintiffs have provided no alternative class definition.)

#### *1. Legal standard for Rule 23 and Article III standing for absent class members.*

To justify class certification, a plaintiff must satisfy each requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well

as at least one of the subsections of Rule 23(b). *See Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). When a Plaintiff seeks certification under Rule 23(b)(3), he must also show predominance and superiority. *See* Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) requires that common issues of law or evidence predominate over individualized inquiries. If the evidence "fails to support the predominance of common issues," a court should decertify. 3 *Herbert B. Newberg & William B. Rubenstein, Newberg and Rubenstein on Class Actions* § 7:38 (6th ed., June 2026 update). Separate from the requirements in Rule 23(a) and (b)(3), "a class must be sufficiently definite that its members are ascertainable." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012); *Oshana*, 472 F.3d at 513 ("The plaintiff must also show . . . that the class is indeed identifiable as a class.").

A decertification motion is a request for "reconsideration of [the] previous ruling" granting class certification. *See Driver v. Apple Illinois, LLC*, 739 F.3d 1073, 1077 (7th Cir. 2014). Courts may alter or amend a class certification before judgment as the case progresses and the record develops. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 826 (7th Cir. 2012) (courts can and should reassess their class rulings as the case develops); Fed. R. Civ. P. 23(c)(1)(C). This is particularly true when it becomes apparent that the existing class fails to meet the requirements of Rule 23. *Newberg & Rubenstein*, *supra*, § 7:38.

The party seeking to maintain a class always bears the burden of proving that Rule 23 is satisfied. *Newberg & Rubenstein*, *supra*, § 7:39 n.2 (collecting Northern

District of Illinois decisions and explaining that there are no heightened standards for decertification litigants). Decertification is appropriate when subsequent developments reveal that Rule 23's prerequisites were never met or are no longer met. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013) (affirming decertification where no manageable method of trying claims class-wide); *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 376–77 (7th Cir. 2015) (district courts may "peek" at the merits and weigh competing evidence to decide Rule 23).

As the Seventh Circuit has recognized, the "advent of *TransUnion* sets the stage for a renewed examination of the intersection of the demands of Article III and the requirements of Rule 23." *Moss*, 20 F.4th at 379 n.7. The touchstone is that Article III "is not dispensed in gross": each class member must have standing at the time of judgment. *TransUnion*, 594 U.S. at 431–32. Rule 23 ensures that this constitutional constraint can be honored in a manageable way at the end of the case.

The Seventh Circuit evaluates standing for named plaintiff(s) at certification and treats the presence of absent, allegedly uninjured members as a Rule 23 problem rather than a front-end jurisdictional defect. *See Messner*, 669 F.3d at 815–16 (that some class members were not injured "does not preclude class certification" (quoting *Kohen*, 571 F.3d at 677–78)). Class certification thus does not "require proof that every class member was injured." *Arandell*, 149 F.4th at 898; *see also Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016).

At the same time, Rule 23 does not tolerate classes awash with uninjured members. A class should not be certified "if it is apparent that it contains a great

many persons who have suffered no injury at the hands of the defendant," *Kohen*, 571 F.3d at 677, and a court should revisit certification if "a high percentage" of the class turns out to be uninjured, *id.* at 679. Exactly how many qualifies as "a great many" is a fact-bound, case-specific judgment. *Messner*, 669 F.3d at 825 ("[s]uch determinations are a matter of degree, and will turn on the facts as they appear from case to case").

Rule 23 requires plaintiffs to show that common proof can separate injured from uninjured in a way that does not devolve into individualized mini-trials at the merits stage. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *Messner*, 669 F.3d at 815–16; *Kohen*, 571 F.3d at 677–78. Because certification is "inherently tentative," the court has a continuing duty to alter or amend a certification order as the record develops. *Isaacs v. Sprint Corp.*, 261 F.3d 679, 682 (7th Cir. 2001) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 (1982)); *see, e.g., Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676–77 (7th Cir. 2001).

For example, commonality under Rule 23(a)(2) demands more than a shared allegation. It requires a common contention that is capable of class-wide resolution. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("[D]etermination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.") In a damages class, that means plaintiffs must identify common evidence that can generate a common answer on the liability elements that matter to every class member. *See Amgen*, 568 U.S. at 466 (Rule 23 asks whether a question is susceptible to common proof); *Tyson Foods*, 577 U.S. at 453–54. The

Seventh Circuit applies the same principle: commonality (and ultimately predominance) turns on whether plaintiffs' method ties the element in dispute to class-wide proof, not on whether some members might later lose on individualized grounds. *Messner*, 669 F.3d at 815–16; *Kohen*, 571 F.3d at 677–78.

The requirements of commonality also interact with Article III. Material variations in the type or existence of an Article III injury across the class generally means that the question of standing is not common to the class. *See Dukes*, 564 U.S. at 349–350 ("Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' " (citation omitted)). The Seventh Circuit sharpens that inquiry with a practical limiter: a class "should not be certified if it is apparent that it contains a great many persons" who for some reason "could not have been harmed by the defendant's allegedly unlawful conduct." *Messner*, 669 F.3d at 824–25 (quoting *Kohen*, 571 F.3d at 677). That "great many" principle is not a talismanic percentage; it is a recognition that when the record shows large swaths of putative members could not have been injured, the purported common question no longer "resolve[s] an issue that is central to the validity of each one of the claims in one stroke," *Dukes*, 564 U.S. at 350, and class treatment fails at the threshold of commonality and, necessarily, under predominance.

*2. Plaintiffs' claims fail Rule 23(a)(2) for failing to show the class experienced a common justiciable injury or provide a common methodology for determining whether a justiciable injury occurred for a substantial number of class members*

Rule 23(a)'s interrelated requirements of commonality, typicality, and adequacy all serve to "effectively limit[] the class claims to those fairly encompassed

by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (citations and quotations omitted); *see id.* at 349 n.5. Having dismissed the claims of all non-injured named Plaintiffs, the Court must consider whether the remaining named Plaintiffs "fairly encompass[]" the claims of absent members. *Id.* at 349.

At the certification stage in this case (*Ploss II*), the Court found that Rule 23 was satisfied because Plaintiffs pleaded that all traders in the defined windows "lost money" when prices rose and because Plaintiffs had a proposed common method—Dr. Pirrong's event study—to prove that the alleged manipulation raised futures prices and thereby "injured the members of the class." (Dkt. 332 at 3 (reciting allegation that "all of the Plaintiffs . . . lost money"); (*id.* at 20–21 (crediting "common evidence—Pirrong's event study" to show class-wide injury and rejecting Defendant Kraft's predominance attack at that stage)). In doing so, the Court expressly treated disputes about whether some members "ultimately were not harmed" as merits issues to be sorted out later, distinguishing that from a class definition that "include[s] a great number of members who . . . could not have been harmed." (*Id.* at 21–22 (citing *Messner*, 669 F.3d at 824)).

But commonality is not frozen at certification, and it is not satisfied if the promised "common evidence" later proves incapable of resolving the injury question in one stroke. *See Dukes*, 564 U.S. at 350; *Kohen*, 571 F.3d at 579 (affirming certification but suggesting to the defendants that they "depose a random sample of class members to determine how many were net gainers from the alleged

manipulation and therefore were not injured, and if it turns out to be a high percentage he could urge the district court to revisit its decision to certify the class.")

Two developments in this case warrant reconsideration. *First*, the data used to certify Plaintiffs' class was "masked." (Dkt. 645 at 18 n.10.) That is, the trading accounts were not identifiable, so it was impossible to apply the methodology to determine who paid or received artificiality. But after certification, when the data was "unmasked" (*id.*), it became clear that 38–44% of class members were not actually injured. (Dkt. 578 at 7 n. 3; Dkt. 573-2 ¶ 627; Dkt. 633-6 ¶ 474.)

Of further concern, Plaintiffs' expert's artificiality data was incapable of even providing an answer on injury for at least 30% of class members. (Dkt. 573-3 at 39 ¶ 154; Dkt. 605 ¶ 474.) *Second,* since the class certification order in 2020, the Supreme Court has clarified that in a damages action "[e]very class member must have Article III standing in order to recover individual damages," tightening the nexus between proof of injury and the viability of a class-wide answer. *TransUnion*, 594 U.S. at 431.

The lack of demonstrable injury for at least 57% of class members alone is enough to fail the requirements of commonality under Rule 23. *See, e.g., Hansen v. Country Mut. Ins. Co.*, No. 18-cv-244, 2023 WL 6291629, at *28 (N.D. Ill. Sept. 25, 2023) (denying certification where 44% of class members could show no damages); *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580–85 (N.D. Ill. 2005), *aff'd*, 472 F.3d 506, 513–14 (7th Cir. 2006) (denying certification where "countless" putative members "could not show any damage"); *In re Rail Freight Fuel Surcharge Antitrust*

*Litig.*, 292 F. Supp. 3d 14, 137–40 (D.D.C. 2017), *aff'd*, 934 F.3d 619, 629–31 (D.C. Cir. 2019) (rejecting certification where 12.7% were uninjured; reported cases "suggest that 5% to 6% constitutes the outer limits of a de minimis number"); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51–58 (1st Cir. 2018) (vacating certification where approximately 10% were uninjured and could not be culled without individualized trials); *see also Kohen*, 571 F.3d at 677 ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury.").

A class split nearly down the middle between those who profited from the episode and those who claim a loss does not share a common injury question or answer. A cohort that is half helped and half hurt by the same event definitionally does not present a common injury; it presents opposing positions, defeating Rule 23.

But perhaps most concerning is that the proposed methodology cannot furnish an answer as to whether injury *could have* occurred for substantial portions of the class: at least 30% of all absent class members. (Dkt. 652 at 7 n. 3; Dkt. 573-3 at 39 ¶ 154; Dkt. 605 ¶ 474.) After *TransUnion*, a damages class cannot include uninjured members. *TransUnion*, 594 U.S. at 431–35. Each member must have a concrete injury at judgment. *Id.* So when a Court has no common tools to separate the injured from the uninjured, the class must fail. *See Espenscheid*, 705 F.3d at 773–76 (affirming decertification where plaintiffs lacked a feasible trial plan; damages would require 2,341 individualized hearings and "many [class members were] not harmed at all").

Plaintiffs assure the Court that Defendants "will not be responsible for one penny of damages to any 'net gainers.' " (Dkt. 645 at 28.) Yet Plaintiffs simultaneously assert that Dr. Pirrong's event study is an inter-day futures "price impact model" (*id.*), that does not account for intraday traders' net losses (*see* Dkt. 573-3 at 39 ¶ 154 (Dr. Robinson stating that "the methods we have at the moment do not measure this.")).

This mismatch defeats commonality. Plaintiff's entire theory of harm rests on Dr. Pirrong's price artificiality, yet Dr. Pirrong's method "uses per-day differences between actual and hypothetical prices" and therefore cannot calculate damages for intraday traders. (Dkt. 332 at 21.) The previous certification order (*Ploss II*) postponed that crucial issue for later in litigation. (*Id.*) It is now clear that a model that takes only an end-of-day snapshot cannot establish whether someone who bought and sold before the close was harmed or helped. Because Plaintiffs' only "common" tool cannot assess intraday profit and loss for at least 30% of class members, it cannot provide a class-wide injury answer. Plaintiffs' classes therefore fail Rule 23(a)(2).

This failure of common evidence under Rule 23(a)(2) likely[8] also infects Rule 23(a)(3) and (a)(4): where many putative members benefitted from the episode (or injured in ways that turn on individualized trade-level netting), the injured named representatives are neither typical of, nor adequate to represent, the class. *See CE*

[8] Whether typicality or adequacy is lacking need not be addressed given the holding that Rule 23(a)(2) fails.

*Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724–25 (7th Cir. 2011) (atypical or idiosyncratic claims defeat typicality and adequacy); *Dukes*, 564 U.S. at 353. Moreover, there are no named Plaintiffs who traded options. (Dkt. 645 at 52.) It is Plaintiffs' burden to identify class members who will adequately represent the interest of this options class certified in the 2020 order. *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017) ("the named plaintiff must 'be part of the class and possess the same interest and suffer the same injury as the class members.' ") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

Rule 23 gives district courts the duty and power to correct course when the evidentiary record exposes these problems. *See* Fed. R. Civ. P. 23(c)(1)(C) (class order may be altered or amended before final judgment); *Kohen*, 571 F.3d at 679; *Arreola v. Godinez*, 546 F.3d 788, 799 (7th Cir. 2008). The Court must therefore decertify the classes.

Accordingly, where the summary judgment record shows that Plaintiffs' chosen "common" method cannot supply a common injury answer—and that a great many class members suffered no injury at all—decertification is required to preserve Rule 23's commonality requirement and to avoid unmanageable, transaction-by-transaction mini-trials masquerading as class-wide adjudication.[9] *See Espenscheid*, 705 F.3d at 773–76 (affirming decertification where plaintiffs' "representative" proof

[9] Because the class fails under Rule 23(a)(2)'s commonality requirement, it necessarily fails under Rule 23(b)(3)'s predominance requirement, which imposes a "far more demanding" inquiry. *Amchem*, 521 U.S. at 623–24; *see also Dukes*, 564 U.S. at 350 (commonality is a prerequisite to all Rule 23(b) categories).

couldn't supply a class-wide method of proving injury or damages—"2341 separate hearings loomed"); *Parko*, 739 F.3d at 1090–92 (reversing certification because the district court deferred testing the realism of plaintiffs' injury model and asserting that courts must probe whether common proof actually exists rather than allow individualized mini-trials to overrun the case).

### *3. Decertification, Rather Than Limiting the Class Definition, Is the Proper Approach*

Rule 23 both authorizes and expects district courts to revisit certification "in the light of subsequent developments in the litigation," and to "alter[] or amend[]" the order before final judgment if the Rule's demands are not, or no longer, met. *Falcon*, 457 U.S. at 160 (court remains "free to modify" certification as the record matures); Fed. R. Civ. P. 23(c)(1)(C); *Bell*, 800 F.3d at 376–79 (district courts should reassess whether Rule 23 is satisfied based on newly produced evidence); *See Ellis*, 217 F.R.D. at 419 (same).

Rule 23 requires the party seeking the class device to demonstrate with evidence that each element of Rule 23 is satisfied and must continue to do so as the case proceeds. *See Pietrzycki v. Heights Tower Serv., Inc.*, 290 F. Supp. 3d 822, 831 (N.D. Ill. 2017) (collecting cases that the burden remains with the party seeking class certification, even on a motion for decertification). And when the evidentiary record diverges from the certification-stage assumptions, the court must course-correct by narrowing, redefining, or, where necessary, decertifying the class. *See Ellis*, 217 F.R.D. at 419 ("Because the court must decide whether to certify a class early in the proceedings, it remains under a continuing obligation to review whether proceeding

as a class action is appropriate."); *Szabo*, 249 F.3d at 675–77 (court must "make whatever factual and legal inquiries are necessary" to test compliance with Rule 23); *Falcon*, 457 U.S. at 160; *Bell*, 800 F.3d at 379.

When a class is over-inclusive of noninjured members, the problem "should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Messner*, 669 F.3d at 825 (*citing Campbell v. First American Title Ins. Co.*, 269 F.R.D. 68, 73–74 (D. Me. 2010) (court revised class definition to correct problem); *Flanagan v. Allstate Ins. Co.,* 228 F.R.D. 617, 618–19 (N.D.Ill. 2005) (same)). Refinement is appropriate when a workable, party-proposed redefinition exists that would solve the problem of overinclusion, ensure common evidence exists, and avoid individualized mini-trials would not ensue. *Messner*, 669 F.3d at 825.

Plaintiffs have not asked to redefine the class in the alternative to decertification, but it is their burden to propose and support a certifiable class definition. *See Oshana,* 472 F.3d at 513 (the party seeking certification bears the burden of establishing that Rule 23 is met, including a workable class definition).

Although Rule 23(c)(1)(C) permits a court to alter or amend a class order before final judgment, the Seventh Circuit has stressed that certification must rest on a rigorous analysis of an adversarial record rather than judicial improvisation. *See Szabo*, 249 F.3d at 675–76 (stating the district court must "receive evidence . . . and resolve" disputes material to Rule 23). And although *Messner* observes that overbreadth "can and often should be solved by refining the class definition," it does so in the context of "minor overbreadth problems that do not call into question the

validity of the class as a whole"; nothing in *Messner* obliges a court to rescue an untenable class on its own. 669 F.3d at 826 n. 15; *see also Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 (2d Cir. 2021) ("the district court 'has no sua sponte obligation' to alter the class definition to avoid decertification") (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980)). Accordingly, whereas here Plaintiffs have not sought a narrowed definition that would remedy their class defects under Rule 23, the appropriate course is decertification.

### C. Summary Judgment

#### *1. Overview of Plaintiffs' claims and applicable standards*

Plaintiffs bring three claims arising from the alleged scheme: (1) manipulation under Sections 6(c)(1) and 9(a)(2) of the Commodity Exchange Act; (2) monopolization under Section 2 of the Sherman Antitrust Act; and (3) common law unjust enrichment.[10] Section 6(c)(1) of the CEA makes it

> unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of Commission regulations.

7 U.S.C. § 6(1)(c). To establish a Section 6(c)(1) claim, a plaintiff must show that the defendant intentionally or recklessly used or employed (or attempted to use or employ) any manipulative device, scheme, or artifice to defraud; or intentionally or

[10] Plaintiffs also allege Defendants are strictly and vicariously liable in Count III for torts committed by Defendants' employees in the furtherance of its business. (Dkt. 71 ¶ 116–20) (citing 7 U.S.C. 2(a)(1)(B)). This claim is coterminous with Counts I and II. *See Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 966 (7th Cir. 1986).

recklessly engaged (or attempted to engage) in any act fraudulent or deceitful practice or course of business. 17 C.F.R. § 180.1(a)(1), (3).

Section 9(a)(2) of the CEA makes it a felony to "manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap." 7 U.S.C. § 13(a)(2). A plaintiff alleging a Section 9(a)(2) claim must show four elements: "(1) the defendant[] possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764–65 (7th Cir. 2015).

Under Section 2 of the Sherman Act, it is unlawful for anyone to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. This section of the Sherman Act prohibits "the employment of unjustifiable means to gain that power" and requires showing two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

It is undisputed that, based on the elements of these claims, this case centers on two questions: (1) whether Kraft engaged in the alleged long wheat futures scheme; and (2) whether that scheme inflated futures prices in the marketplace. (Dkt. 332 at 12.)

### 2. *Manipulation under Sections 6(c)(1) and 9(a)(2) of the CEA*

Defendants seek summary judgment on Plaintiffs' CEA claims. Defendants argue that Plaintiffs' claims are barred by the applicable statute of limitations. In Defendants' view, Plaintiffs claim began to accrue in 2011 when the trades were executed because Plaintiffs knew, or should have known, that Defendants caused the alleged market manipulation. (Dkt. 621 at 32–35.) Plaintiffs respond that they could not have known about any impermissible market manipulation because evidence showing "Kraft's misconduct" was in the exclusive possession of Defendants. (Dkt. 676 at 56 n. 29.)

#### i. Plaintiffs' CEA claims are time-barred

The parties disagree on two fronts of the statute of limitations issue: the correct understanding of the discovery rule as codified in 7 U.S.C. § 25(c); and whether, under the proper understanding of that rule, there exists a genuine dispute of material fact which precludes granting Defendant's motion for summary judgment. Each issue is addressed in turn.

Both parties agree that private damages claims under the CEA must be brought no "later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). Although the parties agree that the two-year statute of limitations contained in Section 25(c) of the CEA applies here, they disagree as to when the limitations period began. (Dkt. 620 at 23–26; Dkt. 681 at 44.) It is the rule that "[t]he proper standard for determining the commencement of the limitations period [for claims brought under the CEA] is when the plaintiff knew or in the exercise of reasonable

diligence should have known of defendant's alleged misconduct." *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991). Plaintiffs argue that they were put on notice of Defendants' alleged misconduct when the CFTC filed a formal complaint against Kraft for alleged CEA violations on April 1, 2015. (Dkt. 681 at 44 n.12.)

Defendants counter that the injuries on which Plaintiffs' CEA claims are based occurred on futures positions that "expired in December 2011 and registered on Plaintiffs' accounts no later than March 2012." (Dkt. 620 at 24.) As a result, "[b]ecause 'discovery of the injury' is what 'gets the [CEA limitations] clock ticking' on private damages suits," the CEA's two-year limitations period ended no later than March 2014. (*Id.* (citing *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 675 (7th Cir. 2009))). Defendants argue Plaintiffs "knew and understood the amount of [their] losses and the reason for them" by March 2012 at the latest, and that such knowledge was "sufficient to arouse suspicion or curiosity, thus commencing the running of the statute of limitations" in March 2012. *Dyer*, 928 F.2d at 241 (citation omitted); (Dkt. 690 at 20.) This would mean the limitations period ended in March 2014 (at the latest) and that Plaintiffs' 2015 CEA claims are time-barred.

Plaintiffs respond that the Defendants base their "entire limitations argument on an incorrect statement of the law." (Dkt. 681 at 54.) They argue Defendants' citation to *Cerberus* lacks critical context: the paragraph preceding Defendants' citation states that the applicable statute of limitations "begins to run when the plaintiffs discover, or should, if diligent, have discovered, that they had been injured

*by the defendants*." *Cerberus*, 559 F.3d at 674 (emphasis added). (Dkt. 681 at 54.) This, in Plaintiffs' view, shows that the statute of limitations cannot begin to accrue until they knew (or had reason to know) specifically that Defendants were the ones who caused their injuries. (Dkt. 681 at 44-45.).

Plaintiffs' argument fails. Quoting yet more of *Cerberus*'s language is instructive: "[a] plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Cerberus*, 559 F.3d at 674. This means that the accrual inquiry on the discovery of harm, not the discovery of the identity of the defendant who caused the harm. This is true even where, as here, knowledge of the defendant is necessary to prove the elements of the claim. *See In re Dairy Farmers,* 801 F.3d at 764-65. Whether Plaintiffs have the requisite information to state a claim under the CEA is a question distinct from the accrual question—all Plaintiffs needed was knowledge "of the harm itself." *Cerberus*, 559 F.3d at 674.

This understanding of the discovery rule is confirmed by a recent decision, cited by Defendants in their notice of supplemental authority. (Dkt. 746.) (*LJM Partners, Ltd. v. Barclays Capital, Inc.,* 165 F.4th 552 (7th Cir. 2026)). *LJM Partners* involved plaintiffs who sustained nearly $1 billion in net losses from alleged market manipulation in February 2018. The *LJM* plaintiffs filed "Doe" complaints and discovery requests to identify the defendants they ultimately sued under the CEA in 2022. *See id.* at 559-60, 566.

Even though the *LJM* plaintiffs did not know the identities of the defendants—as evidenced by filing "Doe" complaints—the Seventh Circuit held that the plaintiffs' action was untimely under the CEA's two-year statute of limitations.[11] *See id.* at 562, 570; 7 U.S.C. § 25(c). *LJM Partners* explained that the limitations period began in February 2018, when each plaintiff "learned of its injury," and the period "expired" in February 2020, well before the plaintiffs discovered the identity of the defendants in 2022. *Id.* at 562-64, 570.

This outcome would be impossible under Plaintiffs' interpretation of the CEA's discovery rule. Under Plaintiffs' reading, the limitations period would not have commenced until the *LJM* plaintiffs discovered the identities of the defendants in 2022, rather than when they learned of their injury in 2018—contrary to the holding in *LJM Partners*. *Id.* Plaintiffs' interpretation is also difficult to reconcile with the option to sue a "Doe" defendant when the identity of the defendant is unknown. *See Howell ex rel. Goerdt v. Tribune Entertainment Co.*, 106 F.3d 215, 218 (7th Cir. 1997) (federal law permits plaintiffs to name unknown parties as additional "Doe" defendants in suits based on federal question jurisdiction).

[11] More precisely, the Seventh Circuit held that the Plaintiffs could not amend their complaints in 2022 under Rule 15(c)(1)(C) of the Federal Rules of Civil Procedure to add the names of the previously unknown "Doe" defendants, because their CEA claims were time-barred. *LJM Partners*, 165 F.4th at 570. Accrual of the limitations period under the CEA thus hinges on something other than knowledge of the identity of the defendants. And as the Seventh Circuit explained, "LJM's original complaints demonstrate[d] that it had reason to know of Defendants' allegedly culpable mental state when it filed them"—when LJM knew it had been harmed but was unsure of who did the harm. *Id.* This further supports the inference that knowledge of a defendant's identity is not necessary for accrual.

If Plaintiffs were correct that the limitations period does not begin to accrue until a defendant's identity is known, then plaintiffs who know they have suffered an injury, but not the identity of the one who caused it, could effectively sidestep the statute of limitations so long as they do not bring suit. *See United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000) ("The discovery rule does not permit the victim of an alleged wrong to postpone the running of the statute of limitations by willfully closing his eyes, ostrich-like-to a known probability that he has been injured, *even if he is not certain*. A plaintiff who either knew that he was injured or *who would have known* is deemed to have 'discovered' the injury for purposes of the statute of limitations."), *superseded by statute on other grounds by* 18 U.S.C. § 983(e)(3), (5).

Although knowledge of the relevant harm and knowledge of the defendant's identity often go together, the Seventh Circuit has distinguished those two conditions. "[T]he running of the statute of limitations does not await the completion of a plaintiff's 'precomplaint investigation' and [a] plaintiff is not required to have collected, *before* he files suit, all the evidence he needs in order to win the suit.' " *Chopper Trading LLC v. Allston Trading, LLC*, No.19-cv-1674, 2025 WL 3484934, at *10 (N.D. Ill Dec. 4, 2025) (quoting *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386 (7th Cir. 2010)). Instead, the limitations period "commences to run when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge of the conduct in question." *Dyer*, 928 F.2d at 240. Knowledge of that conduct will often, though it need not, include knowledge of the defendant's identity.

With that framework in mind, the analysis turns to whether there exists a genuine issue as to any material fact concerning Plaintiffs' knowledge of the harm they suffered because of Defendants' actions. *See Stark v. Johnson & Johnson*, 10 F.4th 823, 828 (7th Cir. 2021) ("Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."); *see also* Fed. R. Civ. P. 56(a).

As explained below, there is no genuine issue as to any material fact on the limitations issue, and therefore Defendants are entitled to judgment as a matter of law.

Plaintiffs' substantive response to Defendants' limitations argument is that Defendants undermine their limitations argument with their merits argument. (Dkt. 681 at 55–56.) Plaintiffs contend that Defendants "decisively undercut[] [their] limitations argument . . . by strenuously arguing throughout its brief that its conduct was economic, that market participants believed it was economic, and that Kraft's internal documents and communications would reflect as much." (*Id*. at 55.)

At bottom, Plaintiffs' argument is that Defendants cannot speak out of both sides of their mouth and still win on summary judgment. In Plaintiffs' view, Defendants create a genuine dispute of material fact by proffering evidence on the merits that their conduct was economic while also arguing for limitations purposes that the Plaintiffs knew (or should have known) they had been injured by Defendants' conduct. If the conduct was economic, Plaintiffs argue, then Plaintiffs could not have reasonably known their injury was due to Defendants' misconduct. (*See* Dkt. 681 at

57.) Such knowledge, in Plaintiffs' view, is necessary to trigger accrual of the statute of limitations.

But the limitations inquiry turns on Plaintiffs' claims, not the Defendants' merits defenses or legal conclusions. Defendants should not be forced effectively to concede the merits of a case to preserve a limitations defense. *See Bishop v. Gainer*, 272 F.3d 1009, 1014–15 (7th Cir. 2001) (stating it would be "an entirely strange concept" to find that a "statute of limitations [does] not begin to run until a defendant acknowledge[s] liability"). If Plaintiffs are to show there is a genuine issue of material fact on the limitations issue, it must be in some way other than arguing that Defendants tripped over themselves in making their merits arguments.

The record shows that Plaintiffs knew, or should have known, of their injuries no later than March 2012, placing Plaintiffs' CEA action claim outside the two-year limitations period. *See Dyer*, 928 F.2d at 240; 7 U.S.C. § 25(c). The challenged contract prices and losses that Plaintiffs suffered were visible on their accounts in December 2011. (*See* Dkt. 71 ¶¶ 15–22; Dkt. 661 ¶¶ 132–134.) Plaintiffs admit through Dr. Pirrong's expert report that Defendants' "false" signals of "economic" demand, though anonymous, were "publicly observable" through November 2011 "order flow." (Dkt. 332 at 9; Dkt. 661 ¶ 117.) Plaintiffs also do not dispute that the "uneconomic" truth of those signals was "revealed"—and had CME floor traders "gossiping" like "schoolgirls" about Defendants' deliveries—in December 2011. (Dkt. 661 ¶¶ 94, 100.) And Plaintiffs admit that "nothing happened subsequent to 14 December [2011] that changed the 'uneconomic' nature of Defendants' 2011 deliveries." (Dkt. 661 ¶ 101.)

It is impossible for Plaintiffs to maintain both that the "facts of [Defendants'] manipulation were totally concealed" until 2015 (Dkt. 113 at 47 (quoting Dkt. 71 ¶ 93)), and that Defendants' "false" signals were "publicly observable," "uneconomic" as an "objective matter," and that "nothing happened subsequent[ly]" to make those facts less apparent. (Dkt. 332 at 9; Dkt. 661 ¶ 117; Dkt. 561 at 4; Dkt. 661 ¶ 101.) These undisputed facts were sufficient to trigger the two-year limitations period when Plaintiffs could have brought suit—these facts show (1) an alleged injury (trading losses) that (2) Plaintiffs knew or suspected was caused by Defendants' allegedly uneconomic position.[12]

These undisputed facts show, at the least, that Plaintiffs knew or should have known that some mischief was afoot. *Dyer*, 928 F.2d at 240-41 (CEA limitations period begins to accrue when the facts surrounding plaintiff's injury are "sufficient to arouse suspicion or curiosity" in a plaintiff who, "in the exercise of reasonable diligence" would and "should have known of [Defendants'] misconduct."). Accordingly, the Court finds as a matter of law that the limitations period commenced no later than March 2012, when the December 2011 contracts closed out: well over two years before Plaintiffs brought this suit in 2015. (*See* Dkt. 71.) Plaintiffs' CEA claims are time-barred.

[12] These undisputed facts are sufficient to show that Plaintiffs knew, or should have known, not only of their injury, but also that these Defendants caused the injury. Even under Plaintiff's own interpretation of the discovery rule in 7 U.S.C. Section 25(c), therefore, they possessed the actual or constructive knowledge (no later than March 2012) that their injury was caused by these particular Defendants.

### C. Monopolization Under Section 2 of the Sherman Antitrust Act

Plaintiffs allege that Kraft violated the Sherman Act by gaining control of a large interest in wheat futures at the end of 2012 to create anti-competitive prices. (Dkt. 71 ¶¶ 158–71.) Section 2 of the Sherman Act makes it unlawful for anyone to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. This section of the Sherman Act prohibits "the employment of unjustifiable means to gain that power" and requires "two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Grinnell*, 384 U.S. at 570–71. Unlawful acquisition of monopoly power is "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," all of which are permissible. *Id.*

Plaintiffs allege that Defendants had monopoly power over the futures market and exercised that power in violation of Section 2. Plaintiffs allege that Defendants' monopoly power is evidenced by its high market share in the December futures contract. Defendants argue that Plaintiffs have failed to properly define any market that Kraft could have monopolized, and that they lack evidence to prove their monopoly claim. In refutation of Plaintiffs' allegations, Defendants make several related arguments.

Defendants contend that Plaintiffs' evidence is insufficient to demonstrate Kraft's control over prices or its ability to exclude competition in any relevant market. As with their CEA claims, Plaintiffs' antitrust claim is largely based on their expert's

opinions and data related to the futures market, but Defendants dispute the relevance and sufficiency of this evidence. Defendants further argue that, even if Plaintiffs could define a relevant market, they have no proof of monopoly power in any proposed market. Defendants criticize Plaintiffs' attempts to show direct evidence of Kraft's monopoly power as being overly reliant on Plaintiffs' expert evidence, and Defendants assert that Plaintiffs fail to meet the legal standards for proving monopoly. (Dkt. 690 at 31–32.)

Defendants also assert that Plaintiffs' arguments about the "CTD" (cheapest to deliver) market are unsupported and unpled. (*Id.* at 33–34.) Defendants assert that Kraft did not have control over the deliverable supply in this market, and the evidence shows that grain elevators, who were net short position holders, chose where to deliver on Kraft's futures contracts, refuting any claim of monopoly power. (*Id.* at 34.) In sum, Defendants argue that Plaintiffs cannot define a relevant market, demonstrate anticompetitive conduct, or prove they suffered an antitrust injury. Defendants also argue that Plaintiffs' evidence of damages is insufficient.

*1. Plaintiffs have triable evidence that Kraft possessed monopoly power*

The first element of Section 2—possession of monopoly power—means "the power to exclude competition or to control price." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) (citation omitted); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1198 (7th Cir. 1983) (monopoly power "is the economic power to exclude or limit entry of competitors into the relevant market or to control prices in the relevant market"). Defendants acknowledge that

"market manipulation and monopolization are similar in that they each result in a . . . shift from prices that would prevail absent the challenged conduct." (Dkt. 620 at 41.) But Defendants try to argue a position inconsistent with the *MCI Commc'ns Corp.* definition cited above: that it is an "undisputed fact" that Kraft did not have the "legal definition of monopoly power," which Defendants repeatedly claim requires a showing that they controlled the underlying, physical supply of the commodity. (Dkt. 690 at 33.) But it is not necessary for Defendants to control the physical supply of the commodity:

> "[C]ash-bought [commodities] versus futures-bought [commodities] have distinct features and are not necessarily substitutes—the former is used for immediate consumption, and the latter is used for hedging against risks. . . . So [Plaintiffs are] not required to also include the cash wheat market in the market definition, because cash wheat and futures market wheat are not necessarily interchangeable. Nor must an antitrust violation be based on a corner or squeeze involving control over both markets."

(Dkt. 113 at 54–55 (citing *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 902 (N.D. Ill. 2011).)

Defendants counter that "[f]or a long futures manipulation to involve a 'form of monopol[y],' the defendant must *also* control the 'deliverable supply of the underlying good'" and that it is "the control of this *physical* supply . . . that can give defendants in such cases a 'form of monopol[y]'." (Dkt. 690 at 33 (quoting *Kohen*, 571 F.3d 672).) But this argument is rooted in a misreading of *Kohen*'s conclusion. In *Kohen*, the court did not say that control of the physical supply of a commodity is a

necessary component of legally cognizable monopoly. In fact, the quoted language comes from a secondary source cited by the court for a different purpose.[13]

Defendants' cited authorities in support of summary judgment on Plaintiffs' antitrust claims are distinguishable. Defendants posit that "the Seventh Circuit has long held [that] 'a reasonable finder of fact *cannot* infer monopoly power just from high prices.' Proof of price movement is *not* proof of monopoly power because there are many factors that can cause prices to move—including competitively beneficial factors—that are not exercises of monopoly power." (Dkt. 620 at 41) (quoting *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411–12 (7th Cir. 1995)). But Defendants try to prove too much from the unremarkable proposition that high prices alone prove monopoly power. Although high prices may not be a sufficient condition for proving monopoly power, high prices still may be probative evidence of such power to a reasonable factfinder. *See MCI Commc'ns Corp.*, 708 F.2d at 1198.

Defendants also state that "the Supreme Court has instructed that a finding of monopoly power requires evidence that the defendant controlled so much supply in a relevant geographic and product market that it had 'the ability to raise price profitability by *restricting output*' in the market." (Dkt. 620 at 41) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)). Defendants then state that the

---

[13] *Kohen* cites Robert W. Kolb & James A. Overdahl, *Understanding Futures Markets* 80 (6th ed. 2006) ("a successful effort by a trader or group of traders to influence the price of a futures contract by intentionally acquiring market power in the deliverable supply of the underlying good while simultaneously acquiring a large long futures position"). *Kohen*, 571 F.3d at 674.

Seventh Circuit "has instructed that monopoly power requires the ability to 'control the supply' such that the monopolist can 'cut back the market's total output and so raise price[s].'" (*Id.*) (citing *Indiana Grocery*, 864 F.2d at 1414). As with the *Marshfield Clinic* quotations, these citations appear to be taken out of context. None of Defendants' cited cases added additional elements to what Section 2 already requires. Instead, they evaluated variables in the parties' claims, which were relevant to a finding of monopoly power.

In *Indiana Grocery*, the court considered that one of the parties lacked the ability to "control the supply of groceries," which is relevant for assessing the plausibility of an alleged predatory pricing scheme. *See Indiana Grocery*, 864 F.2d at 1414–15. In *American Express Co.*, the Court's reference to "restricting output" in the market appears in a more general discussion of a party's ability to charge anticompetitive prices for its services. 585 U.S. at 549. Neither case does material definitively added additional elements necessary to prove monopoly power; and Defendants' argument rests on its assertion that Plaintiffs have failed to provide evidence in support of these additional elements.

Plaintiffs assert that "the jury will be entitled to find that Kraft's emails, in effect, confess that Kraft had a deliberate plan to engage in market power tactics in the December Contract and 'flatten' the spread." (Dkt. 681 at 33.) Plaintiffs continue, by stating that, "[t]hough sanitized, these emails permit the jury to find that Kraft carefully planned to obtain the power to control and flatten the spread [between the future and cash market prices]." (*Id.*) Defendants disagree and argue that the emails

are irrelevant and unnecessary to the analysis. But at this stage, Plaintiffs get the nod: whether Defendants exercised monopoly power is a genuine issue of material fact that precludes summary judgment.

At bottom, this dispute centers around (1) whether Kraft had the ability to influence prices; and, if so, (2) whether Kraft acted on that ability in order to intentionally manipulate the market. There exists a genuine issue of fact regarding whether Kraft possessed monopoly power. Summary judgment on these grounds is therefore unwarranted.

### D. Common Law Unjust Enrichment

Under Illinois law, unjust enrichment "is not a separate cause of action." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011). It operates as "a condition brought about by fraud or other unlawful conduct," which is "tied to the fate of the [underlying fraud] claim." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 740 (7th Cir. 2019); *Dairy Farmers*, 801 F.3d at 765. Because this claim shares the metes and bounds of the surviving Sherman Act claim, summary judgment would be inappropriate for the reasons stated above.

## IV. CONCLUSION

Defendants' motion to decertify class (Dkt. 571) is granted and Defendants' motion for summary judgment (Dkt. 588) is granted in part and denied in part.

SO ORDERED in No. 15 C 02937

Date: September 30, 2026

JOHN F. KNESS
United States District Judge